UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANE DOE<br>*Plaintiff*, | )<br>)<br>) | 3:18-CV-01322 (KAD) |
| v. | )<br>) | |
| TOWN OF GREENWICH, et al.,<br>*Defendants*. | )<br>) | July 14, 2020 |

**ORDER ON MOTION TO COMPEL (ECF No. 185)**

Kari A. Dooley, United States District Judge

Pending before the Court is the Plaintiff's motion to compel answers to certain questions posed to non-party deponent Peter Roe ("Roe") during his deposition. Counsel for Roe instructed him not to answer certain questions on the basis that they were precluded by the protective order entered by this Court on September 11, 2019 or that the answers were protected by the attorney client privilege. Plaintiff asserts that the Court's protective order did not preclude the inquiries at issue. Plaintiff further asserts that Roe waived the attorney client privilege with respect to the communications about which Roe was questioned. For the following reasons, the motion to compel is GRANTED in part and DENIED in part.

**Background**

The parties and non-party Roe are presumed to know the procedural history of the case and the nature and scope of the allegations. Plaintiff Jane Doe ("Doe") is a former student at Greenwich Academy. Roe is a former student at the Brunswick School. Doe alleges that in August 2016, she gave a statement to the Greenwich Police Department that she had been sexually assaulted by Roe on June 3, 2016. Defendants Reeves and Rondini investigated her complaint. And although an application for an Arrest Warrant was prepared and presented to the State's Attorney which would have charged Roe (as a juvenile), the State's Attorney did not sign nor present the warrant

application to a judge for consideration. Plaintiff sues the defendants and alleges that the investigation into her complaint was a complete sham which resulted from the defendants' policy of colluding with the Brunswick School to protect the reputation of the Brunswick School and to shield its students from prosecution. She alleges that this policy of not investigating complaints against Brunswick students violated her rights under the Equal Protection Clause of the United States Constitution.

**The Protective Order**

In April 2019, the Plaintiff served Roe with a subpoena to appear for deposition on May 7, 2019. Plaintiff's counsel did not contact counsel for Roe to arrange for service of the subpoena and did not wait until the school semester was completed when Roe would return to the Connecticut area. Rather, Plaintiff's counsel contacted the Dean of Students where Roe attends college and arranged for service in his dorm by campus security. Roe moved for a protective order and the deposition did not go forward as noticed. In the motion, Roe sought to preclude the deposition from taking place at all and cited to the Plaintiff's conduct in serving the subpoena, *inter alia*, as evidence that the deposition was for purposes of harassment. *See* ECF No. 65 at 3. The Court rejected this argument, but at a hearing on the motion agreed that the deposition should be substantially curtailed.

On September 11, 2019, after extensive oral argument, the Court issued a protective order with respect to the notice of deposition and subpoena served on Roe. The Court first reviewed the document requests, and then tailored the permissible scope of inquiry based upon the ruling regarding the document requests.

Ultimately, the Court ruled as follows:

1. By Agreement, the motion was granted to the extent it sought use of the Roe pseudonym; ECF No. 106 at 16.

2. By Agreement, the motion was granted to the extent that the Plaintiff, her attorneys, agents or representatives were precluded from further disclosure, dissemination or publication of any information identifying Roe; *Id*. at 17.

3. The motion was further granted and Plaintiff was "precluded from making inquiry about the events leading up to and occurring at the June 3rd, 2016 gathering." *Id*. at 44.

4. The motion was further granted insofar as "the question as to who paid Peter Roe's legal fees . . . is not . . . within the scope of Rule 26 in this case" *Id*. at 46–47.

5. The motion was denied and Plaintiff was permitted to make "[i]nquiry regarding whatever observations/information Peter Roe has **about the investigation,** because, as I indicated, he was a percipient witness to it." *Id*. at 53 (emphasis added).

6. The motion was denied and Plaintiff was permitted to make inquiry "about any discipline that may have been imposed by Brunswick." *Id*.

7. The motion was denied, in reference to Item H on the subpoena, and the Court permitted inquiry as to communications between Peter Roe and other witnesses in this and the parallel state case **after** the commencement of this litigation to explore, for example, whether the witnesses in the litigation were speaking to each other about the case in advance of their depositions. As the Court noted, these are standard lines of inquiry at any deposition. The Court made clear however that these communications are "different than conversations/discussions he may have had at the time of the investigation with these other witnesses; because, again, under the limited theory of liability that's presented here, I just don't think that that's relevant." *Id*. at 53–54.

8. The motion was denied and Plaintiff was permitted to inquire about "communications with Jane Doe following the incident." *Id*. at 59.

Underpinning these rulings was the Court's determination that the events of June 3, 2016 are wholly irrelevant to the claims in this case because the jury is not going to be asked to decide whether, in fact, Doe was sexually assaulted by Roe. The Court therefore precluded any questioning of Roe as to the events of or leading up to June 3, 2016. However, the Court also noted that Roe was a percipient witness to the police investigation of Doe's complaint, which is the subject of the complaint, and that therefore questions regarding his observations of the investigation were fair areas of inquiry. It is at the intersection of these two determinations that much of the current dispute arises.

**The Motion to Compel**

The disagreement between counsel regarding the scope of the protective order resulted in several areas of inquiry with respect to which Roe was instructed not to answer. These include: inquiry regarding communications between Roe and personnel at Brunswick during the investigation; inquiry regarding the retention of Roe's counsel at the time of the investigation; and inquiry into communications between Roe and Doe during the investigation.

As noted above, the present dispute also includes a claim of attorney client privilege with respect to Roe's communications with his counsel during the 2016 investigation. The genesis of this issue, which the Court addresses first, is set forth below.

**The Attorney Client Privilege**

At the deposition, Roe was shown what was marked as Exhibit 4, a series of e-mails between he and his headmaster on various dates between August 4, 2016 and August 23, 2016. He was also shown what was marked as Exhibit 5, screenshots of text messages between Roe and his

headmaster spanning dates August 24, 2016 through January 19, 2017. At various places within these documents, Roe appears to share the communications he was having with his counsel during the investigation. Preliminarily, the Court notes that these documents were produced by the Brunswick School in the companion litigation brought by Doe in the state court against the Brunswick School. They were not produced by Roe, inadvertently or otherwise, and because Roe is not a party to any of the litigation arising out of Doe's claims, he was not otherwise aware that the texts and e-mails had been produced. When questioned about these e-mails and texts messages, Roe's counsel asserted the attorney client privilege and instructed Roe not to answer the questions. *See* Roe Tr. at 50–54 (Exhibit 4); *Id.* at 71–73 (Exhibit 5).[1] The Plaintiff responded that the privilege was waived when the communications were disclosed to the headmaster in 2016. *Id.* at 53–54 (Exhibit 4); *Id.* at 73 (Exhibit 5). The Plaintiff also asserted that the privilege was waived insofar as it was not asserted prior to the deposition even though the documents were disclosed to counsel on December 21, 2019, seventeen days before the deposition on January 7, 2020.[2] *See Id.* at 110. Roe responds that he did not waive the privilege in 2016 because he was a minor and further that no waiver occurred when he waited until the deposition to assert the privilege.

The attorney client privilege "'is one of the oldest recognized privileges for confidential communications.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009) (quoting *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)). "By assuring confidentiality, the privilege encourages clients to make 'full and frank' disclosures to their attorneys, who are then better able to provide candid advice and effective representation [which] in turn, serves 'broader public

---

[1] A redacted version of the Roe deposition transcript will be docketed under seal when received from counsel. Counsel for Roe and Doe are requested to prepare the redacted transcript and submit it to the Court on or before September 1, 2020.
[2] While the Court agrees with Plaintiff that it would have been preferable for Roe's counsel to have asserted the privilege in advance of the deposition when he received the documents which purport to contain the privileged communications, the Court does not find a waiver of the privilege on this basis under these circumstances.

interests in the observance of law and administration of justice.'" *Carpenter*, 558 U.S. at 108 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389. Indeed, a lawyer's "assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888).

However, when a holder of privileged communications shares those communications with a third person, the holder is deemed to have waived the privilege by the disclosure. *In re Martinez Sampedro*, No. 3:18-MC-47 (JBA), 2020 WL 1158795, at *2 (D. Conn. Jan. 29, 2020). And the Court has not found, and the parties have not cited, any authority for the proposition that a minor cannot waive the attorney client privilege in this way. However, nor is Roe's status as a minor at the time he shared his privileged communications with his headmaster irrelevant to the analysis. As both parties acknowledge, at least in the context of whether a minor has waived a constitutional right, the analysis depends on a confluence of factors and the totality of the circumstances of the purported waiver. *See*, *e.g.*, *Gallegos v. Colorado*, 370 U.S. 49, 55 (1962) (applying totality of the circumstances analysis finding that a minor's confession was obtained in violation of due process rights); *Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (applying totality of the circumstances analysis to determine whether a minor waived his Miranda rights); *United States v. Burrous*, 147 F.3d 111, 116 (2d Cir. 1998) (applying totality of the circumstances analysis finding that minor knowingly and voluntarily waived his Fifth Amendment rights).

And the law, in other areas, treats minors differently than adults out of a recognition that they do not always know, due to a lack of maturity or world experience, what it is they should be doing, or in this case, not be doing. For example, in Connecticut, "the general rule is well

established that a child may bring a civil action *only* by a guardian or next friend, whose responsibility it is to ensure that the interests of the ward are well represented." *Newman v. Newman*, 235 Conn. 82, 95 (1995) (emphasis added) (internal quotation marks omitted). In addition, under Connecticut law, statements made by 16-year-olds to police officers or judicial court officials are inadmissible in that child's delinquency proceedings unless the police officer or judicial court official, among other requirements, made a reasonable effort to contact the child's parent or guardian. CONN. GEN. STAT. § 46b-137(b); *see In re Enrique S.*, 32 Conn. App. 431, 436 (1993) (noting that the purpose of a similar rule regarding children under 16-years-old "is to help an accused make a valid decision to speak or remain silent."). And Connecticut raised the age jurisdiction for the juvenile courts to 17 in recognition of emerging science regarding brain development and its impact on adolescent decision making. *See More States Consider Raising the Age for Juvenile Crime*, PBS.ORG, https://www.pbs.org/wgbh/frontline/article/more-states-consider-raising-the-age-for-juvenile-crime/ (last visited July 14, 2020).

      Similarly, in the context of entering into contracts, "Connecticut has long recognized the common-law rule that a minor child's contracts are voidable. Under this rule, a minor may, upon reaching majority, choose either to ratify or to avoid contractual obligations entered into during his minority. The traditional reasoning behind this rule is based on the well established common-law principles that the law should protect children from the detrimental consequences of their youthful and improvident acts, and that children should be able to emerge into adulthood unencumbered by financial obligations incurred during the course of their minority. The rule is further supported by a policy of protecting children from unscrupulous individuals seeking to profit from their youth and inexperience." *Yale Diagnostic Radiology v. Estate of Harun Fountain*, 267 Conn. 351, 355–56 (2004) (internal citations omitted).

Given the various protections afforded minors in the law, it seems particularly harsh to summarily find that Roe waived his attorney client privilege when he shared privileged communications with his headmaster. *See*, *e.g.*, *In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000) (noting, in the context of inadvertent disclosures, "courts have limited the scope of that waiver based on the circumstances involved and overall fairness.").

In this vein, the Court has reviewed the entirety of the Roe deposition transcript. During the investigation, Roe was 16 years old. The investigation into Doe's allegations left Roe scared and anxious. It is clear that he considered his headmaster to be a friend and a source of guidance and support. In one of the earliest e-mail exchanges, Roe advises the headmaster of the substance of his lawyer's activity and advice. Remarkably, the headmaster responded, "Thanks for the update . . . glad you're getting good advice[.] Hang in there and *keep me posted*[.]" (ECF No. 186-2 at 46) (emphasis added).[3] This response would not only encourage further disclosure of what are clearly privileged communications but might even be seen as a directive to Roe that he do so. And it is beyond reasonable contemplation that Roe would ignore this request from his headmaster. It is also troubling that the headmaster himself did not recognize the impropriety of his communications with Roe and caution Roe against disclosing his counsel's advice. Notably, this exchange was dated August 4, 2016, and the text messages which contained additional disclosures by Roe, and about which he was questioned, all occurred after this e-mail exchange in which Roe was told to "keep me posted" by his headmaster.

Under the totality of the circumstances presented here, the Court concludes that Roe did not waive his attorney client privilege by virtue of his disclosures to the headmaster. Roe will not be required to answer any questions about communications between himself and his lawyer during

---

[3] This exchange appears in a document previously ordered sealed by the Court. However, this limited portion of the document does not implicate the Court's identified privacy concerns and so is unsealed for purposes of this decision.

the investigation, to include questions about the text messages or e-mails in which those communications are disclosed or referenced.

**Non-Privilege Issues**

>  **Inquiry into Peter Roe's communications with Brunswick personnel during the investigation**

Many of the questions which Roe was instructed not to answer involved conversations or communications between Roe and Messrs. Philip, Potter, and Follansbee, all Brunswick personnel, during the investigation. Roe takes the position that the Court's protective order precludes this line of inquiry because, as the Court held, "conversations/discussions he may have had at the time of the investigation with these other witnesses, . . . under the limited theory of liability that's presented here, [are not] relevant." ECF No. 106 at 54. The Plaintiff maintains that the Court's ruling applied only to communications with persons who were witness to the events of June 3, 2016. Allowing that there may be ambiguity in terms of the scope of the Court's order, the Court resolves the issue here.

First, the Court's reference to "these other witnesses" was a reference back to Item H on the subpoena which sought Roe's communications with witnesses in this and the parallel state proceeding, which the Court allowed with respect to communications which post-dated the commencement of the litigation. In contrast, the Court prohibited inquiry into communications with these witnesses at the time of the investigation. There was no reference to, and the Court did not limit this restriction to, only those who were witness to the events of June 3, 2016. In addition, nor did the Court intend to limit the prohibition only to those who are identified as witnesses in this litigation. While that is the context in which the issue arose, whether they are witnesses now or not matters little. The communications Roe had with anyone during the investigation are irrelevant, subject to a single exception discussed below, to the Plaintiff's Equal Protection claim.

In addition, to the extent the communications with these individuals included a discussion as to what happened on June 3, 2016, inquiry as to them was also prohibited by the Court's order.[4]

However, the Court did permit inquiry into "whatever observations/information Peter Roe has about the investigation[.]" ECF No. 106 at 53. Therefore, conversations he had with others during the investigation may well include information or knowledge he had or received about the investigation (subject of course to the assertion of the attorney client privilege as discussed above). The Court has no way of knowing whether the answers to some of the questions at issue would have included such information but to the extent they would have, they must be answered. To be clear, the information which must be disclosed is information about the investigation itself, not whatever might have been said between people about the subject of the investigation, to wit, the events of June 3, 2016.

**Inquiry into the retention of Roe's counsel during the investigation**

The Court's protective order did not specifically address whether Doe could inquire as to the circumstances under which Roe obtained counsel during the investigation. However, the circumstances of how Roe obtained counsel were discussed at the September 11, 2019 hearing in the context of whether the protective order should extend to information regarding the identity of the person or persons who paid Roe's counsel. The Court precluded this latter inquiry as outside the scope of discovery. These issues are two sides of the same coin. Roe shall not have to answer questions regarding the circumstances under which he obtained counsel during the investigation.

**Communications with Jane Doe during the investigation**

At the hearing on the motion for protective order, the Court indicated that "communications with Jane Doe following the incident" was a fair line of inquiry. ECF No. 106 at 59. In response,

---

[4] Obviously, the Court does not know the extent to which the answers would have included such information, but the Court has no reason not to accept counsel's representation that the answers would have done so.

10

Roe's counsel stated, "I think they actually have everything [(presumably referring to the document request)], but that's fine." *Id*. The Court clarified that Roe "can be asked about that," *id*., to which no further objection was made.

> Notwithstanding, during the deposition, the following colloquy occurred:
>
> Question: Did you contact [Jane Doe] about your phone call from the police department?
> Answer: Yes.
> Question: Okay. Why did you do that?
> Mr. Jones: Objection. This goes to the events of that evening. I'm instructing him not to answer. It's precluded by the protective order.
>
> Roe Tr. at 31.

This exchange makes manifest that the Court's order had internal inconsistencies. The Court had permitted inquiry into the contacts between Roe and Doe, seemingly without restriction as to subject matter. The Court had also, however, significantly restricted the subject matter of the deposition. The Court therefore clarifies the extent to which Roe must answer questions regarding his contact with Doe during the investigation.

Roe must answer questions regarding contacts with Doe to the extent, and only to the extent, the communications related to the conduct of the investigation by the Greenwich Police Department. As previously observed, simply because the investigation concerned the events of June 3, 2016, does not bring the events of June 3, 2016 within Roe's information or observations of that investigation.

**Mechanism for Obtaining Roe's Testimony**

Having determined that there are inquiries Roe must answer, the Court turns to the mechanism for obtaining this testimony. The Court does not believe that it would be appropriate or efficient to re-convene Roe's deposition. The Court is very troubled by the tone, tenor and

content of the discourse between both counsel at the deposition. The deposition transcript further reveals inappropriate commentary by Plaintiff's counsel that Roe was "lying" at the deposition,[5] and contains inquiries by Plaintiff's counsel as to matters irrelevant to the claims in this action.[6]

---

[5] In the deposition, Roe denied discussing the investigation with Mr. Potter. Plaintiff's counsel then marked a previously undisclosed document which included an e-mail between Mr. Potter and Mr. Philip, in which Mr. Potter describes discussions with Roe about the investigation. She read portions of the document and then asked: "Do you want to change your testimony now?" Roe Tr. at 89. When Roe's counsel objected because the document had not been produced, as ordered by the Court, Plaintiff's counsel responded, "[w]e did not anticipate using this document. It is being introduced as impeachment because we did not anticipate that [Roe] would be lying about any of his testimony." *Id.* at 90. That one witness's testimony (or memory) might be inconsistent with a document created at the time of the events in question is so commonplace as to be completely unremarkable. And it certainly does not lead to the inescapable conclusion that the witness was "lying" or justify an on the record accusation to that effect.

[6] For example, Plaintiff's counsel asked Roe about his circle of friends and whether he knows whether these friends have an opinion about the Plaintiff:

> Q: You don't know whether [Friend 1] has an opinion or he doesn't have an opinion?
>
> A: I don't know.
>
> […]
>
> Q: Okay. So you've never heard him call [Jane Doe] a lying bitch?
>
> A: No.
>
> Q: Never?
>
> A: Never.
>
> Q: Would you be surprised to hear him say that?
>
> [Objection by counsel]
>
> A: No.
>
> […]
>
> Q: Do you know [Friend 2]?
>
> A: Yes.
>
> […]
>
> Q: Did you ever hear him call [Jane] a life ruiner?
>
> A: No.
>
> […]
>
> Q: Do you know [Friend 3]?
>
> A: Yes.
>
> […]
>
> Q: Okay. And did you and [Friend 3] send a Snapchat photo to [Jane] on her graduation day?
>
> A: I didn't. I don't think I was in a photo sent to [Jane].

Roe Tr. at 98–101.

Accordingly, the Court shall require Roe to answer the following questions under oath in interrogatory form, subject however to the Court's ruling regarding the assertion of the attorney client privilege:

1. Beginning on or about August 3, 2016 and thereafter while the investigation was ongoing, did you have any communications with Mr. Philip about the conduct of the investigation?

2. If yes, describe when, where, how (e.g., by telephone) each such communication occurred and describe what you communicated to him and what he communicated to you on each occasion.

3. Beginning on or about August 3, 2016 and thereafter while the investigation was ongoing, did you have any communications with Mr. Potter about the conduct of the investigation?

4. If yes, describe when, where, how (e.g., by telephone) each such communication occurred and describe what you communicated to him and what he communicated to you on each occasion.

5. Beginning on or about August 3, 2016 and thereafter while the investigation was ongoing, did you have any communications with Mr. Follansbee about the conduct of the investigation?

6. If yes, describe when, where, how (e.g., by telephone) each such communication occurred and describe what you communicated to him and what he communicated to you on each occasion.

7. Beginning on or about August 3, 2016 and thereafter while the investigation was ongoing, did you have any communications with Jane Doe about the conduct of the investigation?

8. If yes, describe when, where, how (e.g., by telephone) each such communication occurred and describe what you communicated to her and what she communicated to you on each occasion.

Roe shall submit sworn written answers to these questions to the Plaintiff's counsel on or before July 24, 2020.

**SO ORDERED** at Bridgeport, Connecticut, this 14th day of July 2020.

                                            */s/ Kari A. Dooley*
                                            KARI A. DOOLEY
                                            UNITED STATES DISTRICT JUDGE