UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____X
                                          )
                                          )
JANE DOE,                                 )        Index No. 3:18-cv-01322-KAD
                    Plaintiff,            )
                                          )
v.                                        )
                                          )        September 28, 2020
TOWN OF GREENWICH, et al.,                )
                                          )
                    Defendants.           )
_____X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BRAXTON HOOK LLC
Attorneys for Plaintiff
280 Railroad Ave., Suite 205
Greenwich, CT 06830
Tel. (203) 661-4610
Fax (203) 661-4611

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** 1

**STATEMENT OF FACTS** 1

  I. Pattern of Collusion Between Brunswick School and GPD 1

    A.  The First Sexual Assault Video 2

    B.  Other Complaints in 2014 of a Brunswick Underage
Drinking Party and a Second Brunswick
Sexual Assault Video 10

    C.  False Statements to the Press by both
Brunswick and GPD 14

    D.  Brunswick Interferes in an Assault Allegation
Against One of Its Students 16

  II.  Collusion Pattern Continues with Jane Doe Investigation 19

    A.  GPD's Initial Investigation Stalls 20

    B.  Brunswick's Intervention during the Pause in
the Investigation 23

    C.  Det. Rondini's Resumed Investigation Departed
from GPD Norms and Policies 29

    D.  Det. Rondini Coordinates with Defendant's Attorney
and Manipulates the Evidence to Serve Brunswick's
and the Defense's Purposes 33

    E.  GPD Chief of Police Approved the Conduct of the
Doe Investigation 47

**ARGUMENT** 48

  I.  Standard for Summary Judgment 48

  II.  Defendant's Position on the Applicable Law
of Equal Protection is Wrong 50

i

III.  The Facts Adduced by Plaintiff, Construed with All Inferences
      and Credibility Determinations in her Favor Provide Evidence on
      Which a Reasonable Jury Could Return a Verdict for Plaintiff                53

IV.   A Jury Can Reasonably Find that Defendant's
      Actions were Ratified                                                       59

V.    Defendants' Analysis of Answers to Interrogatories Is Not
      Relevant and Most Facts Asserted in Addressing Them are
      Disputed by the Evidence                                                    59

      A.    Sgt. Reeves' dressing down of Father Doe
            and the Doe's attorney                                                60

      B.    Det. Rondini's "investigation" violated numerous
            GPD policies and practices                                           61

      C.    Plaintiff has adduced more than sufficient evidence
            from which a jury could infer a pattern and practice of
            investigating Brunswick students less rigorously than
            others accused of criminal activity                                  61

VI.   Hough's Testimony is Irrelevant, Not Credible, and
      Should be Excluded                                                         62

VII.  Reeves and Rondini are Not Entitled to Qualified Immunity                  67

**CONCLUSION**                                                                   70

**TABLE OF AUTHORITIES**

<u>Cases</u>

<u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ...............   52

<u>Amnesty Am. V. Town of West Hartford</u>, 361 F.3d 113 (2d Cir. 2004)...........................  52, 59

<u>Amorgianos v. National R.R. Passenger Corp.</u>, 303 F.3d 256 (2d Cir. 2002) ......................   64

<u>Anderson v. Liberty Lobbby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ...   49

<u>Baez v. JetBlue Airways Corp.</u>, 793 F.3d 269 (2d Cir. 2015) ...................................................   48

<u>Cantave v. New York City Police Officers</u>, No. 09-CV-2226 (CBA-LB),
2011 WL 1239895 (E.D.N.Y. Mar. 28, 2011) ........................................................................ 51 fn. 3

<u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed. 107 (1988) ............  52, 59

<u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786,
125 L.Ed.2d 469 (1993) ............................................................................................   63

<u>Dingwell v. Cossette</u>, 327 F. Supp. 3d 462 (D. Conn. 2018) .................................................  52, 59

<u>Duff v. General Motors Corp.</u>, 962 F. Supp. 1420 (D. Kan. 1997) ......................................   62

<u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508) (1997) .....64, 67

<u>Gomez v. City of Nashua, New Hampshire</u>, 126 F.R.D. 432 (D.N.H. 1989) .................. 50 fn. 2

<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) .............   68-69, 70

<u>Hayes v. New York City Dep't of Corr.</u>, 84 F.3d 614 (2d Cir. 1996) ......................................   49

<u>Hope v. Pelzer</u>, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ..............................   68

<u>Innis Arden Golf Club v. Pitney Bowes, Inc.</u>, 629 F. Supp. 2d 175 (D. Conn. 2009).........63 fn. 8

<u>Maldonado v. City of New York</u>, No. 12-CV-4304 (RRM-JMA),
2012 WL 3839615 (E.D.N.Y. Sept. 5, 2012 ........................................................................  51 fn. 3

<u>Monell v. Dep't of Soc. Services of City of New York</u>, 436 U.S. 658,
98 S.Ct. 2018, 20136, 56 L.Ed.2d 611  (1978) ..................................................   52, 53

<u>Moustakis v. New York City Police Dep't</u>, 181 F.3d 83 (2d Cir. 1999) ..........................   51 fn. 3

<u>Myers v. County of Orange</u>, 157 F.3d 66 (1998) ......................................................50-53, 58, 68

Parks v. Segar, No. 3:09-cv-1162 (HBF), 2012 WL 4051833 (D. Conn. Sept. 13. 2012) ..... 68

Pena v. DePrisco, 432 F.3d 98 (2d Cir. 2005) ................................................................ 67 68, 70

Raskin v. Wyatt Co., 125 F.3d 55 (2d Cir. 1997) ...................................................................... 63

Rennols v. City of New York, No. 00-CV-6692 (NGG), 2003 WL 22427752
(E.D.N.Y. Oct. 23, 2003), aff'd, 124 F. App'x 66 (2d Cir. 2005) ...................................... 51 fn. 3

Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ....................... 67-68

Sec. & Exch. Comm'n v. Sourlis, 851 F.3d 139 (2d Cir. 2016) ....................................... 48-49

Selig v. BMW of N. Am., Inc., 832 S.W.2d 95 (Tex. App. 1992) ..................................... 62

Shew v. Horvath, No. 8:16-cv-766-T-33JSS, 2017 WL 632515
(M.D. Fla. Feb. 16, 2017) ................................................................................. 67 fn. 10

State v. Kinchen, 243 Conn. 690 (Conn. 1998) ................................................................ 50 fn. 32

Thomas v. Fayette Cty., 194 F. Supp. 3d 358 (W.D. Penn. 2016) ..................................... 63

United States v. Lanier, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) .............. 68

Water Pollution Control Auth. Of City of Norwalk v. Flowserve U.S. Inc.,
No. 3:14-cv-00549 (VLB), 2018 WL 1525709 (D. Conn. Mar. 28, 2018), aff'd,
782 Fed. App. 9 (2d Cir. 2019) ..................................................................................... 63-64, 67

## Rules and Statutes

42 U.S.C. § 1983 ...................................................................................................... 52

Fed. R. Evid. 702 ....................................................................................................... 63

Local R. Civ. P. 5(c) .................................................................................................. 49-50

**PRELIMINARY STATEMENT**

Defendants' motion for summary judgment is based on an erroneous interpretation of the law and ignores reams of evidence that establish a long-standing pattern of conducting investigations of criminal complaints against Brunswick students less rigorously than those against non-Brunswick students, thus permitting Brunswick students to harm others with impunity.  Improper communications between GPD and Brunswick, both explicit and those which can be inferred, have allowed Brunswick to intervene in criminal cases with witnesses and victims to prevent its students from being charged.  In Jane's case, and in other cases, detectives flouted the policies and norms of their department to dispense this favorable treatment, unlike when non-Brunswick students are accused.  Plaintiff lays out more than sufficient evidence below from which a jury could find in her favor on her equal protection claim. Defendants' motion for summary judgment therefore must be denied.

**STATEMENT OF FACTS**

**I.   PATTERN OF COLLUSION BETWEEN BRUNSWICK SCHOOL AND GPD**

The investigation into the criminal complaint filed by Jane Doe against Peter Roe followed a years-long pattern of the Greenwich Police Department ("GPD") to apply a less rigorous approach to investigations of criminal activity alleged against students of Brunswick School ("Brunswick").  Brunswick employed a back channel of communications with GPD designed to allow the school and its headmaster to intervene immediately in any case of possible criminal charges with the intent of dissuading victims from pursuing criminal charges and influencing witnesses to provide statements to the police that followed alternate narratives to avoid the potential for prosecution.

### A. The First Sexual Assault Video

On October 6, 2014, Greenwich Country Day School ("GCDS") Security Director Mike Reynolds contacted the Greenwich Police Department ("GPD") to report that the school had received a video of an apparent sexual assault of an unconscious teenage girl by a boy that was observed and video recorded by other teenage boys ("First Sexual Assault Video"). The video came with a text message from an anonymous source and showed "a juvenile male [who] appeared to be digitally penetrating [the girl's] vagina under her shorts." The text message stated that a "'[Brunswick boy] fingered [a Greenwich Academy girl] on the couch in front of everyone. . . . [the Greenwich Academy girl] is passed out and that's rape.'" (Defs. Ex. 35 at TOG 1034). The video was one of two recordings of the sexual assault made by the boys, which were circulating widely among the high school students. One of the videos was recorded by a Brunswick School ("Brunswick") student and the other was recorded by a GCDS student. (Defs. Ex. 35 at TOG 1040; Pl. Ex. FF at WICK 866).

At the time this complaint was received, the GPD Special Victims Section ("SVS") was headed by now Capt. Mark Zuccerella.[1] Among the detectives who reported to him in SVS was Det. Christy Girard. At the time, it was known in GPD that Det. Girard had a son who attended Brunswick, which is a private boys' preparatory school in Greenwich. (Pl. Ex. Q at 34:13-21; 35:15-25; 36:1-2; 174:9-13 and 24-25; 175:1-7). The tuition at Brunswick that year was approximately $35,000. (Pl. Ex. CC at ¶ 3). Despite the fact that Det. Girard had a relationship with Brunswick, she was allowed to conduct the investigation into the sexual assault involving

---

[1] Mark Zuccerella was a sergeant and detective at the time and is now a captain. He will be referred to in this memorandum of law with his current rank of Captain. Capt. Zuccerella testified as both a fact witness and a 30(b)(6) witness for Defendant Town of Greenwich.

Brunswick students in violation of the GPD's Conflict of Interest policy.  (Pl. Ex. K at TOG 1516-19).  The intent of that policy, as described by GPD Deputy Chief Robert Berry,[2] is "to try to maintain the integrity of the investigation, if someone has some type of relationship to someone involved, we try to remove them and have investigators that. . . don't have any direct connections."  (Pl. Ex. R at 59:2-10; Pl. Ex. K at TOG 1516-19).  GPD Capt. James Bonney[3] testified that he believed it would be a conflict of interest for a detective who was already receiving more than a nominal financial benefit from a person or business to then conduct an investigation involving the same person or business.  (Pl. Ex. S at 38:2-18).  Capt. Bonney was a lieutenant in the Detective Division at the time of this investigation, and the direct supervisor of then-sergeant Zuccerella.  (Pl. Ex. S at 15:9-11, 47:3-25, 48:1-13).

Plaintiff was denied her discovery request to ascertain whether Det. Girard received financial assistance from Brunswick for the tuition of her son.  But if Det. Girard did obtain financial assistance from the school, there would have been not only a direct "relationship" between Brunswick and Det. Girard, but she would have been receiving a financial benefit from the school as well.  Either way, Det. Girard's objectivity regarding Brunswick was compromised and her assignment to the investigation was a departure from the GPD's policy regarding conflicts of interest.  Her actions during the investigation, mostly concealed from her supervisor, Capt. Zuccerella, demonstrated that she was indeed working with Brunswick to derail the investigation of the criminal complaint against a Brunswick student.

---

[2] At his deposition, Robert Berry was a captain and is now Deputy Chief.  He was assigned to the Detective Division in May, 2017.  He testified that he did not implement new protocols regarding investigations when he joined the Detective Division, but "[j]ust reinforce[d] what is currently in our policy manual."  (Pl. Ex. R at 23:12-15, 28:12-17).

[3] Capt. James Bonney held the rank of Lieutenant at the time of his deposition.

The policies for the GPD Detective Division that are in force today are the same policies that were in place in 2016.  (Pl. Ex. R at 23:13-15, 28:12-17; Pl. Ex. GG at 11:25, 12:1-13).  When he was head of SVS, Capt. Zuccerella had a policy and practice to provide absolutely no information to private schools in the course of a criminal investigation involving any of their students.  (Pl. Ex. Q at 183:3-25, 184:1-10, 131:14-17).  Nevertheless, without Capt. Zuccerella's knowledge, Det. Girard called Brunswick Director of Security Michael DeAngelo just before 5:00 p.m. on the day she received the criminal complaint, and told him to have Brunswick Headmaster, Tom Philip, call her on her cell phone to further discuss the situation.  DeAngelo is a retired GPD detective (as well as treasurer of the Retired Policeman's Association).  (Pl. Ex. JJ at 18:20)  Det. Girard told Michael DeAngelo all of the information she had gained thus far, including the fact that the parents of the victim wanted to first tell their daughter about the video before the police interviewed her.  (Pl. Ex. N at WICK 775; Pl. Ex. Q at 188:5-21).

Later the same evening, the parents of the victim called Det. Girard and told her that their daughter claimed not to have been raped, but that she had agreed to the sexual contact. Although it was already after 10:00 p.m., Det. Girard immediately emailed Brunswick Headmaster Philip and shared this information with him, stating "I know it is late but I just received a call from the family.  They assured me there was no sexual assault."  (Defs. Ex. 35 at TOG 1035; Pl. Ex. N at WICK 776).  Here, again, on the same day as the criminal complaint was received, Det. Girard briefed Philip on the confidential information she obtained about the incident without the knowledge of her supervisor, in violation of SVS policy and practice.  (Pl. Ex. Q at 189:13-25, 190:10-25, 191:14-16, 192:24-25, 193:1-4; 206:13-25, 207:1-5).  Det. Girard also facilitated contact between the victim's family and Tom Philip.  Philip emailed Det. Girard

4

at 4:26 a.m. on the morning of October 7th to tell her that the victim's father had called him the previous evening, after he had spoken to Det. Girard.  The victim's father had spoken to Philip even before anyone in the victim's family had seen the video, and more significantly, before Capt. Zuccerella had a chance to speak with the father.  (Pl. Ex. N at WICK 776; Defs. Ex. 35 at TOG 1035).

Thus, Philip was able to directly influence the victim's family on the very first day of the investigation and did so in an effort to shield his students from criminal prosecution.  Capt. Zuccerella testified that it was the interference of the schools that prevented prosecution in this case, and the interference of the schools was directly facilitated by Det. Girard without Capt. Zuccerella's knowledge.  (Pl. Ex Q at 213:4-15).  Capt. Zuccerella's supervisor, then-Lt. Bonney, testified that he had no idea why Det. Girard would provide this information to Brunswick.  (Pl. Ex. S at 54:21-25, 55:1-25, 56:1-16).  Capt. Zuccerella was contacted several times by Brunswick Director of Security DeAngelo, but he repeatedly told DeAngelo that he couldn't tell him anything about the investigation.  (Pl. Ex. Q at 249:14-25, 250:1-5).  As a result, Capt. Zuccerella was kept out of the loop, and Det. Girard provided information.

Two days after GPD received the criminal complaint, on the morning of October 8, 2014, Philip notified by email the school's Upper School Faculty about the sexual assault investigation. In that email, Philip explained that "an impromptu gathering [was] held at the home of a Freshman boy" during which "alcohol made its way into the gathering and in a somewhat circuitous way, [and] the party has gained the attention of the Greenwich Police."  There was no mention of an unconscious girl being digitally manipulated by a Brunswick boy, with the assault being video recorded and the recordings being widely distributed by two other boys,

one of whom was a Brunswick student.  Philip had in that short time begun to construct a new narrative about the sexual assault that took place at that "impromptu gathering" – that it was merely a case of underage drinking.  (Pl. Ex. FF at WICK 864).

In his email, Philip also noted that by then – only two days after the complaint was filed with GPD – he had already "had **several** conversations with the Greenwich Police and remain[ed] unclear as to whether their investigation will run a full course or not."  (Pl. Ex. FF at WICK 864, emphasis added).  Such detailed knowledge of the investigation, and his conjecture after only two days that the investigation might not run its full course, could only have come from Det. Girard because Capt. Zuccerella imposed a firm policy and practice in SVS of not sharing information with the private schools.  (Pl. Ex. Q at 183:3-25, 184:1-10).  Capt. Bonney testified that it was not appropriate for a police officer to share with Brunswick the information that the investigation might not run its full course.  (Pl. Ex. S at 77:15-25, 78:1-2).  Significantly, Det. Girard's updates on the investigation were directed only at Brunswick.  She did not provide any updates to Adam Rohdie, GCDS Headmaster, even though the other boy who video recorded the sexual assault and distributed it was a GCDS student.  (Pl. Ex. NN at ¶¶ 5-9).

In Capt. Zuccerella's view, Brunswick's intervention prevented GPD from conducting a full investigation.  (Pl. Ex. Q at 183:1-25).  Once Brunswick got involved, the victim's family notified GPD that it did not want criminal charges to be pursued against the boys.  Det. Girard wrote in the case/incident report that she then reached out to the Assistant State's Attorneys ("ASAs") and advised them of that fact, and the ASAs agreed not to prosecute as long as the victim's family put in writing that this was their request.  (Defs. Ex. 35 at TOG 1040, TOG 1043). ASA Capozzi had no recollection of this case. (Pl. Ex. OO at 27:21-28:2).  The case/incident

6

report also states that the ASAs "warned if the videos resurface, they have the right to prosecute." (Defs. Ex. 35 at TOG 1040).

It is not true that the reason for choosing not to prosecute was that the victim said she gave consent.  In the case/incident reports of the investigation, the parents stated on October 6th – before they viewed the video – that their daughter claimed to have agreed to the sexual contact.  However, the next day, when they went to GPD headquarters to view the video, "they questioned if [their daughter] was able to physically consent due to [her] appearance of being unresponsive."  Thereafter, there is no indication in the the parents' letter to Det. Girard that their daughter had given consent.  In fact, the letter left open the possibility that the victim and her family might in the future request that the police pursue criminal charges.  (Defs. Ex. 35 at TOG 1035, TOG 1040, TOG 1043).

Capt. Zuccerella acknowledged that, had Brunswick not intervened, the detectives could have "circumvented talking to the prosecutors because we had all the information we wanted, we had all the names, we could have done everything right then and there, maybe we could have done an on view arrest, but that didn't play out that way."  He testified at deposition that, before Brunswick became involved, "this was going to be an arrest warrant application no matter what."  (Pl. Ex. Q at 181: 11-12, 204:1-13, 243:14-18).  Capt. Zuccerella also noted that the charges involving the video recording and distribution of the sexual assault could have been bumped up to adult court as Class B felonies, regardless of the age of the boys.  (Pl. Ex. Q at 198:19-25, 199:1-2 and 7-11).  Capt. Zuccerella testified that he believed the victim had been "violated" and that "justice . . . was not done."  (Pl. Ex. Q at 203:4-6, 205:2-3).

7

In fact, in a similar investigation conducted by Capt. Zuccerella that did not involve Brunswick students, a full investigation was conducted and an arrest warrant application was submitted and approved by the ASA, despite the fact that the victim claimed there was no crime committed and refused to testify against the assailant.  In that case, an anonymous source provided a letter describing inappropriate conduct by a stepfather towards a 16-year-old girl.  The SVS detectives were able to interview the girl and obtain corroborating information.  Thereafter, however, an attorney representing the victim and her mother denied police any further access to the victim, and another attorney submitted an affidavit from the victim describing the actions of her stepfather as "sophomoric and immature" and stating that she would not testify against her stepfather.  Having the benefit of an interview with the victim and completion of the investigation, Capt. Zuccerella was able to submit an arrest warrant application, that was granted, even though the victim was refusing to cooperate or testify.  (Pl. Ex. PP at TOG 2567-72).

Due to the coordinated activity between GPD's Det. Girard and Brunswick's Headmaster Philip in the First Sexual Assault Video investigation, despite the seriousness of the offenses, the case/incident reports show that the only action GPD took was for Det. Girard to speak to the boys who video recorded the sexual assault "regarding the consequences of underage drinking and poor decisions" or "poor choices," and to warn them that if the videos resurfaced the police would revisit the filing of criminal charges.  The Brunswick boy was suspended[4] and the GCDS boy was also disciplined, although the case/incident reports do not specify what that

---

[4] It is not clear where the information about discipline from Brunswick came from since nothing in the case/incident reports describes or references any contact between GPD and Brunswick.

discipline was.  Det. Girard also spoke to the boy who sexually assaulted the unconscious girl about his "poor choice."  There is no indication in the case/incident report that he was disciplined by Brunswick in any way, and the only punishment cited was being forbidden by his parents "to attend any events with friends" and being "under strict discipline" at home. (Defs. Ex. 35 at TOG 1040-41).  Thus, the focus on underage drinking and poor decision-making appeared to overshadow the fact that a sexual assault had occurred, pornographic images of a minor had been distributed, and that the emotional consequences for the victim would likely be more significant and far-ranging than the lenient consequences faced by the boys who sexually assaulted her and violated her privacy.

In addition to departing from SVS policy and practice by immediately engaging Brunswick in the investigation into these very serious criminal offenses, Det. Girard also departed from GPD policy and practice by providing only sketchy details about the investigation in the case/incident reports.  GPD policy and practice with respect to case/incident reports is to include every single fact related to the subject of the crime under investigation, including all discussions with the victim, suspect(s), witnesses, or attorneys.  All information is to be provided so that if there is a need to look at the investigation again, the police have the full information and need not rely on memory.  (Pl. Ex. S at 22:16-25, 23:1-22; Pl. Ex. R at 54:12-16; Pl. Ex. Q at 102:20-22, 108:10-25, 109:1-5, 125:13-23, 126:12-25, 127:1-9 and 21-25).

The First Sexual Assault Video case/incident reports are, in contrast to GPD policy and practice, very thin on details. There is no description of Det. Girard's contacts with Tom Philip, or anyone at Brunswick, even though Philip indicated that within the first two days of the investigation he had several conversations with GPD.  (Defs. Ex. 35; Pl. Ex. FF WICK 864).  Det.

9

Girard's email to Philip the evening of October 6 was from her personal email and was never transferred to the case/incident report as it should have been.  (Pl. Ex. T at 119:14 – 120:15; Pl. Ex. Q at 9:14-25, 10:1-24).  There is no record that Philip had spoken to the victim's father, although there is a description of the contacts with families made by GCDS Headmaster Adam Rohdie.  Other than a short statement that Det. Girard spoke with the ASAs, there is no description of what she told them, when she spoke with them, how many discussions she had with them, or what questions they may have asked.  There is no indication of when Det. Girard reached out to the victim's family to request the letter confirming their request not to prosecute at that time, nor is there any description of the substance of that contact.  There is no indication of which, if any, witnesses were interviewed.  (Defs. Ex. 35).  Capt. Bonney testified that all these facts would have been germane to the ASAs in reaching their decisions and should have been in the report.  As the report does not describe the content of the discussions between Det. Girard and the ASAs, and these facts are not contained within the reports, there is no way to know whether Det. Girard communicated any of this information to the ASAs.  (Pl. Ex. S at 49:21-25, 50:1-13, 51:25, 52:1-25, 53:1-7; Pl. Ex. OO at 27:21-28:2).

### B.  Other Complaints in 2014 of a Brunswick Underage Drinking Party and a Second Brunswick Sexual Assault Video

During the same time frame of the fall of 2014, the mother of a female Greenwich High School student raised an alarm to GPD about two incidents involving Brunswick students.  The mother, who is a medical doctor ("Dr. X"), picked up her daughter from a party held at the home of a Brunswick student ("F").  The father of the Brunswick student ("Father F") walked her daughter out to the car and directed her into the back seat.  He said nothing about the girl's condition or about why he needed to walk her to the car.  Dr. X watched her daughter with

alarm because she was unable to walk by herself and was stumbling.  When she got into the car

she reeked of vomit, was very disheveled, and obviously drunk.  The girl's sweatshirt was on

inside out and had vomit across the entire front.  (Pl. Ex. W at 7:22-24, 8:1-5, 9:10-18, 12:6-14,

20:8-12, 21:4-25, 22:1-25).  Dr. X was so alarmed by her daughter's condition that she later

made a complaint to GPD's anonymous tip line about the underage drinking that occurred that

night, as well as the fact that the parents were aware of the drinking as evidenced by the

father's lack of concern when he walked her daughter to the car.  Dr. X provided the address of

the residence and told them that the parents had to have known about the drinking because

the father clearly knew her daughter was drunk when he walked her to the car.  Dr. X was also

upset by the fact that Father F was so nonchalant about her daughter's condition, as if it were

no big deal.  (Pl. Ex. W at 31:9-21, 42:6-25, 43:1-8).

> GPD personnel testified that for all complaints received, an investigation file should be

opened even if it is found to be without merit. (Pl. Ex. JJJ at 86:3-24; Pl. Ex. R at 66:18-67:12). In

contravention of this policy and practice, there is no evidence that any investigation was

conducted in response to this complaint by Dr. X.  (Pl. Ex. W at 31:6-8, Pl. Ex. Q at 214:17-25).

> In addition to finding her daughter incoherent and disheveled, Dr. X made another

alarming discovery on the night of the party.  Since her daughter was too inebriated to answer

her mother's questions about what happened at the party, Dr. X took her daughter's cell phone

to see if there was anything she could find out.  She found a group text with a video that

showed "a girl who was completely naked.  You could not see her face and she was laying face

down with her head in the distance.  And there were a group of boys on the side.  One of them

was digitally manipulating her.  And she was obviously unconscious because she wasn't moving

when this was happening.  And the boys were all laughing. . . ."  (Pl. Ex. W at 23:10-25, 24:1-6).

The video (the "Second Sexual Assault Video") Dr. X described was very different from the video

confiscated in the First Sexual Assault Video investigation.  In the First Sexual Assault Video, the

girl was clothed; in this video she was "completely naked."  In the First Sexual Assault Video, the

girl's face was visible; in this video, she was face down with her head in the distance.  Capt.

Zuccerella saw the First Sexual Assault Video and testified that it was different from the

description of the Second Sexual Assault Video.  (Pl. Ex. Q at 228:5-25, 229:1-4, 234:21-25,

235:1).

   The Second Sexual Assault Video was so concerning that Dr. X contacted a friend who

was an attorney and asked his advice about what to do with it.  He advised her to contact a

retired GPD police officer, Lt. Thomas Keegan.  Dr. X testified that she spoke with Lt. Keegan

and provided him with the Second Sexual Assault Video.  (Pl. Ex. W at 29:5-11 and 18-25, 30:1-

25, 31:1-5, 38:1-25, 39:1-6, 40:20-25, 41:1-25, 42:1-5).  She also testified that her daughter told

her, and she told Lt. Keegan, that the boys involved were Brunswick students, and that the

victim was from GCDS.  (Pl. Ex. W at 25:16-25, 26:1, 44:1-9, 48:12-25, 49:1-14).

   Lt. Keegan's recollection of how he received the Second Sexual Assault Video was

different from that of Dr. X, but he does not dispute the fact that he received it.  He testified

that he thought it was a video of underage drinking and not a sexual assault, but he also stated

that he couldn't see anything on the video and did not view the entire video.  (Pl. Ex. V at 75:6-

25, 76:1-25, 85:7-25, 94:1-11).  Lt. Keegan testified that he gave the Second Sexual Assault

Video to then Lt. Bonney and Det. Girard.  (Pl. Ex. V at 85:7-13, 94:12-25, 95:1-9).  Capt. Bonney

testified that he did not recall receiving the Second Sexual Assault Video but that if Lt. Keegan

said that he provided it to him, he probably did.  He also testified that if he received it, he would have handed it off to someone in SVS to handle.   (Pl. Ex. S at 79:12-25, 80:1-22, 84:4-10).  Det. Girard denied receiving the Second Sexual Assault Video from Lt. Keegan.  (Pl. Ex. T at 164:7-9, 127:3-9).  Capt. Zuccerella testified that he could not recall ever hearing about any such video recording.  (Pl. Ex. Q 233:4-23).

There is no evidence of any investigation into the Second Sexual Assault Video.  (Pl. Ex. Q at 214:17-25).  Defendants claim that the Second Sexual Assault Video was the same assault as the First Sexual Assault Video.  If it was, then pursuant to the ASA's directives as recorded by Det. Girard, the case should have been reopened for prosecution because the video resurfaced.  However, given the vastly different descriptions of the videos, it is unlikely that it is the same event.  It is possible that it is a second sexual assault at the same party, and it is also possible that it is a video of a sexual assault from a different party.  Since no one from GPD has admitted to having received the Second Sexual Assault Video, and no one has testified to having conducted any inquiry into it, there is no way to know when and how the Second Sexual Assault Video was recorded.  But there is no dispute that (1) such a video existed, (2) it was turned over to GPD, (3) the boys in the video were reported to GPD to be from Brunswick, and (4) the Second Sexual Assault Video was not investigated by anyone at GPD.  (Pl. Ex. W at 25:16-25, 26:1, 29:5-11 and 18-25, 30:1-25, 31:1-5, 38:1-25, 39:1-6, 40:20-25, 41:1-25, 42:1-5, 44:1-9, 48:12-25, 49:1-14; Pl. Ex. V at 85:7-13, 94:12-25, 95:1-9; Pl. Ex. S at 79:12-25, 80:1-22, 84:4-10; Pl. Ex. Q at 214:17-25, 233:4-23).

### C. *False Statements to the Press by both Brunswick and GPD*

In another departure from GPD practice, GPD provided information about the First

Sexual Assault Video investigation to the press.  (Defs. Ex. 41).  In a November 13, 2014 article

in the Greenwich Time, then Lt. Kraig Gray,[5] GPD Public Information Officer, was quoted as

saying "[t]he Greenwich Police Department does not generally comment on rumors, . . . but

based upon the level of misinformation and confusion, we can say that we chased down *two*

allegations that turned out to be unfounded."  (Defs. Ex. 41 at 3) (emphasis added).  In fact, in

addition to being a departure from normal practice, the statements made to the press by GPD

were entirely false.  (Pl. Ex. Q at 208:8-25, 209:1-25; 210:1-20, 214:17-25).  Lt. Gray is reported

as saying that GPD "investigated at that time and determined the allegations were unfounded."

The article further states that "[p]olice interviewed multiple students, parents and

administrators, and determined that no crime had been committed."   (Defs. Ex. 41 at 1).  In

fact, the First Sexual Assault Video case/incident reports established beyond refute that the

allegations were true and that charges were not filed only at the request of the parents of the

victim, not because no crimes had been committed.  (Defs. Ex. 35). Further, neither the victim

nor the attacker, nor the videographers were interviewed.  (Defs. Ex. 35).

The Greenwich Time article also quotes from a November 12, 2014, letter from

Brunswick Headmaster Tom Philip to the parents of students of Brunswick's middle and high

school.  In that letter, Philip falsely stated that "Brunswick students . . . acknowledged that cell-

phone images had been taken at various points" but that none of the Brunswick students

---

[5] Kraig Gray is now a captain with the GPD.  He held the rank of Lieutenant in 2014 when he gave statements to the
Greenwich Time.

admitted to "participating in (or having knowledge of) any instance of sexual assault."  (Pl. Ex. O at WICK 778).  As the First Sexual Assault Video case/incident reports reveal, those statements are false because neither the Brunswick boy who digitally penetrated the victim, nor the Brunswick boy who video recorded the assault, denied they had done so to the police. (Defs. Ex. 35 at TOG 1041).

Philip's letter goes on to describe that "[c]oncurrent to this inquiry, the school learned of yet another party, again involving students from multiple schools and of varying ages, at a private home, where alcohol was available."  (Pl. Ex. O at WICK 778).  The Greenwich Time article also refers to this second party, stating that "[t]he headmaster's letter also made reference to a second party, which police addressed as well. . . . Shortly after their first investigation, department officials became aware of another alleged incident of assault at a high school party under similar circumstances.  A similar investigation turned up the same result as the first one did, police said."  (Defs. Ex. 41 at 2-3).  This other party discussed by Headmaster Philip and Lt. Gray may have referred to the GPD anonymous tip line complaint filed by Dr. X about the party her daughter attended at F's house, and it may have referred to the video recording that Dr. X turned over to Lt. Keegan. However, there is no record of any second investigation, and no one at GPD can recall anything about this second party or investigation. (Defs. Ex. 36 at Interrogatory 2; Pl. Ex. Q at 214:17-25).  However, since these statements given to the Greenwich Time are contemporaneous evidence of a second party and video, which is corroborated by the testimony of Dr. X, who had personal knowledge of both, a jury could conclude that Brunswick and GPD took steps to cover them up.

15

The timing of the <u>Greenwich Time</u> article also supports an inference that there was coordination between Brunswick and GPD.  Philip's November 12th letter to parents of Brunswick students states that the school was contacted by a <u>New York Times</u> reporter the day before, on November 11th.  (Pl. Ex. O at WICK 778).  The November 13th <u>Greenwich Time</u> article stated that Lt. Gray spoke with the newspaper the day before, on Wednesday, November 12th.  The First Sexual Assault Video case/incident report states that the final report, closing the file, was typed on November 13th.  (Defs. Ex. 35 at TOG 1042).  Putting the timeline together, it appears that the inquiry by the <u>New York Times</u> reporter on Tuesday, November 11, 2014, set in motion the Brunswick Headmaster's letter to the parents and Lt. Gray's comments to the <u>Greenwich Time</u> the very next day.  And one day later, November 13th, the <u>Greenwich Time</u> published the article detailing the "unusual" acknowledgement of the investigations, and the GPD formally closed out its investigation.

### D. *Brunswick Interferes in an Assault Allegation Against One of Its Students*

One year later, on October 3, 2015, another incident involving an assault by a Brunswick student again revealed interference by Brunswick in a GPD investigation that resulted in no punishment for the Brunswick student aggressor (the "2015 Brunswick Assault").  In that incident, a teen center in Greenwich was hosting a dance for all high school students within the Town of Greenwich.  "C", an 18-year-old boy who attended Greenwich High School, was beaten by M, a 17-year-old boy who attended Brunswick School. (Defs. Ex. 34, Ex. 1).  C's injuries were severe – he sustained a bloody nose, bruised lip, swelling on his left cheek, severe welt on the back of his head, and a concussion.  (Defs. Ex. 34, Ex. 1 at 10/4/15 Report at 3, 10/7/15 Supplementary Report at 1).  One hour after the incident, C was interviewed by a GPD police

officer in the emergency room and provided a sworn statement.  In that statement he stated

that a Brunswick student approached him and told him that he was not welcome at the dance.

Twenty minutes later, the same Brunswick student approached him again and insisted that he

and his friends leave.  He stated that as the Brunswick student came at him, he stood his

ground and put his hands up defensively, and the Brunswick student punched him numerous

times in the face, and continued punching him after he fell to the floor.  (Defs. Ex. 34, Ex. 1 at

10/4/15 Report at 2-3).  C gave his initial statement in the early morning hours of Sunday

October 4, 2015.  The patrol officer who was handling the matter attempted to talk to Kyle

Silver, the teen center's director, who declined to talk about the incident because of the late

hour and asked to speak the next week. (Defs. Ex. 34, Ex. 1 at 10/4/15 Report at 3).

After the initial interview, the patrol officer handed the 2015 Brunswick Assault

investigation to SVS. (Defs. Ex. 34, Ex. 1 at 10/4/15 Report at 4-5). On Wednesday, October 7,

C's mother updated the SVS detective, informing him that C was diagnosed with a concussion

as a result of the fight.  Otherwise, nothing happened in the investigation the week of October

5, 2015.

Tom Philip, however, swung into action.  C's parents contacted Philip on October 8,

2015 to let him know that a Brunswick student had assaulted their son, that other students

who witnessed it could corroborate the account, and informed him that they had filed a police

report.  Philip responded that "I was aware of the incident and actually had lengthy discussions

with both [M] as well as his father . . . *I have also contacted Arch Street and the Police*."  (Defs.

Ex. 39 at p. 2) (emphasis added). Philip's "contacts" with the police were not documented in the

2015 Brunswick Assault case/incident report, contrary to GPD practice and policy. They did, however, have their intended effect.

By the time M was interviewed on October 15, 2014, Philip had coordinated a narrative in which M claimed that C was the aggressor but refused to provide a sworn statement. There was no indication that M suffered any injuries in the altercation. (Defs. Ex. 34, Ex. 1 at 10/15/15 Supplementary Report).

GPD took no action with respect to this incident because SVS determined that M acted in self-defense, even though C provided a sworn statement to the contrary only hours after the incident. GPD based the decision on an interview with the director of the teen center conducted ten days later, after the director's contact with Philip, in which he said that "he was under the impression that [C] was the instigator in the incident. [C] related to Kyle that he had pushed [M] first, and that [M] had come back in a more aggressive man[ner]. [C] told Kyle that he started the incident by pushing [M]." (Defs. Ex. 34, Ex. 1 at 10/4/15 Report at 2-3, 10/16/15 Supplementary Report at 1.) SVS took no steps to reconcile M's much-delayed unsworn account with the sworn account C provided on the same night as the incident, and did not question whether the teen center director had been persuaded to offer the hearsay or that he might have a motive to downplay the incident to protect his business. SVS also did not factor in credibility issues, such as the refusal of M to provide a sworn statement and the fact that C was seriously injured while M sustained no injuries at all. Even if SVS credited M's story, it never considered the fact that Brunswick student M's response to being pushed, if that happened, was far in excess of what was necessary because it resulted in serious bodily injury to C.

In contrast to the handling of this assault and battery case, in a 2017 assault case involving young people at a party in a private residence, a GPD detective identified witnesses to the event other than the victim and the perpetrator and brought those witnesses in for questioning.[6] The detective did not rely on hearsay but challenged each eye witness with what he learned from other witnesses and from electronic and video evidence.  He audio or video recorded each of those interviews and subjected what he learned to critical analysis, expressing his opinion regarding the plausibility of various witnesses' statements.  No such rigorous procedures were followed in the 2015 Brunswick Assault investigation.

In another situation involving a possible drug charge, Brunswick Headmaster Philip took the unusual step of visiting GPD headquarters to talk to Chief Heavey to discuss resolution of the situation without any arrest being made.  (Pl. Ex. RR 41:7-42:25). Since there is no record of the matter, nor any investigation or arrest, the date of the meeting between Chief Heavey and Philip is unknown.  What is known is that no other headmaster or principal of any school, public or private, had such a meeting with Chief Heavey.  (Pl. Ex. III at 53:4 – 54:3; Pl. Ex. NN ¶ 9).

## II.  COLLUSION PATTERN CONTINUES WITH JANE DOE INVESTIGATION

The pattern of collusion continued the next year, in 2016.  Plaintiff Jane Doe was sexually assaulted by Peter Roe on June 3, 2016, during a pool gathering of about 13 classmates[7] and friends at her home. She was 16 years old at the time and finishing her sophomore year at Greenwich Academy ("GA"), a private girls' school in Greenwich,

---

[6] There is no dispute that there were other witnesses to the altercation between M and BC; BC's parents mentioned it in their email to Philip and the responding patrol officer noted that a group of Brunswick students left the teen center that night chanting "free [M]." (Defs. Ex. 39 at 2; Defs. Ex. 34 at 1)

[7] While 13 students attended altogether, there were never that many present at one time.  Students left early due to sports and SAT tests and came late, including Peter Roe.  (Defs. Ex. 18 at TOG 643: Defs. Ex. 18 at TOG 666: Defs. Ex. 17 at TOG 164).

Connecticut.  (Defs. Ex. 17 at TOG 156-57; Defs. Ex. 18 at TOG 645-46, 670-72; Pl. Ex. A at 28:2-4, 56:4). Most of the boys who came over to swim attended Brunswick School, which combines its high school program with GA's.  It took Jane some time to process what happened to her and, after a few weeks, she realized she needed help. (Pl. Ex. A at 160:2-6, 210:5-23). With the encouragement of a friend, Jane went to GA's counselor and told her what happened. (Pl. Ex. A at 210:21-23). The counselor, Charlanne Zepf Bauerlein made a mandatory report to the Department of Children and Families ("DCF"), which forwarded the complaint to GPD as required. (Defs. Ex. 16). GPD then contacted the Doe family. (Defs. Ex. 18 at TOG 646).

The "investigation" that ensued was a sham designed not to uncover the truth but to trash Jane Doe's credibility and manufacture "inconsistencies" so that the detective in charge of the investigation, Det. Krystie Rondini could report to the State's Attorney that Jane Doe was inconsistent.  These efforts appeared to be coordinated with Brunswick – in particular Brunswick's attempt to make this case about alcohol consumption by minors instead of sexual assault – in an effort to shield the accused Brunswick student, Peter Roe, from prosecution, a pattern consistent with the First Sexual Assault Video.

### A. GPD's Initial Investigation Stalled

Det. Rondini interviewed Jane at her home on August 2, 2016, immediately after which Jane composed a written statement. (Defs. Ex. 17 at TOG 156-57; Defs. Ex. 19).[8]  She reported that when Peter Roe arrived, late in the party (around 9:30 p.m.), he seemed drunk and, after a while, that he attacked Jane's brother.  At this point, around 10:30 p.m., a couple of Roe's

---

[8] The transcript's cover page (Defs. Ex. 19 at TOG 973) states that Attorney Audrey Felsen was present; she was not. (Ex. TT at ¶ 3; Pl. Ex. A 247:6-248:8).

friends brought him to the bathroom to sober up and called Jane in to help; the boys

subsequently both had to depart, leaving Jane in the bathroom alone with Roe.  She reported

that he pulled her bikini top down, kept saying he "wanted to fuck her," and that "he ended up

kind of reaching down the side of my bottom and like his finger like kind of like was like in you

know the area for like a while like like a little second and then I kind of pushed him away . . ."

(Defs. Ex. 19 at 6-7).  In her written statement, Jane reiterated that Roe "ended up pull[ing] part

of my top down and getting a finger inside the bottom of my suit bottom.  He even tried to pull

his pants down but I stopped him." (Defs. Ex. 17 at TOG 157).

      Det. Rondini did not ask Jane a single question during this interview about whether Jane

or anyone else had been drinking at the party,[9] which makes sense since it is irrelevant to the

question of whether or not Jane was sexually assaulted. (Defs. Ex. 19).  Det. Rondini also did not

ask Jane whether Roe's fingers entered her vagina or were on her vagina and did not explain

the importance of that distinction.  (Defs. Ex. 19).  This was to become significant later in the

investigation because Det. Rondini later cited it as a discrepancy in Jane Doe's statement,

calling into question Jane's credibility.  (Defs. Ex. 18 at TOG 641).  In fact, it reflected Jane's

youth and naivete because Jane did not feel comfortable describing what happened and did not

know how to really explain it.  (Pl. Ex. A at 256:20-257:7, 554:4-8)

      On August 3, 2016, Jane's brother submitted a written statement concerning what he

witnessed the night of June 3rd.  Det. Rondini directed him to sit down and write what he

---

[9] In one of the numerous conflicts in Det. Rondini's deposition testimony, when asked whether "you remember asking [Jane] whether she was drinking in August of 2016?" Det. Rondini responded "Yes, I do remember." This is particularly noteworthy because Det. Rondini claimed not to remember almost anything else about the investigation.  (Pl. Ex. GG at 130:22-24).

remembered.  She did not ask him any questions, though he asked her a few questions for guidance about whether to include various details.  Her case report claims Brother Doe "related" various facts which were only contained in his written statement, thus giving the false impression that he had been interviewed.  (Defs. Ex. 18 at TOG 658-59; Pl. Ex. AA at ¶ 3-4). Brother Doe confirmed that Roe had attacked him, provided a Facebook message from Roe apologizing for attacking Brother Doe (Defs. Ex. 18, TOG 751-752), and wrote that he saw the boys go into the pool house and then Jane come out with a scratch on her shoulder.  Brother Doe also wrote that he found a bottle of alcohol in Roe's backpack, which prompted him to demand that Roe be sent home in an Uber. (Defs. Ex. 17 at TOG 158-59).

Det. Rondini made two more phone calls – to Brunswick students N and L, both of whom were out of town at the time – on August 8th.  N was at his summer camp and spoke with Det. Rondini by phone.  He confirmed Roe's attack on Brother Doe and that Roe had been drinking alcohol, although he did not know where the alcohol came from. (Defs. Ex. 18 at TOG 665).  L's mother spoke with Det. Rondini and told her that they would contact her upon their return from vacation.[10]  (Defs. Ex. 18 at TOG 660).  After August 8th, Det. Rondini's investigation came to a halt.  Nothing was done by Det. Rondini until August 25th, two days after the Doe family's attorney wrote a letter of complaint about how the investigation was being conducted. (Defs. Ex. 18; Pl. Ex. UU at WICK 371).  Given the facts below, it is a reasonable inference that this pause in pursuing the facts and the truth was designed to give Brunswick's Headmaster, Tom Philip, an opportunity to intervene.

---

[10] L testified that GPD called him on 8/4/16 while he was in Montana and he said "no comment." (Pl. Ex. D at 167:20-169:14).  This contact does not appear in the case/incident reports. (Defs. Ex. 18).

GPD does not generally pause its assault investigations that do not involve Brunswick students.[11]

### B.  Brunswick's Intervention during the Pause in the Investigation

At this extremely early stage, Brunswick was already alerted that a criminal complaint had been made against one of its students and began intervening.  On August 4, 2016, Peter Roe sent an email to Brunswick Headmaster Philip, saying:

> I met with the attorneys yesterday and they told me I shouldn't go to the police interview yet because they wanted to speak with the detective first. I called them this morning and they said that they spoke with the detective and are going to figure out the story and that they are going to give me another call next week. Thank you for contacting me with the lawyers. I'm sorry for this whole situation. I hope it all turns out okay. Have a great weekend.

Philip's response was: "[G]lad you're getting good advice.  Hang in there and keep me posted." (Pl. Ex. M at WICK 331).  On August 5, 2016, Philip's notes and an email to the headmistress of GA, Molly King, indicate that he was upset that he was not given a "heads up" before the police were involved as it is "playing very poorly" that "GA call[ed] police on [a] B[runs]w[ic]k boy." (Pl. Ex. VV at WICK 332, Pl. Ex WW at WICK 302). His notes also indicate that he already was aware of the name of the detective assigned to the case. (Pl. Ex. WW at 302).

Philip also activated the back channel to GPD.  On August 6, 2016, Brunswick's Director of Security Michael DeAngelo emailed Philip that he had spoken to Det. Girard, who was a "bit evasive."  (Defs. Ex. 31 at WICK 333; Pl. Ex. JJ at 137:2-15, 138:15-17).  In that interesting choice of words – that Det. Girard was a "bit evasive" – DeAngelo betrayed the expectation that Det.

---

[11] See e.g., Pl. Ex. PP, at TOG 3059-3063 (all witnesses to assault interviewed within three days); TOG 2522-2526 (witnesses to juvenile assault interviewed within one week); TOG 2527-2536 (all local witnesses interviewed within two weeks and evidence and witnesses located in Maine secured within 20 days); TOG 2537-2552 (all witnesses interviewed within five days); TOG 2567-2572 (all witnesses interviewed within eight days); TOG 2581-2595 (all witnesses interviewed within two weeks); TOG 2597-2602 (all witnesses interviewed within three weeks).

Girard would be fully forthcoming with information about the criminal investigation.  At this time, Det. Girard still had a child enrolled at Brunswick, but she was no longer assigned to SVS.  She had been transferred to handle cold case investigations.  (Pl. Ex. T at 22:25 – 23:8).  Despite the fact that she no longer had any connection to SVS, Det. Girard announced to Philip and DeAngelo in September 2016 – while the Doe Investigation was in its infancy – that she had been appointed the liaison from GPD to Brunswick, and that "the Girards are quite invested in the safety and welfare of Brunswick, so never hesitate to call me 24/7."  (Pl. Ex. N at WICK 887).

The liaison position was one created in SVS to provide a conduit for the private schools to GPD for information and advice.  Det. Girard was the only police officer outside of SVS to be appointed a liaison to a private school.  (Pl. Ex. Q at 71:3-25, 72:1-25, 73:1-12, 75:12-25, 76:1-5 and 14-16).  No one from GPD knows who made the decision to appoint her liaison to Brunswick even though she was in the cold case unit rather than in SVS. (Pl. Ex. Q at 73:6-9; Pl. Ex. HH at 137:1-5; Pl. Ex. T at 89:10-90:20, 194:6-195:5, 197:24-198:16, 200:5-17; Pl. Ex. S at 33:4-25, 34:6-23). Det. Girard's assignment as liaison to Brunswick was very unusual not only because she was no longer in SVS, but also because she continued to have a conflict of interest in having her child attend Brunswick.  Had she been interested only in working as a liaison to the schools, Det. Girard could have been assigned to GCDS.  Yet GCDS Headmaster Adam Rohdie does not have a GPD liaison assigned to his school as does Brunswick, even though the liaison position was intended to be available for all private schools.  (Pl. Ex. NN at ¶ 4; Pl. Ex. Q at 36:25-37:7, 37:17-22; Pl. Ex. HH at 137:1-139:14).

Philip's deposition testimony concerning Brunswick's repeated contacts with GPD conflicts with that of Sgt. Reeves and Capt. Zuccerella because he claimed that he has only

asked DeAngelo to regularly check with GPD about whether a student is going to be charged. (Pl. Ex. RR at 95:5-12, 125:3-20, 125:22-126:3). By contrast, Capt. Zuccerella testified that DeAngelo "calls all the time" and that he "did tell Brent [Reeves], don't tell them anything.  So, there is a reason why I would have told him that, so. . . . This case, the [Doe] case is because they wanted to know what was going on, and they had no right to know."  (Pl. Ex. Q at 249:22-25, 250:1-3).  Sgt. Reeves disregarded Capt. Zuccerella's advice and spoke with DeAngelo, who told him that Father Doe was "trying to get this kid in trouble" – a sentiment Sgt. Reeves also expressed to Father Doe. (Pl. Ex. U at 45-46; Pl. Ex. ZZ at 68:3-70:13).  Like Philip, DeAngelo disputed Sgt. Reeves' testimony and claimed at deposition that he did not recall ever talking to Sgt. Reeves, a statement that is hard to believe given the information Sgt. Reeves had that he could not have obtained from any other source (see below). (Pl. Ex. JJ at 56-57, 115-16).

    Just as he had done in the First Sexual Assault Video investigation, Headmaster Philip made efforts to contact the victim's family only days after the complaint was filed to try to influence their actions.  On August 8, 2016, while the Doe family was on vacation, Father Doe received an email from GA's Headmistress, Molly King, relaying a request from Philip for information about what occurred in June. (Pl Ex. C at P 502-509).  August 8th was also the last day Det. Rondini took any action on the investigation until August 25th.  (Defs. Ex. 18; Pl. Ex. UU at WICK 371).  While Father Doe was thoughtfully composing a response, on August 12th, Roe emailed Philip, "Just wanted to let you know that we haven't heard anything from the lawyers or the detective in the past couple days. I was just wondering if maybe they have contacted you or if Mr. [Doe] gave you a call back."  Philip responded, "Thanks for the update; I haven't heard anything more either so (without jinxing anything) I take that as a good sign." (Pl. Ex. M at WICK

336). Clearly Philip assumed that, as with other cases, his efforts would prevent the Doe complaint investigation from running a "full course."

Father Doe responded to Philip by email on August 14th at 5:59 a.m. and gave a brief description of what he knew about what had occurred at the party (Pl. Ex. C at 515). At that time, Mr. Doe was hampered in his ability to obtain information from Jane as Jane's therapist made it clear that she should not be questioned as it would likely trigger a traumatic response. (Pl. Ex. B at 44:18-24, 67:11-15). In response, Philip made a veiled threat about the alcohol issue by asserting that Roe and his parents, who he had met with "several times," were concerned about Jane's accusations "as well as about other circumstances of the party." (Pl. Ex. C at P 517). Within an hour of receiving Philip's response Mr. Doe received a phone call from Sgt. Reeves, who left a message because the Doe family was away traveling on vacation. (Pl. Ex. B at 30:16-32:4; Pl. Ex. EE at Ex. A).

Upon Mr. Doe's return from vacation Sgt. Reeves called him on August 19th. Rather than the case update he was expecting, "the conversation I had with Sergeant Detective Reeves was an intimidating, threatening conversation because I had sent an e-mail summarizing the case to Tom Philip at Brunswick School." (Pl. Ex B at 31:18-21). Mr. Doe recounted the conversation:

> It was a dressing down. And he said that I had sent an e-mail to Brunswick School and that I had no business interfering in a police investigation. He also said that I shouldn't be doing that because I am subject to libel charges because I am libeling the boy. He also said that we could be in trouble for social hosting violations because we were running a drinking party and I, that one, I stopped him and I asked him how he had heard of that. I'm like, who told you that? That's what I said. He said, Brunswick security told me that.

(Pl. Ex. B at 32:15-33:1). Mr. Doe further testified that he "got the feeling . . . [Reeves] really wanted us to drop the case." Sgt. Reeves also informed Mr. Doe that it was a "he-said/she-said case and it is going nowhere." (Pl. Ex. ZZ at 70:8-16).

Mr. Doe was so disturbed by this conversation that he asked his attorney to call the detective and confirm that he did not misunderstand.  Attorney Braxton did so that day, had substantially the same conversation with Sgt. Reeves, and memorialized it in an August 23, 2016 letter ("Braxton Letter"). Attorney Braxton recounted in the letter that "rather than being concerned about adequately investigating the [case], your expressed concern was about the effect [Jane]'s allegations may have on [Roe], his ability to stay at Brunswick, and his college prospects. You basically advised me that I should tell my clients to be quiet so as not to expose themselves to potential liability." (Pl. Ex. UU at WICK 308).

Sgt. Reeves attempted to deny that Brunswick Security told him the pool party was a "drinking party" during his deposition.  Asked where he got the information that it was a drinking party, he claimed "other people who were objective witnesses said there was drinking at the party, not the son of the homeowner." (Pl. Ex. U at 91:20-22).  However, the only witness other than Brother Doe who had been interviewed by that point was N, and Sgt. Reeves acknowledged that the only reference N made to drinking was that he saw Roe drinking, assumed Roe brought it himself, and did not know where Roe obtained the alcohol. (Defs. Ex. 18 at TOG 665; Pl. Ex. U at 99:17-101:21).  At the point in time that Sgt. Reeves spoke with Father Doe, GPD did not have any witness statements that alcohol was consumed by anyone at the party other than Peter Roe.  (Defs. Ex. 18).

Just as in the First Sexual Assault Video investigation, Brunswick Headmaster Philip took over the "investigation" while GPD stayed on the sidelines, and he immediately began creating an alternative narrative of the incident focusing on underage drinking rather than sexual assault.  Philip called the witnesses he could identify into his office, and his notes indicate that the focus of his "investigation" was to try to generate a "drinking party" narrative with which to threaten the Does. (Pl. Ex. WW).  The only notes he took from his first interview with Roe was that Roe never saw Mother Doe, the claim that Jane supplied alcohol,[12] and the identification of another Brunswick student who walked him out of the party. (Pl. Ex. WW at WICK 303). Philip also spoke to the Brunswick student who Roe claimed walked him out to the Uber, "B", and mostly questioned him about alcohol. According to Philip's notes, B also claimed that he went into the pool house bathroom to get Roe when it was time to go home and did not note any concern on Jane's part.  (Pl. Ex. WW at WICK 305). This statement is at odds with every other witness – none of whom said B went into the pool house bathroom – and was inconsistent with what he later told Det. Rondini, presumably after being directed to speak with the police by Philip.  (Defs. Exs. 17, 18).

In addition to interviewing the Brunswick students who attended the party, Philip made the inconceivable demand that Jane Doe submit to yet another interview about the incident – this time by Philip – warning the Doe family that if she was unwilling to be interviewed by Philip, no discipline of the Brunswick student could be possible.  (Pl. Ex. C at P 520).  Clearly this

___

[12] This assertion is false – (Defs. Ex. 18 at TOG 666; Pl. Ex. A at 51:13-24; Pl. Ex. B at 67:20-68:10; Pl. Ex. BBB at 129:3-6. 130:2-5;). Brunswick student L texted with Jane that he was going to bring alcohol, despite Jane's clear reluctance. (Pl. Ex. Y at P 903). The Court did not permit Plaintiff to inquire about the events of the night of June 3rd in depositions, and Plaintiff therefore could not question Roe about this purported statement.

was another attempt to intimidate the Doe family to drop the case as there was no valid reason

for Brunswick to subject the victim to an additional interview – potentially retraumatizing her –

when Philip already had access to the information submitted to the DCF by Brunswick's sister

school, GA, the GA counselor, and the email summary from Father Doe. (Defs. Ex. 16; Pl. Ex. C

at P 515). Furthermore, the emails and texts between Philip and Peter Roe throughout the

police investigation demonstrate that he was not conducting an objective investigation into the

incident, but rather doing everything he could to support Roe and bolster his defense. (Pl. Ex.

M at WICK 331, 336, 340-341; Pl. Ex. CCC at 109:9-110:2, 62:17-63:6, 69:7-15, 78:13-19). Roe

testified that he considered Philip to be his friend in this situation. (Pl. Ex. CCC at 109:9-110:2)

### C. Det. Rondini's Resumed Investigation Departed from GPD Norms and Policies

Following the Doe family's complaint about the stalled investigation, it was clear to

Brunswick and GPD that GPD would not be able to abandon the investigation. Instead, Rondini

used none of her presumed investigative skills to determine whether Roe had attacked Jane

when she resumed speaking to witnesses on August 25, 2016. She failed to document

everything that occurred during the investigation, documented interviews inaccurately, failed

to critically question witnesses and their accounts, refused to pursue electronic evidence that

may have been available to her, and ultimately submitted a misleading arrest warrant affidavit.

On August 25, 2016, "S" who was at the party and slept at Jane's house that night,

wrote a statement which reported that Roe was grabbing girls inappropriately, that Roe

attacked Jane's brother, and that Jane told her that evening that Roe tried to "hook up with

her" multiple times despite her repeatedly saying no. (Defs. Ex. 17 at TOG 160; Defs. Ex. 18 at

TOG 675). The significance of this first report by Jane of the attack was not flagged in the

case/incident reports. (Pl. Ex. K at TOG 1985; Ex. HH at 27:19-30:8] This was the mildest of Det.

Rondini's transgressions, however.

On September 5, 2016, Sam Gonzalez went to GPD to give a statement. (Pl. Ex. BB at ¶

3).  Det. Rondini appeared uninterested in what Gonzalez had to say, spoke to him for a minute

or two, and then instructed him to write down what he remembered.  She did not ask him a

single question and did not even review his statement before he left the police station. (Pl. Ex.

BB at ¶¶ 3-4).  Gonzalez stated that he was staying at the Doe's pool house on June 3rd, knew

the kids were having a party, and came home from work later than usual. Upon arriving in the

driveway, he saw a car parked with young people in it and texted Mother Doe about it at 10:21

p.m.  He then went to the main house and, after some time, to the pool house. He wrote that

he did not see any kids or adults drinking and did not see Peter Roe.  (Defs. Ex. 18 at TOG 654-

55). Det. Rondini did not ask him for a copy of the text message to Mrs. Doe.  The contents of

Gonzalez's written statement are reproduced in the case reports as stating that he "related"

these facts, falsely implying that he was interviewed.  (Defs. Ex. 18 at TOG 654; Pl. Ex. BB at ¶¶

3-4).  His statement, and the time of his arrival at the Doe home, became extremely important

as it contradicted a later witness sent in by Philip and Roe's attorney, Michael Jones, for the

purpose of making it look as if Jane were lying.

On September 7, 2016, Jane's therapist Rebecca Stiritz, who started treating Jane after

the sexual assault came to light, sent a letter to Det. Rondini recounting the assault Jane

described to her and stated that Jane had not been drinking,[13] and detailing Jane's emotional

---

[13] Defendants make much of this statement, somehow equating "drinking" with having a few sips of beer brought
to the party by L., which is what Jane consistently said throughout.  Dr. Stiritz also made that point in her

trauma.  Unlike other written statements, this letter from Stiritz is very briefly summarized in the case reports and is absent entirely from the arrest warrant application/affidavit, presumably because it is consistent with what Jane told Det. Rondini from the beginning.  (Defs. Ex. 18 at TOG 674; Defs. Ex. 22).

By contrast, when Roe's first attorney Phil Russell, called Det. Rondini on September 7, 2016, she included all the hearsay details of that call.  Russell claimed that the last contact between Jane and Roe was via a text from Jane the week of August 22, 2016.  Russell said that in the text Roe said he was contacted by the police and that Jane responded that she never wanted it to get this far and that everything will be fine.  Russell also stated that Roe and Jane had no contact after that.  (Defs. Ex. 18 at TOG 634).  None of this information is true, yet Det. Rondini apparently asked no questions, did not try to corroborate that information with Jane, and did not insist on getting a copy of the text, in violation of the UPM policy on competency in investigations.  (Pl. Ex. I 75:5-82:20; Pl. Ex. K at TOG 1528-29).[14]  Det. Rondini contacted Roe on August 3, 2016, and his text to Jane was also on August 3, not the week of August 22nd.  In that text exchange, Jane did not make the statements attributed to her by Russell.[15] (Pl. Ex. Y at P

---

deposition – that she was clear in her letter that Jane was steady on her feet and not impaired. (Pl. Ex. AAA at 37:22-38:4).

[14] After acknowledging that she did not have the alleged text messages referred to by Russell, Det. Rondini could not explain why she did not try to obtain them, quoted below:

Q: . . . So when the lawyer told you that there are texts that say this and you felt that it was significant enough to tell the State's Attorney, did you subpoena those texts?

A. No.

Q. Why not?

A. Because I didn't.

Q. No reason? You didn't feel it was important?

A. I didn't do it.

(Pl. Ex. I at 78:24 – 79:7).

[15] The text Jane actually sent to Roe on August 3, 2016 was the following: "The one thing I've learned through everything is that it's important to be honest. so I'm going to be completely honest here: what you did to me was

899-901).  Worse, this information is presented as fact in the arrest warrant affidavit.  (Defs. Ex. 22 at TOG 954).

When Brother Doe's friend Patrick Kennedy arrived to give a statement on September 9, 2016, Det. Rondini was not there and another detective took his statement, which he wrote at the police station.  No one reviewed his statement; no one asked him any questions; no one ever followed up with him in any way. (Pl. Ex. Z at ¶¶ 3-4).  Kennedy also confirmed the basic facts about people's movements that evening, that Roe attacked Brother Doe, and that Roe was behaving inappropriately with the girls at the party.  (Defs. Ex. 17 at TOG 164-66; Defs. Ex. 18 at TOG 666-67). In the case/incident report of Kennedy's statement, as is required for these reports, the officer who took the statement, Det. Bussell, made it crystal clear that Kennedy's statement was written at the police station, and that he is paraphrasing the written statement. (Defs. Ex. 18 at TOG 666). By contrast, Det. Rondini wrote her case/incident reports as if she had interviewed witnesses who had simply written statements with no interrogation. (Pl. Ex. Z, (Defs. Ex. 18 at 656-57, Pl. Ex. MM at 79:9-24, Pl. Ex. LL at 61:13-62:16; Defs. Ex. 18 at 658-59, Pl. Ex. AA; Defs. Ex. 18 at 654-55, Pl. Ex. BB).

Some important details were omitted from the case/incident recap of Kennedy's statement, for example, Roe saying he was "going to kill that fucking kid" as he was attacking

---

the worst thing that's ever happened to me. i really thought I could handle it and that I would be able to keep the damage to a minimum, but it ended up reaching a point where if I didn't get help I was putting my self in danger.  I shouldn't have to feel bad for something that I didn't do but somehow I do. and I just wanted to let you know that what's about to happen was not my decision and I tried to prevent it in every way possible but this whole thing is no longer in my control. please take care of yourself and things might seem like they can't get any worse but you'll get through it. I can tell you that bc I've somehow survived everything that's happened to me this year. also I appreciate the friendship we once had and I don't regret being friends with you. please don't respond to this as I'm not suppose to be talking to you.  I just don't want to have to live with things having been unsaid." (Pl. Ex. Y at P 901-902).

Brother Doe.  (Defs. Ex. 17 at TOG 166; Defs. Ex. 18 at TOG 666-67; Defs. Ex. 22 at TOG 954-55).

When Det. Rondini drafted the summary of Kennedy's statement in the arrest warrant affidavit,

she did not disclose that he was not interviewed or asked any questions, implying to the

prosecutor that he was. (Defs. Ex. 18 at 666-67; Defs. Ex. 22 at TOG 954-55).  Moreover, Det.

Rondini felt compelled to add that Kennedy brought in notes, which was not in Det. Bussell's

writeup, thus bringing into question Kennedy's credibility.  (Pl. Ex. I at 85:17-19). This addition

by Det. Rondini is significant because Det. Rondini failed to include such context in her

case/incident report for the witness identified by Roe's attorney, "L," who "responded" to GPD

headquarters with his attorney and an attorney-prepared typewritten statement.  (Defs. Ex. 17

at TOG 175-77; Defs. Ex. 18 at TOG 661).

### D.    Det. Rondini Coordinates with Defendant's Attorney and Manipulates the Evidence to Serve Brunswick's and the Defense's Purposes

When Charlanne Zepf Bauerlein called Det. Rondini and followed up with an email on

September 15th, Det. Rondini did not include in her case/incident report any of the details of

that communication, in which Zepf Bauerlein recounted Jane's description of the attack which

Zepf Bauerlein said was consistent on the three occasions she and Jane had spoken about it.[16]

(Defs. Ex. 18 at TOG 642).  Zepf Bauerlein's written statement reports that Jane described both

groping by Roe and that Roe "put his fingers in her vagina/vaginal area." Det. Rondini recasts

this in the case/incident report to Roe "put 'his fingers inside her vagina **and** vaginal area.'"

(Defs. Ex. 17 at TOG 168-69; Defs. Ex. 18 at TOG 640) (emphasis added).  Det. Rondini then used

her own mischaracterization to cast doubt upon Jane's credibility by writing "[i]t should be

---

[16] The email has never been produced, although the case report states that it is attached.

noted that when the undersigned initially spoke with [Jane] she did not disclose that [Roe] had digitally penetrated her but that he only had gro[]ped he[r] [sic]." (Defs. Ex. 18 at TOG 641). As noted above, Det. Rondini never asked Jane about, and never explained that there was any importance to, this detail. (Defs. Ex. 19). The case/incident report and arrest warrant affidavit also omit any mention of the serious psychological symptoms Jane was displaying when she talked to Zepf Bauerlein. (Defs. Ex. 17 at TOG 170-71).

Following Mr. Doe's conversation with Sgt. Reeves, and with the feedback the Does received from some witnesses about not being asked any questions by Det. Rondini, it became clear that the Doe family needed help understanding the criminal process.   Therefore, on September 14th they retained a victim's advocate, Audrey Felsen, to guide them and interact with GPD. (Pl. Ex. J at ¶ 2).  Attorney Felsen's first contact with GPD was around September 26th.  Felsen did not contact anyone from Brunswick or Brunswick Security about her representation.  (Pl. Ex. J at ¶¶ 2,4).  The back channel between Brunswick and GPD operated efficiently, however, and by September 29th, DeAngelo was reporting to Philip that the Doe's lawyer was now Attorney Felsen. (Pl. Ex. VV at WICK 625). Philip could not explain where DeAngelo obtained this information, and then claimed he may have received a letter from Attorney Felsen.  (Pl. Ex. RR at 189:17 – 190:13).  He did not. (Pl. Ex. J at ¶ 4).  DeAngelo claimed that his memory about where he obtained this information was wiped clean.  (Pl. Ex. JJ at 129:5-24).[17]

---

[17] DeAngelo's testimony was not credible.  He testified that the only times he contacted GPD were in this case and in the 2014 case.  (Pl. Ex. JJ at 132:4-133:3).  Capt. Zuccerella testified that DeAngelo called "all the time." (Pl. Ex. Q at 249:22-25, 250:1-3).

At this point the coordination of Roe's defense with the GPD and Brunswick accelerated, with Philip keeping close tabs on the investigation and ensuring witnesses submitted statements consistent with the Brunswick narrative.  (Pl. Ex. VV at WICK 733).  L, a Brunswick student who was in the bathroom with Roe and Doe, initially declined to speak to the police. (Defs. Ex. 18 at TOG 660).  He testified at deposition that he was pulled out of class to meet with Philip in late September/early October 2016, asked about the party, "[a]nd then [Philip} just sort of said, you know, you should make a statement."  (Pl. Ex. D at 185:16-186:9). Afterward, Philip "checked in concerning the status of my giving a statement or not.  You know, as a follow up to our talk," and L responded that it was scheduled. (Pl. Ex. D at 195:14-196:9). Philip first claimed that L came to him to tell him he was making a statement and then Philip claimed that he did not remember anything except that he met with L in the fall and "it had something to do with him making a statement to the police." (Pl. Ex. RR at 180:8-14). Philip claimed during his deposition that this was his only meeting with L concerning the party.  In answers to interrogatories during the Doe case against Brunswick, however, he attested to also meeting with L in August and interviewing him about the party. (Pl. Ex. GGG at Interrogatory 15; Pl. Ex. RR at 120:5-122:5, 157:25-158:23).

On October 12th Michael Jones, an attorney hired and paid by two Brunswick trustees to represent Peter Roe, met with Det. Rondini, who at first claimed at deposition that she did not recall meeting with him. (Pl. Ex. GG at 123:20-21).  That same day, Roe reported to Philip that Jones spoke to GPD and "they are not sure what to do.  They still need to investigate." Roe further reported that Jones needed to speak with L and "B", another student who was at the party.  (Pl. Ex. M at WICK 721).  Presumably after this, Philip prodded L to make a police

statement.  By October 14th Jones was emailing Det. Rondini that "we were able to make some

progress on this end," that L has agreed to give a statement, that his parents are apparently

sending him in with a lawyer, that Jane admitted the assault did not happen, and that Roe was

physically incapacitated.  (Pl. Ex. L at TOG 434).[18]  This information must have come from

Brunswick, as L testified that he did not meet with his attorney until the date of his statement,

October 27th.  (Pl. Ex. D at 191:15-20, 204:23-205:2; Defs. Ex. 18 at TOG 661).  Given L's

testimony that he did not meet with his attorney until that day, it is clear that L's attorney

prepared his statement.  Jones' email to Det. Rondini on October 26, 2016 indicated that L's

attorney needed time to complete it.  (Pl. Ex. L at TOG-433, 435).

Similarly, on October 19th, after previously refusing to give a statement to the police, B

had a telephone conversation with Det. Rondini, declining to give a sworn statement, and gave

a much-embellished account of what happened at the party as compared to what he told Philip

when interviewed by him in August.  (Pl. Ex. WW at WICK 305; Def. Ex. 18 at TOG 635-36).  This

embellished account now conformed with the Brunswick narrative – that there was lots of

alcohol, that Jane provided it, and that he had to physically carry Roe out to an Uber.  (Defs. Ex.

18 at TOG 635-36).  No other witnesses said anything close to his statement that B physically

carried Roe out, and the only ones who said that Jane provided the alcohol were the witnesses

provided by Brunswick and Jones.[19] Det. Rondini did nothing to follow up on these

inconsistencies between statements.  (Pl. Ex. GG at 61:2-24).

---

[18] Plaintiff was not permitted to depose Jones to find out where he obtained this information or how he knew what the content of Jane's statement had been.
[19] See e.g., Def. Ex. 18 at TOG 665, 666, 668, 662, 667, 676.

On October 19-20, Philip and Roe exchanged several text messages in which Roe reported that B gave a statement to the police and said it went well.  Roe also asked Philip if he knew whether L had given a statement.  Philip responded, "Excellent.  I heard [L] has submitted a statement along the lines of what he told you and me." (Pl. Ex. M at WICK 723). The Court precluded Plaintiff from inquiring about Roe's communications with Philip about the police investigation, and Plaintiff submits that allowing such inquiry would have revealed, for example, where Philip got this information.

On the same date, Jones emailed Det. Rondini to tell her that he knew B had given a statement and further stated:

> I understand from Gene Riccio [L's attorney] that he will be delivering [L]'s statement to you soon . . . I have been told that [G] will speak to her parents tonight about speaking with you as well. I am told [G] will back up L's account of the conversation they both had with [Jane] a day or so after the party, which I understand is very helpful to [Roe]. Let's talk soon. Thanks for your help.

(Pl. Ex. L at TOG 504).  Det. Rondini responded, "I did speak with Gene the other day and I am hoping to have [L]'s statement beginning of next week at the latest."   Jones replied, "I spoke to Gene last night and he told me he was at his desk putting [L]'s statement together for you." (Pl. Ex. L at TOG 504). During her deposition, Det. Rondini did not admit to having knowledge that Jones was coordinating L's statement with Riccio, testifying that she did not recall any communications that indicated this obvious coordination of stories. (Pl. Ex. GG at 81:14-25, 96:20-97:1).

Jones also informed Rondini of the coordination he was arranging of L's story with "G"'s, a Greenwich Academy student who was not at the party.  In a chain of emails on October 26-27, Jones reported to Det. Rondini that Riccio told him the L statement "was almost finalized" and

that she should have it in the next day or two; Jones also inquired about whether G had been in.  Det. Rondini acknowledged to Jones that she had also been speaking to Riccio about the impending statement but advised that she would not be at work when he brought it in, so she would have to review it later.  She also advised Jones that G's mother told Rondini that G did not want to get involved. Jones then pressured G to give a statement and confirmed that he was familiar with the particulars of L's statement.  (Pl. Ex. L at TOG 491-492).

None of these exchanges between Jones and Det. Rondini is recorded in the case reports, violating GPD practice/policy. As discussed above, all information is expected to be provided in case/incident reports.  (Pl. Ex. S at 22:16-25, 23:1-22; Pl. Ex. R at 54:12-16; Pl. Ex. Q at 102:20-22, 108:10-25, 109:1-5, 125:13-23, 126:12-25, 127:1-9 and 21-25).

L arrived at GPD headquarters with his attorney and a prepared typewritten statement on October 27th at 6:45 p.m. and left at 6:50 p.m. (Defs. Ex. 17 at TOG 175; Pl. Ex. D at 211:8-19).[20] His statement could not withstand scrutiny, but Det. Rondini did not subject it to any. Det. Rondini testified that Riccio contacted her about L giving a statement (Pl. Ex. I at 104:12-15) but denied that she knew he was coordinating with Jones – obviously belied by her email exchange with Jones. (Pl. Ex. GG at 96:20-23).  She testified, under oath, that L told her that he typed the statement, (Pl. Ex. I at 105:18-106:8), and that despite the formal language, she did not suspect it was written by his attorney (Pl. Ex. I at 107:1-8)  She further testified that she asked L whether the statement was true and "is this everything you remember from the night of the event?" (Pl. Ex. I at 108:10-13).

_____

[20] The statement is on GPD stationery (Def. Ex. 17 at TOG 175-177), and no one was able to explain why.

However, the documentary evidence makes it clear that ***Rondini was not present at the police station when L delivered his statement.*** L was there for five minutes and the officer who signed the acknowledgement was "Badge 30," identified in interrogatories as Eric Scorca. (Defs. Ex. 17 at TOG 175-77; Pl. Ex. XX at interrogatory 5).   Det. Rondini's work schedule reflects that she left for the day at 4 p.m., consistent with what she told Jones. (Pl. Ex. YY at TOG 1032; Pl. Ex. L at TOG 491).  L testified that his visit to the police station was short, that he did not recognize Det. Rondini during his deposition, and that his attorney brought the typed statement – typed by his attorney – to the police station.  He testified that the police officer to whom they handed the statement authenticated it, but that he did not remember being asked any questions at all.  (Pl. Ex. D at 209:16-212:3).

One of the most glaring falsehoods in L's typewritten statement is paragraph 10, in which he attests that, "During the course of the evening, a tenant who lived on the second floor of the pool house was moving his belongings out of his apartment while we were in the pool house."  (Defs. Ex. 17 at TOG 177).  That "tenant" was Sam Gonzalez, who offered documentary evidence, in the form of a time-stamped text message, that he was ***not*** in the pool house during the evening, and did not arrive at the main house until at least 10:21 p.m. or to the pool house until 11:15 p.m. Gonzalez also did not move any belongings that day.  (Pl. Ex. BB at ¶ 2).  L could not get his story straight during his deposition.  Initially, he testified that he got there at 6:30 p.m. and swore to a fabricated story about going to Jane's room to see a stash of vodka. (Pl. Ex. D at 56:5-13).[21] Confronted with his own text messages, which indicated he did not arrive until

---

[21] L's mother also lied in her deposition, claiming she arrived at the party early. (Pl. Ex. G at 20:4-8) Her text messages established that she did not arrive at the party until well after 10 p.m. (Pl. Ex. FFF)

after 8:05 p.m. and that he brought alcohol to the party (about which Jane was not particularly

enthusiastic) (Pl. Ex. Y at P 903), he waffled about his arrival time with a soliloquy about

memory and invoked the Fifth Amendment. (Pl. Ex. D at 61:2-64:1).   Forgetting that he had

been caught in this falsehood, he later claimed he only saw the tenant once, at 6:30 p.m., and

not later in the evening when he was in the bathroom with Roe. He then conceded that his

affidavit to the police "is not accurate" because there was no "tenant" in the pool house while

he was in the pool house with Roe. (Pl. Ex. D at 235:6-25).

Questioned about why she failed to follow up with L regarding the conflict of his written

statement concerning Gonzalez, Det. Rondini testified first that the two statements were not

inconsistent.  (Pl. Ex. GG at 72:4-81:4).  Her contention was that there was no indication of the

time L said he was inside the pool house.  (Pl. Ex. GG at 79:21-80:2). In fact, L's typewritten

statement says he went into the bathroom with Roe at 9 p.m.[22] and recounts events that take,

at most, 40 minutes before he, Roe, and every other student exited the pool house, making it

impossible for him to ever have seen Gonzalez (who did not go to the pool house until at least

11:15 p.m.) in the pool house.  (Defs. Ex. 17 at TOG 175-76; Pl. Ex. BB at ¶ 2).  Det. Rondini then

claimed that, in her experience as a detective, no one has ever given her a sworn statement

that was not truthful.  (Pl. Ex. GG at 78:19-23).  Asked about why she did not test the credibility

of both witnesses, she then testified that L's attorney may have forbidden him from answering

any questions, again implying that she was present when she was not.  (Pl. Ex. GG at 80:5-8).

The more likely explanation is that discrediting the Brunswick-provided witness L would

have made it difficult to assert that Jane was not truthful.  Thus, in her case/incident report,

---

[22] Roe's text messages make it clear that he did not arrive until around 9:30 p.m. (Pl. Ex. 9 at P902).

Det. Rondini provided none of the context surrounding the production of L's statement, and instead records that L "responded" to GPD headquarters with his attorney to provide a statement, and that he provided a sworn written statement. She then repeatedly stated that L "related" various facts that are lifted from his typewritten statement as if he had been interviewed, which he was not. (Defs. Ex. 18 at TOG 661-62).

In the arrest warrant affidavit, which was sent to Assistant State's Attorney ("ASA") John Capozzi, Det. Rondini omitted all references to L's statements about Gonzalez and provided none of the context of how L produced his statement.  She stated that L came to headquarters "to provide a voluntary statement." There is no indication that it is a written statement, never mind a typewritten statement prepared by an attorney, and no mention that L arrived with an attorney.  Her affidavit states that L "related" various assertions of fact as if he were interviewed but makes key omissions.  While most of the verbiage attributed to L is taken verbatim from his typewritten statement, the paragraph about the pool house "tenant" moving his belongings around "during the course of the evening" is omitted entirely. (Defs. Ex. 22 at TOG 960-61). To avoid alerting the ASA to the conflict between L's statement and Gonzalez's statement, Det. Rondini excluded the entirety of Gonzalez's statement and instead stated that Det. Rondini interviewed Gonzalez and that he "did not have anything of evideidentary (sic) value to add." (Defs. Ex. 22 at TOG 965).[23]

---

[23] This conduct directly violates GPD's competency policy, which lists as a violation "Accepting or reporting information related to duties as true or factual without taking reasonable steps to verify the correctness and accuracy of the information." (Pl. Ex. K TOG 1529). It also violates GPD's policy against dishonesty, which lists as a violation "Falsifying any report in part or whole or failing to provide a complete and accurate report or account when it is evident to a reasonable and prudent person that a complete report would lead to a different conclusion." (Pl. Ex. K at TOG 1527).

Det. Rondini's explanation for not including Gonzalez's statement in the arrest warrant affidavit was "because I didn't." (Pl. Ex. I at 114:19-21). She then contended that it was not relevant because Gonzalez was not in the pool house bathroom when Roe attacked Jane but could not explain why anyone else's statement would be relevant if that were the criterion. (Pl. Ex. I at 97:18-99:7, Pl. Ex. GG at 117:16-22, 145:4-22). Sgt. Reeves conceded that the paragraph in L's statement contending that a tenant was moving belongings during the evening was relevant. (Pl. Ex. U at 129:7-13). When Sgt. Reeves realized that this information was omitted from the arrest warrant affidavit, however, he changed his testimony and made the same claim as Det. Rondini – that Gonzalez's statement was not relevant because he was not in the bathroom when Jane was attacked. (Pl. Ex. U at 130:15-134). Sgt. Reeves conceded that one of the witnesses had to be lying (Pl. Ex. U at 136:15-18), but claimed it was likely that ASA Capozzi told Rondini to leave Gonzalez's statement out. (Pl. Ex. HH at 115:5-119:7). At his deposition, however, ASA Capozzi said that it would not be a normal practice to remove a witness's statement from an arrest warrant affidavit and that he was surprised to hear there had been a tenant in the pool house. He did not recall anyone bringing it up with him during the investigation. (Pl. Ex. OO at 24:13-25:18).

This intentional omission blatantly violated practice and procedure in preparing arrest warrant affidavits. In his deposition, ASA Capozzi was clear that he expects law enforcement to "give me everything that they have." (Pl. Ex. OO at 11:2-3). He added that it is not his expectation that law enforcement would make judgments about the evidentiary value of a piece of evidence when presenting an arrest warrant affidavit. (Pl. Ex. OO at 11:8-12). Further, he testified that an arrest warrant affidavit should describe how a statement is taken, for

example, written at the station, typewritten and delivered with a lawyer, or orally. (Pl. Ex. OO at 14:16-15:11).  ASA Capozzi also testified that he always tells police officers to include everything "and not exclude anything." (Pl. Ex. OO at 21:10-17).  Finally, he also did not recall Det. Rondini ever speaking with him about this case. (Pl. Ex. OO at 23:12-23).

L also claimed in his statement that he and G met with Jane a few days after the attack, on June 7th, and that Jane told them Roe only "grazed" her over her swimsuit and that the three of them agreed it was not a big deal.[24] (Defs. Ex. 17 at TOG 177).  G was pressured by Roe's attorney, Jones, to give a statement (Pl. Ex. L at TOG 491) and testified that it was a "possibility" that he told her what to say in her statement.  (Pl. Ex. MM at 78:4-7).  G went to the police station to give a statement accompanied by her mother.[25]  Det. Rondini only gave her instructions and had her write down what she recalled and did not ask any questions at all. (Pl. Ex. MM at 79:9-24; Pl. Ex. LL at 59:23-62:16).  G wrote that Jane said Roe "grazed her inner thigh" but "nothing penetrated her." (Def. Ex. 17 at TOG 174) Thus, while both L and G used the word "grazed," they were inconsistent about where on Jane's body the "grazing" occurred and G was never asked how one would "penetrate" while grazing an inner thigh.

Both L and G claimed in their statements that, during their discussion on June 7th, Jane was calm. (Defs. Ex. 17 at TOG 174, 177).  In fact, in the middle of that discussion, Brother Doe knocked on Jane's door and opened it.  Jane was crying hysterically to the point of hyperventilating, and G screamed at him to close the door. [Pl. Ex. AA at ¶ 5).

---

[24] In his deposition, L admitted that "perhaps" Jane was saying that the sexual contact by Roe was against her will. (Pl. Ex. D at 166).
[25] The day before G gave her statement, her mother arrived unannounced at the Doe residence to speak to Mrs. Doe.  When Mrs. Doe called her in response, Mrs. G begged her to have Jane drop the case against Roe. (Pl. Ex. LL at 41:9-12; Pl. Ex. BBB at 167:9-13, 115:9-116:2).

G, who did not attend the party, gratuitously added in her statement that, "To my knowledge both of them [Jane and Roe] had been drinking." During her deposition, G admitted that she did not have any knowledge on which to base that statement.  (Pl. Ex. MM at 81:9-24).  She also admitted that her recollection when she gave her statement could have been defective. (Pl. Ex. MM at 82:21-83:6).  G also left out of her statement the text exchange she and L had with Jane two days after their meeting.[26]  Jane reported that she "just told [Roe] . . . and told him to give me a little space for a while."  G responded, "Was he ok?", and L responded, "How are you feeling?" Jane replied that Roe cried, which appeared to impress G.  (Pl. Ex. Y at P 1141).  If Jane had reported to them that Roe only "grazed" her bathing suit, this communication would simply make no sense.

In addition to the information about the "tenant" being invented, or "not accurate" as L put it, L's statement also said that he brought Roe out of the pool house bathroom by a side door, and that B and T helped Roe to a cab (Defs. Ex. 17 at TOG 176), contradicting what B said to Det. Rondini (Defs. Ex. 18 at TOG 635).  Det. Rondini did not do anything to corroborate this. Had she done so, Jane's testimony and Mrs. Doe's testimony would have established that Roe was able to walk and stand on his own, contrary to the contention of L and B.  (Pl. Ex. A at 92:12-15, 93:3-5, 95:21-96:4, Pl. Ex. BBB at 129:14-130:1)[27]

Det. Rondini then asked Jane to come back for a second interview and made sure to keep Roe's attorney Jones apprised of what witnesses were saying and what she was doing.  On

---

[26] In yet another falsehood in L's statement, he claims their meeting was the last contact he had with Jane before the police called in August.  (Defs. Ex. 17 at TOG 177 ¶ 13).

[27] GPD's practice is to confront witnesses with inconsistencies with what they learn from other witnesses and to analyze statements from witnesses with a critical eye, which did not occur here. Pl. Ex. PP at TOGs 3057-68, 3069-75, 2516-2521, 2522-2526, 2537-2553; 2581-2595).

November 8ᵗʰ, Det. Rondini emailed Jones to let him know that she was meeting with Jane again. Jones followed up asking if she could share any news, and Det. Rondini told him she had to reschedule.  (Pl. Ex. L at p.TOG 465).  Shortly afterward, Roe texted Philip that GPD was going to meet with Jane "to confront her with contradicting information and that he believes he will hear back from them tomorrow."  Philip's response:  "Thx….fingers crossed!!!!!!"  (Pl. Ex. M at WICK 724).[28]

Det. Rondini met with Jane on November 19ᵗʰ and video recorded the interview.  This was the only interview recorded during the entire investigation even though Capt. Bonney testified that since before 2013 all interviews conducted at GPD headquarters are video recorded.  (Pl. Ex. S at 15:9-11, 19:22-25, 20:1-13).[29]  The only facts about which Det. Rondini asked Jane were generally whether she drank, to which she replied that she had sips of what L brought to the party; text messages between Roe and Jane, which Jane had given to her attorney Felsen; and whether Roe had penetrated her with his fingers.  (Defs. Ex. 20 at 9:24-10:2).  When 16-year-old Jane was trying to get the words out to explain the nature of the sexual assault, Det. Rondini interrupted her and suggested "Touching? Would you say touching like skin-to-skin contact?" (Defs. Ex. 20 10:12-13).  She continued leading Jane, asking if she "pulled away from him" at that point. (Defs. Ex. 20 at 10:15-18).  (She pushed him against the wall and held him there. (Def. Ex. 17 at TOG 157))  Det. Rondini also asked Jane if she walked Roe out to the Uber but did not ask if he was physically carried out, so did not get any

---

[28] Capt. Zuccerella testified that in an investigation, a detective should "share everything" with the victim, but "[a]s little as possible with the suspect."  (Pl. Ex. Q at 145:9-11, 146:5-7)  Det. Rondini testified at deposition that witness statements are not a "big secret" and telling Jones about it was not a problem.  (Pl. Ex. GG at 132:25-133:10).

[29] Other assault cases appear to follow this policy.  See, e.g. Pl. Ex. PP at TOGs 3069-3075, 2509-15, , 2527-36, 2581-2596.

"clarifying" information. (Defs. Ex. 20 at 12:10-13:6). Mrs. Doe, who came in to be interviewed immediately afterward, was clear that the boys were standing on their own in the driveway circle waiting for their ride. (Defs. Ex. 20 at 16:23-24).

While the GPD's policy is that all information gathered, including all contacts and attempted contacts should be included in the investigation case/incident reports (Pl. Ex. S at 22:16-25, 23:1-22; Pl. Ex. R at 54:12-16; Pl. Ex. Q at 102:20-22, 108:10-25, 109:1-5, 125:13-23, 126:12-25, 127:1-9 and 21-25), just as with the First Sexual Assault Video investigation, that was not done in the investigation into Jane Doe's complaint. Key information that the Assistant State's Attorney would want and need was omitted from the case/incident reports.  For example, after Jane made her statement on August 2nd, the Greenwich Police Department attempted to contact Roe (Pl. Ex. Y at P 899), but that attempted contact does not appear in the case/incident reports of the investigation. In addition, Det. Rondini carried on extensive communications with Roe's attorney, Michael Jones (Pl. Ex. L. at TOG 443-440, 460-507, 607-618), yet none of that information is in the case/incident reports.  Sgt. Reeves testified that he received a call from Brunswick's DeAngelo, who complained that Jane father was trying to get a Brunswick boy in trouble (Pl. Ex. U at 45:5-46:6), yet that information is not contained in the case/incident reports.  (Defs. Ex. 18).

The case/incident reports are also supposed to reflect specifically how information is conveyed – for example, orally in an interview, via written statement, or through an attorney. (Pl. Ex. OO at 15:17-16:5; Pl. Ex. Q at 137:8-23). Presumably, the manner in which the statement is obtained, such as a spontaneous handwritten statement compared to a carefully crafted attorney-approved typewritten statement, assists the ASA in evaluating weight and credibility.

46

Det. Rondini routinely did not provide any context as to how the witness statements were obtained, making it appear that witnesses had been questioned by a detective when in fact they actually had submitted written statements of their recollections without guidance on what information was relevant and without being questioned.  (Pl. Ex. PP).

Finally, on January 19, 2017, Rondini learned that ASA Capozzi had decided not to sign the arrest warrant.  (Defs. Ex. 23). On January 19, 2017, Philip texted Roe "fingers crossed that good news is coming soon." (Pl. Ex. M at WICK 728).  Philip admitted during the deposition that he knew about the decision at that point, and that he might have learned it from Brunswick's board. (Pl. Ex. RR at 210:7-21). Several hours later, Roe clearly had received the news.  Id.  The Does did not find out until January 20, 2017. (Pl. Ex. C at P 448).

### E.      GPD Chief of Police Approved the Conduct of the Doe Investigation

From August 8, 2016, when Det. Rondini interviewed N and contacted L, who declined to be interviewed, until August 25, 2016, after the Doe family's attorney submitted their complaint about the investigation, there was no activity at all in the Doe Investigation.[30]  (Defs. Ex. 18).  It can reasonably be inferred that the investigation would have died at that point, as Philip clearly anticipated and as Sgt. Reeves conveyed to Father Doe was Sgt. Reeves preference, if the Braxton Letter had not been sent to GPD.

GPD Chief James Heavey was copied on the Braxton Letter and responded to her on August 25th via email that "A member of the professional standards section will be in touch with you to further investigate your complaint." (Pl. Ex. UU at WICK 309). Sgt. Reeves testified as

---

[30] The case/incident reports have an entry on August 22, 2016 stating that Attorney Phillip Russell called to inform GPD that Roe would not be making a statement, but it appears that the call was actually made on or about August 3, 2016, but was not recorded at that time. (Defs. Ex. 18 at TOG 633; Pl. Ex. M at WICK 331).

well that the Braxton Letter was a "civilian complaint," which he contended prevented him from personally responding regarding anything he thought was inaccurate.  He added that "I was contacted by the chief and I told them okay, they are going to do their civilian complaint process." (Pl. Ex. U at 102:4-19). When neither Attorney Braxton nor the Doe family received any further contact regarding the Braxton Letter, Braxton sent a Freedom of Information Request on May 23, 2018, asking for documents concerning the complaint.  (Pl. Ex. UU at P 206). GPD Director of General Services, Gregory Hannigan, responded that the "complaint you described was received verbally by Chief Heavey. He inquired about the conduct of the investigation and was satisfied with the response. There was no written communication between the Chief and anyone else in the Department." (Pl. Ex. UU at P 212).

The Doe complaint investigation differed in material aspects from the GPD SVS policy and practice for conducting investigations.  The approval of GPD's Chief Heavey is evidence that the informal policy and practice of pursuing investigations of criminal complaints against Brunswick students less rigorously than investigations of non-Brunswick students was authorized and approved at the highest level.

## ARGUMENT

### I.    Standard for Summary Judgment

Summary judgment pursuant to Fed. R. Civ. P. 56 "is appropriate when, having resolved all ambiguities and permissible factual inferences in favor of the party against whom summary judgment is sought, there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law." Baez v. JetBlue Airways Corp., 793 F.3d 269, 273 (2d Cir. 2015).  A genuine dispute exists when "if the party against whom summary judgment is

sought is given the benefit of all permissible inferences and all credibility assessments, a

rational factfinder could resolve all material factual issues in favor of that party." Sec. & Exch.

Comm'n v. Sourlis, 851 F.3d 139, 144 (2d Cir. 2016).  Summary judgment is appropriate only if

"there can be but one reasonable conclusion," it is "quite clear what the truth is," and no

rational factfinder could find in favor of the nonmovant.  Id. (citations omitted). "[T]he

substantive law will identify which facts are material." Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  In applying this standard, the court

should not weigh evidence or assess the credibility of witnesses, as such determinations are the

sole province of the jury. Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).

This Court's Local Rule 56(c), after cautioning counsel not to make such motions

cavalierly, sets forth the standard clearly:

> A party moving for summary judgment bears a heavy burden. A party may obtain
> summary judgment as to a claim or defense only when there is no genuine
> dispute as to any material fact and the moving party is entitled to judgment as a
> matter of law as to that claim or defense – or the part of that claim or defense –
> on which summary judgment is sought.
>
> In deciding a motion for summary judgment, the court must assume that a trier
> of fact would resolve all factual disputes in favor of the party opposing summary
> judgment. All admissible evidence favorable to the party opposing the motion
> (including direct, indirect, and circumstantial evidence, and evidence admissible
> only for a limited purpose such as impeachment), and all permissible inferences
> based on such evidence, must be credited if such evidence and inferences could
> be credited by a trier of fact. The Court must disregard all evidence supporting
> the moving party that the jury would not be required to believe with regard to a
> disputed issue of fact, and must resolve all credibility questions in favor of the
> party opposing summary judgment.

Local R. Civ. P. 56(c). In this case, there is a plethora of disputed material facts, and it is clear that a reasonable factfinder could return a verdict for Plaintiff. Defendant's summary judgment motion therefore must be denied.

## II.   Defendant's Position on the Applicable Law of Equal Protection is Wrong

Defendants' contention that Plaintiff must prove that "Defendants submitted an arrest warrant application to the State's Attorney deliberately designed to avoid an arrest warrant being issued" is an incorrect statement of the law that applies to Plaintiff's equal protection claim under Myers v. County of Orange, 157 F.3d 66 (1998).[31]

As a threshold matter, it would be impossible to prove such a proposition since a prosecutor's deliberative process is privileged and Plaintiff therefore could not ask the juvenile prosecutor in this case, ASA Capozzi, what would have made a difference in his decision making. (Doc. # 104).[32]

Defendants' asserted framework for what Plaintiff would have to prove implicitly requires the Court to determine which aspects of an arrest warrant application would be determinative for a prosecutor and entirely misses the point of an equal protection claim. As this Court previously noted, the Plaintiff is asserting that "the policy of protecting Brunswick students at the expense of their victims undermines the ability of the police department to fully

---

[31] Even if the Court agreed with this proposition, Plaintiff has submitted sufficient facts from which a reasonable fact finder could conclude that the GPD did submit an arrest warrant that was designed to fail.

[32] As ASA Capozzi pointed out in his protective order motion filed in this case, the Connecticut Supreme Court in State v. Kinchen, 243 Conn. 690 (Conn. 1998), shielded the prosecutorial decision-making process from discovery because "Such factors as the strength of the case, the prosecution's general deterrence value, the [state's] enforcement priorities, and the case's relationship to the [state's] overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." Kinchen, 243 Conn. at 699. Thus, "[t]he decision whether to prosecute is the product of a deliberative process which should be afforded a high degree of protection from public inquiry." Gomez v. City of Nashua, New Hampshire, 126 F.R.D. 432, 435 (D.N.H. 1989).

investigate and the state's attorney to obtain all available evidence" and that this deprives her of the right to be treated the same as victims of other criminal assaults in the criminal investigation of her complaint.  (Doc. # 115 at 9).  This is the <u>Myers</u> claim that the Court sustained and on which Defendants move for summary judgment.

Because Defendants do not address the fundamental claim in this case or its essential elements, this Court should deny their motion for summary judgment on those grounds. Should the Court determine that some portion of Defendants' motion challenges an essential element of Plaintiff's equal protection claim, there remain abundant genuine issues of material fact and the motion must be denied.  The Court's previous articulation of Plaintiff's claim is consistent with applicable case law.  In <u>Myers</u>, which involved an express police policy not to investigate cross complaints until the initial complaint was disposed of, without giving primary regard to the particular facts involved, the Second Circuit held that law enforcement policies that "distort the truth-seeking process" do not serve a legitimate governmental interest.  Such distortion occurs when a policy "inhibits collection of the fullest possible information from all sources relating to a potentially criminal incident."   <u>Myers</u>, 157 F.3d at 75.

Nothing in <u>Myers</u> limits its holding to an express oral or written policy, nor do equal protection cases make such a distinction.  While acknowledging that courts which have denied an equal protection claim based on <u>Myers</u>, as this Court pointed out, generally did so because the plaintiffs in those cases did not allege any explicit oral or written policy,[33] Defendants argue

---

[33] Doc. #115 at pp. 9-10; <u>see</u> <u>Moustakis v. New York City Police Dep't</u>, 181 F.3d 83 (2d Cir. 1999); <u>Rennols v. City of New York</u>, No. 00-CV-6692 (NGG), 2003 WL 22427752, at *5 (E.D.N.Y. Oct. 23, 2003), <u>aff'd</u>, 124 F. App'x 66 (2d Cir. 2005); <u>Cantave v. New York City Police Officers</u>, No. 09-CV -2226 (CBA LB), 2011 WL 1239895, at *6 (E.D.N.Y. Mar. 28, 2011); <u>Maldonado v. City of New York</u>, No. 12-CV-4304 (RRM JMA), 2012 WL 3839615, at *2–3 (E.D.N.Y. Sept. 5, 2012).

that this Court should not "extend <u>Myers</u> to include implicit, as opposed to just express policies," and should deny Plaintiff's claim on those grounds.  (Doc. # 282-2 at p. 10).  Such a reading would gut the purpose of 42 U.S.C. § 1983, the statute pursuant to which Plaintiff's claim and similar equal protection claims are brought.  That statute states "Every person who, under color of any statute, ordinance, regulation, *custom, or usage*, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable  . . ." 42 U.S.C. § 1983 (emphasis added). The U.S. Supreme Court explained that, "'Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . .'" <u>Monell v. Dep't of Soc. Services of City of New York</u>, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), (<u>quoting</u> <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 167–168 (1970)).

Section 1983 thus requires a plaintiff suing a municipal entity to prove "that the asserted violation of a federally protected right was caused by a municipal policy, a municipal custom or practice, or the decision of a municipal policymaker with final policymaking authority." <u>Dingwell v. Cossette</u>, 327 F. Supp. 3d 462, 474 (D. Conn. 2018).   A plaintiff may establish liability by proving that "'the authorized policymakers approve[d] a subordinate's decision and the basis for it.'"  <u>Amnesty Am. v. Town of West Hartford</u>, 361 F.3d 113, 126, (2d Cir. 2004) (quoting <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988).  "When the constitutional violation is based on a subordinate employee's decision, a municipality is liable if the policymaker approved of the decision whether by action or omission. [citation omitted] A policymaker may do so by issuing an order or a ratification, or simply by being 'aware of a subordinate's unconstitutional actions, and consciously cho[osing]

to ignore them, effectively ratifying the actions.'" <u>Dingwell</u>, at 475, <u>quoting</u> <u>Amnesty Am</u>., 361 F.3d at 126.

If this Court determined that <u>Myers</u> required an express and/or written policy, rather than requiring proof of a pattern and practice of treating assault complaints against Brunswick students differently than assault complaints against non-Brunswick students, it would judicially nullify a key provision of Section 1983. <u>See Monell</u> at 691. Instead, as Defendants occasionally concede in their moving memorandum, "The issue is whether a reasonable jury could draw an inference . . . that there is a policy of collusion between GPD and Brunswick to protect Brunswick students f[ro]m suffering the consequences of their criminal conduct." (Doc. # 282-2 at 3-4). More precisely, as this Court held, Plaintiff must show that there is a "policy of protecting Brunswick students at the expense of their victims" by not treating victims of criminal assaults by Brunswick students the same as other victims of criminal assaults in the investigation of complaints. (Doc. #115 at 8-10).

III.    **The Facts Adduced by Plaintiff, Construed with All Inferences and Credibility Determinations in her Favor Provide Evidence on Which a Reasonable Jury Could Return a Verdict for Plaintiff**

Plaintiff has described a pattern with a plethora of facts, above, from which GPD's informal policy of failing to investigate criminal complaints against Brunswick students as rigorously as investigations of other criminal complaints can be inferred. This pattern and implicit policy "distort[s] the truth-seeking process" and "inhibits collection of the fullest possible information from all sources relating to a potentially criminal incident." <u>Myers</u>, 157 F.3d at 75. Among the facts establishing this pattern are the following:

53

**A pattern of apparent coordination between GPD and Brunswick:** In the 2014 Sexual Assault Video investigation, Det. Girard and Headmaster Philip were explicitly coordinating with each other regarding the investigation. They appeared to do so with the 2014 Sexual Assault Investigation and second video non-investigation, as the statement to families by Brunswick and the statement to the public by GPD mirrored each other and were equally false. In the 2015 assault, Philip reported in an email to the victim's mother that, between the night the assault happened and more than a week later when other witnesses spoke to GPD,[34] he had been in contact with the police, the accused Brunswick student and his parents, and the teen center director, on whose later unsworn hearsay statements GPD relied in determining that M acted in self-defense.  In Jane's case, there were multiple communications between Brunswick's DeAngelo and the GPD about the investigation and Det. Rondini communicated regularly with Roe's attorney, Michael Jones, who was paid by Brunswick trustees. Coupled with the inside information Headmaster Philip obtained about the investigation on a regular basis, it can be inferred that Jones was the conduit between GPD and Philip.  See Statement of Facts, pp. 2-44. The Court would not permit Plaintiff to depose Jones about his communications with Brunswick, which might have proven that connection expressly.

By contrast, in other cases involving schools, there was no coordination. (See e.g., Pl. Ex. PP, TOG 2516-2521 (juvenile off-campus case where schools not contacted); TOG 2822-2526 (juvenile assault where, even with involvement of GPD's School Resource Officer ("SRO") no school personnel were involved); TOG 2527-2536 (juvenile car theft where SRO assists in

---

[34] M reported to GPD headquarters nine days later but refused to provide a sworn statement; the teen center director spoke to an SVS detective 11 days later, and also did not provide a sworn statement. (Defs. Ex. 34 case/incident reports).

identifying suspects but school is not involved); TOG 2597-2602  (assault involving juveniles where SRO provided information and, when conflict about the assault spilled over to Greenwich High School, the administrator called the police in to investigate rather than playing that role herself)).

       **A pattern of inappropriate communications between GPD and Brunswick about criminal complaints against Brunswick students:** As detailed above, numerous inappropriate communications occurred during the course of the 2014, 2015, and 2016 investigations, many of which coordinated Brunswick's and GPD's actions despite the fact that none of the investigations involved any activities at the school.  Sgt. Zuccarella was crystal clear that communications between the schools and GPD were off limits. (Pl. Ex. Q at 183:3-25, 184:1-10, 131:14-17).  By contrast, Adam Rohdie, GCDS Headmaster, attested that he has never contacted the police about a criminal complaint against a student.  (Rohdie Aff. ¶ 9). Likewise, Chief Heavey testified that the only head of a private school who has ever met with him about criminal charges against one of its students was Tom Philip.  (Pl. Ex. III at 53:4 – 54:3).

       By contrast, no other cases involving juveniles document any inappropriate communications between their schools and GPD. (See Pl. Ex. PP, TOG 2516-2521; TOG 2522-2526; TOG 2527-2536; TOG 2597-2602).

       **A pattern of not interviewing or not adequately interviewing witnesses in criminal complaints against Brunswick students:**  In the 2014 Sexual Assault Investigation, GPD did not interview a single witness or even the victim.  (Statement of Facts at 2-10; Defs. Ex. 35). Regarding the Second Sexual Assault Video and anonymous tip about an underage drinking party involving Brunswick students, GPD essentially made those complaints disappear and did

not even look for witnesses, while representing to the public that the complaints were thoroughly investigated.  (Statement of Facts at pp. 10-16; Defs. Ex. 41 at 1-2).  The pattern repeated itself with the 2015 assault, in which GPD took the unsworn hearsay statement of a possibly motivated "witness," with whom Philip had intervened, as the final word, did not follow up on conflicting witness statements, and made no effort to identify other witnesses. (Defs. Exs. 34 and 39). Finally, in Jane's case, as set forth in the Statement of Facts, above, there were myriad issues with witness interviews, among them:

- With many witnesses, Rondini asked no questions and simply had the witnesses write down what they recalled. This is contrary to GPD practice, as warrant applications in other cases make clear, and GPD's policy regarding competency. She used the word "related" in the case reports and arrest warrant application to mislead the reader into believing that she actually interviewed these witnesses. Such inaccuracy does not meet the ASA's expectations for an arrest warrant (Pl. Ex. OO 14:16-15:4) or the GPD policy regarding dishonesty. (Pl. Ex. K TOG 1526-27).  She failed to record all interviews at GPD headquarters, and recorded only an interview with Jane, contrary to GPD practice. (Pl. Ex. S at 15:9-11, 19:22-25, 20:1-13)

- Det. Rondini did not do anything to corroborate witness statements or reconcile conflicts between witness statements.  Even with Jane's second interview, which was supposedly for the purpose of reconciling conflicts, Det. Rondini still did not do so.  Jane's second interview was a trap to try to induce inconsistencies.  She did not ask Jane about her meeting with L and G, and therefore did not know that Brother Doe interrupted the meeting and saw Jane displaying a different demeanor than sworn to by L and G. Rondini did not subject either L's or G's statement to questioning of any kind. Rondini fed words to Jane when she was stumbling in attempting to convey what happened to her, and then used Det. Rondini's own phrase to manufacture an inconsistency. (Defs. Ex. 20 at 10).  When she received L's statement about the movements of a "tenant" in the pool house, she did not further inquire with the "tenant," Sam Gonzalez, or L to determine who was telling the truth.  (Defs. Exs. 17 and 18). This conflicted with GPD investigative practice (Pl. Ex. X [comparator warrants]; Pl. Ex. K TOG 1528-29).[35] She then omitted the conflicting statements from the arrest warrant application, which was improper, as arrest

---

[35] Among the conduct specified as violating UPM 1004l: "Accepting or reporting information related to duties as true or factual without taking reasonable steps to verify the correctness and accuracy of the information. Consistent failure to enter accurate report data on reports or into information storage files."

warrant applications are supposed to include all information. (Pl. Ex OO at 24:14-
25:18)

Further, ASA Capozzi testified that law enforcement is expected to indicate clearly what kind of

statement a witness gave – telephonic, in writing only, or orally. (Pl. Ex. OO at 14:16-15:4;

15:11) Numerous arrest warrant applications in cases that do not involve Brunswick students

do so. See Ex. PP.

**A pattern of failing to properly document investigations of Brunswick students**

**presumably to obscure ongoing collusion:**  In the 2014 Sexual Assault Video investigation,

extensive contacts between Det. Girard and Brunswick Headmaster Philip were not

documented anywhere, nor were contacts between Philip and the victim's family or Det.

Girard's discussions with the ASAs. The anonymous tip from Dr. X regarding an underage

drinking party involving Brunswick students was not documented as required.  The Second

Sexual Assault Video submitted to GPD by Dr. X was not documented either, violating GPD's

policy of opening an investigation file for every complaint, whether or not it is anonymous and

contradicting GPD's statement to the press.  (Pl. Ex. JJJ at 86:3-24; Pl. Ex. R at 66:18-67:12;

Defs. Ex. 41). In Jane's case, as noted above, Det. Rondini did not accurately record the

circumstances of most interviews.  She even recounted a text message as if it were an

interview (Defs. Ex. 18 at TOG 651-52) and omitted entirely her numerous communications

with Jones, including those in which he coordinated witnesses with her.   (Defs. Ex. 18).

Ultimately, this made the report of the investigation and the arrest warrant application

misleading, violating the GPD policy regarding competency. (Pl. Ex. K at 1526-27.)

As explained in the Statement of Facts, both GPD and ASA Capozzi made it clear that these issues were not acceptable practice; they violate GPD policy; and are not evident in arrest warrant applications when someone not affiliated with Brunswick is investigated. (Pl. Ex. PP)

**A pattern of dishonesty in cases in which Brunswick students are accused:**  In the 2014 cases, the GPD and Brunswick were dishonest to the press, the public, and to the Brunswick School community, claiming that community "rumors" were unsubstantiated when they were actually proven true. In 2015 there is no evidence that GPD told C or his parents about what Silver or M had said, or that the investigation was closed.  Had they been informed, presumably they would have provided the names of witnesses who could be interviewed.  (Defs. Ex. 39 at 2-3). In Jane's case, Det. Rondini serially misrepresented facts in her deposition when confronted with her actions.  She was not forthcoming with either the ASA, for example failing to inform him of the conflict between L's and Gonzalez's statements, or Jane, as she did not address the "consistency" issues she allegedly perceived in the investigation. Sgt. Reeves, likewise, misrepresented facts in his deposition testimony.  He misrepresented where he heard the misinformation about the June 3, 2016 party being a drinking party as well as the removal of Sam Gonzalez's statement and the paragraph in L's statement about Gonzalez in the arrest warrant application. These actions are a direct violation of GPD's policy regarding dishonesty. (Pl. Ex. K at TOG 1528-29). Under these circumstances, a fair inference may be drawn that favoring Brunswick was the motivating factor for these misrepresentations.

Taken together, these patterns and implicit policies distorted the truth-seeking process and inhibited "collection of the fullest possible information from all sources relating to a potentially criminal incident."  Myers, 157 F.3d at 75. By definition, these practices serve no

legitimate governmental interest.  Id.  Plaintiff has thus provided more than enough evidence

from which a jury can infer that GPD has a pattern of favoring Brunswick aggressors to prevent

the collection of full information and ascertainment of the truth in its investigations.

**IV.       A Jury Can Reasonably Find that Defendant's Actions were Ratified**

As noted above, Section 1983 requires a plaintiff suing a municipal entity to prove that

the violation of a federally protected right was caused by a municipal policy,  custom, or

practice, or the "decision of a municipal policymaker with final policymaking authority."

Dingwell v. Cossette, 327 F. Supp. 3d 462, 474 (D. Conn. 2018).   A plaintiff may establish

liability by proving that "'the authorized policymakers approve[d] a subordinate's decision and

the basis for it.'"  Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 126 (2d Cir. 2004)

(quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107

(1988)).  This approval may occur by action or omission, such as being aware of a subordinate's

unconstitutional actions and consciously choosing to ignore them.  Dingwell, at 475.

Chief Heavey ratified Defendants' unconstitutional actions in this case. Chief Heavey

acknowledged receipt of the Braxton Letter, which complained of the failure to investigate,

posited that it was because the perpetrator was a Brunswick student, and objected to the

intimidation tactics employed by Sgt. Reeves.  A subsequent email complained that witnesses

were not being interviewed, in an apparent continuance of the failure to adequately

investigate. (Pl. Ex. UU). Chief Heavey inquired about these issues and decided that his

employees' unconstitutional actions did not even deserve investigation by the Professional

Standards Division. He thus tacitly approved the policy of investigating criminal complaints

against Brunswick students less rigorously than criminal complaints against others.  Pursuant to

<u>Monell</u>, § 1983 imposes liability for these constitutional violations against the Town of

Greenwich.

**V.     Defendants' Analysis of Answers to Interrogatories Is Not Relevant and Most
        Facts Asserted in Addressing Them are Disputed by the Evidence**

The recitation of answers to interrogatories concerning the facts constituting collusion

or an implicit policy capture in summary the pattern set forth in the statement of facts, above,

and the pattern analysis in Section II.  By attacking each discrete item, Defendants ignore the

pattern and ignore the fact that the consistent failures in every investigation involving a

Brunswick student Plaintiff could identify are absent in other, non-Brunswick related

investigations.  Nevertheless, Plaintiff will address the substance of Defendants' points below:

**a.     Sgt. Reeves' dressing down of Father Doe and the Doe's attorney:** Sgt. Reeves

did not have to explicitly tell Father Doe to drop the case to be perceived as dissuading him

from pursuing the case. (The point about the conversation not being with Plaintiff is immaterial;

she was 16 years old.) Sgt. Reeves engaged in an "intimidating, threatening conversation" in

which Father Doe was accused of running a drinking party for minors, threatened with social

hosting liability, threatened with libel for conveying his daughter's complaint, threatened with

criminal action against his son, and told not to communicate with Brunswick (even though

Brunswick had reached out to him).  (Pl. Ex. B at Tr 32:15-33:1). Father Doe testified that he had

the impression that Sgt. Reeves wanted him to drop the case, and Sgt. Reeves explicitly told

him that his daughter's complaint "is going nowhere."  (Pl. Ex. B at 8/28/19 69:13-70:16). Sgt.

Reeves followed that up with substantially the same conversation with the Doe's legal

representative in which he added that the real concern should be Peter Roe's standing at

Brunswick and Roe's college prospects.  (Pl. Ex. UU).  Such harsh communications that carry the

explicit threat of criminal and civil legal action easily give rise to an inference that Sgt. Reeves was attempting to dissuade the Does from pursuing justice.

**b.      Det. Rondini's "investigation" violated numerous GPD policies and practices:**

Defendants' argument that Plaintiff's "nitpicking" about the blatant defects in Det. Rondini's investigation are her personal opinion which will wilt in the face of Dr. Hough's expert opinion is unavailing.  As is set forth above and in the statement of facts, Det. Rondini's investigation continued a long-standing pattern of failing to rigorously investigate criminal complaints against Brunswick students by allowing Philip to intervene with victims and witnesses, failing to question witnesses, failing to address conflicting statements, and failing to give full information to prosecutors.  Many GPD command staff and the juvenile prosecutor testified that these practices did not comply with the GPD's or the prosecutors' practices and policies, and it did not comply with GPD's policies regarding competency and dishonesty.  As is shown below, Dr. Hough's opinion and testimony are fatally flawed and will not be admissible, as it was not even based on the evidence in this case.[36]

**c.      Plaintiff has adduced more than sufficient evidence from which a jury could infer a pattern and practice of investigating Brunswick students less rigorously than others accused of criminal activity:**  As is set forth in the Statement of Facts and Plaintiff's argument, above, there is a wealth of factual information from which an inference of an informal policy of not rigorously investigating criminal complaints against Brunswick students can be made.

---

[36] Defendants' argument about Philip's notes is disgraceful.  This Court would not let Plaintiff inquire about the events of June 3rd.  Plaintiff therefore did not inquire about the portions of Philip's notes that related to the events of that day.  Defendants' counsel had Philip read them into the record, however, because he claimed they were illegible and now uses this hearsay that was not even subject to examination at deposition to claim that Det. Rondini interviewing Philip would not have been helpful.  Such an interview would not have been limited to his notes and those notes were not subjected to any inquiry at deposition, therefore they should be disregarded.

Defendants seem to be arguing that a negligence standard was not met here; but that is not what a Myers case is.  The question is not whether the investigation into Jane Doe and others injured by Brunswick students met a particular professional standard.  The question is whether these victims were treated by GPD equally with victims of non-Brunswick perpetrators.  The answer is clearly no. The Court is referred to Plaintiff's discussion of the 2014 sexual assault videotapes/cases and the 2015 assault in Plaintiff's Statement of Facts and Argument rather than repeating those facts here.  Most of Defendants' arguments ignore documentary and deposition testimony that squarely refutes their contentions, for example, Girard's email correspondence with Philip regarding a sexual assault complaint that her supervisor testified should never have been shared.  Defendants are willfully blind to the wealth of information establishing the denial of equal protection to people injured by Brunswick students.

**VI.      Hough's Testimony is Irrelevant, Not Credible, and Should be Excluded**

As a threshold issue, Defendants' claim that "'the opposing party must controvert [expert] evidence by producing other expert testimony,'" and that the trier of fact could be "'"guided solely by the opinion testimony of experts,"'" is a misreading of the case they cite in support of that proposition.  (Doc. # 282-2 at 12-13).  Duff v. General Motors Corp., 962 F. Supp. 1420, 1423 (D. Kan. 1997), the case upon which Defendants rely, stands for the opposite proposition.  In that diversity jurisdiction case, the Kansas District Court determined that Texas state law applied to the claims of the plaintiff.  The quoted excerpt from Selig v. BMW of N. Am., Inc., 832 S.W.2d 95 (Tex. App. 1992), dealt with Texas procedural law regarding evidence submitted on a summary judgment motion.  The Kansas District Court held that while Texas substantive state law applied, the state's procedural law did not.  Duff, 962 F. Supp. at 1423.

Thus, not only is the law cited by Defendants Texas state law, which does not apply in this

Connecticut federal action, the federal court rejected the argument that even in that diversity

case Texas procedural law should apply.  Other federal courts have held that federal procedural

law allows lay evidence to dispute an expert's testimony on summary judgment. E.g., Thomas v.

Fayette Cty., 194 F. Supp. 3d 358, 368 (W.D. Penn. 2016).

 Dr. Hough's testimony should be excluded by the Court because his expert opinion is

both irrelevant and unreliable as it does not address the actual legal claim in this action, and

does not satisfy the standards set forth by Federal Rule of Evidence 702 and Daubert v. Merrell

Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[37]

 "[T]he district court functions as the gatekeeper for expert testimony."  Raskin v. Wyatt

Co., 125 F.3d 55, 66 (2d Cir. 1997). "The court performs the same role at the summary

judgment phase as at trial; an expert's report is not a talisman against summary judgment."  Id.

"Expert witness testimony is admissible only if: (1) 'the expert's . . . specialized knowledge will

help the trier of fact to understand the evidence or to determine a fact in issue;' (2) 'the

testimony is based upon sufficient facts or data;' (3) 'the testimony is the product of reliable

principles and methods;' and (4) 'the expert has reliably applied the principles and methods to

the facts of the case.'"  Water Pollution Control Auth. of City of Norwalk v. Flowserve U.S. Inc.,

No. 3:14-cv-00549 (VLB), 2018 WL 1525709, *6 (D. Conn. Mar. 28, 2018), aff'd, 782 Fed. Appx. 9

(2d Cir. 2019), (quoting Fed. R. Evid. 702).  "An expert's opinion is not admissible unless a

'rigorous examination of the fact on which the expert relies, the methods by which the expert

---

[37] Plaintiff will be filing a motion to exclude Dr. Hough's testimony concurrent with her opposition to Defendants'
motion to dismiss.  A party may file a motion to exclude expert testimony in conjunction with a motion for
summary judgment.  Innis Arden Golf Club v. Pitney Bowes, Inc., 629 F. Supp. 2d 175 (D. Conn. 2009).

draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand' reveals that the opinion is "reliable at every step.'" Id. (quoting Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002)).  As the U.S. Supreme Court held, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." General Electric Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997).

Defendants offer the expert testimony of Dr. Richard Hough as evidence that the investigation into Jane's complaint was "reasonable, appropriate, and in accordance with customary law enforcement practice."  (Doc. # 282-2 at 13).  However, that is not the legal standard at issue in this litigation.  As discussed above, Jane's claim in this case is deprivation of equal protection in violation of Section 1983, specifically that "the policy of protecting Brunswick students at the expense of their victims undermines the ability of the police department to fully investigate and the state's attorney to obtain all available evidence," depriving her of the right to be treated the same as victims of other criminal assaults in the criminal investigation of her complaint.  (Doc. # 115 at 9).  Thus, a jury will be required to determine if the Defendants' investigation followed the same practices and policies as their investigations of other criminal assault complaints, not whether it was "reasonable, appropriate, and in accordance with customary law enforcement practice."  On this point, Dr. Hough offered no opinion or testimony.  (Defs. Ex. 33).

Even if the Court were to consider Dr. Hough's testimony relevant, it is unreliable because his conclusions were based on a review of a smattering of documents and the deposition testimony of the Doe family, the partial deposition testimony of Det. Rondini and

Sgt. Reeves,[38] the deposition testimony of Brunswick student L and his mother, the deposition testimony of GA student G and her mother, and the deposition testimony of Peter Roe.  (Defs. Ex. 33 at 8-11).  He did not review the depositions of the 10 other GPD officers who were deposed, among them the Chief of Police, three Captains, and the designated 30(b)(6) witness on the topic of GPD policies.  (Defs.  Ex. 33, Ex. 1 at 8-11).  Most significantly, in this action based on GPD's policies and practices, Dr. Hough did not review a single GPD policy and he did not interview a single GPD officer.  (Pl. Ex. DDD at 11-12, 15, 49-52).  In fact, some of the facts cited in support of his expert conclusion did not even exist at the time of the investigation. He cites the training given to Det. Rondini and Sgt. Reeves and the training methods used by GPD among the facts upon which he based his expert opinion. (Defs. Ex. 33 at 5, #5 and #6).  But he conceded at deposition that he knew nothing about the content of those courses.  Further, many of the courses he identified were given after 2016, after the investigation was completed. Dr. Hough also drew no connection between that training and the GPD's policies and practices. His testimony was simply that he knew the topics of the courses given, and that "they were trained as is pretty much routine and customary for investigators in U.S. law enforcement agencies."  (Pl. Ex. DDD at 23-29).

Similarly, Dr. Hough bases his expert opinion on the fact the GPD is "state accredited by the Connecticut Police Officer Standards and Training Council's (POST-C)."  (Defs. Ex. 33 at 6, # 8).  This state accreditation was not received by GPD until three years after the investigation at

---

[38] Det. Rondini and Sgt. Reeves were deposed on two days each because of the pendency of Defendants' motion to dismiss.  In an effort to undertake discovery in the interim and attempt to comply with the scheduling order, the parties agreed to split the one-day depositions into two.  Dr. Hough reviewed only the depositions taken in March 2019, and not their conclusions in July 2020.

issue – in 2019 – and Dr. Hough did not know when the police department began working towards that accreditation.  (Pl. Ex. DDD at 44-48).  He finally conceded at deposition that "I don't see that the accreditation of 2019 is direct to what practices and procedures that they were using in 2016."  (Pl. Ex. DDD at 47:24-25, 48:1).  More to the point, he gave no indication how accredited policies in any year would shed light on whether the investigations involving Brunswick students differed in any way from investigations of other juveniles.

For an expert to render an opinion on whether the Doe investigation was conducted in accordance with the same policies and practices as all other investigations, it is incumbent to not only know what those policies and practices are, but to hear from police officers as to how they apply those policies and practices.  Dr. Hough did neither.  (Pl. Ex. DDD at 49-50).  Dr. Hough also could not articulate at deposition any factual basis for his conclusions that the investigation was reasonable and appropriate.  (Pl. Ex. DDD at 52-69).  When asked what assumptions, if any he relied upon, he responded "I have no way to answer that question."  (Pl. Ex. DDD at 16:15-20).  When asked to describe his methodology, Dr. Hough testified:

> The methodology that is used in this type of social science research and comparison is looking at the steps that were taken by the officers in a discretionary style investigative manner done by law enforcement every single day throughout the United States, and making a comparison of that to how others similarly situated, those other 18,000 law enforcement agencies in the country, as well as the various other ones that don't do local law enforcement types of activities . . . .

(Pl. Ex. DDD at 13:6-14).  Dr. Hough compared the conduct of the Doe investigation to thousands of law enforcement and non-law-enforcement agencies throughout the country. What he did not do was compare it to investigations by GPD of complaints against juveniles who did not attend Brunswick.  In fact, Dr. Hough's expert report is nothing more than a listing

of generalizations about procedures used by detectives in investigating complaints, without reference to any specific facts about the Doe investigation or any reference to conformity with GPD's regular policies and practices for conducting investigations.  (Defs. Ex. 33).  Finally, Dr. Hough could not think of any peer review of his methodology and admitted that there are no standards or controls that applied to his methodology.  (Pl. Ex. DDD at 16-17).[39]

Dr. Hough's expert testimony should be disregarded on this motion for summary judgment because his expert opinion (1) will not help the trier of fact to understand whether the Doe investigation was in conformity with investigations of criminal complaints against juveniles who did not attend Brunswick; (2) his testimony is not based upon sufficient facts or data; (3) his methodology has not been shown to be reliable; and (4) he could not explain how his methodology applied to the facts of the case.  Flowserve, 2018 WL 1525709 at *6.  As such, this opinion evidence is connected to existing data only by the *ipse dixit* of Dr. Hough, and thus inadmissible.  Joiner, 522 U.S. at 146, 118 S.Ct. at 519.

## VII.    Reeves and Rondini are Not Entitled to Qualified Immunity

In a claim of violation of a constitutional right, "in order to decide whether the defendants are entitled to qualified immunity, [the court] must determine whether that right was clearly established at the time of the defendants' behavior at issue."  Pena v. DePrisco, 432 F.3d 98, 114 (2d Cir. 2005), citing Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).  "The relevant, dispositive inquiry in determining whether a [federal] right is

---

[39] When asked at deposition whether any of his expert opinions had been subject to a motion to exclude, and if any of his opinions were excluded by a court, Dr. Hough replied "No."  (Pl. Ex. DDD at 7).  In fact, in 2017 there was a motion to exclude Dr. Hough's expert testimony in Shew v. Horvath, No. 8:16-cv-766-T-33JSS, 2017 WL 632515, *1 (M.D. Fla. Feb. 16, 2017).  The court in that case excluded the portion of Dr. Hough's testimony that amounted to a legal conclusion.  Id. at *7-*8.

clearly established is whether it would [have] be[en] clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202, 121 S.Ct. at 2156. Although the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," id. at 201, 121 S.Ct. at 2156, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 2156, 153 L.Ed.2d 666 (2002). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997). "[I]n applying the rule of qualified immunity under 42 U.S.C § 1983 . . . , [the U.S. Supreme Court] ha[s] referred to decisions of the Courts of Appeals when enquiring whether a right was 'clearly established.'" Id. at 269, 117 S.Ct. at 1226. "Thus, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law' by giving 'ample room for mistaken judgments.'" Parks v. Segar, No. 3:09-cv-1162 (HBF), 2012 WL 4051833, *6 (D. Conn. Sept. 13, 2012).

The constitutional violation at issue here has been established law for many years. In 1998, the Second Circuit held that the failure to treat criminal complaints even handedly was a constitutional violation of the Equal Protection Clause. Myers, 157 F.3d at 74-75. In 2005, the Second Circuit held that *explicit approval* by police officers was not needed to establish such a constitutional violation, and that a pattern of conduct "may implicitly send a message of official sanction." Pena, 432 F.3d at 111-12. The final query is whether a reasonable person would

have known that the defendant's conduct was a violation of the law.  Harlow v. Fitzgerald, 457

U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).   "If the law was clearly established,

the immunity defense ordinarily should fail, since a reasonably competent public official should

know the law governing his conduct."  Harlow, 457 U.S. at 818-19, 102 S.Ct. at 2738.

As described above, there is ample evidence that Defendants violated Jane Doe's right

to Equal Protection because the investigation into her complaint of sexual assault was handled

differently from other assault complaints.  There are genuine issues of material fact as to

whether the actions of Det. Rondini and Sgt. Reeves were intentional, plainly incompetent, or

mere mistakes.  For example, there is no dispute that Det. Rondini suspended all investigation

activities from August 8th through August 25th, allowing Brunswick's headmaster to intervene by

talking to witnesses, attempting to influence the victim's family to withdraw Jane's complaint,

and formulating an alternative cover story of underage drinking to excuse the conduct of Peter

Roe.  There is a genuine issue of material fact as to whether this was done by mistake, due to

plain incompetence or was intentional.  Similarly, there is the same genuine issue of material

facts regarding her:  (1) failure to conduct actual interviews of witnesses, (2) failure to resolve

inconsistencies in the statements of witnesses, (3) failure to video record any but the victim's

interviews at GPD, (4) inappropriate disclosure of investigation information to the suspect's

attorney, and (5) failure to provide all information collected to the ASA, all contrary to GPD and

SVS practices and policies.

There are genuine issues of material fact as to whether Sgt. Reeves simply made

mistakes, was plainly incompetent, or intentionally acted when he violated GPD and SVS

practice and informal policy by speaking with Brunswick's security head DeAngelo about

confidential details of the investigation, attempting to coerce the victim's family into withdrawing the complaint, and permitting Det. Rondini's many violations of practice and policy.

The law of <u>Myers</u> and the constitutional guarantee of equal protection under the law has been established since 1998.  A "reasonably competent" GPD officer should know the law governing his and her conduct.  <u>Harlow</u>, 457 U.S. at 818-19, 102 S.Ct. at 2738.  As the Second Circuit in <u>Pena</u> held, a "pattern of conduct" is sufficient to "send a message of official sanction" of police activities.  The facts stated above demonstrate such a pattern of conduct that establish the constitutional violation of Jane's rights.  432 F.3d at 111-12.

### CONCLUSION

The evidence described above provides more than sufficient admissible evidence from which a jury could find that GPD violated Jane's equal protection rights with its pattern and practice of deferring to Brunswick when its students are accused of crimes.  Defendants' motion for summary judgment therefore must be denied.

Dated: September 28, 2020
      Bridgeport, CT

                                  BRAXTON HOOK LLC
                                  Attorneys for Plaintiff

                    By:        /s/Elizabeth I. Hook
                                  Elizabeth I. Hook (ct30554)
                                  Meredith C. Braxton (ct17395)
                                  280 Railroad Ave., Suite 205
                                  Greenwich, CT 06830
                                  Tel. (203) 661-4610
                                  Fax (203) 661-4611
                                  ehook@braxtonhook.com

**CERTIFICATION**

This is to certify that on September 28, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by electronic mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Courts CM/ECF System.

                                        /s/Elizabeth I. Hook