UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

_____x
)
JANE DOE,                                        )
)                    No. 3:18-cv-01322-KAD
Plaintiff,             )
)
v.                     )                    September 28, 2020
)
TOWN OF GREENWICH, et al                         )
)
Defendants.            )
_____x

**PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT OF FACTS
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

A.   The June 2016 Pool Party

1.   Jane Doe hosted a pool party at her home on June 3, 2016.  Ex. 1, J. Doe Depo. at p. 40,

l. 11-16.  *No dispute.*

2.   At the time of the pool party, Plaintiff was completing her sophomore year at

Greenwich Academy.  Doc. No. 46 at ¶ 12.   *No dispute.*

3.   Greenwich Academy is an all-girl college-preparatory day school located in Greenwich,

Connecticut.  Doc. No. 46 at ¶ 12.   *No dispute.*

4.   Approximately fifteen or so of Jane's friends attended the pool party.  Ex. 1, J. Doe

Depo. at p. 42. l. 25 – p. 43, l. 11.  Most of the pool party attendees were students at Greenwich

Academy or Brunswick School.  Ex. 1, J. Doe Depo. at p. 43, l. 2-14.   *Disputed.  Jane Doe*

*identified 11 people in her deposition.*

5.   Brunswick is an all-boy college preparatory day school also located in Greenwich, Connecticut.  Doc. No. 46 at ¶ 2.   *No dispute.*

6.   GA is commonly referred to as the "sister" school of Brunswick.  Starting in high school, Brunswick and GA students can take classes at both schools, and have some joint school sponsored social events.  Ex. 1, J. Doe Depo. at p. 36, l. 24 - p. 39, l. 15; Doc. No. 46 at ¶ 12.   *No dispute.*

7.   The pool party took place in the evening, with the majority of Jane's friends arriving between 6 and 9pm.  Ex. 1, J. Doe Depo. at p. 46, l. 2-6.  Doe's parents (hereinafter referred to as "Mother Doe" and "Father Doe") were home at the time of the party, and some of her friends' parents were there as well.  Ex. 1, J. Doe Depo. at p. 43, l. 19 - p. 44, l. 2. *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.   No dispute.*

8.   The Doe pool area is a small distance from the main residence (Ex. 1, J. Doe Depo. at p. 42, l. 15-17) however it's very open and easy to walk over to the pool area from the main residence.  Ex. 1, J. Doe Depo. at p. 44, l. 3-7.  *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.  No dispute.*

9.   Jane Doe's adult brother (hereinafter referred to as "Brother Doe") was home at the time of the party and at some point during the evening was physically down by the pool area during the party.  Ex. 1, J. Doe Depo. at p. 42, l. 18-19; p. 62, l. 16-21.  Brother Doe's adult friend, PK, was also at the pool party at some point during the evening.  Ex. 1, J. Doe Depo. at p. 63, l. 3-12.  See also Witness Statements of PK, Ex. 17 at TOG-000164-000166, and Brother Doe,

2

Ex. 17 at TOG-000158, Case Incident Reports, Ex. 18 at TOG-00658, TOG-000666-000667.

*Object to introduction of this evidence based on Judge Dooley's ruling that the events of the*

*party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.*

10. In Jane Doe's own words, the pool party could be described as a drinking party.  Ex. 1, J.

Doe Depo. at p. 467, l. 18 - p. 468, l. 9.   *Object to introduction of this evidence based on Judge*

*Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at*

*60:20-25, 61:1-5.  Disputed.  These were not Jane's words; Jane testified that she did not agree*

*with that connotation.  Defs. Ex. 1 at 467:4-25, 468:1.*

11. Most of Jane's friends at the pool party had been drinking.  Ex. 1, J. Doe Depo. at p. 74; l.

20 - p. 75, l. 7.  Ex. 13, TP Depo. at p. 212, l. 25-p. 214, l. 24; See TP Notes (Ex. 6 to TP Depo.).

*Object to introduction of this evidence based on Judge Dooley's ruling that the events of the*

*party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.  Disputed.  Jane was*

*asked about "any sip, any touch of alcohol."  That is not the same as "had been drinking."  Defs.*

*Ex. 1 at 74:20-25, 75:1-12.  Object to Tom Philip notes as evidence since he was not at the party*

*and therefore had no personal knowledge, and was not interviewed by GPD during the course of*

*the investigation.*

12. In fact, all but two of the minor attendees at the party were drinking alcohol.  Ex. 1, J.

Doe Depo. at p. 400, l. 13-16; Ex. 13, TP Depo. at p. 212, l. 25-p. 214, l. 24; See TP Notes (Ex. 6 to

TP Depo.).   *Object to introduction of this evidence based on Judge Dooley's ruling that the*

*events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.  Disputed.*

*Jane was asked about "any sip, any touch of alcohol."  That is not the same as "had been*

*drinking."  Defs. Ex. 1 at 74:20-25, 75:1-12.  Object to Tom Philip notes as evidence since he was*

*not at the party and therefore had no personal knowledge, and was not interviewed by GPD*

*during the course of the investigation.*

13. Prior to the party, Jane had discussions with her friends, Peter Roe and BW Student 3, about bringing the alcohol to her pool party.  Ex. 1, J. Doe Depo. at p. 46, l. 12-16; p. 53, l. 16 - p. 54, l. 2.  See also text messages, Ex. 27 at P0902; P0903; P0890; P0892. *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5. Disputed.  Jane did not have discussions about bringing alcohol; Peter Roe and BW Student 3 told her they were bringing alcohol.*

14. Concerned that her parents would find out that her friends were bringing alcohol, Jane suggested that they hide it when entering the home.  Ex. 1, J. Doe Depo. at p. 51, l. 5-8; p. 53, l. 20-23; see also Ex. 27, P0892. *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.   No dispute.*

15. It was fairly obvious that at least some of Jane's friends at the party were drunk.  Ex. 1, J. Doe Depo. at p. 57; l. 1-6. *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5. Disputed.  Jane testified only that it was fairly obvious that Peter Roe and the two friends he came with were drunk.  Pl. Ex. A, 56:1-25, 57:1-6.*

16. After the party, Jane Doe's parents became aware that minors drank alcohol at the pool party they hosted.   Ex. 2, Father Doe Depo. (Conn. Super.) at p. 24, l. 4-19; Ex. 4, Mother Doe Depo. (Conn. Super.) at p. 69, l. 6-9; p. 74, l. 15-16.  See also Ex. 26, P1142, P1213.  *Disputed. Jane Doe's parents testified that they learned of it only months later, after the GPD investigation*

*was underway.  Pl. Ex. B at 21:10-25, 22, 23, 24:1-19; Defs. Ex. 4 at 69:6-21, 74:4-17; Defs. Ex. 20 at 19:12-25, 20, 21:1-7.*

17. After the party, Jane admitted to her parents only that she had a few sips of beer and hard cider brought by a friend.  Ex. 1, J. Doe Depo. at p. 60, l. 7-22.  *Disputed.  Jane Doe testified that she told her father she had sips of beer and hard cider.*

B.   The Alleged Assault in the Pool House

18. Jane invited her friend Peter Roe to the pool party.  Ex. 1, J. Doe Depo. at p. 65; l. 12 - p. 66, l. 2.  At the time, Peter Roe was one of Jane's friends, and she had a "crush" on him.  Ex. 1, J. Doe Depo. at p. 67, l. 23-25; p. 70, l. 5-7.  *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.*

19. Peter Roe arrived at the pool party around 9:00 pm with two other friends, BW Student 6 and BW Student 7.  Ex. 1, J. Doe Depo. p. 65, l. 12-17.  All three boys attended Brunswick School.  Ex. 1, J. Doe Depo. at p. 80, l. 6-8.  *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.  Disputed.  Peter Roe arrived at around 9:30 p.m., after being greeted by Father Doe at the front door of the main house.  Defs. Ex. 26 at P 892; Pl. Ex. C at P 515.*

20. Jane had text communications with Peter Roe prior to the pool party in which they discussed hiding alcohol in his backpack when he arrived so that Jane's parents would not see it.  See Ex. 26, P0893. *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.*

*Disputed. Jane Doe asked Peter Roe if he was bringing alcohol with him and when he responded yes, she asked him to conceal from her parents who were not permitting drinking at the party.*

21. Peter Roe drank openly from a bottle of whiskey and was intoxicated at the pool party. Minor 14 Statement, Ex. 17 at TOG-000675-000676; BW Student 5 Interview, Ex. 18 at TOG-000665; Ex 1, J. Doe Depo p. 57, l. 4-5. *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action. Doc. # 106 at 60:20-25, 61:1-5. Disputed. The Statements simply say that Peter Roe was intoxicated; Jane Doe testified that it was fairly obvious that Peter Roe was drunk. Brother Doe testified that after the altercation with Peter Roe, he noticed an empty bottle in Peter Roe's bag while he was in the process of evicting him from the party, and that he did not see any open drinking. Pl. Ex. E at 25:18-24, 61:21-25, 62:1-4.*

22. There were conflicting witness statements about an alleged altercation between Peter Roe and Jane Doe's brother that may have occurred in the pool area hot tub. See Ex. 18, Case Incident Reports at TOG-000649; TOG-000651; TOG-000655; TOG-000658, TOG-000665; TOG-000666; TOG-000676; see also Ex. 17, witness statements at TOG-000156; TOG-000158; TOG-000161; TOG-000165-000166. *Disputed. All the witness statements indicated that Peter Roe was the aggressor towards Brother Doe, who had to restrain him. Peter Roe sent Brother Doe a Facebook message afterwards apologizing for "trying to fight" Brother Doe. Pl. Ex. F at P 1384. BW Student 3 testified at deposition that Peter Roe was "aggressive" and "put his hands on" Brother Doe "out of the blue." Pl. Ex. D at 73:17-25, 74:1-22; Defs. Ex. 18 at TOG 643.*

23. Roe needed to sober up, so two other Roe friends, BW Student 3 and BW Student 5, took him to the pool house bathroom to try and get him to throw up. Ex. 1, J. Doe Depo. at p.

76, l. 20 - p. 77, l. 7.  Minor 14 Statement, Ex. 17, TOG-000676; Case Incident Report Ex. 18 at

TOG-000665; BW Student 3 Statement, Ex. 17 at TOG-000176.  *Object to introduction of this*

*evidence based on Judge Dooley's ruling that the events of the party are not admissible in this*

*action.  Doc. # 106 at 60:20-25, 61:1-5.*

24. Jane Doe went into the pool house to check on Peter Roe. Ex. 1, J. Doe Depo. at p. 80; l.

12-18; J. Doe Statement, Ex. 17 at TOG-000156.  When Jane entered the pool house, BW

Student 3 was in the bathroom with Roe and BW Student 5 was outside the bathroom because

a parent was there to pick him up.  Ex. 1, J. Doe Depo. p. 82, l. 14-20.  *Object to introduction of*

*this evidence based on Judge Dooley's ruling that the events of the party are not admissible in*

*this action.  Doc. # 106 at 60:20-25, 61:1-5. Disputed.  BW Student #5 told Det. Rondini in a*

*telephone interview that he went into the bathroom with BW Student 3 and Peter Roe.  Defs. Ex.*

*18 at TOG 665; Det. Rondini wrote in the arrest warrant application "That [Brunswick Student 5*

*related he went into the bathroom with [Peter Roe] and [Brunswick Student 3] and while they*

*were in there [Peter Roe] did not get sick. . . . "  Defs. Ex. 22 at TOG 951; Jane Doe's statement*

*said that "BW Student 3 and BW Student 5 took [Roe] to the bathroom.  Defs. Ex. 17 at TOG*

*156.  Pl. Ex. A at 79:19-23.*

25. Doe was in the bathroom where Roe's friend, BW Student 3, was trying to get Roe to

throw up.  Ex. 1, J. Doe Depo. at p. 85; l. 9-14; BW Student 3 Statement, Ex. 17 at TOG-000176.

*Object to introduction of this evidence based on Judge Dooley's ruling that the events of the*

*party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5. Disputed.  Jane Doe*

*testified that Peter Roe was standing by the sink, he was not hunched over the toilet, she didn't*

*see any evidence of his throwing up, and she and BW Student 3 were getting him to drink water by the sink.  Pl. Ex. A at 84:6-25, 85:1-4.*

26. Peter's friend, BW Student 3, left the bathroom, and Jane was left alone with Roe for somewhere between 5 and 15 minutes.  Ex. 1, J. Doe Depo. at p. 86, 14 - p. 87, l. 13; BW Student 3 Statement, Ex. 17 at TOG-000176.  *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.*

27. At some point while they were alone in the bathroom, Jane Doe claims that she was sexually assaulted by Peter Roe.  Jane's Statement, Ex. 17, TOG-000156-000157; arrest warrant application, Ex. 22 at p. 1, TOG 000948.  *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.*

28. Roe's friend, BW Student 3, returned to the bathroom, and Doe exited the bathroom. Ex. 1, J. Doe Depo. at p. 88, l. 6-22; BW Student 3 Statement, Ex. 17 at TOG-000176.  *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.*

29. Immediately upon exiting the bathroom Jane described what occurred as "weird" to her remaining party guests.  Ex. 1, J. Doe Depo. at p. 89, l. 22 - p. 90, l. 1.  *Object to introduction of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.*

30. Jane Doe, Peter Roe and a small group of friends, BW Student 3, BW Student 6, BW Student 7, Minor 14 then waited by the pool area for an Uber to arrive, eventually walking to

the front of the home to meet the Uber.  Ex. 1, J. Doe Depo. at p. 93; l. 18-24; p. 95, l. 21-23.

See also Case Incident Reports, Ex. 18 at TOG-000635, TOG-000669, TOG-000676-000677.

*Object to introduction of this evidence based on Judge Dooley's ruling that the events of the*

*party are not admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.Disputed.  BW Student 3*

*did not walk with the others to the front of the house; rather he exited from the other side of the*

*house with his mother.  Pl. Ex. G at 21:12-17.*

31. Mother Doe and another parent were also standing in the driveway right next to Jane

and her friends while they waited for the Uber.  Ex. 1, J. Doe Depo. at p. 98, l. 20-25. *Object to*

*introduction of this evidence based on Judge Dooley's ruling that the events of the party are not*

*admissible in this action.  Doc. # 106 at 60:20-25, 61:1-5.  Disputed.  Mother Doe was the only*

*parent at the front of the house when Peter Roe and his friends waited for their Uber.  Defs. Ex.*

*20 at 16:8-25, 17:1-22; Pl. Ex. G at 21:12-17.*

32. Peter Roe and his two friends, BW Student 7 and BW Student 6, left in the Uber.  Ex. 1, J.

Doe Depo. at p. 104, l. 1-2; Ex. 17, Minor 14 Statement at TOG-000162, BW Student 3

Statement at TOG-000176; Ex. 18, Case Incident Report at TOG-000635.  *Object to introduction*

*of this evidence based on Judge Dooley's ruling that the events of the party are not admissible in*

*this action.  Doc. # 106 at 60:20-25, 61:1-5.*

33. That same evening, shortly after the alleged assault, Jane communicated with one of the

boys, BW Student 7, who brought Peter to his house, asking if they needed anything and

expressing concern for Peter's well-being.  Ex. 26, P999-P1000. *Object to introduction of this*

*evidence based on Judge Dooley's ruling that the events of the party are not admissible in this*

*action.  Doc. # 106 at 60:20-25, 61:1-5.  Disputed.  In this text exchange, Jane Doe's expressed*

*concern was limited to advising against drinking in the morning.*

34. The day after the alleged incident Jane Doe attended the Governor's Ball, an all-day

concert in New York City, with friends, where she saw Peter Roe.   Ex. 1, J. Doe Depo. At p. 121,

l. 4-8; p. 136, l. 14-17; p. 244, l. 3-9.   *No dispute.*

C.   The Days Following the Alleged Assault

35. In the days that followed her party, Plaintiff confided in some of her friends about the

incident in the pool house, using varying descriptions to describe what had occurred.  See text

messages at Par. 36-38.  *Disputed.  Jane Doe's texts to her friends are not inconsistent.  They*

*simply tell bits and pieces of what happened as she was able as a 16-year old to process it.  This*

*is consistent with trauma victims.  Pl. Ex. H.  at Ex. A, 2-3.*

36. On the morning after the party, Jane texted two friends, Minor 12 and Minor 13, telling

them that Peter Roe had made comments expressing his love for her, but omitting that any

sexual assault had occurred.  Ex. 26 at P1003-1005; P1066-1068.  *Disputed.  Jane Doe's text at*

*Ex. 26 P 1003-04 and P 1066 states that Peter Roe was "throwing himself on me."  Jane Doe's*

*text at P 1066 states "I JUST WOKE UP AND LIKE I WAS HOPING LAST NIGHT WAS A DREAM [I*

*DON'T KNOW] WHAT TO DO."  Jane Doe's texts to her friends are not inconsistent.  They simply*

*tell bits and pieces of what happened as she was able as a 16-year old suffering from trauma.*

*This is consistent with trauma victims.  Pl. Ex. H at Ex. A, 2-3.*

37. Doe also confided in her friend, Minor 12, that she never liked anyone more in her life

than she liked Roe.  Ex. 26, P1011-P1012.  *No dispute.*

38. In other instances, Doe texted other friends, Minor 13, Minor 11, Minor 10, using the words "fingered", rape, and sexual assault to describe what allegedly occurred between her and Roe.  See Text Messages, Ex. 26:  P1077 ("I got fingered"); P0949 (I WAS FUCKING SEXUALLY ASSAKTED (sic) AND ALMOST RAPED"); P0951 (WHAT TYPE OF GIRL STAYS WOTH (sic) SOMEONE THAT RAPES SOMEONE"); P1080 ("Roe told ___apparently and THEYRE (sic) STAYING TOGETHER," "WHAT TYPE OF PERSON STAYS WITH A RAPIST"); P0911 ("he managed to finger me"); P1112 ("needs to understand that I was sexually assaulted").  *Disputed.  Jane Doe's texts to her friends are not inconsistent.  They simply tell bits and pieces of what happened as she was able as a 16-year old trying to process it.  This is consistent with trauma victims.  Pl. Ex. H at Ex. A, 2-3.*

39. Approximately 375 pages of text messages were turned over by Doe during the course of this litigation.  Only 10 pages of text messages were selected by Jane Doe and turned over to the GPD.  None of the text messages described herein were disclosed by Jane to the GPD during the course of its investigation.  Ex. 1, J. Doe Depo. p. 47, l. 14 - p. 48, l. 22.  *Disputed.  Det. Rondini did not make any demand of Jane for all text messages with her friends.  The transcript of Det. Rondini's second interview with Paula makes clear that she asked for text messages between Peter Roe and Jane Doe after the sexual assault.  All of those texts were turned over to Det. Rondini.  Defs. Ex. 20 at 6:5-25, 7, 8, 9:1-22, 11:11-25, 12:1-9; Pl. Ex. Y. at P 893-901.  Det. Rondini did not ask Jane Doe for texts with all of her friends before and after the sexual assault, nor did she ask any of the students who attended the party for their text messages.  Defs. Ex. 20 at 6:5-25, 7, 8, 9:1-22, 11:11-25, 12:1-9  Pl. Ex. I at 29:4-25, 30:1-5, 78:24-25, 79:1-7.  The text*

*messages turned over by Jane Doe were responsive to Defendants' discovery requests and consisted of texts with all of her friends, including Roe, before and after the sexual assault.*

40. Jane Doe, and her legal counsel, made the decision as to what communications were "relevant" to the GPD investigation of the alleged assault and so which would be provided to Det. Rondini.  Ex. 1, J. Doe Depo. at p. 288; l. 18 - p. 289, l. 8.  *Disputed.  Det. Rondini did not make any demand of Jane for all text messages with her friends.  The transcript of Det. Rondini's second interview with Paula makes clear that she asked for text messages between Peter Roe and Jane Doe after the sexual assault.  As requested, all of those texts were turned over to Det. Rondini.  Defs. Ex. 20 at 6:5-25, 7, 8, 9:1-22, 11:11-25, 12:1-9; Pl. Ex. Y. at P 893-901.  Det. Rondini did not ask Jane Doe for texts with all of her friends before and after the sexual assault. Defs. Ex. 20 at 6:5-25, 7, 8, 9:1-22, 11:11-25, 12:1-9  Pl. Ex. I at 29:4-25, 30:1-5, 78:24-25, 79:1-7.  Further, BW Student 3 asked Jane Doe to delete her text message exchange with him, which she did and later recovered.  Jane Doe's parents were also not able to push her for them on advice of her therapist. (Pl. Ex. B at 44:19-24).*

D.   The Peter Roe Investigation

41. On July 26, 2016, Jane Doe disclosed the alleged assault to her GA counselor, CZB.  See Ex. 17, Statement of CZB at TOG-000167; Ex. 18, Case Incident Report at TOG-000639.  CZB then contacted Jane Doe's parents.  Ex. 1, J. Doe Depo. at p. 228, l. 3-10.  *No dispute.*

42. On that same day, Det. Krystie Rondini of the Greenwich Police Department received a Department of Children and Families Report regarding the alleged sexual assault of Jane Doe. See DCF Report, Ex. 16, TOG-000745-000746; Ex. 22, Arrest Warrant App. at p. 2; TOG 000948. *No dispute.*

43. Det. Rondini has been a member of the Greenwich Police Department since 2004. Depo. of Krystie Rondini dated 3/19/19, Ex. 7 at p. 5, l. 23 - p. 6, l. 2.  She has been a detective in the SVS Section since 2012.  Id. at p. 6, l. 13-21.  *No dispute.*

44. Det. Rondini's supervisor is Sgt. Detective Brent Reeves.  Depo. of Krystie Rondini dated 3/19/19, Ex. 7, p. 7, l. 4-5.  As her supervisor, Sgt. Det. Reeves is involved in all the cases Rondini handles, and would read, review and discuss cases with her on a daily basis.  Depo. of Krystie Rondini dated 3/19/19, Ex. 7 at p. 7, l. 14-22.  *No dispute.*

45. Jane Doe was represented by Attorney Audrey Felsen during the course of the GPD investigation into her allegations.  Ex. 1, J. Doe Depo. at p. 266, l. 25 - p. 267, l. 3.  Beginning no later than August 23, 2016, Jane Doe was also represented by Attorney Meredith Braxton as well.  See Doc. 46 at Ex. A.  *Disputed.  Audrey Felsen was retained by the Doe family almost two months after the criminal complaint was filed by Jane Doe.  Pl. Ex. J at ¶¶ 2-3.*

46. On July 28, 2016, Mother and Father Doe came to the GPD and met with Rondini where she discussed how the investigation would proceed.  See Ex. 18, Case Incident Report at TOG-000646.  *No dispute.*

47. Jane Doe told a friend, Minor 11, that members of the GA administration, MK, TS, and CZB, had told Jane that four Greenwich Academy girls are sexually assaulted a year, but that these girls they don't have the courage to go to the police, and that GA needed Jane to help change that.  See Text Mess. Ex. 26 at P0988.  See also Ex. 1, J. Doe Depo. at p. 497, l. 14 - p. 498, l. 3.  *Disputed.  Jane, in her traumatized state, did not recall correctly who told her that four girls a year are sexually assaulted; in fact it was her therapist, Dr. Rebecca Stiritz, who told her that.  Jane also never told anyone that MK or TS had said that to her.  Defs. Ex. 30.*

13

48. Neither MK, TS, nor CZB ever told Doe that four Greenwich Academy students are sexually assaulted each year.  See Affidavits of MK, para. 5-8 (Ex. 27), TS, para. 5-7 (Ex. 28), and CZB, para. 4-6 (Ex. 29).  *No dispute.*

1.   The First Interview

49. Det. Krystie Rondini came to Plaintiff's home on August 2nd to take Doe's statement to the police.  Ex. 1, J. Doe Depo. at p. 245, l. 24 - p. 246, l. 5; see written statement of Jane Doe dated Aug. 2, 2016, Ex. 17, TOG-000156-000157; see also transcription of Jane Doe Interview dated August 2, 2016, Ex. 19, TOG-000793-000985.  *No dispute.*

50. Plaintiff's parents were home while Det. Rondini took the statement, and CZB as well as Det. Rondini sat with Jane while she gave the statement.  Ex. 1, J. Doe Depo. p. 247, l. 6-9; p. 248, l. 9-11.  *No dispute.*

51. While Jane Doe had previously described the incident in the pool bathroom to others as rape or sexual assault, see supra at ¶ 38, at no time during that first interview did Jane Doe tell Rondini that she was raped or sexually assaulted, or that Peter Roe's finger had entered her vagina at any point.  Ex. 1, J. Doe Depo. p. 257, l. 9-23; p. 258, l. 25 – p. 259, l. 14; see transcription of Jane Doe interview dated the August 2, 2016, Ex. 19 at p. 7, TOG-000979; see written statement of Jane Doe, Ex. 17 at p. 2, TOG-000157.  *Disputed.  Jane Doe described the sexual assault in the best way she could as a 16-year old girl who was inexperienced and suffering from trauma.  The GA counselor she spoke to, Charlanne Zepf Bauerlein, provided a statement to GPD that said that Jane Doe was consistent in all three instances she spoke with her, and that she described it as a sexual assault.  Defs. Ex. 17 at TOG 167-71; Defs. Ex. 18 at TOG 642.  It is not inconsistent for Jane Doe to tell bits and pieces of the story as a victim of*

14

trauma.  *Pl. Ex. H at Ex. A, 2-3.  Det. Rondini never asked Jane Doe if his finger had entered her vagina, nor what the significance of the distinction was.  Jane Doe's therapist, Dr. Rebecca Stiritz, acknowledged that in her interview with Det. Rondini, "[t]here are aspects of her statement that are difficult to discuss, that she has already revealed to me and Charlanne, but it was uncomfortable for her nonetheless."  Defs. Ex. 30.*

52. On August 1, 2016, Jane Doe's psychologist had provided Jane with the legal definitions of sexual assault and rape.  See Ex. 30, email from Stiritz to Doe Family dated 8/1/16.  *No dispute.*

53. At no time did Jane Doe reach out to Det. Rondini after she gave her statement to try to clarify or add more details.  Ex. 1, J. Doe Depo. at p. 264, l. 9-12.  *Disputed.  Jane Doe was a 16-year old girl who was not experienced in either sexual assault issues or the criminal justice system and did not know what details were important or even what she had said.  This is typical of victims of sexual assault. Pl. Ex. H, at Ex. A, 2-3.  The GPD Uniform Policy Manual clearly puts the onus on the police investigator, and not the victim, to follow up with a victim in a non-judgmental manner.  Pl. Ex. K at TOG 1987-88. Although Jane, herself, did not provide more details, her attorney Audrey Felsen provided additional information to Det. Rondini, including Peter Roe's Facebook apology to Brother Doe, a letter from GA counselor Charlanne Zepf Bauerlein and a summary of the events of the party. Pl. Ex. F at P 1384; Pl. Ex. X; Defs. Ex. 24 at TOG 621-22.*

54. Jane Doe provided Det. Rondini the names of people that had attended her party or that she thought Det. Rondini should speak with about the incident.  J. Doe Depo at p. 266, l. 2-5;

see transcription of Jane Doe interview dated November 17, 2016, Ex. 20 at p. 2, l. 1 – p. 4, l. 13, TOG-000987-000989.  *No dispute.*

55. Jane Doe's attorney, Audrey Felsen, provided information and communicated with Det Rondini regularly.  See Ex. 24, emails from Audrey Felsen to Krystie Rondini dated Sept. 26 and 29, 2016 (TOG-000513-000515) and Nov. 16, 2016 (TOG-000621-000622).  In Attorney Felsen's own words, Det. Rondini called Felsen more than Felsen called Rondini during the investigation. See 11/17/16 Transcript of Second Interview, Ex. 20 at p. 23, l. 11; TOG-001008.  *Disputed.  The exchange of information between Det. Rondini and the Doe family and their attorney consisted of providing contact information for people who attended the party, clarifying Det. Rondini's confusion over the name of the Brunswick student she interviewed by phone at his summer camp; providing the letter from GA counselor Charlanne Zepf Bauerlein; and providing a summary of the events of the night of the party.  Defs. Ex. 24.  In contrast, Det. Rondini's extensive correspondence with Peter Roe's attorney reveals that she was sharing information about the investigation, speculating about the credibility of Jane Doe, discussing a false report about GA's alleged discipline of G for making a statement, and discussing "confronting" Jane Doe about her statements.  Pl. Ex. L.  GPD Lt. Zuccerella testified that the practice and policy is to tell the suspect's attorney nothing, and to share everything with the victim.  Pl. Ex. Q at 145:9-11, 146:5-10.  Det. Rondini did the reverse.*

56. The Doe family also provided the GPD with the names of witnesses they believed were pertinent to the investigation, and summaries of information they expected from those witnesses.  See Ex. 24, email exchanges between Rondini, Audrey Felsen and the Does.  *No dispute.*

16

57. At the request of the Doe family, Jane Doe's treating psychologist, Dr. Stiritz, sent a letter to Det. Rondini detailing the events of the incident as relayed to her by Jane.  See Ex. 21, September 1, 2016 letter from Stiritz to Rondini.  *No dispute.*

58. The GPD never spoke to Peter Roe, only his attorney, who informed Det. Rondini that his client was exercising his constitutional right to not speak to the police.  Ex, 7, Rondini Depo. 3/19/19 at p. 73; l. 13-15; 6/25/20 p. 59, l. 11-13; Ex. 18, Case Incident Report at TOG-000633. *Dispute.  Peter Roe had two attorneys, not one, representing him in the investigation – Phil Russell, who was replaced by Michael Jones.  Det. Rondini spoke with Russell about an alleged statement by Jane Doe in a text message to Peter Roe, and she recorded that alleged statement in the case/incident report without asking for a copy of the text exchange to verify the accuracy of the statement.  The statement was false but Det. Rondini took no steps to ascertain that.  Pl. Ex. Y at P 893-901; Defs. Ex. 18 at TOG 634.  Det. Rondini also had extensive correspondence with Jones regarding Peter Roe's version of events, coercing witnesses to give statements, and speculating about a false claim that GA was disciplining one witness for giving a statement.  Pl. Ex. L, Defs. Ex. 27, Defs. Ex. 28.  None of Det. Rondini's correspondence or discussions with Jones were recorded in the case/incident reports of the investigation, as required.  Defs. Ex. 18.*

2.   Inconsistencies Arise in the Investigation

59. The GPD interviewed approximately 19 people, including the Doe family members.  See Ex. 18, Case Incident Reports, TOG000632-000687.  *Disputed.  Det. Rondini did not conduct interviews with many of the witnesses.  She merely asked them to tell her or write down what they recalled.  She did not ask any follow up questions to clarify or resolve inconsistencies. Pl. Exs. Z, AA, BB, DD, KK; Pl. Ex. LL at 59:24-25, 60:1, 61:7-25, 62:11-12; Pl. Ex. MM at 79:9-24.*

60. During the course of the police investigation, these individuals gave differing accounts of what Jane Doe had told them about the alleged incident.  Ex. 7, Rondini Depo. 3/19/19 p. 132; l. 3-6. *Disputed.  Witnesses gave Det. Rondini accounts of what Jane Doe told them at various times after the sexual assault, and these accounts were consistent.  Defs. Ex. 17 at TOG 160-63, TOG 167-71; Ex. 18 at TOG 640-42, TOG 651-53, TOG 664, TOG 676-77, TOG 679, TOG 682.*

61. First, there were inconsistencies as to whether Peter Roe had digitally penetrated Doe versus just placing his hand inside her bikini bottom.   Ex. 7, Det. Rondini Depo. 3/19/19 p. 132, l. 7-10.  *Disputed.  This is not an inconsistency.  This is the difficulty of a young traumatized victim trying to describe how she was sexually assaulted.  This is consistent with trauma victims.  Pl. Ex. H at Ex. A, 2-3.  Jane Doe's therapist, Dr. Rebecca Stiritz, acknowledged that in her interview with Det. Rondini, "[t]here are aspects of her statement that are difficult to discuss, that she has already revealed to me and Charlanne, but it was uncomfortable for her nonetheless."  Defs. Ex. 30.*

62. When Det. Rondini spoke with Jane on Aug. 2nd, Jane did not say that Peter Roe inserted his finger into her vagina.  Ex. 7, Det. Rondini Depo. 3/19/19 p. 133, l. 4-12; p. 135, l. 3-5; see also transcript of Aug 2, 2016 interview, Ex. 19 at p. 7, l. 9-21, TOG-000979; Ex. 22, Arrest Warrant App. at p. 11, TOG-000958.  *Disputed.  Jane Doe described the sexual assault in the best way she could as a 16-year old girl who was inexperienced and suffering from trauma.  The GA counselor she spoke to, Charlanne Zepf Bauerlein, provided a statement to GPD that said that Jane Doe was consistent in all three instances she spoke with her, and that she described it as a sexual assault.  Defs. Ex. 17 at TOG 167-71; Defs. Ex. 18 at TOG 642.  It is not inconsistent for Jane Doe to tell bits and pieces of the story as a victim of trauma.  Pl. Ex. H at Ex. A, 2-3.  Det.*

18

*Rondini never asked Jane Doe if his finger had entered her vagina, nor what the significance of the distinction was.  Jane Doe's therapist, Dr. Rebecca Stiritz, acknowledged that in her interview with Det. Rondini, "[t]here are aspects of her statement that are difficult to discuss, that she has already revealed to me and Charlanne, but it was uncomfortable for her nonetheless."  Defs. Ex. 30.  GPD's current policy for interviewing 16-year-olds in this type of sensitive case is to have a specially trained expert conduct a forensic interview.  (Pl. Ex. HH at 108:9-19).*

63. This was inconsistent with what CZB swore Jane had told her, and what witnesses disclosed to Det. Rondini during the course of the investigation.  See Ex. 17, CZB Statement at TOG-000167-000171; Ex. 18, Case Incident Report at TOG-000639-000641; Ex. 7, Det. Rondini Depo. 3/19/19 at p. 135, l. 6-10.  See Infra at ¶ 64-67.  *Disputed.  GA counselor Charlanne Zepf Bauerlein wrote in her witness statement that Jane told her that Peter Roe "put his finger(s) in her vagina/vaginal area."  Defs. Ex. 17 at TOG 169.  Det. Rondini changed the wording to put "his fingers inside her vagina and vaginal area."  Defs. Ex. 18 at TOG 640.  Det. Rondini, herself, created the inconsistency.*

64. One of Jane's friends, Minor 14, who attended the pool party provided a sworn statement that on the night of the pool party Jane had told her that Peter attempted to "hook up" with her numerous times and she pushed him off and said no, and that Jane told her she was proud of herself for not giving in to Peter because she liked him.  Ex. 17, Minor 14 Statement at TOG 000160-000163; Ex. 18, Case Incident Report at TOG-000677.  *Disputed. Minor 14's written statement, recorded by Det. Rondini in the Case/Incident report as if it were an interview, also stated that immediately after Peter Roe and his friends left the party, Jane*

Doe "seemed pretty out of it," and that during the month or so after the incident, Jane Doe told

her "she wanted to avoid [Roe] at all costs."

65. Two of Doe's friends, BW Student 3 and GA Student 1, also provided sworn statements

to the GPD that a few days after the pool party Jane had told them that Roe had just "grazed"

her over the swimsuit and laughed about the incident.  See Ex. 17, BW Student 3 Statement at

TOG-000175-000177; GA Student 1 Statement at TOG-000174; Ex. 18, Case Incident Reports at

TOG-000656-000567, TOG-000661-000663.  *Disputed.  These statements are not credible*

*because there are numerous inconsistencies in them that Det. Rondini failed to investigate, and*

*they were provided with much prodding and coercion by Peter Roe's attorney Michael Jones.  Pl.*

*Ex. L at 434-35, 439, 491-92, 506..  Det. Rondini's Case/Incident report concerning GA Student*

*1's statement describes Jane Roe as very distraught when first approached by GA Student 1 in*

*school – behavior that is inconsistent with GA Student 1's later description about Jane Doe's*

*laughing about it: "[GA Student 1] related that the Tuesday after the party at [Jane]'s she and*

*[Jane] were talking in school about the party when [Jane] began to cry.  [GA Student 1] asked*

*[Jane] what happened and she said something with [Peter Roe], [GA Student 1] asked her if*

*[Peter Roe] raped her and [Jane] only began to cry more.  [GA Student 1] told her to calm down*

*and she would come over to her house after school so they could talk then since school was not*

*the best place to talk."  Defs. Ex. 18 at TOG 656.  Brother Doe walked into Jane Doe's room at*

*the time GA Student 1 and BW Student 3 were talking to her that day and observed that Jane*

*Doe was crying hysterically and not laughing, as suggested by these two witnesses.  Pl. Ex. AA at*

*¶ 5.  Since Det. Rondini never asked Jane Doe about this incident to resolve the discrepancy, she*

*did not get this information.  Defs. Ex. 20.  Furthermore, GA Student 1 reported Jane Doe's*

20

words as Peter Roe's action as "his hand grazed her inner thigh."  Defs. Ex. 17 at TOG 174.  By contrast, BW Student 3 said Jane Doe described Roe's action as he "just 'grazed' her over her swimsuit."  Defs. Ex. 17 at TOG 177.  Other than using unlikely words for teenagers such as "grazed" and "swimsuit," these two statements are not consistent with each other and, more importantly, not consistent with the several other statements provided by friends to whom Jane had told the story.  Defs. Ex. 18 at TOG 652, 664, 679, 682.

GA Student 1 had also been disciplined by GA administration for having bullied Jane Doe in the months after the investigation began. Pl. Ex. HHH at ¶ 6. The student's mother called GPD the next day with the intention of withdrawing her daughter's statement but was talked out of doing so by Sgt. Reeves.  Pl. Ex. LL at 104:4-15.

BW Student 3's statement was prepared by his attorney and submitted by him and his attorney in typewritten form at GPD headquarters.  Defs. Ex. 17 at TOG 175-77.  Although Det. Rondini was not at headquarters when they arrived and did not accept the statement, she falsely testified at deposition that she was there, took his statement, asked him only a couple of questions. Pl. Ex. I at 105:7-25, 106:1-21, 108:10-13.   BW Student 3 testified at deposition that he was at GPD headquarters only five minutes or so, didn't recognize Det. Rondini, who was in the room during his deposition, that no one asked him any questions, and that his attorney had typed his statement.  Pl. Ex. D at 208:5-25, 209-211, 212:1-3.  The case/incident report is prepared by Badge 30, identified by Defendants as police officer Eric Scorca, and Det. Rondini's work calendar confirms that she left for the day before BW Student 3 arrived at the station. Defs. Ex. 17 at TOG 175-77; Pl. Ex. XX at interrogatory 5; Pl. Ex. YY at TOG 1032.  BW Student 3's statement also states that there was a tenant in the pool house where the assault took place in

*the bathroom, and that he was moving his belongings out during the party.  This is in direct*

*contrast with the tenant of the pool house, whose statement indicates that he did not arrive to*

*the main house until  around 10:21 p.m., and did not go to the pool house until all of Jane's*

*friends were gone, around 11:15 p.m.  Defs. Ex. 17 at TOG 172; Pl. Ex. BB at ¶ 2.  BW Student 3's*

*witness statement said that Roe was taken into the pool house bathroom around 9 p.m., and*

*approximately 40 minutes later, around 9:40 p.m., he assisted Roe out of the bathroom and was*

*taken by his two friends out to get the Uber.  Defs. Ex. 17 at TOG 175-77.  In addition, the tenant*

*was not moving his belongings out of the pool house that evening.  Defs. Ex. 17 at TOG 172,*

*TOG 177; Pl. Ex. BB at ¶ 2.  Det. Rondini took no steps to resolve this discrepancy to try to*

*ascertain credibility.  Instead, she simply removed Gonzalez's statement and the portion of BW*

*Student 3's statement that referred to Gonzalez, from the arrest warrant application altogether.*

*Defs. Ex. 22.*

66. Another friend of Jane's, SG, told Det. Rondini that the day after the party Doe told her

that Roe had attempted to take off her bottoms and that she told him to stop.  See Ex. 18, Case

Incident Report at TOG-000679.  *Disputed.  This is not an inconsistency since Det. Rondini did*

*not ask Jane Doe to explain if and why she said this.  Jane Doe wrote in her statement on August*

*2, 2016 that "[h]e even tried to pull his pants down but I stopped him."  Defs. Ex. 17 at TOG 157.*

*Jane also included that information in the text she sent to Roe's girlfriend after the sexual*

*assault:  "he also kept saying he wanted to fuck me and tried to pull his pants down but I was*

*able to stop him."  Pl. Ex. Y at P 910;[1] Pl. Ex. A at 203:15-25, 204:24-25, 205:1-5.  SG could have*

---

[1] The text exchange between Jane and Roe's girlfriend appears at Pl. Ex. Y at P 908-13 and is mistakenly labeled as being with BW-3 on P 911.

*misunderstood Jane, or Det. Rondini could have misunderstood SG.  Det. Rondini did not to ask*
*Jane about this, therefore it is an unresolved discrepancy.  Certainly, the language is close*
*enough to infer that a mistake was made either by SG or Det. Rondini.*

67. Yet another friend, BW Student 6, indicated to Det. Rondini that Jane had told her that
Roe had tried to take her top off and wanted to have sex with her.  See Ex. 18, Case Incident
Report at TOG-000682.  See also Ex. 18, at TOG-000652 and Ex. 25 at TOG-000773, another
friend, Minor 10 told Det. Rondini that Jane Doe told  her that "he [Roe] managed to finger
me"); Ex. 18 at TOG-000664, another friend, told Det. Rondini that Jane Doe told her that Roe
"made advances towards her and then forced himself on her and put his fingers inside her
vagina").  *Disputed. These stories are not inconsistent.  They are pieces of the story.  It is not*
*inconsistent for Jane Doe to tell bits and pieces of the story as a victim of trauma and they*
*uniformly convey that a sexual assault happened.  Pl. Ex. H at Ex. A, 2-3.  Further the minor*
*whose statement is referred to at TOG 682 is not a Brunswick student.*

68. Inconsistencies also arose during the investigation as to whether Jane Doe had been
drinking the night of the pool party, and whether she had provided alcohol to attendees.  Jane
Doe's psychologist had informed Det. Rondini that Doe said she had not been drinking on the
evening of the pool party.  See Ex. 21, Sept. 1, 2016 letter from Stiritz to Det. Rondini.  *Disputed.*
*At her deposition, Dr. Rebecca Stiritz clarified that Jane had told her she had not been drinking*
*in terms of being intoxicated, but rather that she was steady on her feet and able to fend Peter*
*Roe off.  Dr. Stiritz testified, "[b]ut she didn't say I did not have a sip.  She just said, I was not*
*affected, I was not drinking."  Pl. Ex. AAA at 37:8-25, 38:1-4.*

69. Jane Doe's statement to her psychologist was inconsistent with what numerous individuals disclosed during the GPD investigation.  See Ex. 17, witness statements: TOG-000160-000161 ("[Jane] seemed to have been drinking a deep reddish drink, which I am not sure whether or not it was alcohol…the majority of the drinks were alcohol and other kids were definitely drinking as well."), TOG-000175 ("…alcohol was consumed by minors at the party."); Case incident reports: TOG-000635 ("…he did see [Jane] and other guests drinking alcohol…some kids brought alcohol, but that [Jane] had provided some of the alcohol as well…[Jane's] older brother…was aware."), TOG-000643 ("…majority of the guests at the party were drinking alcohol."), TOG-000648 ("…there was alcohol at the party and that most everyone seemed to be drinking and were already 'tipsy'"…guests were drinking some type of hard apple cider, Smirnoff Ice and a large bottle of unknown hard alcohol."), TOG-000651 ("there was alcohol at the party and most of the guests were drinking…believes [Jane] was drinking as well."), TOG-000668 ("[Jane] related she did have a few sips of a beer that night."), TOG-000685 (…a lot of guests were drinking alcohol…[Jane] was offering alcoholic drinks to the guests.").  *Disputed.  Jane Doe was never inconsistent.  Jane Doe did not tell Det. Rondini at any time that she had not had alcohol that night.  She was not asked that question in the first interview, and when asked that question in the second interview, she said she had sips of alcohol.  Most of the witness statements did not confirm that Jane was drinking alcohol, only that she might have been.  Defs. Ex. 19, Defs. Ex. 20 at 5:11-23.*

70. Finally, there were also inconsistencies as to how Jane was able to leave the bathroom after the alleged assault had occurred.  In her statement to the police, Jane swore that she held Roe up against the bathroom wall until Roe's friend came back to the bathroom.  See Ex. 17,

Jane Doe Witness Statement, TOG 000157.  Roe's friend, BW Student 3, however, swore that when he returned to the bathroom, Peter was on his knees with his head in the toilet attempting to vomit, and furthermore, that Jane was calm and greeted him normally.  See Ex. 17, BW Student 3 Statement at TOG 000176, and Ex. 18, Case Incident Report at TOG-000661. *Disputed.  This is a disputed issue of fact between Jane and BW Student 3, not an inconsistent statement by Jane.  Furthermore, there is nothing in this statement about how Jane was able to leave the bathroom.  Moreover, BW Student 3 admitted that the attorney-generated statement he submitted to the police "was not accurate." Pl. Ex. D at 235:24-25.*

3.    The Second Interview

71.  Jane Doe was interviewed a second time by Det. Rondini on November 17, 2016 at the GPD.  Ex. 1, J. Doe Depo at p. 274, l. 5-19; see Jane Doe Video Interview dated November 17, 2016, Ex. 20 at TOG-000986-001025; See also Ex. 18, Case Incident Report at TOG-000668-000669.  *Not disputed.*

72.  Det. Rondini re-interviewed Jane Doe so that she could clarify the inconsistencies that had come up during the police investigation.  Ex. 1, J. Doe Depo. at p. 275; l. 20-24; see also see Jane Doe Video Interview dated November 17, 2016, Ex. 20 at p. 2, TOG-000987.  *Disputed.  The only inconsistencies were the ones Det. Rondini tried to create.  Det. Rondini re-interviewed Jane Doe to "confront her" with purported inconsistencies and to report back to Roe's attorney Michael Jones what she said.  Pl. Ex. M at WICK 724.  Jane Doe was not inconsistent about her description of Peter Roe putting "his finger(s) in her vagina/vaginal area," and she was not inconsistent about takings some sips of alcohol.  Pl. Ex. X. Rather, it was GA Student 1 and BW Student 3 who were inconsistent in their statements, but Det. Rondini never attempted to*

25

*"confront" them with their inconsistencies, indeed never even asked them any questions.  Pl. Ex.*
*D at 211:8-25, 212:1-3, Pl. Ex. MM at 79:9-24.*

73. Specifically, Det. Rondini needed to clarify whether Roe's finger entered Doe's vagina and whether or not Jane had been drinking the evening of the pool party.  Ex. 7, Rondini Depo. 3/19/19 at p. 142; l. 3-6.  *Disputed.  There is no relevance to the fact that Jane Doe may have consumed alcohol when she was sexually assaulted.  There is no legal defense to sexual assault based on a victim's consumption of alcohol.  Since Jane Doe was never questioned by Det. Rondini about her consumption of alcohol during the first interview, there was no need to "confront" her about it during the second interview.  Defs. Ex. 19.  Whether Peter Roe's finger entered Jane Doe's vagina is only important as a legal distinction, and would not be apparent as a distinction to a 16-year old victim of sexual assault.  In this regard, as well, it was Det. Rondini's mischaracterization of GA counselor Charlanne Zepf Bauerlein's written statement that Peter Roe "put his finger(s) in her vagina/vaginal area."  Defs. Ex. 17 at TOG 169; Ex. 18 at 640.*

74. Jane Doe's attorney and mother were present with her at the second interview.  Ex. 1, J. Doe Depo. at p. 274, l. 20-22.  *Disputed.  Jane Doe's mother was not present during Det. Rondini's interview, but came in to be interviewed after it was over.  Defs. Ex. 20 at 15.*

75. During the second interview, Det. Rondini asked Jane Doe if Peter Roe's finger went inside her vagina.  See Ex. 20, 11/17/16 Transcript at p. 9, l. 24 - p. 10, l. 14, TOG-000994-000995.  *No dispute.*

76. Again, Jane reiterated that his finger did not go insider her vagina.  See Ex. 20, 11/17/16 Transcript at p. 10, l. 10-14, TOG-000995 ("So, you're saying it didn't actually go inside of

you…Not exact—like not—it didn't go inside, but it was like right there—not to….Touching? Would you say like skin-to-skin contact…..Yeah.")  *Disputed.  Jane did not reiterate anything. Det. Rondini never asked her during the first interview how far or deep Peter Roe's finger went and Jane Doe struggled with describing this very personal and traumatic event.  Defs. Ex. 19 at 7:9-16.  In the second interview, Det. Rondini's questioning was leading, designed to get Jane Doe to describe the act in a certain way.*

77. Det. Rondini also informed Jane that witnesses interviewed during the investigation had said that Jane had been drinking at the pool party, and asked Jane to clarify whether she had been drinking.  See Ex. 20, 11/17/16 Transcript at p. 5, l. 11-14, TOG-000990.  *Disputed.  Jane had nothing to clarify about her drinking alcohol during the party because she was never asked about her alcohol consumption during the first interview.  Defs. Ex. 19.*

78. During that second interview Jane admitted that she had a few sips of beer.  Ex. 20, 11/17/16 Transcript at p. 5; l. 11-23, TOG-000990.  *Disputed.  Since Jane never denied having any sips of alcohol, there was nothing for Jane to admit.*

79. This was in direct contravention to Doe's psychologist who represented to the GPD that Jane told her that she had not been drinking the night in question.  See Ex. 21, Sept. 1, 2016 Stiritz letter.  *Disputed.  At her deposition, Dr. Rebecca Stiritz clarified that Jane had told her she had not been drinking in terms of being intoxicated, but rather that she was steady on her feet and able to fend Peter Roe off.  Dr. Stiritz testified, "[b]ut she didn't say I did not have a sip.  She just said, I was not affected, I was not drinking."  Pl. Ex. AAA at 37:8-25, 38:1-4.*

E.   The State's Attorney Makes the Determination Not to Prosecute Peter Roe

27

80. On Dec. 27, 2016, upon completion of her investigation, Det. Rondini transmitted a twenty-one-page arrest warrant application for Peter Roe to the State's Attorney Office.  See Ex. 18, Case Incident Report at TOG-000686; Ex. 22, Arrest Warrant App. (TOG-000946-000967). *Disputed.  On December 22, 2016, a 21-page arrest warrant application was submitted.  On December 27, 2016, five days later, a 19-page arrest warrant application was submitted.  Two pages were deleted from the arrest warrant application and then resubmitted, but Det. Rondini could not explain what was deleted and why.  Pl. Ex. I at 53:25-55:7.  Plaintiffs were denied their discovery request for the NexGen system's data regarding such deletions.*

81. The Arrest Warrant Application for Peter Roe was in good form when it was submitted to the Assistant State's Attorney.  Ex. 11, Capozzi Depo. at p. 37, l. 8-10.  *Disputed.  ASA Capozzi could not comment on what was not in the arrest warrant application, nor was he privy to the many violations of GPD practice and policy committed by Det. Rondini and Sgt. Reeves.  He was not competent to opine upon these matters.  Specifically:*

- *Sam Gonzalez' sworn statement was entirely removed from the arrest warrant application and BW Student 3's statement remained.  The portion of BW Student 3's statement that was directly contradicted by Gonzalez's statement was removed from the arrest warrant application as well. Defs. Ex. 17 at TOG 172-73, TOG 175-77; Ex. 22 at TOG 960-61, TOG 965.*

- *State's Attorney Capozzi testified that "I'm more surprised that there was a tenant in a pool house. . . . Because I don't think I recall there being a tenant in the pool house from what I remember. . . . I don't remember discussing anything about a tenant in a pool house." Pl. Ex. OO at  24:21-25, 25:1-18.*

- *Sgt. Reeves testified in his deposition that State's Attorney Capozzi probably told Det. Rondini to remove the Gonzalez statement.  State's Attorney Capozzi testified that he didn't recall asking Det. Rondini to remove the statement from the affidavit and that it is not a normal practice of his. Pl. Ex. HH at 115:5-20; Pl. Ex. OO at 24:13-25, 25:1-18.*

- *State's Attorney Capozzi testified that when an investigation is concluded, it is his expectation that the police will present all the information that they gathered. "I would expect*

*[that the Police Dept] would give me everything that they have." He also testified that it would not be his expectation that the police department submitting an arrest warrant application will have made judgments about the evidentiary value of a particular piece of evidence.  Pl. Ex. OO at 10:9-25, 11:1-12.*

- *Other information missing from the arrest warrant application included:  (1) the fact that GA Student 1 was not an objective witness because she had been disciplined by GA for bullying Jane Doe Pl. Ex. LL at 96-104; numerous communications between Det. Rondini and Roe Attorney Michael Jones concerning substantive investigation matters Pl. Ex. L; Sgt. Reeves' communications with Brunswick's head of security Michael DeAngelo Pl. Ex. GG at 21:3-10; Sgt. Reeves' intimidating phone conversation with Father Doe Pl. Ex. GG at 21:16-25, 22-25, 26:1-3, Ex. OO at 10:9-25, 11:1-12.*

- *State's Attorney Capozzi testified that "the text message needs to be included in the arrest warrant application. . . . Basically take almost like a snapshot of what was said in the text message as far as who said it and when and put that into the affidavit application, I would expect that. I know sometimes those can be lengthy, but if it's relevant, I would expect it to be in there. . . . The text message itself should be quoted."  Pl. Ex. OO at 34:2-19.  The text messages were not included in this way.*

82. If the State's Attorney felt that any information was missing from the Roe Arrest Warrant Application, he would have asked for more information from the police.  Ex. 11, Capozzi Depo. at p. 37, l. 11-15.  *Disputed.  State's Attorney Capozzi expected the police to provide him with everything they have gathered and he could not possibly know what had been gathered but purposely deleted.  Pl. Ex. OO at 10:9-25, 11:1-12.*

83. On January 19, 2017, the Assistant State's Attorney, John Capozzi, informed the GPD that he did not "find that probable cause exist[ed] to charge the accused [Peter Roe] with a crime.  See Ex. 23, Capozzi email to Det. Rondini dated 1/19/17; see also Ex. 18, Case Incident Report at TOG-000638.  *No dispute.*

84. Upon learning of that decision, Jane Doe's parents requested a meeting with State's Attorney Colangelo at the Stamford Courthouse.  See Ex. 2, Father Doe Depo. (Conn. Super.) at p. 151, l. 3-15.  *Disputed.  Jane Doe's parents did not request a meeting with State's Attorney*

*Colangelo until June 2017, four months after the decision not to charge Peter Roe and only after*

*they had received the case file through the Freedom of Information Act.  Pl. Ex. BBB at 129:16-*

*25, 130:1-9.*

85. The Doe's attorney, Audrey Felsen, was also present at the meeting and requested that

the State's Attorney reconsider the decision not to charge Peter Roe; however, he refused.  *See*

Ex. 2, Father Doe Depo. (Conn. Super.) at p. 153, l. 17-23.  *Disputed.  The reference does not*

*state that.*

86. During that meeting, State's Attorney Colangelo told the Does and their attorney that

Jane was inconsistent in her testimony to the GPD.  Ex. 3, Father Doe Depo. (USDC) at p. 53, l.

17-19.  *Disputed.  State's Attorney Colangelo told the Does that he relies on the police who said*

*she was inconsistent. Pl. Ex. B at 56:3-19, 61:5-16.*

F.   The GPD's Interactions with Brunswick During the Investigation

87. During the course of her investigation, Det. Rondini never spoke with anyone at

Brunswick School regarding the GPD's investigation into Jane Doe's allegations.  Ex. 7, Det.

Rondini Depo. 3/19/19 at p. 30, l. 9-15.   *Disputed.  Det. Rondini had extensive communications*

*with Roe's attorney Michael Jones, who was paid for his representation by Brunswick trustees*

*Ian McKinnon and Thomas O'Malley.  Jones communicated what he learned from Det. Rondini*

*to Peter Roe, who communicated it to Brunswick headmaster Tom Philip.  Brunswick*

*headmaster's information was provided back to Det. Rondini through the same route, to Peter*

*Roe, then Michael Jones.  Pl. Ex. L, Ex. M.*

88. Det. Rondini never discussed Brunswick School with her supervisor, Sgt. Det. Reeves.  Ex.

7, Det. Rondini Depo. 3/19/19 at p. 32, l. 1-3.  *Disputed.  Det. Rondini collected the witness*

*statements of several Brunswick students and thus could not have avoided having any*

*conversation about Brunswick School with the Sgt. supervising her investigation.*

89. TP, the headmaster at Brunswick School, never spoke to anyone at GPD about Jane

Doe's allegations.  Ex. 13, TP Depo. p. 128, l. 1-6; p. 146, l. 17-18; p. 163, l. 20-21; p. 209, l. 13-

14.  *Disputed.  Det. Rondini had extensive communications with Roe's attorney Michael Jones,*

*who was paid for his representation by Brunswick trustees.  Jones communicated what he*

*learned from Det. Rondini to Peter Roe, who communicated it to Brunswick headmaster Tom*

*Philip.  Brunswick headmaster's information was provided back to Det. Rondini through the*

*same route, to Peter Roe, then Michael Jones.  Pl. Ex. L, Ex. M.  Headmaster Tom Philip used his*

*Director of Security, a former GPD Captain, Mike DeAngelo, to act as his conduit with GPD.  In*

*his deposition, Philip testified that DeAngelo called GPD multiple times to corroborate facts from*

*the investigation. Pl. Ex. RR at 60:24-25, 61:1-5.  In his email to Father Doe, Philip told him that*

*"the Greenwich police have been made aware" that "we are investigating the matter."  Pl. Ex. C*

*at P 520.  DeAngelo's email to Philip confirmed that he had reached out to Det. Girard to get*

*information about the investigation into Jane Doe's complaint.  Pl. Ex. N at WICK 333.  Sgt.*

*Reeves testified that DeAngelo called him and told him that Father Doe was trying to get Peter*

*Roe in trouble, and that he learned of the Brunswick narrative from DeAngelo that the Doe's*

*were supposedly running a "drinking party."  Pl. Ex. HH at 21:3-25.*

90. MD retired from GPD in 2006 holding the rank of Captain.  Ex. 12, MD depo at p. 11, l. 4-

9.  He is currently the Director of Security for Brunswick School.  Id. p. 15, l. 13-14.  *No dispute.*

91. There was no exchange of substantive information between the GPD and Brunswick

School during the course of the investigation into Jane Doe's allegations.  The only interaction

the GPD had with Brunswick pertaining to the Doe investigation was limited to the following:

a)  In July or August 2016, BW Head of Security Mike DeAngelo called Sgt. Det. Brent
Reeves and told him that Jane Doe's father had called Brunswick about the incident, and asked
Sgt. Det. Reeves what he could tell him about the investigation.  Ex. 9, Sgt. Det. Reeves Depo. at
p. 45, l. 5 - p. 46, l. 1.  Sgt. Det. Reeves provided no information to BW Head of Security Mike
DeAngelo and told him that he could not tell him anything.  Id. at p. 46, l. 2-4.  Sgt. Det. Reeves
never spoke to BW Head of Security Mike DeAngelo again or anyone else from Brunswick about
Jane Doe's allegations or the investigation.  Id. at p. 50, l. 14-20.  *Disputed.  Sgt. Reeves told
Father Doe that the Doe's could be liable for running a drinking party.  At that point in the GPD
investigation, the only statements made to GPD about drinking involved Peter Roe being
intoxicated.  The "drinking party" narrative was created by Brunswick Headmaster Tom Philip to
change the focus from the sexual assault to underage drinking.  The only way Sgt. Reeves could
have gotten this information was from Brunswick. (Pl. Ex. ZZ at 70:8-16; Pl. Ex. U at 91:20-22,
99:17-101:21; Defs. Ex. 18 at TOG 665).*

b)  In August 2016, BW Head of Security Mike DeAngelo claims he reached out to GPD Det.
Christy Girard.  While Det. Girard has no recollection of this conversation, the day after the call
BW Head of Security Mike DeAngelo indicated that Det. Girard was evasive when he called,
didn't have any details or information, gave him no information, and had actually been
reassigned and was working the cold case unit in Rocky Hill at the time.  See Ex. 31, email
between BW Head of Security Mike DeAngelo and Headmaster Tom Philip dated August 6,
2016.  Det. Rondini never spoke to Det. Girard during the course of the Doe investigation.  Ex. 8,
Det. Rondini Depo. 6/25/20 at p. 119, l. 19-25.  *Disputed.  The fact that he felt that Det. Girard
was evasive betrays Michael DeAngelo's expectation that she would be forthcoming with
details.  In addition, just one month later, Det. Girard, who was no longer in SVS, was
nonetheless assigned to be the liaison between GPD and Brunswick, and promised to be there
for Brunswick 24/7.  She also had a child who attended Brunswick and was the only non-SVS
person to serve as a private school liaison.  There was no logical reason to appoint Det. Girard
as the Brunswick liaison, and no one from GPD admitted to making the decision to appoint her.
The inference is that she was intended to serve as a conduit for information on the Doe
investigation. Sgt. Reeves admitted to at least one conversations with DeAngelo and Capt.
Zuccerella testified that DeAngelo calls all the time.  Pl. Ex. HH at 21:3-6; Pl. Ex. Q at 249:15-25,
250:1-16. Philip testified that DeAngelo called GPD multiple times to corroborate facts from the
investigation. Pl. Ex. RR at 60:24-25, 61:1-5.*

c)  BW Head of Security Mike DeAngelo also reached out to Chief Heavey asking about the
progress of the investigation.  See Ex. 10, Heavey Depo. at p. 49, l. 6-14.  See also Ex. 32, email
from BW Head of Security Mike DeAngelo to Heavey dated Sept. 21, 2016.  These contacts with

GPD were for the sole purpose of ascertaining what the procedural status of the investigation was. No substantive information was transmitted or requested. Brunswick wanted only to know if the investigation was nearing an end and if Roe was to be arrested. Brunswick wanted to know this information so that it could prepare to remove Roe from the school and arrange for him to attend school somewhere else. See Ex. 12, BW Head of Security Mike DeAngelo Depo. at p. 62, l. 13 - p. 63, l. 10; p. 113, l. 24 - p. 115, l. 21; p. 124, l. 23 - p. 125, l. 8; p. 150, l. 9-20; Ex. 13, Headmaster Tom Philip Depo. p. 55, l. 22 - p. 56, l. 20; p. 125, 1l. 4-20; p. 152, l. 6 - p. 153, l. 4; p. 153, l. 20 - p. 154, l. 12; p. 160, l. 2-23; p. 163, l. 17 - p. 164, l. 3, p. 175, l. 22 - p. 176, l. 1; p. 192, l. 3-15; p. 197, l. 12-15; p. 204, l. 16-25; p. 209, l. 10-14; p. 211, l. 15 - p. 212, l. 4; p. 217, l. 24 - p. 218, l. 3. Chief Heavey did not give BW Head of Security Mike DeAngelo any substantive information pertaining to the investigation. Ex. 10, Heavey Depo. at p. 49, l. 10 - p. 50, l. 2. Chief Heavey did not speak to anyone else from Brunswick School about the Doe investigation. Ex. 10, Heavey Depo. p. 50, l. 3-6. *Disputed. Det. Rondini had extensive communications with Roe's attorney Michael Jones, who was paid for his representation by Brunswick trustees. Jones communicated what he learned from Det. Rondini to Peter Roe, who communicated it to Brunswick headmaster Tom Philip. Brunswick headmaster's information was provided back to Det. Rondini through the same route, to Peter Roe, then Michael Jones. Pl. Ex. L, Ex. M. Headmaster Tom Philip used his Director of Security, a former GPD Captain, Mike DeAngelo, to act as his conduit with GPD. In his deposition, Philip testified that DeAngelo called GPD multiple times to corroborate facts from the investigation. Pl. Ex. RR at 60:24-25, 61:1-5. Philip was not conducting an objective investigation of the matter; he was providing Roe with support and information to help with his defense. Pl. Ex. M at WICK 724 and WICK 728. Capt. Zuccerella also testified that whenever DeAngelo calls it is for information about the investigation. Pl. Ex. Q at 250:8-12.*

92. There is no evidence that anyone from Brunswick ever asked the GPD for special treatment of Roe or any other Brunswick student. There is no evidence from which any such special treatment can be reasonably inferred. See Ex. 13, TP Depo. at p. 110, l. 11-p. 111, l. 7; p. 111, l. 24 - p. 112, l .2; p. 113, l. 14 - p. 114, l. 3; p. 137, l. 11-16; p. 146, l. 15-18; p. 165, l. 25 - p. 166, l. 13; p. 218, l. 4-11. *Disputed. There is sufficient evidence of intervention by Brunswick headmaster Tom Philip to infer that he was seeking lenient treatment for his students. In each of the cases in which Philip was able to intervene before completion of the investigation, the Brunswick students were not charged. Defs. Ex. 23, Defs. Ex. 35 at TOG 1042-1043.*

G.  The Adequacy of the GPD Investigation & Arrest Warrant Application

93. Dr. Richard Hough was retained by Defendants to review the adequacy of the Doe investigation and arrest warrant application.  Dr. Hough is a nationally recognized expert in the field.  See Ex. 33, Affidavit of Richard M. Hough, Sr., Ph.D. (Appendix B to attached Report).  *No dispute.*

94. Dr. Richard Hough was retained by Defendants to review the adequacy of the Doe investigation and arrest warrant application.  Dr. Hough is a nationally recognized expert in the field.  See Ex. 33, Affidavit of Richard M. Hough, Sr., Ph.D. (Appendix B to attached Report).  *No dispute.*

95. Dr. Hough's conclusion is that the Roe investigation and the arrest warrant application were handled in a reasonable and appropriate manner that accorded with customary law enforcement practice in cases involving allegations of battery or sexual assault.  See Ex. 33, Hough's Report, p. 5, ¶1 – p. 7, ¶13.  *Disputed.  Dr. Hough is not a fact witness and his expert opinion is not fact.*

96. Dr. Hough confirmed the adequacy of Det. Rondini's investigation of the Doe matter and her arrest warrant submission in his report and, again, repeatedly, during his deposition by Plaintiff.  Id.; Ex. 14, Hough Depo., Vol. 2 at p. 11, l. 6 - p. 14, l. 7; p. 14, l. 21 – p. 16, l. 4 (the documents and professional materials reviewed in preparing the Hough opinion), Ex. 14, Hough Depo., Vol. 2 at p. 41, l. 18 – p. 44, l. 2; p. 51, l. 20 – p. 52, l.,6; p 52, l. 20 – p. 53, l. 6; p. 56, l. 25 – p. 57, l. 6; p. 59, l.22 – p. 60, l. 4.  *Disputed.  Dr. Hough is not a fact witness and his expert opinion is not fact.*

97. Dr. Hough specifically found that the steps Det. Rondini took to interview those witnesses who were available were sufficient for the type of investigation represented by the

Jane Doe case.  Ex. 14, Hough Depo., Vol. 2, p.19, l. l. 18 – p. 21, l. 6; p. 41, l. 18 -p.42, l.1.

*Disputed.  Dr. Hough is not a fact witness and his expert opinion is not fact.*

H.  Plaintiff's Collusion & Policy Evidence

98.  When this case was filed, the only evidence of a GPD policy favoring Brunswick students to Plaintiff's, or anyone else's, detriment were community gossip, the fact that Brunswick's security department was staffed by retired GPD officers, and Father Doe's belief that Brunswick's Headmaster had conveyed the substance of an email Father Doe sent to him about the alleged assault to the GPD.  See Ex. 3, Father Doe Depo. at p. 34, l. 12-21; p. 47, l. 2-8; see Ex. 6, Braxton Depo. at p. 34, l. 9-17; 37, l. 5-10, p. 50, l. 13 – p. 51, l. 6.  *Disputed.  Sgt. Reeves called Father Doe to intimidate him into withdrawing the criminal complaint by threatening criminal action against his son for battery and for running a drinking party, and warning of potential civil liability for defamation.  Sgt. Reeves also suggested the concerns of the effect on Peter Roe at Brunswick and for his college chances were more important than obtaining justice for Jane Doe's assault. Pl. Ex. UU at WICK 307-308.  Regardless of what evidence existed before discovery took place in this action, discovery has provided ample evidence of such a GPD policy.*

99.  At no time in the August 19, 2016 conversation did Sgt. Det Reeves tell Father Doe or Jane Doe's counsel to withdraw the case against Peter Roe.  Ex. 3, Father Doe Depo. at p. 44, l. 8-10; p. 30, l. 1 – p. 33, l. 3; p. 44, l. 2 - p. 45, l. 13.  Ex. 9, Sgt. Det. Reeves Depo., p. 164, l. 13 – p. 178, l. 5.  Ex. 6, Braxton Depo., p. 32, l. 16 – p. 33, l.25.  *Disputed.  Sgt. Reeves' extremely intimidating phone call to Father Doe conveyed the distinct impression that Sgt. Reeves wanted him to drop the case.  Sgt. Reeves also informed him that the case "is going nowhere." (Pl. Ex. ZZ at 70:8-16).*

100.    During the course of the investigation, Det. Rondini asked Jane Doe to provide

her with relevant text messages.  Ex. 8, Det. Rondini Depo 6/25/20 at p. 36, l. 13-16, 25; p. 37, l.

1-18.  *Disputed.  There is no such request in the first interview with Jane Doe. Defs. Ex. 19. In the*

*second interview Det. Rondini asked for text messages between Peter Roe and Jane Doe after*

*the sexual assault and not for any others.  All of those texts were turned over to Det. Rondini.*

*Defs. Ex. 20 at 6:5-25, 7, 8, 9:1-22, 11:11-25, 12:1-9; Pl. Ex. Y. at P 893-901. There is no record of*

*Det. Rondini requesting "relevant" text messages.*

101.    In 2014, the GPD was notified of an alleged sexual assault on a then middle-

school aged girl by a group of middle-school aged Brunswick School boys.  (the "RW Case").  See

Ex. 35, Case Incident Report at TOG-001034.  *Disputed.  The students were all in 9th grade,*

*attending high schools.  Defs. Ex. 35.*

102.    The State's Attorney requested that the parents in the RW Case put in writing

their request the matter be closed and that criminal charges not be sought against the

concerned boys.  See Ex. 5, Depo. of Christy Gerard at p. 98, l. 7-11; See also Case Incident

Report, Ex. 35 at TOG-001043.   *No dispute.*

103.    The existence of a video recording of a second alleged 2014 sexual assault has

never been established.  See Defendants' Objections and Responses to Plaintiff's Fourth

Request for Production of Documents, response to RFP No. 2, Ex. 36.  *Disputed.  Dr. X testified*

*that she saw the video on her daughter's phone and turned it over to former GPD Lt. Keegan.*

*Lt. Keegan testified that he got the video from an intermediary that was given to that person by*

*a parent, but could not see what was on it.  Lt. Keegan testified that he turned the video over to*

*Lt. Bonney and Det. Girard.  Lt. Bonney testified that if Lt. Keegan said he gave it to him, then he*

*probably gave it to him. (Pl. Ex. S at 79:12-25, 80:1-22, 84:4-10; Pl. Ex. V at 85:7-13, 94:12-25, 95:1-9; Pl. Ex. W at 29:5-11 and 18-25, 30:1-25, 31:1-5, 38:1-25, 39:1-6, 40:20-25, 41:1-25, 42:1-5).*

104.    Plaintiff's evidence of this alleged second 2014 sexual assault was the testimony of SY who allegedly saw a cell phone video of such an incident on her daughter's phone, involving an unidentified young woman and a group of young men who her daughter told SY that she, the daughter, "assumed" were from Brunswick School.  Ex. 15, SY Depo. at p. 23, l. 10-13; p. 23, l. 23-p.24, l. 7; p. 25, l. 1-3, 7-9, 13-15; p. 24, l.20-p. 26, l. 4.  *Disputed.  Dr. X testified that her daughter identified the boys as Brunswick students.  The victim could not be identified because she was face down with her head in the distance. (Pl. Ex. W at 23:10-25, 24:1-6; 25:16-25, 26:1, 44:1-9, 48:12-25, 49:1-14).*

105.    In 2015, the GPD investigated an alleged assault at the Arch Street Teen Center. See Ex. 34, CFS 1500003631, attached as Ex. 1 to the Aff. of Gregory Hannigan.  The incident involved a seventeen-year old Greenwich High School Student and an eighteen-year old Brunswick School student.  See id.  During the course of the investigation, the GPD learned that it was the Greenwich High School student, not the Brunswick student that had started the fight. See Id. at p. 11 of the document.  No criminal action was taken.  Id.  *Disputed.  The only sworn statement obtained in the investigation was obtained only hours after the incident from the Greenwich High School student, who did not state that he started the fight.  GPD disregarded this contemporaneous sworn statement and instead credited the unsworn statement of the Brunswick student, and the unsworn hearsay statement of the teen center director, both given several days after the incident and after both had spoken with Brunswick headmaster Tom*

*Philip.  The Greenwich High School student sustained injuries, including a concussion, that required medical treatment, while the Brunswick student was completely unharmed.  (Defs. Exs. 34 and 39).*

106.     Det. Christy Girard was not working in the SVS section of the GPD when the Doe case was investigated by the GPD, and played no role investigating the charges against Peter Roe.  She was handling cold case homicide matters and was largely working out of Rocky Hill, CT.  Ex. 5, Christy Girard Depo. at p. 26, l. 1-6; p. 70, l. 12-22; p. 188, l. 16-24; p. 193, l. l. 3-7; p. 199, l. 16-22; p. 202, l. 24-p. 203, l. 6.  *Disputed.  Det. Girard, having no affiliation with SVS at that point, was nonetheless appointed the GPD liaison to Brunswick.  No other officer outside of SVS had ever been appointed a private school liaison, and no one would admit making the decision to appoint her.  Once appointed, she notified Tom Philip and Michael DeAngelo of her appointment and assured them she was there for Brunswick 24/7. (Pl. Ex. N at WICK 887; Pl. Ex. Q at 73:6-9; Pl. Ex. U at 137:1-5; Pl. Ex. T at 89:10-90:20, 194:6-195:5, 197:24-198:16, 200:5-17; Pl. Ex. S at 33:4-25, 34:6-23).*

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS

1.      On October 6, 2014, Greenwich Country Day School ("GCDS") Security Director Mike Reynolds contacted the Greenwich Police Department ("GPD") to report that the school had received a video of an apparent sexual assault of an unconscious teenage girl by a boy that was observed and video recorded by other teenage boys ("2014 Sexual Assault Investigation"). (Defs. Ex. 35 at TOG 1034).

2.      The video obtained from GCDS in the 2014 Sexual Assault Investigation was one

of two recordings of the sexual assault made by the boys, which were circulating widely among

the high school students.  One of the videos was recorded by a Brunswick School ("Brunswick")

student.  (Defs. Ex. 35 at TOG 1040; Pl. Ex. FF at WICK 866).

3.      At the time the 2014 Sexual Assault Investigation complaint was received, the

GPD Special Victims Section ("SVS") was headed by now Capt. Mark Zuccerella.  Among the

detectives who reported to him in SVS was Det. Christy Girard.  At the time, it was known in

GPD that Det. Girard had a son who attended Brunswick, which is a private boys' preparatory

school in Greenwich.  From 2011 through at least 2018, Det. Girard's child was the only child of

a GPD officer who attended Brunswick. (Pl. Ex. Q at 34:13-21; 35:15-25; 36:1-2; 174:9-13 and

24-25; 175:1-7).  The tuition at Brunswick that year was about $35,000.  (Pl. Ex. CC ¶ 3).

4.      Det. Girard being allowed to conduct the investigation into the 2014 Sexual

Assault Investigation involving Brunswick students was in violation of the GPD's Conflict of

Interest policy because she had a relationship with the school.  (Pl. Ex. K at TOG 1516-19; Pl. Ex.

R at 59:2-10; Pl. Ex. K at TOG 1516-19; Pl. Ex. S at 38:2-18).

5.      The policies for the GPD Detective Division that are in force today are the same

policies that were in place in 2016.  (Pl. Ex. R at 23:13-15, 28:12-17; Pl. Ex. GG at 11:25, 12:1-

13).  When he was head of SVS, Capt. Zuccerella had a policy and practice to provide absolutely

no information to private schools in the course of a criminal investigation involving any of their

students.  (Pl. Ex. Q at 183:3-25, 184:1-10, 131:14-17).

6.      Without Capt. Zuccerella's knowledge, Det. Girard called Brunswick Director of

Security Michael DeAngelo the day she received the 2014 Sexual Assault Investigation

39

complaint, and told him to have Brunswick Headmaster, Tom Philip, call her.  (Pl. Ex. JJ at 18:20)

Det. Girard told Michael DeAngelo all of the information she had gained thus far, including the

fact that the parents of the victim wanted to first tell their daughter about the video before the

police interviewed her.  (Pl. Ex. N at WICK 775; Pl. Ex. Q at 188:5-21).

7.      In the evening of the day GPD received the 2014 Sexual Assault Investigation

complaint, the parents of the victim called Det. Girard and told her that their daughter claimed

not to have been raped, but that she had agreed to the sexual contact.  Det. Girard immediately

emailed Brunswick Headmaster Philip and shared this information with him  (Defs. Ex. 35 at

TOG 1035; Pl. Ex. N at WICK 776).

8.      Capt. Zuccerella testified that it was the interference of the schools that

prevented prosecution in the 2014 Sexual Assault Investigation case.  (Pl. Ex Q at 213:4-15).

9.      Two days after GPD received the 2014 Sexual Assault Investigation complaint, on

the morning of October 8, 2014, Philip notified by email the school's Upper School Faculty

about it.  There was no indication that a sexual assault had been video recorded.  (Pl. Ex. FF at

WICK 864).  Philip noted that by then he had already "had several conversations with the

Greenwich Police and remain[ed] unclear as to whether their investigation will run a full course

or not."  (Pl. Ex. FF at WICK 864).

10.     Capt. Bonney testified that it was not appropriate for a police officer to share

with Brunswick the information that the investigation might not run its full course.  (Pl. Ex. S at

77:15-25, 78:1-2).

11.     Of the schools attended by the boys who were being investigated in the 2014

Sexual Assault Investigation, Det. Girard's updates on the investigation were directed only at

40

Brunswick.  She did not provide any updates to Adam Rohdie, GCDS Headmaster, though the other boy who video recorded the assault was a GCDS student.  (Pl. Ex. NN at ¶¶ 5-9).

12.     In the case/incident reports of the 2014 Sexual Assault Investigation, the parents stated on October 6th – before they viewed the video – that their daughter claimed to have agreed to the sexual contact.  The next day, when they went to GPD headquarters to view the video, "they questioned if their daughter was able to physically consent due to apparently being unconscious.  There is no indication in the parents' letter to Det. Girard that their daughter had given consent.  The letter left open the possibility that the victim and her family might in the future request that the police pursue criminal charges.  (Defs. Ex. 35 at TOG 1035, TOG 1040, TOG 1043).

13.     Capt. Zuccerella testified that, had Brunswick not intervened in the 2014 Sexual Assault Investigation, the detectives could have "circumvented talking to the prosecutors because we had all the information we wanted, we had all the names, we could have done everything right then and there, maybe we could have done an on view arrest, but that didn't play out that way."  He further testified that, before Brunswick became involved, "this was going to be an arrest warrant application no matter what."  (Pl. Ex. Q at 181: 11-12, 204:1-13, 243:14-18).

14.     In the 2014 Sexual Assault Investigation, charges involving the video recording and distribution of the sexual assault could have been bumped up to adult court as Class B felonies, regardless of the age of the boys.  (Pl. Ex. Q at 198:19-25, 199:1-2 and 7-11).

15.     In a similar investigation conducted by Capt. Zuccerella that did not involve Brunswick students, a full investigation was conducted and an arrest warrant application was

submitted and approved by the ASA, despite the fact that the victim claimed there was no crime committed and refused to testify against the assailant.  (Pl. Ex. PP at TOG 2567-72).

16.     In the 2014 Sexual Assault Investigation, Det. Girard provided only sketchy details about the investigation in the case/incident reports.  GPD policy and practice with respect to case/incident reports is to include every single fact related to the subject of the crime under investigation, including all discussions with the victim, suspect(s), witnesses, or attorneys.  All information is to be provided so that if there is a need to look at the investigation again, the police have the full information and need not rely on memory.  (Pl. Ex. S at 22:16-25, 23:1-22; Pl. Ex. R at 54:12-16; Pl. Ex. Q at 102:20-22, 108:10-25, 109:1-5, 125:13-23, 126:12-25, 127:1-9 and 21-25).

17.     The 2014 Sexual Assault Investigation case/incident reports contain no description of Det. Girard's contacts with Tom Philip, or any in administration at Brunswick. (Defs. Ex. 35; Pl. Ex. FF WICK 864).  Det. Girard's email to Philip the evening of October 6 was from her personal email and was never transferred to the case/incident report.  (Pl. Ex. T at 119:14 – 120:15; Pl. Ex. Q at 9:14-25, 10:1-24).  There is no record that Philip had spoken to the victim's father, although there is a description of the contacts with families made by GCDS Headmaster Adam Rohdie.  Other than a short statement that Det. Girard spoke with the ASAs, there is no description of what she told them, when she spoke with them, how many discussions she had with them, or what questions they may have asked.  There is no indication of when Det. Girard reached out to the victim's family to request the letter confirming their request not to prosecute at that time, nor is there any description of the substance of that contact.  There is no indication of which, if any, witnesses were interviewed.  (Defs. Ex. 35).

42

Capt. Bonney and ASA Capozzi testified that all these facts would have been germane to the ASAs in reaching their decisions and should have been in the report. As the report does not describe the content of the discussions between Det. Girard and the ASAs, and these facts are not contained within the reports, there is no way to know whether Det. Girard communicated any of this information to the ASAs. (Pl. Ex. S at 49:21-25, 50:1-13, 51:25, 52:1-25, 53:1-7; Pl. Ex. OO at 27:21-28:2).

18.     During the same time frame of the fall of 2014, the mother of a female Greenwich High School student ("Dr. X") raised an alarm to GPD about two incidents involving Brunswick students. Dr. X made a complaint to GPD's anonymous tip line about the underage drinking that occurred the night she picked up her daughter from a party at a house hosted by a Brunswick student, as well as the fact that the parents were aware of the drinking ("Underage Drinking Party Complaint"). (Pl. Ex. W at 31:9-21, 42:6-25, 43:1-8). There is no evidence that any investigation was conducted in response to this complaint by Dr. X. (Pl. Ex. W at 31:6-8, Pl. Ex. Q at 214:17-25).

19.     Dr. X found a video on her daughter's cell phone that showed a naked girl face down with her head in the distance being digitally manipulated by a boy with other boys watching and laughing ("Second Sexual Assault Video"). (Pl. Ex. W at 23:10-25, 24:1-6).

20.     The Second Sexual Assault Video described by Dr. X was very different from the video confiscated in the 2014 Sexual Assault Investigation. (Pl. Ex. Q at 228:5-25, 229:1-4, 234:21-25, 235:1).

21.     Dr. X contacted a friend who was an attorney and asked his advice about what to do with it. He advised her to contact a retired GPD police officer, Lt. Thomas Keegan. Dr. X

testified that she spoke with Lt. Keegan and provided him with the Second Sexual Assault

Video.  (Pl. Ex. W at 29:5-11 and 18-25, 30:1-25, 31:1-5, 38:1-25, 39:1-6, 40:20-25, 41:1-25,

42:1-5).  She also testified that her daughter told her, and she told Lt. Keegan, that the boys

involved were Brunswick students, and that the victim was from GCDS.  (Pl. Ex. W at 25:16-25,

26:1, 44:1-9, 48:12-25, 49:1-14).

22.     Lt. Keegan's recollection of how he received the Second Sexual Assault Video

was different from that of Dr. X, but he does not dispute the fact that he received it.  He

testified that he thought it was a video of underage drinking and not a sexual assault, but he

also stated that he couldn't see anything on the video and did not view the entire video.  (Pl. Ex.

V at 75:6-25, 76:1-25, 85:7-25, 94:1-11).  Lt. Keegan testified that he gave the Second Sexual

Assault Video to then Lt. Bonney and Det. Girard.  (Pl. Ex. V at 85:7-13, 94:12-25, 95:1-9).

23.     There is no evidence of any investigation into the Second Sexual Assault Video.

(Pl. Ex. Q at 214:17-25).

24.     In another departure from GPD practice, GPD provided information about the

First Sexual Assault Video investigation to the press.  (Defs. Ex. 41).  In a November 13, 2014

article in the Greenwich Time, then Lt. Kraig Gray, GPD Public Information Officer, was quoted

as saying "[t]he Greenwich Police Department does not generally comment on rumors, . . . but

based upon the level of misinformation and confusion, we can say that we chased down two

allegations that turned out to be unfounded."  (Defs. Ex. 41 at 3).

25.     The statements made to the press by GPD were entirely false.  (Pl. Ex. Q at

208:8-25, 209:1-25; 210:1-20, 214:17-25).  Lt. Gray is reported as saying that GPD investigated

and determined the allegations were unfounded," and that "[p]olice interviewed multiple

44

students, parents and administrators, and determined that no crime had been committed."
(Defs. Ex. 41 at 1).  The 2014 Sexual Assault Video case/incident reports establish that the
allegations were true and that charges were not filed only at the request of the parents of the
victim, not because no crimes had been committed.  (Defs. Ex. 35). Further, neither the victim
nor the attacker, nor the videographers were interviewed.  (Defs. Ex. 35).

26.     The Greenwich Time article also quotes from a November 12, 2014, letter from
Brunswick Headmaster Tom Philip to the parents of students of Brunswick's middle and high
school. (Pl. Ex. O at WICK 778).  Philip's letter describes "yet another party." (Pl. Ex. O at WICK
778).  The Greenwich Time article also refers to this second party, stating that the police
addressed it as well, and that a similar investigation turned up the same result as the first one.
(Defs. Ex. 41 at 2-3).

27.     No one at GPD can recall anything about this second party or investigation.
(Defs. Ex. 36 at Interrogatory 2; Pl. Ex. Q at 214:17-25).

28.     Philip's November 12th letter to parents of Brunswick students states that the
school was contacted by a New York Times reporter the day before, on November 11th.  (Pl. Ex.
O at WICK 778).  The November 13th Greenwich Time article stated that Lt. Gray spoke with the
newspaper the day before, on Wednesday, November 12th.  The First Sexual Assault Video
case/incident report states that the final report, closing the file, was typed on November 13th.
(Defs. Ex. 35 at TOG 1042).

29.     On October 3, 2015, another incident involving an assault by a Brunswick
student ("2015 Brunswick Assault") involved a beating at a dance at a teen center in Greenwich.
In that incident, "C", an 18-year-old boy who attended Greenwich High School, was beaten by

M, a 17-year-old boy who attended Brunswick School. (Defs. Ex. 34, Ex. 1).  C's injuries were severe, M suffered no injuries. (Defs. Ex. 34, Ex. 1 at 10/4/15 Report at 3, 10/7/15 Supplementary Report at 1).  GPD took no action with respect to this incident because SVS determined that M acted in self-defense, even though C provided a sworn statement to the contrary only hours after the incident.  (Defs. Ex. 34, Ex. 1 at 10/4/15 Report at 2-3, 10/16/15 Supplementary Report at 1.)  M and the teen center director provided unsworn statements days later, after they had spoken with Brunswick's Headmaster Tom Philip.  (Def. Ex. 39 at p. 2).

30.    On August 3, 2016, Jane's brother submitted a written statement concerning what he witnessed the night of June 3rd.  Det. Rondini directed him to sit down and write what he remembered.  She did not ask him any questions.  (Pl. Ex. AA at ¶ 3-4).

31.    Det. Rondini made two phone calls on August 8th.  (Defs. Ex. 18 at TOG 665).  After August 8th, nothing was done by Det. Rondini until August 25th, two days after the Doe family's attorney wrote a letter of complaint about how the investigation was being conducted. (Defs. Ex. 18; Pl. Ex. UU at WICK 371).

32.    GPD does not generally pause its assault investigations that do not involve Brunswick students. (Pl. Ex. PP, at TOG 3059-3063; TOG 2522-2526; TOG 2527-2536; TOG 2537-2552; TOG 2567-2572; TOG 2581-2595; TOG 2597-2602).

33.    On September 5, 2016, Sam Gonzalez went to GPD to give a statement. (Pl. Ex. BB at ¶ 3).  Det. Rondini appeared uninterested in what Gonzalez had to say, spoke to him for a minute or two, and then instructed him to write down what he remembered.  She did not ask him a single question and did not even review his statement before he left the police station. (Pl. Ex. BB at ¶¶ 3-4).  Gonzalez's statement conflicted with the statement of L.  Det. Rondini

excluded Gonzalez's statement, and deleted the portion of L's statement that referred to Gonzalez, in her arrest warrant application.  (Defs. Ex. 17 at TOG 172-73, TOG 175-77; Ex. 22 at TOG 960-61, TOG 965).

34.     Det. Rondini had extensive correspondence with Peter Roe's attorney, Michael Jones, in which she shared substantive details of her investigation.  (Pl. Ex. L).

35.     Brunswick's Tom Philip and Peter Roe learned about the decision not to issue an arrest warrant before the Doe family did.  (Def. Ex. 23, Pl. Ex. M at WICK 728, Pl. Ex. RR at 210:7-21, Pl. Ex. C at P 448).

36.     GPD Chief James Heavey responded to Attorney Braxton's August 23rd letter to Sgt. Reeves on August 25th via email, stating that a member of the professional standards section would be in touch to investigate.  (Pl. Ex. UU at WICK 309). When neither Attorney Braxton nor the Doe family received any further contact regarding the Braxton Letter, Braxton sent a Freedom of Information Request on May 23, 2018, asking for documents concerning the complaint.  (Pl. Ex. UU at P 206). GPD Director of General Services, Gregory Hannigan, responded that Chief Heavey inquired about the conduct of the investigation and was satisfied with the response. (Pl. Ex. UU at P 212).

Dated: September 28, 2020
        Bridgeport, CT

                                    BRAXTON HOOK LLC
                                    Attorneys for Plaintiff


                            By:        /s/Meredith C. Braxton
                                    Meredith C. Braxton (ct17395)
                                    Elizabeth I. Hook (ct30554)
                                    280 Railroad Ave., Suite 205
                                    Greenwich, CT 06830
                                    Tel. (203) 661-4610
                                    Fax (203) 661-4611
                                    ehook@braxtonhook.com
                                    mbraxton@braxtonhook.com


### CERTIFICATION

This is to certify that on September 28, 2020, a copy of the foregoing was filed

electronically and served by mail on anyone unable to accept electronic filing.  Notice of this

filing will be sent by electronic mail to all parties by operation of the Court's electronic filing

system or by mail to anyone unable to accept electronic filing as indicated on the Notice of

Electronic Filing.  Parties may access this filing through the Courts CM/ECF System.

                                       /s/Elizabeth I. Hook