# Plaintiff Exhibit B

```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - -X

JANE DOE

                    PLAINTIFF


        vs.                       3-18  CV 01322-KAD



TOWN OF GREENWICH, ET AL

                    DEFENDANTS
- - - - - - - - - - - - - - - - -X


             D E P O S I T I O N

     The deposition of FATHER DOE was taken pursuant to
the rules of Federal Procedure at the law offices of Mitchell
& Sheahan, 246 Post Road East, Westport, Connecticut, before
Shirley Sambrook, CSR, a notary public in and before the
State of Connecticut on February 26, 2019.


         **CONFIDENTIAL - ATTORNEYS' EYES ONLY**
```

```
 1              COURT REPORTER: Anything on the record, folks,
 2     before I swear in the witness?
 3              MR. MITCHELL: Do the same thing as the last
 4     time, deposition for attorneys' eyes only? Is that
 5     all right with you?
 6              MS. HOOK: Yes.  And we would like to get a
 7     formal protective order in place for all exhibits.
 8              MR. MITCHELL: Whatever you want to do is fine.
 9     Draft one up.
10              MS. HOOK: We'll draw up something and send it
11     over to you.  Also, same stipulation, not waiving
12     review and signing of the deposition.
13              MR. MITCHELL: Okay.
14
15
16              ███████  ████████            ████████, ████████
17         ████ GREENWICH, CONNECTICUT ████, being duly
18     sworn, was examined and testified upon his oath as
19     follows:
20
21  DIRECT EXAMINATION BY MR. MITCHELL:
22      Q.   Good morning, Mr. ████████.  I'm Bob Mitchell.  I'm
23  representing the Town of Greenwich and the various police
24  officers in this case.  Before we start, I'm sure you have
25  had a chance to be instructed on how depositions work.  I
```

```
 1          want get out of here and talk to my clients, as I
 2          said five minutes ago, and then I will be happy to
 3          listen to anything you have to say.  Right now
 4          I have a decision to make whether to terminate this
 5          deposition or rather adjourn it and go to court and
 6          ask the court to decide.
 7                MS. HOOK: Okay.
 8                (Whereupon the deposition was in recess from
 9          10:26 a.m. until 10:30 a.m.)
10     Q.   One more time so the record is clear.  I am asking
11  you to give me the names of the people you spoke to and the
12  condition I will put on, I will not contact any of those
13  people without the court's permission.  So, with that
14  understanding, could you tell me who you talked to who the
15  victims of sexual assault or whatever that had a problem with
16  the police.
17                MS. BRAXTON: I don't think it was they had a
18          problem with the police.  That wasn't your question.
19                MR. MITCHELL: All right.
20     Q.   Skip the problem about the police.  Who did you talk
21  to?
22     A.   Well, the first one was ███████████████████████.
23  She was assaulted in college but he didn't succeed.  He -- he
24  was the captain of the swim team.  She was ███████████████
25  ███████.
```

1  Q.  I don't need to hear all of the details.  You don't
2  have to go through the whole thing.  It's all right.
3  A.  She took a chunk out of his arm and bit him
4  basically and then she got away.  Another one was ▓▓▓▓
5  ▓▓▓▓, (phonetic) an attorney from ▓▓▓▓▓▓ who moved.  I
6  think she lives ▓▓▓▓▓▓▓▓▓▓▓▓ now.  She was attacked by
7  her law school professor in her own home while she was making
8  peaches, canning peaches, somewhere in- I think she was
9  somewhere in ▓▓▓▓▓▓.  She cracked it over his head, a
10 jar of hot peaches, and defended herself that way.  Another,
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12 ▓▓▓▓.  She was from ▓▓▓▓▓▓.  She explained that she
13 was attacked and she didn't report it and it was very
14 devastating.  Another girl, friend of my wife's from high
15 school, was attacked in the synagogue.  ▓▓▓▓▓▓▓▓▓▓
16 ▓▓▓▓ was attacked in college and went through the
17 judicial process.  I don't know, I could think of probably
18 more.  I have heard a lot of the stories.  How many do you
19 need?
20 Q.  I just want -- all I want to know, was this the
21 basis of your understanding how victims should be dealt with
22 at the police department?
23 A.  In each case the victim expected to be treated with
24 respect and they don't like to be not believed.  It's harmful
25 to them.

```
 1      Q.   Okay.  What about the --  what about the accused
 2   assailant and their rights to due process?
 3              MS. HOOK: Objection.
 4              MR. MITCHELL: I'm just asking the question.
 5              MS. HOOK: What do you mean what about?  What is
 6         the question?
 7              MR. MITCHELL: I'm asking him what his opinion
 8         is of their rights.
 9      A.   This is a special victims section.  We don't have a
10   special perpetrators section.  It's a special victims
11   section.  The reason they are special victims is because it's
12   humiliating.  This kind of attack is humiliating and
13   devastating, especially to young victims with no experience.
14   It's hard for them.  So you need special support and in that
15   second interview, we didn't get it.  That is my daughter's
16   feeling at that second interview.  It was combative.  It was
17   hostile.  The first -- And she didn't- I don't see why it
18   was necessary.  When we first spoke to Detective Rondini in
19   July, we were told this was a juvenile process.  This --
20   she had to make her statement.  This was not a normal court
21   proceeding.  If she made a statement, the boy would be
22   treated --  We asked, we wanted to make sure the boy did not
23   get jail time and wanted to make sure the boy was given
24   accountability and also training for his treatment of women.
25   That's what we wanted.  We want him out of my daughter's
```

1  life. And so my understanding was that it was -- one
2  statement was enough. My daughter agreed to do that. She
3  wanted justice but she didn't want the blow back. She didn't
4  want all the social blow back that was happening. It was
5  unfurling right from the day one. Teenagers were talking
6  about this. So, that second interview was very harmful to
7  her. She did not enjoy that experience. She was -- It left
8  her -- it was unpleasant for her.
9      Q.   Okay.
10     A.   Much more than even the first one.
11     Q.   You said she didn't want the social blow back.
12 Isn't it true she told people about this herself?
13     A.   That's right. Yes, she did.
14     Q.   The social blow back presumably came from that, did
15 it not?
16          MS. HOOK: Objection.
17     Q.   Social blow back, to at least some degree, resulted
18 from your daughter's having told people about it, isn't that
19 correct.
20     A.   The -- I can answer. So, let's-- The social blow
21 back has many parts to it.
22     Q.   Define what you mean by social blow back, then.
23     A.   Being blocked in social media by half of the
24 Brunswick class. Being bullied at school by one of the girls
25 at GA. Basically inability to deal with the fact that she --

1  had non-privileged conversations with the perpetrator.  Get
2  his information.  The perpetrator told Tom Philip that he had
3  drank to excess.  Okay?  That's -- that's really important
4  information.  Why wasn't that put into the affidavit?
5      Q.   I believe it was.
6      A.   Well --
7           MS. HOOK:  Objection.  Are you testifying?
8      Q.   Putting that aside, I'm asking you, do you have any
9  other source besides common sense and Title 9 for your
10 concerns about the way the police conducted the
11 investigation?
12     A.   The, the timing of it.  So, let's go ahead and look
13 at what happened.  So, we made a statement on the 2nd of
14 August.  My daughter made a statement.
15     Q.   Okay.
16     A.   2016.  And then my daughter had qualified for a
17 national level swim meet so we drove, my daughter and I,
18 drove to Maryland for that swim meet and my wife and son went
19 to France and then ■■■ and I caught up with them.  While we
20 were away, Greenwich Academy contacted me and asked me to, at
21 Tom Philip's request, he's the head of Brunswick School, Tom
22 Philip had asked Molly King, the head of GA, to get a summary
23 of the events that happened that evening, on June 3rd.  I did
24 that while we were traveling.  I sent that e-mail on the
25 14th, which is a Sunday night, from France.  I sent it by

1  e-mail. The next day, Monday, I received a response from Tom
2  Philip where he said, there's a document for that somewhere,
3  and then about an hour later I had a voice mail on my home
4  computer, home voice mail machine, from Sergeant Detective
5  Reeves to call the GPD. So I thought it was an update for
6  the case and so I contacted Detective Rondini to say we are
7  traveling. We'd be back that Thursday, the 18th, and if that
8  would be okay, I'd talk to them the next day, Friday.
9       Q.   Talk to Rondini you mean?
10      A.   Sergeant Detective Reeves.
11      Q.   Okay. Police department, okay.
12      A.   So, the timing of that, it turns out that that call
13  was not an update on the case. I thought it was originally a
14  coincidence. In hindsight, it wasn't a coincidence at all.
15  It was directly related to the e-mail that I had sent to Tom
16  Philip.
17      Q.   How do you know that?
18      A.   Well, because the conversation I had with Sergeant
19  Detective Reeves was an intimidating, threatening
20  conversation because I had sent an e-mail summarizing the
21  case to Tom Philip at Brunswick School.
22      Q.   Sergeant Detective Reeves referenced that e-mail?
23      A.   Yes.
24      Q.   He said you had sent the e-mail to Philip? I'm just
25  asking.

1    A.   Is that a question?

2    Q.   Yes.  Did he specifically mention the e-mail you

3 sent to Philip?

4    A.   Yes.

5    Q.   What did he say?

6    A.   So, if you want that conversation --

7    Q.   What did he say about the e-mail?  I'm sorry.  It

8 wasn't clear.

9    A.   The conversation went as follows.  I was at my desk.

10   Q.   Hold it for a second.  I just want to know what he

11 said?

12   A.   I'm trying to recall the whole conversation.

13   Q.   Okay.  All right.

14   A.   So that, well I spoke to him.  I was expecting an

15 update in the case.  It was not an update in the case.  It

16 was a dressing down.  And he said that I had sent an e-mail

17 to Brunswick School and that I had no business interfering in

18 a police investigation.

19   Q.   Okay.

20   A.   He also said that I shouldn't be doing that because

21 I am subject to libel charges because I am libeling the boy.

22 He also said that we could be in trouble for social hosting

23 violations because we were running a drinking party and I,

24 that one, I stopped him and I asked him how he had heard of

25 that.  I'm like, who told you that?  That's what I said.  He

1  said, Brunswick security told me that. So, it's clear that
2  there was a communication between Sergeant Detective Reeves
3  and Brunswick School. Yet that, that communication, was
4  never included in the FOIA. It's not included in any of the
5  notes that we saw. It was not reported in the affidavit.
6  That's called back channel. That's a secret like two sets of
7  books for the accountants. It's not allowed.
8      Q.   Do you have any other facts that you think indicated
9  some kind of collusion between Brunswick School and the
10 police department?
11     A.   When this case started, when my wife and I first
12 went to Detective Rondini's office at GPD, we asked Detective
13 Rondini who would have access to this file, because we were
14 worried.
15     Q.   Un-huh.
16     A.   We were worried because we all knew the back
17 chatter. There was another case in the fall of 2014 that was
18 well known, freshman year. These are freshman. Okay? These
19 are 9th graders. A girl had consumed excessive alcohol in
20 the basement of someone's home and this is the ▮▮▮▮▮
21 incident. The story was well traveled in the 9th grade of
22 the Brunswick GA school. And the story was very clear and
23 very explicit that there was a girl who had fallen asleep.
24 She was undressed. Somebody did things with her that were
25 not -- they basically touched her in various ways from what

1   A.   No direct knowledge.  Not myself.

2   Q.   Thank you.  You had this conversation with Sergeant
3   Detective Reeves and it involved a discussion of your e-mail
4   to Mr. Philip.  Is there any other evidence, any other facts
5   you have, that support your theory that there was some kind
6   of collusion between Brunswick School and the police
7   department dealing with your daughter's charges?

8   A.   Well, the conversation that happened on the 19th of
9   August with Sergeant Detective Reeves, I was expecting it to
10  be an update in the case.  So, it was this long dressing down
11  that took a while to go through.  After he warned me off,
12  I -- I said to him, you know, if I'm interfering in the
13  police case, so is Brunswick School.  They are interviewing
14  witnesses.  Why don't you ask them to stop?  And then we got
15  into the actual case.  I did ask him how the case was going.
16  He said, well, the boy's refused to make a statement.  This
17  is a he said-she said case and that, you have to understand
18  the context here.  At that time I didn't have full
19  information.  I don't think I even have full information now.
20  When my daughter was attacked, the therapist told us that we
21  were not allowed to review the incident with her.  So this
22  attack occurred and occurred in my own home but I was not to
23  give her the third degree.  I was not allowed to question her
24  about this.  So, so that in that context, Sergeant Detective
25  Reeves continued and he said, did your daughter scream?  Did

1  A.  My wife and my attorney.

2  Q.  I'm sorry. I missed that over the coughing.

3  A.  My wife and my attorney. So in the -- in the arrest
4  warrant application I read afterwards there is a statement by
5  Charlanne Bauerlein Zepf, who is the GA counselor. At the
6  bottom of that there is something that says that,
7  essentially, that the victim ▇ changed her testimony.
8  And I spoke to Charlanne about that. She was at both
9  interviews. She was the one who supplied -- She spoke to
10 my daughter several times through the course of this. She
11 was the first adult to learn of this attack. She received
12 ▇'s phone call and met with ▇ in person, more than
13 once maybe, or once at least. I think twice, and then was
14 attending the formal statement at our house with Detective
15 Rondini. So, Charlanne said ▇ was totally consistent all
16 the way through. That statement in the arrest warrant
17 application made her inconsistent and the State's Attorney
18 Colangelo said once a witness is inconsistent, the case is
19 not -- the case is not provable.

20 Q.  Do you know what the inconsistency was that was
21 being referenced --

22 A.  You already asked that.

23 Q.  Let me finish. That was being referenced in the
24 note at the bottom of the Charlanne statement?

25 A.  They said it has to do with fingering, to use the

1  I told him to contact the police with any information.  So he
2  showed up and gave his statement but it was an irrelevant,
3  bit part.  I don't know why that was such a big mention.  Why
4  was that a big, you know, why was that such a big fact in his
5  head?  Why was that the most important fact?  And the
6  conversation with Colangelo was helpful in a lot of ways.  He
7  explained that he has to trust his police and he has to go by
8  what they tell him and I find that kind of shed a lot of
9  light.  The police have a lot of power.  It's not just the
10 prosecutor.  The police cast a case in a certain light.  If
11 the prosecutor is going through a large volume of cases, they
12 depend on the police.  I understand that.  But on the other
13 hand it does put an obligation on the police, also, to cast
14 the case, each case, in a proper light and in that sense it's
15 not just on the prosecutor.  It is up to the police
16 officer.
17     Q.  What do you mean by cast the case in a proper light?
18 What are they supposed to do?
19     A.  If you want to kill a case, you can kill a case.  He
20 told us explicitly, once your daughter has made inconsistent
21 statements, it's difficult for him to get to a provable case,
22 which makes it unlikely he would ever take a case such as
23 that.  So once those inconsistencies are papered into the
24 affidavit, the case is done.  It's basically what he
25 explained to us.  He will not take a case he cannot win.

1  encourage it but she didn't stop it.  There were the three
2  boys who showed up, ▓▓▓ plus the other two boys.  That
3  would be ▓▓▓ and- and ▓▓▓ whatever his name is.
4     Q.   Dent.
5     A.   And they were carrying a big jug of something.  I
6  learned that from my son, ▓▓▓.  At the time of the party we
7  didn't know of any drinking.  There were -- my daughter
8  admitted to having sips of alcohol.  I don't think she is a
9  drinker too much because of physical reasons but she may have
10 had some alcohol that night.
11    Q.   When did you -- was there a point in time where you
12 came to this understanding that you just described,
13 recognizing it wasn't that night, of course?
14    A.   Much later.  I was not allowed to give my daughter
15 any kind of questions.  Therapist told us not to do that.
16 After we learned of the attack, I asked my son about it.  As
17 soon as we knew of the attack, and you have to keep in mind
18 that that was seven weeks or so after the attack, and I asked
19 my son about it, was there drinking going on?  I was angry
20 actually when I heard about it.  I asked my son if he knew
21 about any drinking.  He said that he didn't know about -- He
22 knew ▓▓▓ had a big jug of something so he knew that
23 he had been drinking and he explained that situation and I
24 thought that they had stolen something from, we have a liquor
25 cabinet and it's well away from the kids.  It's basically in

1  my office area. And I asked him if anyone had stolen alcohol
2  from our cabinet. He said no. They had all supplied it
3  themselves. So that much I learned about the time of when we
4  learned of the attack. I asked ▇▇▇ those questions. I
5  asked if ▇▇▇ supplied any alcohol or whether he was
6  involved. He said he was not involved at all, he told me. I
7  asked him that several times actually because I wanted to be
8  certain of that. And ▇▇▇ did not supply any alcohol
9  according to ▇▇▇. To this date I have never really quizzed
10 my daughter on that whole topic.
11              MR. MITCHELL: What I want to do next, let's go
12         through some of the documents that were produced
13         last time on Mother Doe. I have stapled, I think I
14         figured out the different chains of e-mails. I'm
15         not sure so I brought a stapler. We'll mark the
16         first page and then I will ask him to help me get
17         through each set. I think I have them figured out
18         but I'm not sure. Unless you want to mark the whole
19         packet and go through it that way. I don't care,
20         either way, but it's probably better in the long run
21         to split them up.
22              MS. HOOK: To the extent he points out they are
23         incorrectly paginated, we can rip them apart.
24              MR. MITCHELL: They aren't stapled at all.
25              MS. HOOK: You said to have him identify them,

```
 1              if he can.
 2                      MR. MITCHELL:  I will have him look at them
 3              before we mark them, if this is okay with you?
 4                      MS. HOOK:  That's okay.
 5         Q.   What I'm going to do, so you understand, I am going
 6    to give you this pile.  They have these numbers at the bottom
 7    of the page.  I will tell you the way I interpret them by
 8    number.  You can double check to see if I'm right or not.
 9         A.   These are documents you got from us?
10         Q.   Yes.
11         A.   I have seen these before, I take it?
12         Q.   I hope so.  I don't know if you have or not.  But I
13    think I figured out the chains of e-mails but if I haven't, I
14    want to try to perfect them.  I have some questions on,
15    obviously, on the e-mails.  The first one I have runs from PD
16    0085 to 0087.  I think that's one-page.  Does that seem right
17    to you?  Take a look and see if I'm right.
18         A.   Okay.
19         Q.   Does -- is that a chain, 85-87?
20         A.   Yes.  It looks like it's one chain, yes.
21                      MR. MITCHELL: Let me give you that.  I'm sorry.
22              Here's the whole set.  Here's a set for you.
23                      MS. WADLER: Thank you.
24         Q.   Let's staple that one and we'll mark it FD 3.
25                      (Whereupon PD 85-87 was marked as Defendant's
```

1      Deposition Exhibit FD 3 for Identification)

2      Q.   I'll ask you a couple of questions about it.  If you
3 look at the third and fourth paragraphs down on the front on
4 page 85, 0085.  That's what I want to ask you about.

5      A.   On the third paragraph or the third and fourth?

6      Q.   Third and fourth.  Just the first sentence.  I think
7 first two sentences of the fourth paragraph.

8      A.   Yes.  Okay.

9      Q.   All right.  In those paragraphs you mentioned that,
10 in the third paragraph, We must make sure that ▓▓▓ has buy
11 in for family's decision.  Could you explain what you meant
12 by that.

13     A.   Yeah.  So, ▓▓▓ had two worries.  One is to get the
14 boy out of her life and the other one is that she didn't
15 have a lot of social blow back.  She didn't know how to
16 navigate.  That's why it was so complicated for her after the
17 attack.  She knew that she would be considered the narc
18 (phonetic) for --

19     Q.   Considered a what?

20     A.   Narc.

21     Q.   What's a narc?

22     A.   A person who tattles on the sexual assault
23 perpetrator and she wanted him out of her life but on the
24 other hand she didn't want to be the tattler.  So, she really
25 wrestled with this.  So, in essence, what we came up with was