# Plaintiff Exhibit D

```
 1   UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF CONNECTICUT
 2   -------------------------------x
     JANE DOE,
 3                                   CONFIDENTIAL
                 Plaintiff,
 4
     vs.                  Case No. 3:18-cv-01322-KAD
 5                        Date:  September 18, 2019
     TOWN OF GREENWICH, ET AL,
 6
                 Defendants.
 7   -------------------------------x
     COMPLEX LITIGATION AT WATERBURY
 8
     JANE DOE, JOHN DOE, AND MARY DOE,
 9
                 Plaintiffs,
10
     vs.                  Case No. X06 UWY-CV-18-5024973-S
11
     BRUNSWICK SCHOOL, INC.,
12
                 Defendants.
13   -------------------------------x

14              DEPOSITION OF  ███████████

15       The deposition of  ██████████  was taken on

16   September 18, 2019, beginning at 12:03 p.m., at Two

17   Greenwich Office Park West, Greenwich, Connecticut,

18   before Susan Wandzilak, Registered Professional

19   Reporter and Notary Public in the State of

20   Connecticut.

21              Susan Wandzilak  License No. 377
             DEL VECCHIO REPORTING SERVICES, LLC
22            PROFESSIONAL SHORTHAND REPORTERS
                     117 RANDI DRIVE
23               MADISON, CONNECTICUT 06443
                     800-839-6867
24

25   NEW HAVEN                 STAMFORD          HARTFORD
```

```
1              MR. MITCHELL:  Reese Mitchell for Officers
2        Rondini and Reese in the Federal action.
3              MR. O'NEILL:  Tom O'Neill for Day Pitney for
4        the witness, ██████████████.
5              THE VIDEOGRAPHER:  Will the witness be sworn?
6        ██████████████████,
7              having been first duly sworn, testified as
8        follows:
9              THE COURT REPORTER:  And can I have your full
10       name and address for the record?
11             THE WITNESS:  ████████████ -- ██████████████
12       ████████ is my middle name, ██████████████████,
13       ████████████████.
14                        DIRECT EXAMINATION
15   BY MS. BRAXTON:
16       Q.   Good morning.  May I call you ██████?
17       A.   Yeah, that's fine.  Yes.
18       Q.   You can call me Meredith, if you like.
19       A.   Okay.
20       Q.   Have you ever been deposed before?
21       A.   I have never been deposed.
22       Q.   Okay.  So let me just give you sort of the
23   ground rules here.  I will be asking you questions.
24   You will be giving me answers.  The court reporter is
25   going to be taking down verbatim what you say.
```

1   feature of, you know, where you live and, you know.

2       Q.   You specifically remember people using the

3   secret passageways and everyone gathering at the main

4   house?

5       A.   You know, I remember us entering the premise.

6   So the reason why I specifically remember entering the

7   premise is because ████ wanted to show us under one

8   of her stuffed animals in the corner of her bookshelf

9   she had this sort of like box which held water bottles

10  which she told us would be sort of good use for sort

11  of like a subtle way to, you know, have vodka and hard

12  alcohol that she could maybe then subtly get to the

13  party.

14          So it was sort of a, you know, her showing us

15  that but then also, you know, killing time before the

16  party was at sort of full capacity.

17      Q.   Did she have any vodka in those bottles that

18  you claim you saw that night?

19      A.   Yes.

20      Q.   Okay, and did she bring them out to the pool

21  house?

22      A.   Yes.

23      Q.   Okay.  So you are not going to testify about

24  any of your own alcohol, bringing any alcohol or

25  consuming any alcohol but you are going to throw

1    Q.  What time did ███████ arrive at the party?

2    A.  You know again, I was in the hot tub.  I

3    arrived at the party at 6:30, so I would guess, you

4    know, somewhere around 8:20, 9:00, maybe 8:30,

5    somewhere in that time frame.  You know, it was later,

6    at least an hour after I got there, you know, plus.

7    Q.  Look at Exhibit 2.

8         MR. O'NEILL:  Exhibit 2 is the deposition

9    notice of the subpoena.

10         MS. BRAXTON:  Oh, I am sorry, Exhibit 3.

11         THE WITNESS:  What page?

12         MR. O'NEILL:  We will find out what page she

13    wants you to look at.

14    BY MS. BRAXTON:

15    Q.  Go to page 903.

16         MR. O'NEILL:  Hold on a second before you

17    answer.

18    BY MS. BRAXTON:

19    Q.  Where it says BW8, which is ████████████ and

20    I are going to pick up stuff, so we will be there at

21    8:05.  So does that refresh your recollection about

22    when you were there?

23         MR. O'NEILL:  Object to the question --

24         MS. BRAXTON:  When you arrived at the party.

25         MR. O'NEILL:  -- and instruct the witness not

1            to answer that question.

2                 MS. BRAXTON:  How is when he arrived at the

3            party possibly privileged?

4                 MR. O'NEILL:  It's not, but if you ask the

5            question this way, does the reference to 8:05

6            refresh your recollection as to when you arrived,

7            that might be proper.  But using the entire

8            sentence that I have objected to and instructed

9            him not to answer regarding pick up stuff, I

10           think is improper.

11                MS. BRAXTON:  That's ridiculous.  That's

12           ridiculous.

13                MR. O'NEILL:  Okay, that's your position.

14                MR. SCONZO:  Objection to your use of the

15           word ridiculous.

16                MR. O'NEILL:  That's your position.

17     BY MS. BRAXTON:

18           Q.  When did you arrive at the party?

19           A.  You know, from what I understand, you know,

20     6:30 or later.  These texts suggest it was later.

21     But, you know, it sort of points to my, you know, a

22     lot of time transpiring between here and then.  And

23     her having multiple events.  I mean, the pool was at

24     play.  You know, we would go there.  You know, we were

25     in the house as well.

1        Q.   So, again, you really just don't remember?

2        A.   I mean, it's, you know, really tough.  You

3    are asking me to have precise time recollection, you

4    know, when it happened three plus years ago.  I

5    couldn't even give you precise time recollection from

6    a month ago, you know.  It's pretty tough.  You know I

7    can give you sort of a prediction or a --

8        Q.   But before you testified --

9             MR. O'NEILL:  Can he finish answering the

10            question, please?

11            MS. BRAXTON:  Go right ahead.

12            THE WITNESS:  I can give you my best guess

13            and, you know, I will preface it with that.  You

14            know, when there is some uncertainty as, you

15            know, I think I have earlier but, you know, there

16            is definitely just a bit of uncertainty with the

17            specifics and the timing.

18   BY MS. BRAXTON:

19        Q.   Right.  So you testified before 6:30 so that

20   you would give yourself enough time to go up to

21   ████'s room and see bottles of vodka.  Isn't that

22   right?

23        A.   That's just what I remembered.  You know, it

24   seems that this is an event that has occurred and from

25   what I remember, you know, the bottles that she had in

1    her room were used at the party, you know, to drink.

2            MS. BRAXTON:  Move to strike as

3        non-responsive.

4            MR. SCONZO:  Objection.

5    BY MS. BRAXTON:

6        Q.  So -- and it's still your testimony that

7    ███████  got there by 8:00?

8            MR. SCONZO:  Objection.

9            THE WITNESS:  So I had actually mentioned a

10       bit earlier that -- I'm emphasizing that sort of

11       if we were going to look at the events

12       chronologically, he arrived after me.  You know,

13       quite a bit of time elapsed between my arrival

14       there and his arrival.

15               Now, specific time, you know, I can't,

16       you know, make a precise, you know, guess.  But I

17       can tell you from a chronological standpoint, he

18       arrived after I did.

19   BY MS. BRAXTON:

20       Q.  At 8:00 was the party already going in the

21   pool?

22       A.  From a chronological standpoint, the party

23   was going when ███████ showed up.  We were in the pool.

24   You know, referring to the timing, it's really really

25   difficult for me to, you know, have a good

1      A.   You know, ████ throughout, you know, as I

2  sort of detailed earlier, I saw him grow increasingly

3  irrational and like, you know, intoxicated throughout

4  the night.  You know, he was sipping a large amount of

5  alcohol, consuming it very quickly.

6           And so, you know, there were multiple people

7  actually who said, you know, slow down, I think likely

8  from the people he arrived with.  So I think ████ and

9  ████ probably would have told him something like

10  that.  But, you know, I can't say for sure who told

11  him.  But I definitely remember in passing, people

12  telling him to slow down a bit.

13           Yeah, I don't know if that answered your

14  question.

15      Q.   No, it didn't.

16      A.   So can you rephrase it?

17      Q.   What did you observe happen between ████ and

18  ████?

19      A.   Sorry, yeah.  I remember ████ growing

20  increasingly aggressive and intoxicated.  And then

21  ultimately, you know, was play fighting, I guess, with

22  ████.  But then it grew into, you know -- what I

23  thought was play fighting, it grew a bit more

24  aggressive than that.

25      Q.   Who became more aggressive?

1    A.   Yeah, ████ was sort of, you know, in that

2    having, you know, a good time, like he was just kind

3    of chuckling, laughing.  It was a play fight

4    initially, but then ████ grew pretty -- like, pretty

5    aggressive to the point where we were like whoa, we

6    got to hold this kid back.  You know, but ████ was

7    just sort of laughing.

8         But, you know, he was -- I think ████ had

9    his hands on him for sure.  So, yeah, ████ was, you

10   know, he didn't do anything to cause this altercation.

11   He didn't like, you know, do anything to maybe, you

12   know, cause that as a response.  No sense of like

13   criticism, nothing like that.  It seemed rather out of

14   the blue and I think a large byproduct from his

15   consuming the alcohol.

16   Q.   ████ consuming the alcohol?

17   A.   Yeah, exactly.

18   Q.   Did ████ fight back?

19   A.   No.  From what I understand, it was just sort

20   of had his arm out, you know, preventing him from

21   getting closer, but not like hitting him back or

22   anything, you know.

23   Q.   So you said that ████ was getting

24   increasingly irrational and intoxicated through the

25   night and was getting aggressive.  Correct?

```
 1   BY MS. BRAXTON:
 2       Q.  Right, but they are saying they want to try
 3   to follow what you are saying --
 4       A.  Oh, okay.
 5       Q.  -- as you are going along.  So they wanted a
 6   copy of it now.
 7            MR. O'NEILL:  Do you have a picture on your
 8       phone?
 9            THE WITNESS:  So what do you want -- what do
10       you want me to do?
11            MR. MITCHELL:  We'll take a picture.
12            THE WITNESS:  Okay.
13            MS. BRAXTON:  Do you want me to try to get a
14       copy for you?
15            MR. MITCHELL:  That would be very pleasant of
16       you.
17            MS. BRAXTON:  Let's go off the record for a
18       minute.
19            THE VIDEOGRAPHER:  Off the record at
20       1:49 p.m.
21            (Whereupon, a brief recess was taken.)
22            THE VIDEOGRAPHER:  On the record at 1:57 p.m.
23   BY MS. BRAXTON:
24       Q.  Okay, just by the way, when was the last time
25   that you were at the ███████ house?
```

```
 1        A.   Okay, the last time I was there was probably
 2   the day that I went with ████ to talk with ████
 3   about, you know, something that they kept pretty
 4   secret.  I had no idea what the back story of like why
 5   I was going there was.  Like I wasn't prefaced --
 6        Q.   Do you remember the date?
 7        A.   After this, maybe a few days, maybe the
 8   Monday of the week following.  So three days or four
 9   days later.  The exam return back day, I remember.  I
10   don't know the date.
11        Q.   So let's talk about -- so let's go back to
12   your diagram.
13             MR. SCONZO:  Was this marked?
14             MS. BRAXTON:  It's going to be.
15             MR. O'NEILL:  Not yet.
16             MR. SCONZO:  Okay.
17   BY MS. BRAXTON:
18        Q.   But actually it's kind of messy at this
19   point.
20        A.   Yeah, do you want me to redraw it?
21        Q.   Do you think you could draw just the pool
22   house with its doors?
23        A.   Okay, yeah.  This will be diagram two.
24             MS. BRAXTON:  And I can have the reporter
25        mark this one right now.
```

```
1              MR. SCONZO:  Objection.

2              MR. MITCHELL:  We are objecting to form.

3              MS. BRAXTON:  Okay.  And he can answer so be

4         quiet, please.

5              MR. MITCHELL:  I was responding to your

6         co-counsel.

7              THE WITNESS:  Yeah, I may have misused the

8         term, you know, grazing the swim suit versus

9         forceble entry, I guess.  Forceble entry wasn't a

10        sort of thing that occurred here, you know.

11        That's --

12   BY MS. BRAXTON:

13        Q.   ████████didn't say that she invited him to

14   graze her swim suit, did she?

15        A.   No.

16        Q.   Okay.

17        A.   She didn't say that.

18        Q.   So she was saying it was against her will,

19   correct?

20              MR. SCONZO:  Objection.

21              THE WITNESS:  Perhaps, yes.  Perhaps.

22   BY MS. BRAXTON:

23        Q.   And how many times did ████████say he grazed my

24   swim suit?

25        A.   The number of utterances wasn't specified.  I
```

1    don't know the answer to that question.

2       Q.   And was it established whether ███████ was

3    standing up or had his head over the toilet when he

4    was grazing her swim suit?

5       A.   Yeah, I don't recall.  I think we tried to

6    work -- I think we tried to work out like, so walk us

7    through exactly what happened.  I don't exactly

8    remember.

9       Q.   So that you don't remember?

10      A.   I remember meaning it was inconsequential,

11   what she sort of, in my mind it seemed her walk

12   through was inconsequential like a grazing of the swim

13   suit.  So I sort of, you know, said okay, you know.

14      Q.   If you could look at Exhibit 3, and go to

15   page 907.

16      A.   Here?

17           MR. O'NEILL:  Yeah, that's the one.

18           THE WITNESS:  Um-uh.

19   BY MS. BRAXTON:

20      Q.   So you were communicating with ██████around

21   the 4th of August, correct?

22      A.   Um-uh.

23      Q.   This is you and █████?

24      A.   Um-uh.

25      Q.   Correct?  And ██████ says I need to call you,

1   right?  It's really important.  Can you call me?

2   Correct?  Page 907.

3        A.   This is where the conversation starts?

4        Q.   Yeah.

5        A.   Yes, and this is the only page you are

6   referencing.  Right?

7        Q.   Right now.

8        A.   Okay.

9        Q.   We are going to go beyond that.  Why don't

10  you read -- actually, that's the only page, so yes.

11       A.   Yes, so this is in reference to calls I

12  received -- unsolicited calls I received from the

13  Greenwich Police Department around, like woke me up in

14  the 6:00 o'clock time frame, 6:30 a.m., perhaps

15  Montana time.  So like 8:30 eastern standard time a.m.

16  from the Greenwich Police Department.

17            So it wakes me up.  This phone call wakes me

18  up.  I am sort of sitting in bed.  I get the call,

19  hello, and it's the Greenwich Police Department

20  concerning the events at ███████████ house.  And

21  I'm like, all right, I have no comment for you.  End

22  that phone call, immediately text ██████

23            I believe that there are texts before this

24  that are not there.  Or if you look at her call log I

25  am sure I called her multiple times.

```
1          Q.   So, I mean, just to be straight, the shaded
2     ones are ███████.
3          A.   Um-uh.
4          Q.   And you're the white one.  Right?
5          A.   Yeah.
6          Q.   Okay.
7          A.   So I am saying this chat history suggests
8     that she initiated our conversation.  I am saying
9     that's completely not true.  I am saying I got the
10    call from the Greenwich Police Department and
11    immediately reached out to ███████ saying what's the
12    deal with this?  What's going on?
13              I probably called her several times, and then
14    I recall reaching her via phone a bit later that day.
15         Q.   All right.  Well, she said can you -- it's
16    important, can you call me, right?
17         A.   I believe -- so the statement reference from
18    me --
19         Q.   Well, I am still up here.
20         A.   Yeah.  Yeah, okay.
21         Q.   I am still up here.  She said it's important,
22    can you call me.
23         A.   Um-uh.
24         Q.   Okay, you didn't respond.  Oh, yeah, I got a
25    call from the cops, right?
```

1   Dr. Matus' class is pretty difficult.  The test I

2   didn't do so well on.  Ms. Davico says, you know,

3   ███████, it's time.

4           So they sent Ms. Davico -- you know, I got an

5   e-mail I responded to, I'm going to be there.  But

6   Ms. Davico was sent in, I guess, as a reminder to get

7   me to leave and talk to Mr. Philip.

8           So I finished the test.  I handed it is, go

9   walk into the Altman room which is where I met with

10  Mr. Philip.  You know, he sits me down and he just

11  says, you know -- so we walk in the Altman room.  He

12  says, you know, how are you doing, sort of one line

13  question.  Like, you know, how has the school year

14  been so far, how are you doing this week.  I say, you

15  know, doing well.

16          And then he sort of introduces the case that,

17  you know, Brunswick is facing, I guess he was familiar

18  with given that he conversed with ██████, I guess.  And

19  he said so what happened.  He just asked me what

20  happened, you know after a sort of one line cordial

21  introduction, you know, how is your week going, what

22  happened.

23      Q.  But you said he said something about what

24  ███████ said about the party?

25      A.  No.  I said he is merely familiar with the

1   party because I guess ▮▮▮ had been talking with him

2   from the start of the school year.  So that's why he

3   was familiar, and he just wanted to get my -- you

4   know, what I saw.  So he said, so ▮▮▮, what happened

5   that night.  And then I walked him through everything

6   that happened.  And then he just sort of said, you

7   know, you should make a statement.

8           You know, it was just pretty simple.  It was

9   just like, you know, you should make a statement.

10  Now, after that, I had already been reluctant to do so

11  because I thought that doing so, my identity and my

12  association with the case would harm my well-being as

13  someone who has like a clean slate and good

14  reputation.

15          You know, I felt like you would be able to

16  search my name and find this and stuff.  So I was

17  really hesitant to give statements irrespective of,

18  you know, whether or not it was the police calling me

19  or like Mr. Philip telling me give a statement.

20          But then ultimately like, you know, I think

21  in late October, I ended up giving a statement because

22  I thought, you know, it's, you know, it's a good time

23  after letting everything play out and letting things

24  sort of play out a bit, like I should give a

25  statement.

1   just came up with, you should make a statement?

2       A.   He just sort of acknowledged what happened.

3   Acknowledged, you know, what I said and then, you

4   know, said, you know, I think you should make a

5   statement.  He said something along the lines of, you

6   know, having all the information will help in sort of

7   the case that the police are conducting, something

8   like that.

9           And I said, you know, okay, like duly noted

10  and considered.  Thank you.

11      Q.   When did you hire an attorney?

12      A.   I am less clear on that.  Because that was

13  less from me, more of like I think a knee jerk, like,

14  parental reaction.

15      Q.   When was the first time you met with an

16  attorney?

17      A.   Yeah, I met with the attorney the same day I

18  made the statement.  So I guess I went to the attorney

19  to give the statement.  That was the first time that I

20  had an interaction.

21      Q.   That you met with him?

22      A.   Yeah, was to give the affidavit statement.

23      Q.   Did you speak to him before that?

24      A.   No.

25      Q.   You never spoke to him before that?

1    don't know, I was never informed of anything.

2         Q.   Okay, it was Eugene Riccio, right?

3         A.   Yeah.  Yeah.

4              MS. BRAXTON:  Would you mark that, please?

5              (Whereupon, Plaintiff's Exhibit ▮-9 was

6         marked for identification.)

7    BY MS. BRAXTON:

8         Q.   Let me ask you one more thing.  Aside from

9    the meeting with Mr. Philip, did you have any phone

10   calls with Mr. Philip during the fall of 2016?

11        A.   No phone calls, no.

12        Q.   So that meeting, was that the only

13   communication you had with him?

14        A.   Yeah.  My interactions with Mr. Philip are

15   effectively limited to, you know, for lunch he was

16   always around, like, where lunch was served.  And he

17   would always make small talk with kids coming by.

18   Like, hey Mr. Philip, how is your day going.  Like,

19   it's going well.  You know, get my food and go on.

20   But that was the only one-on-one sort of thing.

21        Q.   No text messaging with him?

22        A.   Maybe.  Maybe.  I might have texted with him,

23   you know, a little bit.  He might have checked in

24   concerning the status of my giving a statement or not.

25   You know, as a follow up to our talk.  You know,

1    because he said, you know, please give a statement,

2    you know, for the investigation or whatever.

3           He said, you know, have you given a statement

4    yet or something, I might remember something like

5    that.  I think I responded like, you know, scheduled

6    to do so or something, some time this week or some

7    time later this month.  You know, I think I might

8    recall something like that.  But as for phone calls or

9    things like that, no.

10      Q.   All right, I am going to hand you Exhibit 9.

11      A.   Okay, yeah.

12      Q.   Okay.  So this is between -- it's between

13   ████████████  and Mr. Philip, text messages.  And he

14   says excellent, I heard -- student five is you -- has

15   submitted a statement along the lines of what he told

16   you and me and that's on October 19.

17          So where would he have gotten the information

18   that you had submitted a statement at that point?

19      A.   You are talking about Mr. Philip?

20      Q.   Yeah.

21      A.   Yeah, so I think, you know, what I sort of

22   mentioned, he followed up after our one-on-one

23   discussion in the Altman room.  You know, when do you

24   plan on giving a statement, you know, just let me

25   know.  I think I gave -- I sent him a text that it was

1    BY MS. BRAXTON:

2        Q.   So when did you decide that you would make a

3    statement?

4        A.   Yeah, so I think in the latter half of

5    October, you know, it really took me quite a bit of

6    time to wrap my head around like, you know, providing

7    perhaps another person's time at the party versus my

8    name being on that, you know, document.  So there was

9    a huge stigma with me in, you know, putting my name on

10   anything, but yeah, late October.

11       Q.   So for example, your statement was October, I

12   believe 27.  Right?

13       A.   Yeah, late October.

14       Q.   So can you give me some idea of when you

15   decided that you would actually make that statement?

16       A.   Maybe like a week and a half prior or

17   something.  You know, how much notice do you have to

18   give to an attorney, maybe like ten days or so.

19       Q.   Okay.  So it was at that point that an

20   attorney was hired?

21       A.   Yeah, I think, you know, contacting and then

22   scheduling the giving of my affidavit, yeah.

23       Q.   Okay, and you said that the only conversation

24   you had with the attorney was the day of your

25   statement?

1        A.   Yeah.  Let me think, yeah.  Yeah, with him,
2    yeah.
3        Q.   So was that a school day?
4        A.   It wasn't during the school hours, meaning it
5    wasn't from like, what do we call that, like 7:45 a.m.
6    to like 3 p.m., it wasn't anywhere in there.
7        Q.   Well, that was my next question, what are the
8    hours for school for you?
9        A.   Yeah, 7:45 to like 3 and then sports maybe
10   from like 3 to 5:30.
11       Q.   Okay.
12       A.   It wasn't -- it wasn't -- it didn't conflict
13   during the school day.  It might have been on like a
14   Sunday or something.  It probably -- he doesn't work
15   on Sunday, probably.  So that doesn't make a lot of
16   sense, but it didn't occur on a school day.
17       Q.   It was the same day as your statement,
18   correct?
19       A.   What was the same day?
20       Q.   The day you met with the attorney, the only
21   time you met with the attorney was the same day as the
22   statement.  Correct?
23       A.   Oh, yeah, because I gave him my statement.
24   He like helped me -- drafting the affidavit and
25   writing stuff up or something, so did that.

1       Q.   So tell me about, okay --

2       A.   They sort of wrote up an affidavit with like,

3   I guess, his computer or something.  I sort of told

4   him verbally.  He typed it out.

5       Q.   Was there anyone with you besides Eugene

6   Riccio?

7       A.   For what, exactly?

8       Q.   When you went to the police station.

9       A.   I think my Mom drove me there just because

10   I -- took her car or something.

11       Q.   Did she go into the police station with you?

12       A.   I think she waited like outside or something

13   like that.

14       Q.   Do you remember or are you guessing?

15       A.   I don't remember my Mom.  I just remember I

16   think she was outside the police station.  I just

17   remember I went there with her.

18       Q.   Okay, but you were accompanied by Mr. Riccio?

19       A.   Yes.

20       Q.   Okay, and -- I think -- so you brought a

21   prepared statement with you, correct?  Is that right?

22       A.   Yeah.  Um-uh.

23       Q.   And was it your lawyer who had it in his

24   possession?

25       A.   I believe so, yeah.

1      Q.   Okay, and is it your recollection that he
2    typed it up at his office?
3      A.   Yes.
4      Q.   Okay, and did you ever see a draft of it?
5      A.   Yeah.  I think he showed me the final draft.
6    And then after we finished, I was on my way.  I guess,
7    after the first meeting or something.  And probably
8    the second meeting was scheduled for us to just like
9    go to the police station to like authenticate it or
10   something with like the police there.  I think that's
11   probably --
12     Q.   Had it already been dropped off with the
13   police at that point?
14     A.   I am not sure.  I am not sure of the
15   specifics.
16     Q.   Okay.  Did anyone meet you at the police
17   station?
18     A.   Anyone, what do you mean?
19     Q.   Like did you meet with any police officer?
20     A.   Yeah.  Yeah.  I mean, so like after I,
21   whatever, like told them, you know, what I was there
22   for, whatever, at the front --
23     Q.   Okay.
24     A.   -- there was someone in the room, you know,
25   with me and my statement, and I think like I had to do

```
1    something in the room and like ended up like I signed
2    it or something, and then -- something like that.
3         Q.   So you signed it while you were there?
4         A.   I think something like that, yeah.
5         Q.   Do you remember signing it while you were
6    there?
7         A.   I couldn't tell you if I signed it when I was
8    there or after the first meeting with the lawyer.  I
9    couldn't tell you which place I signed it at.
10        Q.   So you might have signed it at Mr. Riccio's
11   office?
12        A.   I think likely he didn't have a final draft.
13   So I think it's probably most likely that I signed it
14   at the police station.
15        Q.   Okay.
16        A.   Which would make more sense.
17        Q.   So then you were in a room at the police
18   station with a police officer?
19        A.   Yeah.
20        Q.   And you think you signed it there?
21        A.   Yeah.  Yeah, I think I signed it there.
22        Q.   Okay, so did -- was that police officer a man
23   or a woman?
24        A.   I don't remember.
25        Q.   Okay.  Do you remember their name?
```

```
1        A.   I do not.  No, I couldn't even tell you -- if
2    you showed me their name, I couldn't tell you.
3        Q.   There was a woman in this room earlier with
4    longish hair in a pony tail --
5        A.   Yeah.  Yeah.
6        Q.   Did you recognize her at all?
7        A.   No, I didn't recognize her.
8        Q.   Okay.  So did anyone ask you any questions
9    while you were at the police station?
10       A.   My memory of like the actual like inside
11   there is like kind of a blur.  I am not sure.  To my
12   knowledge, I don't think that, you know, my time in
13   there was pretty brief.  It was kind of like we got
14   in, you know, whatever, got the document, whatever,
15   signed it, left pretty quickly.  So if there were any,
16   it would have been --
17       Q.   Would you say five minutes?
18       A.   Yeah, five minutes probably.  It wasn't too
19   long.  It wasn't drawn out.
20       Q.   Okay, and you don't recall anyone asking you
21   any questions?
22       A.   My recollection of being -- I don't even
23   remember what the room looked like.  So my
24   understanding of like that interaction is probably not
25   so great.  But it was a brief -- I do remember it was
```

```
 1   brief.  So perhaps they asked me a quick question.  I
 2   don't know.  I don't know.  I was out of there very
 3   quickly.
 4        Q.  All right, so let's talk a little bit about
 5   the drafting of your affidavit.
 6        A.  Um-uh.
 7        Q.  So did you -- or statement, rather.  Did you
 8   discuss the draft of your affidavit with anybody?
 9        A.  No.  Not the draft, no.
10        Q.  Did you talk to ███████████ about what you
11   were going to say in your statement?
12        A.  Well, that's -- I guess I, you know, ██████
13   was such a good friend of mine.  You know, one of my
14   best friends, so I talked frequently with█████.  You
15   know, perhaps I mentioned -- you know, I tried to, I
16   tried to not mention this case too much because, you
17   know, I understand it's not a good thing to do, to
18   mention an investigation or something or whatever you
19   would call it while it is taking place.  So I was --
20        Q.  Did you talk to her about what you were
21   saying in your statement?
22        A.  I don't know.  I am not sure.  I am just not
23   sure.
24        Q.  Did you know that █████ was going to make a
25   statement?
```

```
 1   person right now?
 2           MR. SCONZO:  Objection.
 3           THE WITNESS:  I can't read her mind so it
 4       would be tough for me to know that.
 5   BY MS. BRAXTON:
 6       Q.  Paragraph 10, during the course of the
 7   evening, a tenant who lived on the second floor of the
 8   pool house was moving his belongings out of his
 9   apartment while we were in the pool house.
10       A.  Yeah, I think at the start, yeah.  I remember
11   somebody being up there and like --
12       Q.  You saw him once up there, that's what you
13   just said.  Right?
14       A.  Yeah, perhaps.
15       Q.  So this is a lie?
16           MR. SCONZO:  Objection.
17           THE WITNESS:  No.  I believe the wording here
18       during the course of the evening might be not
19       great.  I think the wording is not representative
20       of --
21   BY MS. BRAXTON:
22       Q.  What you saw?
23       A.  Yeah.  I think what I saw was --
24       Q.  In other words, it's not accurate.  Correct?
25       A.  That wording is not accurate.
```