Plaintiff Exhibit I

```
1   UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF CONNECTICUT
2   --------------------------------x        CONFIDENTIAL
    JANE DOE,
3
                 Plaintiff,
4
    vs.                    Case No. 3:18-cv-01322-KAD
5                          Date:  March 19, 2019
    TOWN OF GREENWICH, ET AL,
6
                 Defendants.
7   --------------------------------x

8

9            DEPOSITION OF KRYSTIE RONDINI

10

11       The deposition of Krystie Rondini was taken on

    March 19, 2019, beginning at 10:00 a.m., at 7 Benedict
12
    Place, Greenwich, Connecticut, before Susan Wandzilak,
13
    Registered Professional Reporter and Notary Public in
14
    the State of Connecticut.
15

16

17

18           Susan Wandzilak  License No. 377
         DEL VECCHIO REPORTING SERVICES, LLC
19        PROFESSIONAL SHORTHAND REPORTERS
                   117 RANDI DRIVE
20          MADISON, CONNECTICUT 06443
                   800-839-6867
21
    NEW HAVEN            STAMFORD          HARTFORD
22

23

24

25
```

```
 1                    KRYSTIE RONDINI,
 2       having been first duly sworn, testified as
 3       follows:
 4            THE COURT REPORTER:  Would you please state
 5       your full name and address for the record.
 6            THE WITNESS:  Sure.  Krystie, K-R-Y-S-T-I-E,
 7       Rondini, R-O-N-D-I-N-I, 11 Bruce Place,
 8       Greenwich, Connecticut.
 9                    DIRECT EXAMINATION
10  BY MS. HOOK:
11       Q.  Detective Rondini, you have been present at
12  previous depositions in this case so you know that I
13  am Elizabeth Braxton Hook, attorneys for the
14  Plaintiff.  And Meredith Braxton, my partner, is here
15  as well as Mr. Scanlan.
16            Have you ever had your deposition taken
17  before?
18       A.   Yes.
19       Q.   And can you tell me the circumstances of
20  that.
21       A.   I testified before in court cases for
22  Greenwich Police Department.
23       Q.   About how many?
24       A.   One that I can recall.
25       Q.   And how long ago was that?
```

```
1    every crime is different.  And every person tells me

2    something different, so it would depend on that

3    situation.  And that's my answer.

4         Q.   Okay.  Did you subpoena ██████████████ (ph)

5    text messages in this case?

6         A.   No, I did not.

7         Q.   Why didn't you?

8         A.   Because I didn't have any information that

9    would lead me to believe that I needed to subpoena

10   them.

11        Q.   You were told by the victim that ███████

12   texted her and her brother soon after.  Did you think

13   that those text messages were important?

14        A.   Yes, and I asked the victim and the brother

15   to provide me with all of the text messages back and

16   forth between them.

17        Q.   Okay, to the extent that █████████████ was

18   texting the victim and her brother the next day, did

19   you think that his texts to his friends who were with

20   him the night of the event might have been equally

21   relevant?

22        A.   No.

23        Q.   Why not?

24        A.   Because I don't have any of that information.

25        Q.   You don't have any of what information?
```

1        A.   I don't know what he texted his friends.

2        Q.   Well, you don't no because you didn't

3    subpoena the texts.

4             MR. MITCHELL:  Objection.

5             THE WITNESS:  Correct, I didn't.

6    BY MS. HOOK:

7        Q.   Okay.  What was your first contact with

8    Brunswick School?

9        A.   I didn't have any contacts with Brunswick

10   School.

11       Q.   You have never spoken to anyone at Brunswick

12   School?

13       A.   Regarding this case or in general?

14       Q.   Let's start with regarding this case.

15       A.   No, I did not.

16       Q.   Did you make an affirmative decision not to

17   interview Tom Philip, the headmaster?

18       A.   Did I make a decision not to interview him?

19       Q.   Yes.

20       A.   Yes, I did.

21       Q.   Why?

22       A.   Because I didn't know that anyone had spoken

23   to Tom Philip.

24       Q.   You did not know that anyone had spoken to

25   Tom Philip?

1      Q.   So you just do a stream-of-consciousness

2   recitation and expect the State's Attorney to glean

3   some information from that?

4           MR. MITCHELL:  I object to the form.

5           You needn't answer a stupid question like

6       that.

7           MS. HOOK:  Yes, you do need to answer.

8           MR. MITCHELL:  No, I'm telling her not to

9       answer.

10   BY MS. HOOK:

11      Q.   Do you just put in information as it comes to

12   you without any form or narrative?

13           MR. MITCHELL:  That's different.

14           Go ahead and answer.

15           THE WITNESS:  Okay, I'm not understanding

16       that.  Can you clarify, please.

17   BY MS. HOOK:

18      Q.   Okay.  In reading through this affidavit, it

19   appears that you simply related events as they

20   unfolded without trying to create a narrative or

21   assist the State's Attorney in understanding the case.

22   Is that how you normally do your warrant applications?

23      A.   I don't understand what you're trying to say.

24   I'm sorry.

25      Q.   All right, bottom of the page, there is a --

1    in parens -- this is page 1 of a 21-page affidavit.

2    Do you see that?

3           A.   Um-uh.

4           Q.   Okay.  Turn to the next page.  At the bottom

5    of the next page, TOG 4, can you read to me what it

6    says in the parens in the same place.

7           A.   This is page 2 of 19 of the affidavit.

8           Q.   So what happened to two pages?

9           A.   I'm not sure.  Page 1 of 2, do they

10   include....  I'm not sure.

11          Q.   Did who include?

12          A.   No, I'm sorry.  I was reading this where it

13   says page 1 of 2 information.  I'm not sure.

14          Q.   You are not sure what?

15          A.   I'm not sure -- so when we type a warrant --

16   I typed this warrant.  We revised it and made

17   corrections so that may have shortened the warrant to

18   19 pages.

19          Q.   Do you have the previous drafts of the

20   warrant?

21          A.   They are in the NexGen system.

22               MS. HOOK:  Okay, we call for the production

23        of all drafts.

24               I'm glad you find that amusing.

25               MR. MITCHELL:  We have already done all that.

1   BY MS. HOOK:

2       Q.   Can you tell me what kinds of corrections you

3   made to this affidavit.

4       A.   Again, just grammar.

5       Q.   That accounts for a differential of two

6   pages?

7       A.   I don't know exactly what was changed.  You

8   would have to go into the NexGen.  I can't recall.

9       Q.   Okay, so when we get those documents, we

10  will.  We'll go back to that.

11           Let's go to TOG 4.  In the last paragraph,

12  you state that after a short time -- this is your

13  interview -- on this page, you are describing your

14  interview with the victim on August 2nd, 2016.  Is

15  that correct?

16      A.   Yes.

17      Q.   And in the last paragraph, you say that after

18  a short time, she went into the bathroom to check on

19  Brian.  Brian is the alleged attacker.

20      A.   Um-uh.

21      Q.   Is that actually what ██████ said during her

22  interview?

23      A.   I can't recall the specific --

24           MS. HOOK:  Okay.  Please mark this Rondini 4.

25           (Whereupon, Rondini Exhibit No. 4 was marked

1    Q.   What was the purpose of having a conversation

2  with ███████s attorney?

3    A.   I don't remember the specific reason we

4  spoke.

5    Q.   Okay.  You have included ███████s attorney's

6  statements in this affidavit.  What was the reason for

7  that?

8    A.   I don't know.

9    Q.   Okay, I'm reading from your affidavit that on

10  9-7 spoke with ██████'s attorney, Phil Russell.

11  Attorney Russell related the last time ██████ had any

12  contact with the victim was the week the affiant

13  contacted ██████.  He texted the victim and told her he

14  was contacted by the police.

15       And it goes on.  Why did you include

16  statements by an attorney for the alleged attacker who

17  has refused to cooperate with the police?

18    A.   Because he told me that ██████ and ██████ had

19  the last conversation of that week.  If you continue

20  to read on, it says:  The victim texted him back and

21  said that she never wanted it to go this far and that

22  everything will be fine.

23    Q.   Okay.  So number one, does the attorney for

24  the alleged attacker -- do his statements have

25  evidentiary value?  What value do the statements of an

1    attorney in an investigation?

2         A.   It's what he told me.

3         Q.   I understand it's what he told you, but what

4    does it matter what an attorney tells you?  Is he a

5    witness?

6         A.   I'm sorry.  I'm not following you.

7         Q.   Oh, you don't understand why you would --

8         A.   Because I had a conversation with him.  And I

9    put it in there, that that was the last time that they

10   had contact, ███████ and --

11        Q.   Okay.  Okay.  That was the last time.  And so

12   you took his statements, an attorney who is not a

13   witness of any kind, at face value and put them in the

14   affidavit because you believed them to be credible.

15             MR. MITCHELL:  Objection to the form.

16   BY MS. HOOK:

17        Q.   Why did you put them in the affidavit if you

18   didn't believe them to be credible?

19             MR. MITCHELL:   I object to the form.  She

20        didn't say she believes they were credible.

21   BY MS. HOOK:

22        Q.   So your affidavit does not contain statements

23   that you believe to be credible?

24        A.   Okay, so I had a conversation with him and I

25   included it in my warrant.

1        Q.   Right.

2        A.   Yes.

3        Q.   Why?

4        A.   Because he's stating that he spoke with his

5   client and his client is telling him that's the last

6   time he had contact with the victim.

7        Q.   And what does that have to do in issuing a

8   warrant and putting in investigation information from

9   an attorney?

10            So let's go to Rondini Exhibit 1.  Because

11   you read that the victim texted him back and said she

12   never wanted it to go this far and that everything

13   will be fine.

14        A.   Where?  I'm sorry.  Where in the --

15        Q.   Okay, it's what you read to me on TOG 9.

16        A.   TOG 1?  I'm not sure which one you are

17   referring to.  1, 2, 3?

18        Q.   2.

19        A.   Okay.

20        Q.   Okay, so you read that statement that you

21   included as to what ██████ texted to ██████?

22        A.   Um-uh.

23        Q.   As represented by his attorney even though he

24   refused to speak to you.

25        A.   Um-uh.

1      Q.   Okay.  Did you receive the texts from ████?

2      A.   I can't recall.

3      Q.   Okay, so let's go to Rondini Exhibit 1.  So

4   the texts begin on TOG 79.  Can you please review them

5   and show us where ████ made that statement to him.

6      A.   (After review.)  Okay.

7      Q.   Where is it?

8      A.   Well, it's hard to read this one so I'm not

9   sure what this....

10     Q.   Well, exactly.  It is hard to read that, but

11  is that a text from ████ or is that a text from

12  ████?

13     A.   I can't tell.

14     Q.   Okay.  So you don't have a text that confirms

15  -- you are referring to TOG 88 when you say it's hard

16  to read?

17     A.   Correct.  Correct.

18     Q.   The last line of that text says:  If I could

19  take it all back, I would.  I'm sorry for everything I

20  put you through.

21          Does that sound like a text from ████ or

22  does that sound like a text from ████?

23     A.   I don't know.

24     Q.   You don't know, okay.  So when the lawyer

25  told you that there are texts that say this and you

```
 1    felt that it was significant enough to tell the

 2    State's Attorney, did you subpoena those texts?

 3         A.   No.

 4         Q.   Why not?

 5         A.   Because I didn't.

 6         Q.   No reason?  You didn't feel it was important?

 7         A.   I didn't do it.

 8         Q.   You didn't do it, okay.

 9              When you submitted the affidavit to the

10    State's Attorney, you had those texts in hand and you

11    knew that the statement he gave you was false and yet

12    you included his statement in the affidavit.

13         A.   Whose statement was false?

14         Q.   That she texted back to him she never meant

15    for it to go this far.

16              MR. MITCHELL:  I object to the form.

17    BY MS. HOOK:

18         Q.   All right, let's take that back one step at a

19    time.  So going back to TOG 9, you include the

20    statements of ██████ 's attorney that say that there

21    were texts exchanged between the victim and ██████

22    and that the victim texted him back and said she never

23    wanted it to go this far and that everything will be

24    fine.

25         A.   Yes.
```

1      Q.   And you included it in your affidavit even

2   though, by the time you submitted this affidavit, you

3   had in your possession and had reviewed all of the

4   texts between ███████ and ██████.  Is that correct?

5      A.   All the texts that were provided to me.

6      Q.   Yes.  So are you saying that you didn't know

7   for a fact that that statement was false?

8      A.    No, I just said what Phil Russell related to

9   me.  I didn't say whether it was true or false.  I put

10   that he related.

11      Q.   I see.  So you didn't give any color to the

12   fact.  You gave the same weight to a statement that

13   was demonstrably false by the documents that you had

14   as you gave to everyone else's statement including the

15   victim.

16           MR. MITCHELL:  Objection.  It assumes facts

17      not in evidence, among other things.  It's a

18      statement, not even question.

19   BY MS. HOOK:

20      Q.   I'm sorry, but did you put anything in here

21   about the fact that you did not judge the credibility

22   of his statement at all?

23           Did you put in your affidavit any

24   qualification about the fact that the texts that you

25   have in your possession did not support that

1    statement?

2         A.   Did you say that I had these text messages in

3    my possession?  Is that what you are asking?

4              MS. HOOK:  Read back the question, please.

5              And please listen to it carefully.

6              THE WITNESS:  I am.  I am.  I'm trying to

7         understand.  I'm not trying to be difficult.  I

8         just want to make sure I really truly understand

9         what it is you are asking.

10             MS. HOOK:  Good.  I'd like you to.

11             (Whereupon, the question was read back.)

12             MR. MITCHELL:  I object to the form.

13             Go ahead and answer.

14             THE WITNESS:  I just put in there what the

15        attorney had related to me.  I did not have

16        actual text messages to say that I put he

17        related.

18   BY MS. HOOK:

19        Q.   Okay.  When did you prepare this affidavit?

20        A.   December.

21        Q.   And in December, did you have the text

22   messages?

23        A.   Between?  No, I did not have those specific

24   text messages.

25        Q.   What specific text messages are you talking

1   about?

2        A.   The ones you are asking me about.

3        Q.   I'm sorry, but aren't they hear in Rondini

4   Exhibit 1?  Don't you have them?  You provided them to

5   us.  You have these text messages, correct?

6        A.   You're confusing.  I'm sorry.  So the text

7   messages -- ████  had supplied me with some text

8   messages.

9        Q.   Yes.

10       A.   Okay.

11       Q.   Um-uh.

12       A.   I spoke to his attorney, who related I did

13   not have the text messages that the attorney was

14   speaking of.  Does that....

15       Q.   Okay.  So how do you know that they existed?

16       A.   I don't.

17       Q.   Okay.  So you put a fact into your affidavit

18   to support a warrant application that you did not have

19   any idea was true or not?

20       A.   I put what another person had related to me.

21       Q.   Okay.  All right, let's go on to the next

22   page, page TOG 10.

23       A.   Go ahead.

24       Q.   All right, so you -- your testimony if I

25   understand it is that you simply related the facts as

```
 1        Q.   That it should be noted that --

 2        A.   I already read that.

 3        Q.   I'm sorry.

 4        A.   That's okay.

 5        Q.   Let me step back.  Why did you include that?

 6        A.   Because that's what Detective Bussell --

 7        Q.   Oh, you were looking to see if that's what

 8   Detective Bussell wrote?

 9        A.   I don't know what page --

10             MS. WADLER:  That would be TOG 46 to 47.

11             THE WITNESS:  46 to 47.  Okay, go ahead with

12        your question.

13   BY MS. HOOK:

14        Q.   So did Detective Bussell write that in his

15   case note?

16        A.   No.

17        Q.   Okay, so then why did you include that

18   statement in your affidavit?

19        A.   Because Detective Bussell had told me that.

20        Q.   But why did you include it?  Why did you feel

21   the need to mention that fact?

22        A.   Because he did.

23        Q.   I don't know.  For no reason at all?

24        A.   Yeah, I put it in there because that's what I

25   was told.
```

1       A.   The actual report, because he may have said

2   it to me while we were speaking and that's where I got

3   it from.

4       Q.   And where would that be?

5       A.   I want to see if it's in his report.  So I

6   would have to go through this and look at the written

7   report that I did with Sam, which is Exhibit Number 1.

8   But, of course, unfortunately, it's redacted so it

9   makes it a little more difficult.  So if you would

10  bear with me.

11      Q.   TOG 51, 52.

12      A.   Go ahead.  Your question again.

13      Q.   So what was that relevant about his

14  statements?

15      A.   Well, that he did not see anybody drinking.

16  He did not ever see the boy that they were referring

17  to.  He helped clean up.  He didn't see anything.

18      Q.   What did ██████████████   see?

19      A.   ██████████████   had a conversation with the

20  victim, which the information the victim related to

21  her.

22      Q.   Okay, so let's go back to 51.

23      A.   Um-uh.

24      Q.   52, TOG 52.  So Sam Gonzalez had a

25  contemporaneous conversation with the people at the

1   party minutes after the event and related what they

2   told him.

3        A.   Um-uh.

4        Q.   How is that less relevant than what █████

5   heard from the victim a week later?

6        A.   It didn't pertain to the sex assault so I

7   didn't include that.

8        Q.   One of the boys was drunk and acting poorly.

9   The boy had someone in a choke hold.  None of that was

10   relevant?  They had restrained him.  That's not

11   relevant?

12        A.   No, I didn't put that in there.

13        Q.   What about the second paragraph on 52?  Sam

14   Gonzalez related he did not see any of the kids or

15   adults at the party drinking.  Nor did he ever see --

16   okay, that he never saw any of the kids or adults

17   drinking at the party.

18        A.   Um-uh.

19        Q.   Was that not relevant?  You seem to be very

20   interested in drinking when you interviewed other

21   people.

22        A.   I asked if there was drinking, yes, because

23   some reported it.

24        Q.   But that was not significant to you?

25        A.   It was.  I documented it in the report.  So

1    obviously I documented it.

2        Q.   But you didn't put it in your affidavit to

3    the State's Attorney.

4        A.   Right, I didn't.

5        Q.   Because you didn't think it had evidentiary

6    value?

7        A.   I didn't put it in.

8        Q.   You didn't reflect the story that you wanted

9    to tell?

10       A.   That's not it.  Those are your words.

11       Q.   Rondini Exhibit 3, page TOG 175.  This is the

12   statement provided by ███████████; is that correct?

13       A.   1-?

14       Q.   175.

15       A.   175, sorry.  I believe this is -- yes.

16       Q.   Okay, turn to the next page, TOG 176.  I'm

17   sorry, 177.  Sorry, 176.

18       A.   176 am I looking at?

19       Q.   It's longer than I thought. I'm sorry.  It's

20   TOG 177, paragraph 10.  What does ██████████

21   describe in paragraph 10?

22       A.   During the course of the evening, a tenant

23   who lived on the second floor of the pool house was

24   moving his belongings out of the apartment while we

25   were in the pool house.

1  to all the Brunswick students.  Is that correct?

2       A.  I don't know when Tom spoke to (sic) and I

3  don't know who Tom spoke to, so no, I don't know.

4       Q.  Okay, so how from this point how did it come

5  about that ▮▮▮▮▮▮▮▮ gave a statement?

6       A.  I spoke to the mother, who --

7       Q.  On what day did you speak to the mother?

8       A.  The 5th of September.  That she called me

9  back after speaking with her attorney.  And so at that

10  time they declined to give a -- okay, so this report

11  states he didn't want to give a statement.

12       Q.  So how did it come about that you got a

13  statement from ▮▮▮▮▮▮▮▮?

14       A.  I don't recall the particulars of how we got

15  into contact.  His attorney contacted me.

16       Q.  Okay.  Did any of the other witnesses have an

17  attorney?

18       A.  Not that I recall.

19       Q.  Okay.  Did you think it was strange that

20  ▮▮▮▮▮▮▮▮ had an attorney?

21       A.  Not really.

22       Q.  Why not?

23       A.  Because people get attorneys for all sorts of

24  reasons.  I don't know.

25       Q.  Okay.  But that didn't impact his credibility

1    in your eyes?

2         A.   It was really -- kind of didn't matter to me.

3         Q.   That he had an attorney with him, okay.  So

4    when did he come in to give his statement?

5         A.   Whatever the statement date....  I'm sorry.

6    I'm trying to find the right....  27th of October.

7         Q.   Did you ask him what had happened between

8    September 5th and October 27th, two months, why it

9    took two months for him to change his mind?

10        A.   No, I did not.

11        Q.   Did you think that was a question to ask?

12        A.   No.

13        Q.   You weren't curious?

14        A.   No, I wasn't.

15        Q.   What kind of statement did he provide,

16   written or a typed?

17        A.   A typed.

18        Q.   Who typed that statement?

19        A.   He related that he did.

20        Q.   Excuse me.  I didn't hear you.

21        A.   He related that he typed it.

22        Q.   Did you think that was unusual?

23        A.   No.

24        Q.   Why?

25        A.   Because it's not uncommon for attorneys to

```
 1   prepare a statement with their client and come in and

 2   swear to it.

 3         Q.   So you are saying that the attorney typed it?

 4         A.   No, type it with his attorney, meaning --

 5         Q.   So he typed it with his attorney?

 6         A.   Yes.  He typed it.  He typed it.

 7         Q.   Okay, but whose words were they?

 8         A.   His.

 9         Q.   So let's go to the statement, Rondini Exhibit

10   3, TOG 175.

11         A.   Um-uh.

12         Q.   Paragraph 3:  During the course of the

13   evening, alcohol was consumed by minors at the party.

14              Is that typical language for a teenager?

15         A.   What's typical language for a teenager?

16         Q.   You are an SVS.  Don't you regularly deal

17   with teenagers?

18         A.   Yes, but teenagers speak all different ways.

19         Q.   Were any other statements that kind of

20   formal?

21         A.   That's your opinion.

22         Q.   Okay, number 4:  At approximately 9:00 p.m.,

23   I was -- became aware by my personal observations

24   while in the swimming pool together that ████ was

25   very intoxicated from drinking alcohol.
```

```
 1              Again, that's typical conversation by a
 2      teenager?
 3          A.   That's how he wrote it.
 4          Q.   Did you suspect that this might have been
 5      written by his attorney?
 6          A.   No, I did not.
 7          Q.   It didn't sound very legal to you?
 8          A.   No.
 9          Q.   Okay.  So you never questioned him about who
10      actually wrote this and you never questioned him
11      further?
12          A.   Yes, I did, because if you look at the top,
13      if you read this paragraph, it reads:  I made the
14      following voluntary agreement.  I will abide by
15      statements herein which I do not believe to be true
16      and which a statement is intended to mislead the
17      public servant in the performance of their official
18      duties is a crime under the Connecticut General
19      Statutes.
20              Where he signs, it says:  By affixing my
21      signature to the statement I acknowledge that I have
22      read and/or have read to me and it is true to the best
23      of my knowledge and belief.
24              So he is signing that this is his written
25      statement.
```

1      Q.   He is signing that the content --

2      A.   Is his.

3      Q.   -- is his, but not the words.

4      A.   Yes, those are his content and his words.

5      Q.   And you didn't have any need to question him

6  about each of these statements.  You asked him three

7  questions.

8           Is this true?

9           Yes.

10          What were the other two questions you said?

11     A.   Is this everything that you can recall from

12  the night of the event?  And I don't know what else I

13  would have asked him.

14     Q.   So you asked him two questions about his

15  statement?

16     A.   Yes.

17     Q.   Okay.  The statement does not corroborate --

18  is not corroborated by anybody else's statement, is

19  it?

20     A.   What's not?  Can you be more specific?

21     Q.   Tell me what's corroborated.

22     A.   By other people, what other people have said.

23     Q.   Yes, by other people.

24     A.   That he was at the party.

25     Q.   Okay.

```
 1    that.
 2         Q.   I'm dealing with the same thing.  Your
 3    affidavit.
 4         A.   Number 3, correct?
 5         Q.   I'm sorry.  You are right.  It's not your
 6    affidavit.  Exhibit 3, 175.
 7         A.   Exhibit 3, 175.
 8         Q.   173.
 9         A.   Okay.
10         Q.   So it's at the end of his statement, 173, the
11    last five lines.
12         A.   Go ahead.
13         Q.   So does he mention that the door was locked?
14         A.   Yes.
15         Q.   So you chose to include █████'s statement
16    that the door was not locked, but you chose not to
17    include Sam's statement which said that the door was
18    locked.
19         A.   I didn't include Sam's statement.
20         Q.   Why?
21         A.   Because I didn't.
22         Q.   You don't have a reason?
23         A.   I can't recall for sure, but I believe -- I
24    can't recall.
25         Q.   Did somebody instruct you not to include it?
```