Plaintiff Exhibit Q

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CIVIL ACTION NO:  3:18-cv-01322-KAD

JUNE 17, 2020

---------------------------------------

JANE DOE,

                          Plaintiff

                 -vs-

TOWN OF GREENWICH, ET AL,

                          Defendant

---------------------------------------


     VIDEOTAPED DEPOSITION OF LIEUTENANT MARK ZUCCARELLA

APPEARANCES:

        BRAXTON HOOK, LLC
          Attorneys for the Plaintiff
          280 Railroad Avenue, Suite 205
          Greenwich, Connecticut  06830
          PHONE:  (203) 661-4610
          E MAIL:  ehook@braxtonhook.com
        BY:   ELIZABETH I. HOOK, ATTORNEY-AT-LAW

        MITCHELL & SHEAHAN, P.C.
          Attorneys for the Defendant
          Sergeant Detective Brent Reeves and
          Detective Krystie M. Rondini
          80 Ferry Boulevard, Suite 216
          Stratford, Connecticut  06615
          PHONE:  (203) 873-0240
          E MAIL:  rmitchell@mitchellandsheahan.com
         BY:  ROBERT MITCHELL, ESQUIRE

```
 1   THEREUPON,

 2            L I E U T E N A N T   M A R K   E D W A R D

 3                    Z U C C A R E L L A,

 4              Greenwich Police Department,

 5                  11 Bruce Place,

 6              Greenwich, Connecticut  06830,

 7              first having been duly sworn, was examined and

 8              testified as follows:

 9   DIRECT EXAMINATION

10   BY MS. HOOK:

11      Q      Good morning, Lieutenant Zuccarella.

12      A      Good morning.

13      Q      My name is Elizabeth Hook, as I mentioned

14   earlier.  Have you been deposed before?

15      A      Yes.

16      Q      Okay.  And so, we can get into that a little bit

17   later.

18              Since you've been deposed before, you know how

19   depositions work, but let me just roughly go over the

20   instructions.

21              If you don't understand a question that I ask,

22   please ask me to rephrase it or to state it again.  If you

23   don't ask me to do that, I'll assume that you understand my

24   question.

25              We can't speak at the same time because the
```

1    we just now got personal phones, I mean, work phones for all

2    the officers.

3        Q      Okay.  So, let me just take a step back.  You

4    said now there is.  When did that policy come into effect?

5        A      A week ago, two weeks ago.

6        Q      Okay.  And what was the policy before?

7        A      Well, if you had a cell phone, there was no real

8    policy barring you from using your phone, but if you were to

9    conduct business, you shouldn't be conducting it via your

10   phone, like a police department phone, or go to like the

11   firehouse and use one of the phones there, or somewhere like

12   that.  But most of it, unless it was an emergency, should

13   have been done at headquarters.

14       Q      And if something was done on a personal E mail

15   that was connected with an official investigation, was there

16   a process for ensuring that that E mail was in proper police

17   department records?

18       A      Well, it's part of the case, if you did one, it

19   should be in the file.

20       Q      It should be in the police department official's

21   files?

22       A      Yeah, if it's work-related, it should be done

23   via our greenwichct.org account, but there was nothing that

24   said that you should not, cannot, or shall not.

25       Q      My question's a little bit different.

1          Assuming that somebody, because of an emergency,

2    had to use their personal E mail in connection with an

3    official investigation, was there an expectation, a

4    practice, or a policy that that personal E mail, connected

5    with an official investigation, would somehow be transmitted

6    into the police department's official records?

7          A     It should.  If you use your personal E mail or

8    any device for that matter for work-related purposes, it's

9    opened up to work, you know, along with the other stuff.

10         Q     How would that have been transferred?  How would

11   it have been done if there was a personal E mail used?

12         A     Well, they should probably just copy into,

13   attach it into the report saying, you know, I got an E mail

14   via however.  You know, it wasn't uncommon for people to

15   take pictures at scenes throughout prior to the advent of

16   the new work-related phones, but we told people if you do

17   that, you have to archive it properly.

18         Q     So, it would be treated as a hard copy?

19         A     Well, it depends on what it was for, I mean.

20         Q     Uh-huh.

21         A     Sometimes, you know, again, without speaking to

22   what the E mail was about, but if it was related to a case,

23   and it pertained to a case, it should be documented in the

24   report how I received an E mail and stuff like that.

25         Q     Okay.  Do you know Mike DeAngelo?

Page 34

1    Stanley Ouimette?

2        A       Yeah, I'm going to say it was Stanley because I

3    remember for most of my time I was with Stanley.

4        Q       Okay.

5        A       Because there was always an issue with Stanley

6    being senior and getting days off and two guys could never

7    get a day off.

8        Q       Okay.

9        A       Supervisors.

10       Q       Okay.  So, in March of 2008, you were promoted

11   to sergeant of squad A, what happened next?  What was the

12   next change?

13       A       Well, I did -- I was in charge of that

14   investigative squad.  I was in charge of narcotics

15   investigations and cold case investigations, and then the

16   sergeant at the time, they moved the sergeant into the youth

17   section, and they asked me if I wanted to do that, and I

18   said yeah, I want to do that, but I want changes, you know,

19   with changes.  So, that happened in November.  So, it always

20   seems to be November.  2009, I became the youth section

21   sergeant.

22       Q       So, let me just understand this.  They, in

23   November of 2009, decided to make the youth section its own

24   unit reporting to a sergeant?

25       A       No, they already gave it a sergeant prior to

1    that.   It was something that they never had their own

2    sergeant, but.

3         Q      When did they create a sergeant position for

4    that?

5         A      I don't remember.

6         Q      Who did you replace?

7         A      Jimmy Marr.

8         Q      I'm sorry?

9         A      James Marr.  M-A, I think it's two Rs, but I

10   could be wrong.  He's retired.  I forgot when they moved him

11   from patrol to there.  I -- they never had a sergeant, so.

12   The youth section was always off in its own separate part of

13   the department, which is designed that way since they deal

14   with juvenile matters and confidentiality.

15        Q      Okay.  So, when you took over as sergeant of

16   youth, the youth section --

17        A      Uh-huh (affirmative.)

18        Q      -- who -- how many people did you supervise?

19        A      I got the SRO, six.  The school resource officer

20   was then slid over to my supervision at that time.  Six,

21   five detectives and a -- and the school resource officer.

22   We only had one at the time.

23        Q      Who were the five detectives?

24        A      Chris Webster.  Phyllis Mickel had retired, I

25   never actually worked with her.  Chris Webster, Diana

1    Schuttler, Chrissy Girard, Stanley Ouimette, did I say Kent

2    Reynolds?

3        Q        No.

4        A        Kent Reynolds, those were my five.

5        Q        Okay.  So, what was the function of the school

6    resource officer?

7        A        Sat in Greenwich High School all day.

8        Q        I'm sorry?

9        A        Sat in Greenwich High School all day and did

10   school resource officer and worked for Greenwich High

11   School.

12       Q        Only Greenwich High School?

13       A        Uh-huh (affirmative.)

14       Q        And what were the responsibilities of the five

15   detectives as --

16       A        To investigate all juvenile matters in town and

17   to investigate a report of any child abuse at that time.  It

18   was very limited in what they did.  Everything else, the

19   rapes and anything non-juvenile, was done by the other

20   detectives.

21       Q        Did they have any responsibility for providing

22   the kind of presentation that you described before?

23       A        Uh-huh (affirmative.)  They did that.

24       Q        Okay.  And how were those assignments made?

25       A        Every school has a, what we call a liaison, you

1   know, if they are a detective to call at the time a youth

2   officer, excuse me, to call, in case you have an issue with

3   something relating to things like, you know, school talks,

4   or it was just the way to break up all the schools in town.

5   We have a lot of kids, a lot of kids under 18 in the Town of

6   Greenwich.  I want to say almost half and half too between

7   private and public school, yeah.

8        Q     So, the liaison position was in existence when

9   you took over?

10       A     Yes.

11       Q     Okay.  And how were the liaison relationships

12  established?  Who made the assignments?

13       A     I don't know who made them.  I don't know.  They

14  were made like that.

15       Q     They were already assigned when you got there?

16       A     Yeah, I just carried it over.

17       Q     And how were they broken out, all of the schools

18  in Greenwich?  You had five detectives, so how did they

19  split up?

20       A     Private schools were usually within -- two

21  people did all the private schools, and everyone else

22  divvied up the public schools.  I tried to, you know, it's

23  been monkey wrenched since then, but, you know, you try and

24  keep people in the same group, in the same area of town, you

25  know, so they are not driving all over the place.  Plus too,

1    downstairs, and now she's in the main section of the

2    detective division, the main floor what we call it.

3         Q     Is she still in the cold case unit?

4         A     Yeah, that's her main job.  Every now and again,

5    she might get another case every so often.  But for the most

6    part, she's working on some cases, yeah.

7         Q     Why was she appointed liaison to Brunswick in

8    September of 2016?

9         A     That was where she had, like I said, the school

10   talks, you know.  She was the private school liaison prior

11   to that, and I think that she wanted to continue doing the

12   school talks.  She likes doing school talks.  Some people

13   don't like doing school talks, so that's something that was

14   Brent Reeves' decision.

15        Q     But she was not in SVS, so he wasn't her

16   supervisor?

17        A     No.

18        Q     Was that --

19        A     No, but that's not uncommon.  I mean, that's --

20   you know, for something like that, again, if somebody likes

21   to do something, we're not going to stop them from doing it,

22   you know.  I mean, patrol officer, patrol officers are now

23   giving talks, which is about time, you know, inclusion, get

24   them involved.  For example, building tours, it used to be

25   the special victims section did all the building tours, now

1   other people do building tours.

2        Q      And do you know if she requested that position?

3        A      I don't know.  I mean, it stayed with her.  I

4   don't know.

5        Q      Well, you were a supervisor, you were a sergeant

6   in SVS at the time, in September of 2016, did you ever

7   discuss it with Brent Reeves?

8        A      Yeah, like I probably did, that's why I said

9   yeah because I discussed anything special victims section

10  related with him.  I don't recall any particular

11  conversation other than you've got to get your updated

12  liaison list to the captain because it's a school year, just

13  like we have to get the nursery -- there is also a lot of

14  nursery schools in town that we have to have somebody

15  assigned to.  Usually happens in the end of the summer,

16  before school starts, if there is any changes.  Because,

17  again, like I said, some people don't want to have a certain

18  school or they want to have a certain school, or just,

19  again, just to make it official.

20       Q      Uh-huh.

21       A      You know, that's how I always used to -- I want

22  to make sure that people always did things that they wanted

23  to do.

24       Q      Were there changes in the liaison list every

25  school year?

1      A      There could have been, I don't recall.  It

2  wouldn't be uncommon if there was a change.

3      Q      Okay.

4      A      When I started as a sergeant, and when I ended

5  as a sergeant, there was a rotation, so.

6      Q      Okay.  So, it would have been Sergeant Reeves

7  who appointed her liaison?

8      A      If it was in September, yeah, yeah.  That summer

9  it would have been, yeah.

10      Q      Who did she replace?  Do you know who was the

11  liaison before she took it over again?

12      A      I think Mike Rooney.

13      Q      I'm sorry, who?

14      A      I think Mike Rooney.  I want to recall I gave

15  Mike Rooney private schools.  I know he did Greenwich

16  Catholic, but I'm not recalling now, I'm sorry.  It was

17  something that I don't recall.  But I know Mike Rooney did a

18  lot of -- did some of the private schools.

19      Q      Who was in SVS in September of 2016?

20      A      Well, when I was sitting there, Brent was a

21  sergeant, Carlos Franco was a school resource officer.

22      Q      I'm sorry?

23      A      Carlos Franco was a school resource officer.

24  John King was a detective.  Krystie Rondini was a detective,

25  Charles Eible, Mike Rooney.

1      Q      I'm sorry.  Charles who?

2      A      Eible, he is retired.  E-I-B-L-E.

3      Q      E-I --

4      A      B-L-E.  And I think Jeremy Bussell replaced

5   Krystie.  I'm trying to remember because everybody changes

6   their desk when somebody leaves.  Everyone wants to get

7   closer to the window.

8      Q      So, the Carlos Franco was the school resource

9   officer?

10     A      Yes.

11     Q      John King?

12     A      Yes.

13     Q      Krystie Rondini?

14     A      Yes.

15     Q      Mike Eible?

16     A      Charles Eible.

17     Q      I'm sorry.  Charles Eible.  And Jeremy Bussell?

18     A      Bussell.  I believe Jeremy Bussell.  Yeah,

19   because Jeremy said I'm sad that you are leaving, I was

20   like, oh, thank you.

21     Q      So, were there four detectives and a --

22     A      No, it's always been five detectives.

23     Q      Is the school resource officer considered a

24   detective?

25     A      No.

1      Q      Okay.  So, who would have been the fifth?  John

2    King, Krystie Rondini --

3      A      Mike Rooney.

4      Q      Mike Rooney.  Okay.  Do you know if Christy

5    Girard is still the liaison to Brunswick School?

6      A      I don't know.

7      Q      Okay.  Do you know anything about the SVS?

8      A      Liaison list?

9      Q      About the liaisons in SVS today?

10     A      No, that's Sergeant Reeves runs that, so.

11     Q      Okay.

12     A      I do believe that Christy was taken off of it,

13   though.  I don't know when.  I know that the captain, we

14   talked about that, again, as well as another sergeant, we

15   wanted to keep everything within the section because another

16   sergeant was helping out with Greenwich Catholic school, but

17   I don't know when that was.

18     Q      So, who was the captain who talked about that?

19     A      Robert Berry.

20     Q      What did he say about it?

21     A      Get your liaison list squared away and make sure

22   that the detective's a liaison, not a sergeant from outside

23   the section.

24     Q      Okay.  So, his instruction to SVS was to make

25   sure the liaisons were detectives and that they were within

1   the SVS?

2        A       Yeah, because detectives do work, not sergeants,

3   you know, that kind of thing.  Again, it's mostly for the

4   school talks, lockdowns, school security reasons, stuff like

5   that.  That work should get pushed down.

6        Q       Other than Christy Girard, who was the sergeant

7   who was outside of SVS who served as a liaison?

8        A       It wasn't a liaison, he just was involved.  It

9   wasn't an official liaison.  Again, I haven't seen the list

10  in a few years, that's sergeant's work, as long as somebody

11  has it, like he would be involved.  So, you know, to make

12  sure that the school doesn't call him, make sure the school

13  calls the detective.

14       Q       Okay.  So, do you know of any other detectives

15  outside of SVS who were appointed liaison?

16       A       No, not anybody that was not from SVS, no.

17       Q       Okay.

18       A       No, I don't.  Again, the liaison officer is

19  someone who has familiarity because kids need to see the

20  same people, it helps them see things, especially school

21  talks and stuff like that.  But so if Christy was still kept

22  in one, it's probably because of something like that.

23       Q       Uh-huh.

24       A       Again, that's beyond my -- out of my purview.

25       Q       Okay.  I'm going to direct you to Exhibit 7.

1   injury, the case would be locked.

2      Q      Okay.

3      A      The only access given to it are the people who

4   need to work on it.

5      Q      Okay.  How would we know by looking at this

6   report that whether this was locked or not?

7      A      We don't.

8      Q      We don't know?

9      A      It's just a copy.  But if you got it, then you

10  must have gotten it via an FOI request that allows you to

11  get it.

12     Q      Well -- okay.  This was produced in the course

13  of this litigation, but I'm not, I'm not asking questions

14  about access to the general public, I'm asking questions

15  about access within GPD.

16     A      This is a piece of paper.  This is nothing.

17  This is -- paper is nothing to us.

18     Q      Right.

19     A      This report is nothing to us.  What matters to

20  us are arrest warrants and search warrants.  This is -- we

21  at GPD are a report department, meaning that we write

22  everything in our reports.

23     Q      Okay.

24     A      Other departments, they write everything in

25  investigator notes.  I mean, if we had a shooting here in

1   document the facts that there is no probable cause for an

2   arrest.  I mean, yes, our goal is to arrest people.  But

3   also our goal is not to arrest people.  We're truth finders,

4   fact finders.  You know, we take a victim's complaint, and

5   we investigate it, and we see if there was facts.  If the

6   facts lead us to believe that there is probable cause for an

7   arrest, on a case that takes weeks, you do -- you apply for

8   an arrest warrant, all right?  If there's not, then you

9   don't.  I mean, it's really just the documentation of it.

10          Again, like I said before, some people would put

11  this stuff on notes, we, however, do not.  We put everything

12  in our reports.  We want our prosecutors and, in turn,

13  defense attorneys to have everything it is that they need to

14  either prosecute and then for the defense to defend their

15  case.

16      Q     Is there any information that you collect during

17  the course of an investigation that you would not put into

18  the incident report?

19      A     Not in my opinion, no.  But there could be, I

20  mean, I don't know.  You are asking, that can go ten

21  different ways.

22      Q     Okay.

23      A     Like if I'm talking to this individual about

24  this case, and she was a neighbor and said nothing, I would

25  probably put that in the report, I did a neighborhood

1    canvass and neighbor A said nothing.  Some people would put

2    that in the note.

3         Q    Uh-huh.

4         A    That's why our reports are very wordy.

5         Q    Okay.

6                   MS. HOOK:  We have to make another call

7              into the Court.

8                   MR. MITCHELL:  Uh-huh (affirmative.)

9                   MS. HOOK:  So, we're going to take a break

10             now.

11                  THE VIDEOGRAPHER:  Off the record at 12:49.

12             Hold on a moment please.  We're off.

13             (Whereupon, there was a short recess.)

14                  THE CLERK:  Hi, good afternoon.  This is

15             Judge Merriam's courtroom deputy.  May I inquire

16             who is on the line?

17                  MS. HOOK:  So, Elizabeth Hook with Braxton

18             Hook representing the plaintiff in Doe versus

19             Town of Greenwich.

20                  MR. MITCHELL:  Robert Mitchell with

21             Mitchell & Sheahan, and Abby Wadler from the

22             city attorney's office representing the town and

23             the police defendants.

24                  THE CLERK:  Thank you.

25                  THE COURT:  Hi.

1    BY MS. HOOK:

2        Q      Okay.  So, let's just go back to where we were

3    to finish up on that.

4               We were at Exhibit 7, and we were talking about

5    the content --

6        A      Uh-huh (affirmative.)

7        Q      -- of the case incident report.

8        A      Okay.  Yes.

9        Q      And let me just, again, summarize what I thought

10   you testified to, and then you can correct me where I may go

11   wrong on that.

12       A      Uh-huh (affirmative.)

13       Q      Your practice is to have the case incident

14   report have a robust discussion of all facts in an

15   investigation.  And that each event should be a separate

16   record in order to provide sufficient information for you

17   to, if necessary, be able to apply for an arrest warrant and

18   present information to the prosecutor that is full

19   information about the investigation.  Am I correct?

20       A      Yeah, we have to put in everything, all

21   inculpatory and exculpatory evidence.  And the breaking it

22   down is just for ease, ease of reading, you know what you

23   are reading.

24       Q      You testified that there would be, there may be

25   some information that you would not put into a case incident

1   report, what kind of information would you not put into a

2   case incident report?

3        A      Anything that's not relative to the case.  If

4   it's, like I said, if it's something that's inculpatory or

5   exculpatory, it has to be put in there, but if it's

6   something not related -- I can make up examples, I can't

7   think of one right now.  If I'm investigating a burglary and

8   I interview a neighbor and the neighbor wants to talk to me

9   about a lost dog, I'm not going to put that in the report,

10  you know what I mean?  You put things in the actual case

11  file that are relative to the case.

12       Q      Okay.  So, for example, would you put in

13  information about every person that you interviewed in

14  connection with the case?

15       A      I would.  I would.

16       Q      Okay.

17       A      If they had something, especially if the

18  complainant, the victim, whatever you want -- whatever word

19  you want to use because there kind of is a difference, says

20  I need you to interview A, B, C, and D.  I mean, my motto

21  always was, you can interview whoever you want to interview.

22  If they have information, let us know, talk to them.

23       Q      And would you put in pertinent dates when

24  discussions took place?

25       A      Well, you would put the date in when you talk to

Page 127

1    them, yes.

2           Q      Okay.

3           A      That's just so you know.  Again, it could be in

4    a report.  It doesn't have to be in the report, as long as

5    you can recall it.  Again, this is -- these are, these are

6    inadmissible in court, you know, it's a police report.  You

7    have to have the person there.  As long as you can recall

8    it.  The purpose of the report is to have everything

9    documented.

10          Q      Okay.

11          A      But, yeah, even the dates, though, it's kind of

12   redundant because if you are typing in the date, but the

13   date that the incident was reported are the same, you know,

14   you might notice sometimes the date that the -- that it was

15   written is different than that because that's just when it

16   happened and it was typed.

17          Q      Okay.  Would you make judgments about whether

18   facts had evidentiary value before deciding to put them into

19   the case incident report?

20          A      What do you mean, make judgments?

21          Q      Would you decide not to put information in

22   because you thought it had no evidentiary value?

23          A      No, like I said, it really has to be something

24   completely unrelated to the case for me not to want it in

25   the case file.

1    don't care if Jesus Christ came and asked you, he is not

2    involved, unless he is a parent or the victim.  Don't talk

3    about these things.  I would have talked to Brent about

4    that, that would have been something that I would have

5    talked to Brent about.  I repeat things a lot, especially

6    the important things.  I usually do it in threes.  That

7    would have been something that I drilled into all the new

8    detectives.  You only talk to in this case with the victim,

9    not even the attorney, talk to the victim.  So, if you hired

10   him, and he was your attorney, I don't care what he says,

11   you are the victim, what do you want?  You know, I can't do

12   that for suspects, but, you know, that's how we -- that's

13   how I wanted everyone, how I want everything treated, so.

14        Q     So, when you say you don't talk to the school,

15   do you have -- do you provide any information to the school?

16        A     Never, not unless there is a safety concern or

17   something.

18        Q     Do you obtain any information from the school?

19        A     If it pertained to it, if it happened at the

20   school grounds.  We've had cases in public schools where the

21   crime occurred at the school, so you have to work with the

22   school, just the crime scene is the school.  The only other

23   time the school is notified of anything is by state statute.

24        Q     And what if the school -- what if individuals in

25   the school have information they learned about the event,

```
 1    talked to the victim.  But that case didn't end, you know,

 2    it ended -- I don't know, I don't know successful, but

 3    that's the kind of thing where like, I can't talk to you,

 4    it's hearsay, your statement is hearsay.  All it is is just

 5    to get you -- like this deposition, just to say this is what

 6    I said on this date, I still have to get up on the stand and

 7    testify or something like that, unless I'm deceased.

 8         Q     If a witness appeared at GPD headquarters with a

 9    typed up and prepared statement along with their attorney

10    and simply handed in the statement, would those

11    circumstances of providing that statement appear in the case

12    incident report?

13         A     What do you mean, whether they would be

14    documented if someone came in and gave a statement?

15         Q     Would it be documented that a person came in and

16    provided an already prepared statement rather than writing

17    out a statement?

18         A     They should be.  I mean, it should be.  I would

19    want to know why, because, you know, like I said, when I

20    read it, and say why have these questions, why not answer

21    them, or I'm going to answer them.  Again, it can go either

22    way.  But it should be listed that they came in with their

23    own statement provided by whomever.

24         Q     Okay.  And should it be documented that no

25    questions were asked of the witness?
```

1    interviewed.

2         Q      And what about the suspect, do you interview

3    everybody the suspect brings to you?

4         A      Yeah.  Why not?

5         Q      Okay.  And --

6         A      Again, that's the interview process is to see

7    whether or not what they are -- if they have anything that

8    is relative.

9         Q      And what information about those interviews do

10   you share with the victim?

11        A      I share everything.

12        Q      Okay.  You share with the victim everything that

13   you learned?

14        A      Yeah, but there is some tact to it as well

15   because in many cases like this, they don't end in a way

16   where the victim necessarily wants.  So, we got to gauge the

17   victim.  If the victim is eight years old and the parents

18   are distraught, there is some things you are not going to

19   want to tell them.  You got to find a way to tell them.

20   Usually we bring in people from the Rowan Center to help us

21   with stuff like that.  We don't want to keep victimizing

22   people.

23        Q      Uh-huh.

24        A      But if somebody told us something that was

25   inaccurate, or somebody told us something that we caught

1  them in a lie, let's say, or told us something completely

2  different, we'll probably have to, probably should be going

3  back and talking to the victim, especially if they are their

4  witness.  That's what I would do.

5       Q     And what information would you share with a

6  suspect?

7       A     As little as possible.  They are the suspect.

8  Obviously, anything from harming, and stuff like that, we

9  have to be careful, but, no, we wouldn't share with the

10  suspect, they are the suspect.  Sorry, sorry.

11      Q     It's all right.  It's my MO too.

12            Did you ever talk to Mike DeAngelo about this

13  particular complaint?

14      A     No, I don't -- no.

15      Q     Tom Philip?

16      A     No.

17      Q     Did you talk to anybody at Brunswick School

18  about this complaint?

19      A     No.

20      Q     Do you know why Detective Rondini was assigned

21  to this investigation?

22      A     She was probably working that day.

23      Q     As simple as that?

24      A     It could be as simple as that.  It could be as

25  random as that.  But most of the time, it's -- she was

1       A       Sometimes I recuse and sometimes I make the

2   arrest.

3       Q       Uh-huh.

4       A       I have arrested a lot of my friends growing up,

5   that I grew up with, unfortunately.  But there is also my

6   family has been arrested that I purposely would go to my

7   bosses and say block me from the report so there is no if

8   and, or, buts about saying that I influenced or had anything

9   like that, that's me, so.

10      Q       Right.  Did you judge a conflict of interest by

11  a standard of an actual conflict or an appearance of a

12  conflict as well?

13      A       Again, some people think the appearance is the

14  actual conflict and some people think the appearance could

15  lead to the conflict, I really -- but for me, if you have no

16  appearance of a conflict, then there is no conflict, right,

17  in theory.

18      Q       Well, what I'm asking not is theory, but how

19  you --

20      A       I try not to have -- I try not to put myself in

21  any conflict of interest.

22      Q       Okay.  A couple of paragraphs down, giving out

23  unauthorized information to any person, e.g., leaking to the

24  news media, defense attorneys, bondsmen, parents, patients,

25  and inmates.  How did, if at all, did you apply this kind of

1   practice to your employment?

2       A      Need to know basis.  You know, I could tell a

3   parent, the parent's the victim, sometimes you have to,

4   especially with the ages of the victims.  I could tell an

5   attorney with the victim's permission.  Even a bondsman, I

6   don't tell a bondsman anything.  But, again, if there's a

7   need to know, then they have a need to know.  There is a

8   need to know and a right to know.

9       Q      And what is the need to know in your -- during

10  your employment?  What did you judge the need to know by --

11  where was the need based, whose need?

12      A      Well, it depends on what, sometimes it could be

13  the need of the victim, sometimes it could be the need of

14  the defendant, you know.  Especially if an attorney says,

15  you know, I have A, B, C, or D information that so and so

16  did it and not my guy, well, you might have to talk to them.

17  But, again, that's more of a -- depends on the

18  investigation, you know.  But any outside third party

19  person, no.  Like schools, when you arrest somebody for a

20  class A misdemeanor or felonies, I have to tell them, so.  I

21  don't have to tell them who the victim was, but I got to

22  tell them that the child was arrested for this.

23      Q      So, beyond --

24      A      Beyond the legal, beyond the statutory mandates,

25  no, you don't leak information.

```
 1              talking about?

 2                    MR. MITCHELL:  My mistake.

 3                    MS. HOOK:  Three.  Girard 3.

 4                    MR. MITCHELL:  I'm on the wrong exhibit.

 5              I'm sorry.

 6                    THE WITNESS:  That one.

 7                    MR. MITCHELL:  Sorry about that.

 8   BY MS. HOOK:

 9        Q     So, do you recognize the case incident report?

10        A     Yeah, this is from the Schedule A, wasn't it?

11        Q     It was probably mentioned on it, yes.  Do you

12   recall this investigation?

13        A     I do.

14        Q     Why was Detective Girard assigned to investigate

15   this case?

16        A     Again, without going back and looking at it, she

17   was either working that day or picked up the phone when the

18   call came in.  It just wasn't -- this wasn't a DCF 137.  Oh,

19   no, it was.  Yeah, it was.  Again, back to how the cases

20   come in.  It was just either her turn in the hopper, so to

21   speak, or at the time her cases were not -- she didn't have

22   as many cases as other people.  I don't recall exact reason

23   why.

24        Q     When you assigned her to this case, did you know

25   she had a child who attended Brunswick School at the time
```

1  that she was assigned?

2     A     Yeah, I know she has two children, they go to

3  private schools.  So, at the time, they probably -- I

4  probably did know.  I don't even know how old they are now,

5  I think one graduated high school.  But I probably knew that

6  they went to private school.  I knew they were going to

7  those schools, yeah.

8     Q     Did you have any concerns about a conflict of

9  interest with her child attending that school?

10    A     No, because Christy's pretty straight up.  If I

11 did, she wouldn't be doing it.  She has a good integrity and

12 good -- if she had a problem, she's not afraid to speak up

13 because she has done that before, I don't want to get

14 involved with one parent, that parent in the past.  I had no

15 qualms with that at all.

16    Q     Okay.

17    A     If that's the case, like, for example, at the

18 time Kent Reynolds had kids at public school and he

19 investigated things at that school.  So, no, really it

20 depends on the situation rather than just a blanket conflict

21 of interest.

22    Q     Well, what about it would create a conflict of

23 interest?

24    A     Again, it could, but then, again, my taking of a

25 conflict of interest is what's to gain from it?  So.

1    kids were juveniles, it would fall under John Capozzi.  The

2    way the statutes works, it would have gone from out of the

3    juvenile court to the adult court, but they would have

4    arrested anybody if they had allowed it.  But, yeah, he

5    filmed a girl.

6         Q     So, before talking to the Assistant State's

7    Attorney --

8         A     Uh-huh (affirmative.)

9         Q     -- did you consider filling out an arrest

10   warrant application?

11        A     Yeah, this was going to be an arrest warrant

12   application no matter what.

13        Q     Why did you talk to the State's Attorney before

14   filling out an arrest warrant application?

15        A     Because we always do.  Any cases like this, you

16   always talk to them, especially this one that's crossing

17   jurisdictional boundaries from juvenile to adult court.

18        Q     And what would go to adult court?

19        A     Those charges probably were at the time were

20   bump-ups.  So you can have a juvenile arrested for certain

21   crimes, they get, by state statute, they used to get bumped

22   up to adult court.  So, John Capozzi, who is a juvenile

23   prosecutor, I have spoken to him, and he probably said I got

24   to call Rich on this, this is his bailiwick, because that's

25   happened numerous times with cases like this, and talked to

```
 1        A       I don't know.  Her parents.  We didn't talk to
 2   her.  They didn't want us to talk to her.  No, yeah, I don't
 3   think they would let us talk to her.  I think the school
 4   might have talked to her, talked to the parents too.  This
 5   is one of those things where I don't to involve anybody if
 6   they are not involved.  This is a classic example of getting
 7   your nose out of the business that it's not supposed to be
 8   in.  This case is like a textbook example of that.
 9        Q       Can you --
10        A       Not only did it go to the Greenwich Academy, it
11   went to -- it came to us through Greenwich Country Day
12   School, which is even more aggravating.
13        Q       Why is that aggravating?
14        A       Because they get in the way.  This is why I
15   don't want us talking -- this is why I don't want my
16   detectives talking to anybody unless it's the victim or
17   family with the victim's consent.  That's why Brunswick
18   School in the case that we're here for, I told Brent, you
19   tell them nothing, nothing.  This is why I told Brent with
20   Christy, why I don't want them talking to Greenwich Academy
21   or Greenwich Country Day School, they get told nothing.  It
22   doesn't even happen at that school, but those schools feel
23   those children are their children.  You don't get this in
24   the public school, you only get this in the private schools.
25   It's aggravating because you can't do your job when people
```

1   don't come to the police, they instead go to their school.

2   Ridiculous.  That's why when I -- when Brent took over for

3   me, and that case happened, tell them nothing.  I don't care

4   if Captain DeAngelo was a captain here, he is Security Guard

5   DeAngelo now, tell him nothing, and then I said my stupid

6   Jesus line to him.

7        Q       What is that?

8        A       If Jesus wanted to know, don't tell Jesus unless

9   Jesus is a victim because this is the kind of crap that --

10  sorry.  This is the kind of stuff that aggravates me.

11               MS. HOOK:  I have a document that was an

12               exhibit, but I don't have extra copies of it,

13               can I show you the exhibit?

14               MR. MITCHELL:  Sure.

15               MS. HOOK:  It's from the Girard deposition.

16               I'll give it to you when your attorney is

17               done looking at it.  You know, it's already

18               marked as an exhibit.

19               MR. MITCHELL:  It's marked as Girard

20               Exhibit 9, so the record is clear.  Here.

21  BY MS. HOOK:

22       Q       I'll show you what has been marked as Girard

23  Exhibit 9, what he just handed to you.  If you could take a

24  look at it, and let me know when you are finished reviewing

25  it.

Page 188

1    you are done with it.

2         A       (Witness reading.)

3         Q       Particularly the highlighted portions.

4         A       Okay.

5         Q       This is an E mail from Christy Girard to, it

6    goes along with Girard Exhibit 9, apparently to both Molly

7    King and Brunswick School.  The first E mail on that first

8    page is only to Brunswick School.

9         A       Uh-huh (affirmative.)

10        Q       And if you see the date stamp, around four in

11   the afternoon.

12        A       Uh-huh (affirmative.)

13        Q       Okay.  And do you see the information that Mike

14   DeAngelo is conveying to Tom Philip?

15        A       Uh-huh (affirmative.)

16        Q       Where are you -- saying that Christy wants Tom

17   to call her immediately so she can update him on what's

18   going on?

19        A       Uh-huh (affirmative.)

20        Q       Were you aware of that?

21        A       I wasn't aware of the E mail, no.

22        Q       Were you aware that she was updating Tom Philip

23   in real time as to what was going on?

24        A       I believe -- because we needed to find out where

25   the kids were because we didn't have any information, we

1   wanted to know who had the video because other people had

2   the video and stuff like that.  So, this is a tough

3   situation where we wouldn't -- if they are the gatekeeper of

4   the information, they're going to talk to somebody.  Like,

5   how I say that we were sitting in Molly King's office, I

6   didn't want to go talk to Mike Reynolds, we had to go talk

7   to him because he had the actual video.

8          Q      Okay.

9          A      Which we took and deleted it.  That took us to

10  Greenwich Academy.  I didn't go to Brunswick.  I remember

11  being at Greenwich Academy and having Molly King not telling

12  us things until she talked to the girls.

13         Q      Okay.  But that E mail to Tom Philip --

14         A      Uh-huh (affirmative.)

15         Q      -- where it's an E mail from Mike DeAngelo to

16  Tom Philip --

17         A      Uh-huh (affirmative.)

18         Q      -- saying that Christy called and wanted to

19  update him?

20         A      Yeah, I got to ask Christy.  I don't know

21  what -- this is Mike to Tom from a call that he got from

22  Christy that I was not a part of.  I don't know.

23         Q      So, you weren't aware that she was updating Tom

24  Philip at Brunswick that day?

25         A      Not that I can recall.  I do recall us needing

1   to get information on kids, so.

2        Q        Right.  But did you know that she was providing

3   him with information?

4        A        I don't know.  That, again, this is Mike to Tom.

5        Q        Okay.

6        A        I don't know what Christy told Mike.  If Christy

7   told Mike, if Christy told Mike the word updated, I don't

8   know.  I wasn't --

9        Q        All right.  No, keep it.

10               The first E mail is at four, what time?

11       A        4:58.

12       Q        And that's when Christy called Mike DeAngelo?

13       A        It could be.

14       Q        And then the next page, there is an E mail from

15  Christy to Tom Philip, again, the same day, October 6th at

16  10:19 p.m., do you see that?

17       A        Yeah, isn't that in this one, the first one?

18       Q        That's in the first one also.

19       A        Yeah.

20       Q        And that E mail says, I know it is late, but I

21  just received a call from the family, they assured me there

22  was no sexual assault.  As you know, there are many issues

23  wrapped in this.  Under your practice, should she have been

24  providing Tom Philip that information at 10:18 the night of

25  the --

Page 191

1       A       We needed to get names of people, who the

2   recorder was, and who the recorder wasn't, and names of boys

3   who were there, yeah.

4       Q       Is she asking him for the name of the people?

5       A       I don't know.

6       Q       Is she asking him for information or is she

7   giving him information?

8       A       I don't know.  I don't know.  You have to ask

9   her what she meant by it.  I didn't send this, so I don't

10  know.

11      Q       Well, I'm not asking you to interpret it, I'm

12  asking you to see whether that's factual information about

13  the investigation?

14      A       This is the first time I'm seeing this.

15      Q       Okay.

16      A       So, I don't know.  I didn't know she sent this.

17      Q       Is it true that she got a call from the family

18  and they --

19      A       That's what the report says.  The report says

20  here, right there, that ███ later contacted me and spoke to

21  ██████ and said she was not raped but agreed to the sexual

22  contact.

23      Q       Should Tom Philip have gotten that information

24  that same evening?

25      A       It all depends on what Christy said to ███ and

1      ████, and if ████ wanted them to -- because she had to get

2      information, I don't know.  I'm speculating now because I

3      don't know.  Again, this could be -- this could mean that

4      she wanted to talk to Tom because we needed information

5      because we still at this time did not know who the boys

6      were, the video-er.

7           Q     But she is not asking him for information in

8      this E mail?

9           A     I don't know what she is asking.

10          Q     Do you agree with that?

11          A     I agree that she said, as you know, there are

12     many issues wrapped in this.  If you would like to discuss

13     this further, please tell me.  It could have been issues

14     with their boys.  I don't know.  Their boys could have been

15     the ones that we needed to identify to go after to arrest.

16     I don't know what she meant by that.

17          Q     Okay.  Based on your earlier testimony that you

18     don't provide any information about the victim to the

19     school, was it appropriate for her to tell Tom Philip that

20     the family assured her that there was no sexual assault?

21          A     Only if the family didn't want to be involved.

22     Remember I told you, I did say, if the family wants, we'll

23     talk to whomever.  If the family wants.

24          Q     And was there a reason she had to tell Tom

25     Philip at 10:19 at night rather than waiting until the next

1    business day?

2        A        I don't know.  You have to ask her.

3        Q        Did you know about it that night?

4        A        No.

5        Q        So, Tom Philip knew about it before you did?

6        A        I don't recall.  She could have sent me a text

7    message, I don't remember.

8                 Hold on, let me read this real quick.

9                 Yeah, I don't -- I can't answer that, I don't

10   know.  I don't know.

11       Q        Okay.  Is it significant that this E mail,

12   Exhibit 9, is not in the GPD records, official records of

13   this investigation?

14       A        I don't know.  I don't know.  I don't know if

15   it's in her notes.

16       Q        Is it significant that it's in her personal E

17   mail?

18       A        No.  I don't know if she had notes of that.  She

19   could have notes of that.  She could have taken notes.  I

20   don't know.

21       Q        Well, this is the entire investigation file.

22       A        This isn't the notes.  I don't know.  I don't

23   know if she produced her notes.  Those could be her notes

24   that she produced.  That could be her notes of her saving

25   that E mail.  I don't know.  Again, I can't answer questions

1          So, the result at the end of this investigation

2    was that the victim said that she did not want to prosecute,

3    that nothing had happened, that she would not testify --

4          A     Uh-huh (affirmative.)

5          Q     -- and yet you submitted an arrest warrant

6    application, nonetheless, and successfully obtained one.

7    How is this case different from Girard Exhibit 3 case?

8          A     Different case, different kind of crime,

9    different prosecutors.  I told you in that case with the

10   Rockwood one, it would have been a juvenile matter.  Call

11   the juvenile prosecutor, that's why the name John Capozzi is

12   on it.  John Capozzi brought in Rich Colangelo.  John

13   deferred to Rich Colangelo.  Rich Colangelo told us what to

14   do.  This is different.  There was no need for us to call

15   the prosecutor, we had everything we had.  We presented the

16   facts.  And he never --

17        Q     Why did you have to call the prosecutor in this

18   case involving --

19        A     Because it involved manufacturing child

20   pornography, and at the time Rich Colangelo wanted to know

21   about all that kind of stuff.  Plus same thing with John

22   Capozzi, call him up, say, hey, promoting a minor in a child

23   pornography image or possessing a video that contains child

24   pornography is, depending on how many you have, it's a Class

25   B, I think it's a Class Be felony.  There's only a couple of

1    Class A felonies.  That would have been an automatic bump-up

2    to adult court.

3         Q      So --

4         A      These are two different cases.

5         Q      Okay.

6         A      Two different cases.

7         Q      Okay.  So, if these -- very clearly.

8                If these boys in the, we'll call it the 2014

9    incident, if these boys in the 2014 incident had been

10   charged, they could have been charged as adults?

11        A      Uh-huh (affirmative.)  That's where it gets to

12   be sticky.  That's a prosecutor's decision.  This is a

13   prosecutor's decision.  I don't prosecutor shop.  So, we had

14   to call Capozzi, he's a juvenile matters guy.

15        Q      Okay.

16        A      He decided to call Colangelo.  There were

17   several cases where we had -- several cases where we had

18   cases that were getting bumped up from a juvenile court

19   where that prosecutor, John Capozzi, reached out to the Part

20   A prosecutors.

21        Q      So, your statement earlier that you cannot

22   prosecute a case where the victim does not want to testify

23   and does not want to prosecute is not completely accurate

24   because there are cases in which you can do it?

25        A      I said right after that, there are cases, were

1    prosecute was not because she gave consent, but because they

2    wanted to shield her emotionally?

3         A        That's what they wrote in the letter.

4         Q        Okay.  So, consent was not an issue?

5         A        No, we feel, we, Christy and I, felt that this

6    girl was violated.

7         Q        The girl in the 2014 incident?

8         A        ██████████, yeah.  We feel she was violated.

9    We wanted those guys arrested.  However, we didn't because

10   the prosecutor said no.

11        Q        Uh-huh.

12        A        I don't know how else to get clear.  This, we

13   spoke to the victim, spoke to her, she said, A, B, C, or D

14   and afterward, you get the lawyer from the family, because

15   more than likely this guy's attorney, or another family

16   attorney, if I said you have to testify against him, and you

17   get the letters, that's not uncommon.  The prosecutor,

18   whoever read this one, wanted it signed.  I don't know if it

19   was Rich Colangelo, it was not John Capozzi.  I don't know.

20            Just like with domestics, how many times does

21   the victim in domestics say I don't want my husband or my

22   spouse arrested.  Well, too bad, case law says we have to

23   arrest somebody for probable cause.  There is no victim in

24   that.  So, that's why a lot of those cases get nolled or

25   dismissed.

1       Q       It's your view that this case should not have

2    been dismissed?

3       A       No, no, not at all.

4       Q       Did you think a warning was appropriate for the

5    boys in this case?

6       A       No, I think they should have been in trouble,

7    but that's out of my game, unfortunately, at that point.

8               Now, had this come in the way it should have

9    come in, and we could have circumvented talking to the

10   prosecutors because we had all the information we wanted, we

11   had all the names, we could have done everything right then

12   and there, maybe we could have done an on view arrest, but

13   that didn't play out that way.

14      Q       I'm not sure I understand.  You had to go to the

15   prosecutors because you didn't have the information that you

16   needed?

17      A       No.  On view arrest is, you know, he punches me,

18   I arrest him on view.  If it goes after that, you got to do

19   it by an arrest warrant.  However, you don't know the

20   practices and policies that that State's Attorney wanted

21   done when it came to child abuse -- excuse me, child

22   pornography, on what can be construed as child pornography

23   because I can't call it child pornography, only he can.  You

24   don't know that when it came to those kind of cases, it has

25   to go through him and he tells you what to do.

1        Q        I understand that.

2        A        That's why we did that.   I'm a little upset that

3    justice, in my opinion, was not done for these kids.

4        Q        The question I had is that, to have you explain

5    your statement that had it come in the way, the proper

6    way --

7        A        Uh-huh (affirmative.)

8        Q        -- you could have submitted an arrest warrant

9    application and you wouldn't have had to go to the State's

10   Attorneys first?

11       A        If I had probable cause right then and there, I

12   would have issued those two kids a juvenile summons.

13       Q        So, you didn't have probable -- withdrawn.

14                Explain to me what would have been different if

15   it had come in the way it should have?   What does that mean?

16       A        That means that we would have been able to talk

17   to the victim.

18       Q        Okay.

19       A        And got from her.   We would have been able to

20   hear her from her own mouth that A, B, C, or D happened.   We

21   would have been able to have questioned her, well, we

22   watched the video, in the video you didn't look like you

23   were awake.   We would have been able to, you know, if she

24   tried to BS us and say, well, I was just pretending.   We

25   would have been able to press her on that.   I don't mean

1    press in a bad way, but we would have been able to get her

2    to talk to us.

3         Q      So, is it your impression that somebody from the

4    schools got to her parents --

5         A      No.

6         Q      -- and convinced them not to do that?

7         A      No.  That's just how, unfortunately, some people

8    are.  Unfortunately, there have been numerous cases that

9    have come across my desk -- well, my desk meaning the

10   department's desk -- where people go to an attorney first

11   rather than come to the police department.  And I'm not

12   talking suspects, I'm talking victims.

13        Q      Okay.  But on October 7th at 4:26 -- this is

14   going back to Girard Exhibit 9 --

15        A      Uh-huh (affirmative.)

16        Q      -- which is the E mails.  On October 7th at 4:26

17   in the morning, so less than 24 hours --

18        A      Uh-huh (affirmative.)

19        Q      -- since the report of this incident, Tom Philip

20   writes to Christy, thanks, Christy, the dad called me last

21   night to fill me in.

22        A      Uh-huh (affirmative.)

23        Q      Can you give me a call after the morning rush.

24   Do you think that that was appropriate that he got to talk

25   to the father before you did?

```
 1     A      No.  That's what I've been saying the whole

 2  time.

 3     Q      Okay.

 4     A      That's why this case was screwed up from the

 5  get-go.

 6     Q      Okay.

 7     A      Just like the kid helping the kid to chew the

 8  chicken nuggets, they wouldn't sign that warrant either.

 9  It's -- there is no rhyme or reason to it.  I try to take

10  the passion out of it, but, you know.

11     Q      Passion is good.

12     A      Yeah, well, sometimes.

13     Q      Let me direct you to Exhibit 1, which is your

14  subpoena.

15     A      My subpoena.  Oh, that's the first one.

16     Q      Yes.  Okay.  Can you turn to the fourth page,

17  which is Exhibit 1, it's an article.

18     A      Uh-huh (affirmative.)

19            MR. MITCHELL:  Excuse me one second, Liz.

20            My son is calling me.

21            THE VIDEOGRAPHER:  Off the record at 3:58.

22            (Whereupon, there was a short recess.)

23            THE VIDEOGRAPHER:  Ready to go?  Everybody

24            all set?  We'll be back on the record in a

25            moment.  I'll say when I'm on.
```

Page 208

```
 1                       We're back on the record at 4:02.
 2    BY MS. HOOK:
 3         Q      Okay.  Are you -- do you have in front of you
 4    Exhibit 1 to your subpoena?
 5         A      Yes.
 6         Q      Which is the article?
 7         A      Yes, yes, yes.
 8         Q      Have you seen this article before?
 9         A      I saw it when I got my subpoena.  I did not
10    recall this article, but I saw it.
11         Q      Okay.  So, can you -- can you just read through
12    the article?  It's only two pages.
13         A      Greenwich Police investigated --
14         Q      Not out loud, to yourself.
15         A      (Witness reading.)
16         Q      Having read the article, does this refresh your
17    recollection about it?
18         A      No, I don't recall this article at all.  I
19    don't.  I don't read newspapers.  But I wouldn't have
20    remembered that even if I did back years ago.
21         Q      Do you know what this article is concerning?
22         A      I can -- I would imagine it's concerning the
23    ███████████        case, but I don't, I don't know what
24    Lieutenant Gray, who is now Captain Gray, was talking about.
25         Q      He was Lieutenant Gray at the time?
```

```
 1      A       In charge of -- the public information officer.

 2      Q       Yes.  You don't know what he was talking about?

 3      A       I don't know what he investigated at this time

 4   and determined that the allegations aren't founded.  I don't

 5   know what that means.

 6      Q       Well, I was going to say -- so, let's just talk

 7   about the contents of the article.

 8              Do you agree with the contents of the article as

 9   you have read it?

10                   MR. MITCHELL:  Object to the form.

11                   Go ahead and answer the question.

12                   THE WITNESS:  I'm assuming when I saw the

13                   article it's in reference to the -- because of

14                   the date, the ███████████ call, the video,

15                   but I don't, you know, I don't know anything

16                   about -- I don't know anything about this

17                   nonsense, disciplinary warnings, and all the

18                   other junk.  I don't know anything about that.

19   BY MS. HOOK:

20      Q       So, let's go line-by-line.  So, the first part

21   says, Greenwich Police investigated rumors of a sexual

22   assault at a high school party last month, but found the

23   allegations to be unfounded, officers have told Greenwich

24   Times.  Do you agree that the allegations were found to be

25   unfounded?
```

Page  210

1      A       No, I agree, I think that this case should be

2  closed, again, technical, it should have been closed,

3  exceptionally clear, victim refused to cooperate.

4      Q       The last sentence on that first page says,

5  police interviewed multiple students, parents, and

6  administrators and determined no crime had been committed.

7  Do you agree with that statement?

8      A       Well, I don't know what multiple means, but

9  these people were spoken to.  Maybe when we got the video

10  from an administrator.  I don't agree with it.  I don't

11  agree with anything.  That's why I don't read the

12  newspapers.  No, I don't agree with any of this.  I don't

13  think -- I think there was a crime.  I mean, again, the

14  video, without seeing the video, you guys haven't seen the

15  video, there is some intimation or there is some assumption

16  of what was going on it.  It wasn't like a pornographic

17  video that was made, but there was enough in it, in my

18  opinion, to entertain an arrest warrant.  So, I don't agree

19  with this.  I don't agree with the no crime, no crime had

20  been committed.  I don't agree with that.

21      Q       Did you think that the disciplinary warning and

22  suspensions that were given to the students who engaged in

23  the act and videotaped it were sufficient?

24      A       On a professional level, I really don't have a

25  say.  On a professional, on my -- as a lieutenant with the

1        A       Yeah, I don't have any recollection of telling

2   him that --

3        Q       Okay.

4        A       -- at all.  I recall people getting in our way

5   of doing our job and screwing up the case and having this

6   get screwed.

7        Q       And what people were those?  Those were the

8   ASAs?

9        A       No, the schools.

10       Q       The schools got in your way?

11       A       Yup.

12       Q       Okay.

13       A       That's my opinion.

14       Q       Okay.

15       A       My opinion.

16       Q       The articles also talks about -- you can give

17  that back to me.  There's a clip somewhere.  Oh, it's under

18  here.

19               The article also mentions that there was a

20  second similar investigation, do you know what he is talking

21  about there?

22       A       No, but it's -- no, but I do recall at this

23  time, you know, the rumors.  And this is the problem:  All

24  the different rumors of a situation get molded and melded

25  into one, and it's not uncommon, especially for something

1   like this to have happened at a school, whether public or

2   private, for there to be more once somebody finds out.

3          Like, for example, I'm public information

4   officer now, so I get E mails sent to me from our website or

5   whatever about an incident that happened that we already

6   investigated and arrested somebody on per se, but yet they

7   are now hearing about it from friends or family.  When

8   things like this happen, it's not uncommon to have people

9   calling up the mainline of SVS, the phone line and saying,

10  hey, I just want you to know we're hearing this, or hearing

11  that, or getting an E mail saying, are you guys aware of

12  this are you guys aware of that?  And then through the

13  regular telephone, it getting warped into different cases,

14  especially if it's involving -- especially if the parents

15  hear from the children.  It's not uncommon for case A to

16  happen and then get case B, C, and D, but are just case A.

17     Q     So, you are not aware that there was a second

18  investigation that took place the same time?

19     A     No, I went back and looked.  When I read this, I

20  went back and looked.  I can't find anything before or after

21  that would even be remotely related to this.  I couldn't.

22  I'm not saying, you know, someone else finds something, hit

23  me up, but I could not find, you know, it's not that much

24  between November 14th and that date, there was not many

25  calls to look at.

1        A        Because the video's the same, wouldn't it?

2        Q        Well, you would have to see the video to know if

3   it's the same video, right?

4        A        Yeah.

5        Q        So, here's a deposition transcript of ██████████

6   ██████, who is the parent of a teenage girl in 2014.  So,

7   just look at page 12 and it will tell you the date of the

8   party was sometime around October, 2014.

9        A        Okay.

10       Q        And turn to 23 and 24, and that's a description

11  of a video she found on her daughter's phone.

12       A        (Witness reading.)

13                Okay.

14       Q        Are there any differences between her

15  description of that video and the video that you saw in

16  the --

17       A        I don't remember the girl being naked.  I don't

18  remember her being on her -- being facedown.  I don't

19  remember that, but then, again, I've seen unfortunately too

20  much stuff in my time that I don't, you know, I store it

21  somewhere else in my head.  I don't remember what the video

22  was exactly.

23       Q        Can we make the record clear because I

24  interrupted and you talked?  So, what difference do you

25  recall there being between her description and the video

1   that you saw?

2        A        I don't remember, I don't remember the girl in

3   the ██████████ case being naked.  I don't.  I remember, I

4   recall seeing her face.  I don't recall this.

5        Q        Okay.  Can you please turn to page 29 through

6   31, and that's where she describes how she provided the

7   video to Lieutenant Tommy Keegan.

8        A        Again, it's not going through the proper

9   channels, but that's a different story.

10       Q        Well, she explains what she did?

11       A        He wasn't a police officer at this time.  He was

12  retired.

13                Who is ████?  Who is ████?

14       Q        ████ is her daughter.

15       A        Oh.

16       Q        She discovered the video by confiscating her

17  daughter's phone.

18       A        Okay.  So, sounds like it's the same one, but,

19  again, I don't -- I could have sworn I seen the girl's face,

20  but I could be mistaken.  Where am I supposed to stop

21  reading?

22       Q        Well, she's -- have you gotten to the point

23  where she provided it to --

24       A        No, I didn't get there yet.

25       Q        -- Tommy Keegan?

1    BY MS. HOOK:

2         Q      Yes.

3         A      So, I don't know how he got it.

4         Q      But he got a video which he gave to Lieutenant

5    Bonney and Detective Girard, correct, that's the testimony?

6         A      Yeah, he says he gave it to Bonney and Christy

7    was in the presence of him when he gave the video to Bonney.

8         Q      Okay.  And did either of them ever tell you

9    about a video?

10        A      Not that I can remember.  I can't recall that.

11        Q      Okay.

12        A      I don't recall that.

13        Q      Were you -- you were a sergeant in SVS at the

14   time?

15        A      I was a sergeant the whole time during this.

16        Q      So, would it have been important to at least let

17   you know that they received a video?

18        A      There is a lot of things that would be important

19   for me to know.  He's the lieutenant, the lieutenant didn't

20   want to tell me, or the lieutenant did tell me, I don't

21   recall.  I'm not saying he didn't tell me, I'm not

22   remembering anything about a video coming in this way, I'm

23   not.

24               As I did say before, it's not uncommon for one

25   complaint to come in and then several other complaints to

Page  234

1    come in as well, especially when it comes to images.  When

2    we have the picture of a girl flying around the internet and

3    we know who did it and have it, other videos or other

4    pictures of other people calling us saying that they had the

5    same video as well, but since we're already investigating

6    it, and if it doesn't add anything to it, then I -- it's

7    kind of moot.  And, again, without seeing the video, I don't

8    know.

9         Q      Okay.  So, you were never --

10        A      Let me start reading this.

11               I don't recall.  This is -- I'm not recalling

12   this.  I'm not recalling the video.  I'm not recalling the

13   rumors.  I'm not recalling a second incident that happened

14   with whatever, however it's portrayed.  I'm not -- I didn't

15   call the New York Times, I don't know what Tom Williams

16   did -- Tom Philip did to his kids in his school.  All I know

17   is we wanted to interview some people and we couldn't, and

18   that screwed up where we were going with this, and that's

19   why this case is so disjointed.  But I've never seen a

20   video.

21               If Tommy Keegan said he gave Jim Bonney a video,

22   then he gave Jim Bonney a video.  That's all I can say to

23   that.

24        Q      Okay.

25        A      But I don't recall seeing a naked girl.  The

1    video I saw was not of a naked girl.

2        Q      Okay.  So, two simple questions as to that.

3               If there was such a complaint submitted by a

4    parent of a teenager in both an anonymous tip line and a

5    video provided to --

6        A      Well, it said she tried to do the anonymous tip

7    line.

8        Q      Okay.  The question is, if there was an

9    anonymous tip line and a video provided to a former

10   lieutenant who said he provided to the GPD, should there

11   have been an investigation opened up?

12               MR. MITCHELL:  Object to the form.

13               Go ahead and answer the question.

14               THE WITNESS:  No, not if there is already

15               an investigation ongoing.

16   BY MS. HOOK:

17       Q      Okay.

18       A      Because, again, it's the same case.  If it's the

19   same case, you are not going to open up another

20   investigation.  And, again, all she did was she had it on

21   her girl's phone, and I think she said in her testimony that

22   her daughter wasn't there or was there.  I was trying to

23   read it really fast.

24       Q      Okay.

25       A      So, I don't know.

1      ██████████  case?

2          A      It must have been the teen center.  We had

3    problems, there was issues with the teen center with

4    reporting of things.  You know, they used to have a party, I

5    don't know what it was called, pink and white, or something,

6    red and white, I don't know what it was called.  People were

7    going out to the hospital, overdose on drugs, whatever,

8    excuse me, alcohol, high, drunk, sent to the hospital three

9    or four a night.

10         Q      Uh-huh.

11         A      Or we get a complaint about a fight that

12   happened there that we don't know about, stuff like that,

13   so.

14         Q      So, let me just be clear, your testimony is that

15   the involvement of outside people in your investigation is

16   what tends to screw up your investigations?

17         A      If they prohibit us from getting involved and

18   talk parents out of doing things, yes.

19         Q      Uh-huh.

20         A      That's my opinion.  Some people have a different

21   opinion, that's my opinion.

22         Q      I'm going to ask you to look at Zuccarella

23   Exhibit 12, which is probably at the bottom of your -- oh,

24   you have it?  Okay.

25         A      Yeah, I grabbed it by accident, I guess.

1       Q       Brent Reeves.

2       A       No.  If there was a complaint like that, it

3    should have been a civilian complaint in which it should

4    have been documented and investigated by a lieutenant or

5    above.

6       Q       But you never heard anything about that?

7       A       No.

8       Q       When you said before that there is too much

9    involvement of other people and that screws up your

10   investigations and creates these problems --

11      A       Uh-huh (affirmative.)

12      Q       -- has it been your experience that Brunswick

13   School gets involved in investigations in that way?

14      A       Just this one or the ███████ one, I should

15   say.  Mike DeAngelo would call a few times, and I was a

16   sergeant, and I would say I can't tell you nothing.  If he

17   heard something, because he lives in town, so I can't tell

18   you nothing.  But that stopped pretty much right away with

19   Mike and I, he knew not to ask me because he knew he wasn't

20   getting anything like that.  But this ███████ case,

21   and stuff like that, you know, I don't know what their issue

22   was with this.  I did tell Brent, don't tell them anything.

23   So, there is a reason why I would have told him that, so.

24      Q       Well, is the reason you told him that because he

25   was fishing for information?

Page 250

```
 1        A       Probably, yeah.  This case, the █████ case is

 2   because they wanted to know what was going on, and they had

 3   no right to know.  It didn't happen on school property,

 4   didn't happen during school time, you know.  It's like the

 5   Rockwood Lane one, it didn't happen on school property.

 6        Q       Did DeAngelo call anybody else besides Reeves?

 7        A       I don't know.

 8        Q       But it was your experience that Mike DeAngelo

 9   would try to get information?

10        A       Well, that's his job, so he is going to call and

11   ask for information, and I tell him what I can legally tell

12   him.  You know, but on this, on this case, I told him -- he

13   didn't call me because Brent was doing it, but in the past,

14   he's called me for stuff in the past, as has Mike Reynolds,

15   I don't tell him anything, and he would get all hurt about

16   it, oh, well, sorry.

17        Q       Uh-huh.

18        A       You know, the only one that never really

19   involves, gets -- asks us any questions in public schools

20   (sic) is the guy from Greenwich Academy, Chris Webster.  He

21   never asks because he knows.  Because guess where he used to

22   work?  In the youth section, he knows the routine.

23        Q       Okay.

24                MS. HOOK:  Okay.  I'm going to take a

25                little bit of a break and I think I will be
```