# Plaintiff Exhibit GG

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


JANE DOE

VS.                              3:18-cv-01322-KAD

TOWN OF GREENWICH, ET AL.



    Videotaped deposition of KRYSTIE RONDINI, taken

in accordance with the Connecticut Practice Book at

the law offices of Braxton Hook PLLC, 2 Greenwich

Office Park, West Building Suite 300, Greenwich,

Connecticut, before Deborah Gentile, RPR, a Registered

Professional Reporter and Notary Public, in and for

the State of Connecticut on June 25, 2020, at

10:06 a.m.




                 DEBORAH GENTILE, RPR


          DEL VECCHIO REPORTING SERVICES, LLC
            PROFESSIONAL SHORTHAND REPORTERS
                   117 RANDI DRIVE
             MADISON, CONNECTICUT 06443
                   203.245.9583

    Hartford          New Haven          Stamford

```
 1              MR. MITCHELL:  We have just a --
 2              MS. BRAXTON:  So Elizabeth Hook from --
 3              MS. HOOK:  I'm sorry.  I was just trying to
 4        unmute.  It's Elizabeth Hook with Braxton Hook,
 5        for the plaintiff.
 6              MR. MITCHELL:  Okay.  ███████ --
 7              MS. BRAXTON:  And Abby Wadler will join
 8        later.
 9              MR. MITCHELL:  Abby Wadler.  And then, also
10        present is ███████████ and Brent Reeves.
11              MS. BRAXTON:  Correct.  All set.
12        You did that, yeah.
13              MR. MITCHELL:  You did that, yeah.
14
15              KRYSTIE RONDINI, having first been duly
16        sworn, was deposed and testified as follows:
17
18                    DIRECT EXAMINATION
19        BY MS. BRAXTON:
20        Q    Good morning.
21        A    Good morning.
22        Q    As you know, I'm the attorney for the
23        plaintiff in this matter.  And you were deposed
24        before, the first part of your deposition.
25              Just to remind you, if you don't understand
```

1     A     Yes.

2     Q     Like what kinds?

3     A     If there's a case involving a juvenile, a

4  fight, they get into a fight at school, the --

5     Q     Okay.

6     A     -- they can have access to that.

7     Q     Okay.  So Sergeant Zuccarella testified that

8  the method by which NextGen restricts access to

9  juvenile files is via the birth date that's entered.

10  Does that sound familiar to you?

11     A     It will -- when you enter a birth date into

12  NextGen, if it is a juvenile, it will say "juvenile";

13  it doesn't automatically lock the case.

14     Q     Okay.  So do -- so -- okay.  So if a case is

15  labeled "juvenile" in the NextGen system --

16     A     Uh-huh.

17     Q     -- does the system automatically lock

18  anything?

19     A     No.

20     Q     Okay.  So do you have to lock it?

21     A     Yes.

22     Q     Okay.  And you don't remember whether you

23  ever locked the Doe case?

24     A     I don't remember if I did.

25     Q     Are there Police -- Greenwich Police

Page 12

1    Department policies that apply to investigating sexual

2    assaults?

3        A    Policies?  I believe that they are -- they

4    wrote one.  Recently.

5        Q    Okay.  Was it in effect in 2016?

6        A    I do not believe so.

7        Q    Okay.  Can you tell me what the Greenwich

8    department policies were in -- well, first of all --

9    I'm sorry, withdrawn.

10           Were the practices that the special victims

11   section followed consistent with the policy that went

12   into effect after 2016?

13       A    I believe so.

14       Q    Okay.  So what do you recall of those

15   policies?

16       A    I can't recall them off the top of my head.

17       Q    Okay.  Do you know if it says anything about

18   delayed reporting in victims to be common in sexual

19   assault cases?

20       A    It may.

21       Q    Okay.  But you don't know?

22       A    I don't recall.

23       Q    Okay.  And that odd behavior can be common

24   afterwards?  Do you recall reading that?

25       A    I don't recall if that's in there.

Page 21

1    page?

2         A    I would assume because at that time maybe

3    Audrey was representing her?

4         Q    Okay.  When it was transcribed?

5         A    I believe so.  I don't do the transcribing

6    of it, so I don't know --

7         Q    Okay.  Do you know who provides information

8    to the person who does the transcription?

9         A    Who -- I'm sorry.  Do you know who

10   provides --

11        Q    Who provides information to the person who

12   does the transcription?

13        A    So it would be like an audio recording, and

14   then they give the recording to whoever transcribes

15   it --

16        Q    Right.

17        A    -- and they are the ones that transcribe it.

18        Q    Okay.  But nobody ever asked you to identify

19   the voices on the recording or anything like that?

20        A    No, I don't believe so.

21        Q    And do you know who would have provided the

22   information about the identity of the voices on the

23   recording?

24        A    Do I know who would have provided the

25   identity of -- no, I -- I don't.

1      Q     Okay.  I'll take that, please.

2            Okay.  So when you -- when you interviewed

3   Paula on August 2, did you ask her questions?

4      A     I believe so, yes.

5      Q     Okay.  If you look at the next interview --

6   or next case report, which is at 697.

7      A     Sorry, there -- can I unstaple this?

8   Because it's --

9      Q     Oh, sure.  Yeah.

10     A     It doesn't say the --

11     Q     We'll just have to restaple it.

12     A     Well, yeah, I just ripped it.  But -- I

13  believe I'm looking at it.  Go ahead.

14     Q     So -- so was this the next witness who you

15  asked for information?

16     A     I can't recall the exact order I contacted

17  people, but this is -- the date here is the date I

18  interviewed ███████.

19     Q     Okay.  And he provided a written statement

20  to you?

21     A     I don't recall if he did or not.  I'd have

22  to --

23     Q     Why don't you read the first sentence?

24     A     (Witness complies.)  Yes.

25     Q     Okay.  And did you ask him any questions?

1   recall about that evening?  What you saw, what you

2   heard, what you observed, what you know."  Those kind

3   of questions.

4        Q    Okay.  And then you sat her down to write it

5   out rather than tell you, correct?

6        A    I asked her; she told me.  I asked her if

7   she could write it down after we spoke.  That's

8   typically what I do with --

9        Q    Would it surprise you if ███████ said that,

10  in fact, you just had her write down what she

11  remembered and didn't ask her any questions?

12       A    Would it -- I don't know if I asked her

13  follow-up questions, because maybe what she told me at

14  the time and what she wrote down was enough

15  information and I didn't have any further questions.

16       Q    So is it that you acknowledge you didn't ask

17  her any questions --

18       A    What I'm saying is I asked her, "Can you

19  please tell me everything that you can remember about

20  that night and the incident, what you've heard, what

21  you've seen, what -- any information that you may

22  have, please tell me about it."  What she told me, I

23  may have not asked -- needed -- felt that I needed to

24  ask her any further questions or needed any

25  clarification.  So I said, "Can you please write down

1      A    I can't recall.

2      Q    Now, in -- in this instance, he says that he

3  had to physically carry ███████ out of the party and put

4  him into the Uber, and that he had to physically carry

5  ███████ into his house later.

6           Other witness -- none of the other witnesses

7  you had spoken to at that point had said that.

8      A    I don't recall.  I'd have to go through and

9  look at the statements.

10     Q    Okay.  Well, I can represent to you that

11 none of the other witnesses you had spoken had said

12 anything like that.

13          So did you confront him about that?

14     A    Confront ███████?

15     Q    Yes.

16     A    I don't recall if I did or didn't.  And I

17 don't remember what everyone said, so I'm not going

18 to --

19     Q    Okay.  Did you do anything to investigate

20 that inconsistency?

21     A    I can't recall what I did.

22     Q    Did you do anything to corroborate what he

23 was saying?

24     A    I can't recall.

25     Q    Did you ask -- did you do anything during

1      A      No.  He just said "I came in later than

2   usual."

3      Q      Let me see.

4             It says he came into the driveway, saw a car

5   with two occupants when he was in the driveway, and he

6   texted ████ at 10:21 p.m.  So that would indicate

7   when he arrived, correct?

8      A      That's when he arrived, yes.

9      Q      Okay.  Is that not inconsistent with what

10  Lance says in his statement?

11     A      Let me just --

12            So "During the course of the evening, a

13  tenant who lived on the second floor of the pool house

14  was moving belongings out of his apartment while we

15  were in the pool house."  It doesn't say anything

16  about times.

17     Q      It says "During the course of the evening."

18     A      "During the course of the evening."

19     Q      Sam Gonzalez says he wasn't there till

20  10:21.  How could that have been --

21     A      That's still during the course of the

22  evening.

23     Q      So you didn't think that that was any kind

24  of an inconsistency?

25     A      No.

Page 73

1        Q      You didn't think ██████ might possibly have

2    been lying?

3        A      Why would I think he was lying if he said

4    that Sam was in the pool house?

5        Q      Because Sam said he wasn't in the pool

6    house.

7        A      Sam says "Staying...while we were having a

8    pool party...came in as usual...upon arriving, the

9    car..."

10               (The reporter requested clarification.)

11               THE WITNESS:  Oh, I'm sorry.  I'm just kind

12         of reading it to myself.

13               It says -- hold on.

14               (Reviewing document.)  Okay.  So Sam says he

15         was in the pool house, and he says that he was

16         there.  It doesn't -- the times -- neither one of

17         them put an exact time that they were there.

18    BY MS. BRAXTON:

19        Q      Well, it was definitely after 10:21,

20    correct?

21        A      Yes, Sam says that.

22        Q      Okay.  Does he say anything about moving his

23    belongings?

24        A      (Reviewing document.)  It says he was

25    helping cleaning the pool house.  So he was cleaning

Page 74

1    the pool house.

2         Q    After the kids left, correct?

3         A    He says -- let me -- how about I just read

4    it to you, okay?

5         Q    No.

6         A    Well --

7         Q    No.  No.

8              Did you go back and ask ████ what time that

9    person was moving his belongings in the pool house?

10        A    I don't recall.

11        Q    Doesn't █████s statement imply that someone

12   was in the pool house seeing what was going on while

13   █████ said she was being attacked?

14             MR. MITCHELL:  Object to the form.

15             THE WITNESS:  Yeah.

16             MR. MITCHELL:  Go ahead and answer.

17             THE WITNESS:  Can you rephrase that, please?

18   BY MS. BRAXTON:

19        Q    Doesn't █████'s statement imply that there

20   was an adult in the pool house moving his belongings

21   out --

22        A    During the course of the evening.

23        Q    -- while █████ was being attacked?

24        A    That's not what he says.

25        Q    So you don't think there's any inconsistency

1    there?

2        A       ███    ███    says "During the course of the

3    evening, a tenant who lived on the second floor

4    apartment was moving his belongings out of the

5    apartment while we were in the pool house."  It

6    doesn't say what -- what they were doing in the

7    pool -- pool house.

8        Q    Did you ask him what time he was in the pool

9    house?

10       A    I don't recall.

11       Q    Did you ask ███any questions at all?

12       A    I don't recall.

13       Q    Did you ask Sam Gonzalez if there were

14   people in the bathroom when he got to the pool house?

15       A    I don't recall.

16       Q    In fact, Sam Gonzalez says that the

17   bathroom, both doors were locked when he tried to get

18   into it, correct?

19       A    Let's see.  (Reviewing document.)  Yes.  He

20   said while cleaning the bathroom, doors were both

21   locked.

22       Q    Clearly, he wasn't there when there were

23   kids in the bathroom, correct?

24       A    Could he have been?  Because that --

25       Q    Did you ask anybody anything at all?

 1        A     I don't recall what I asked them.

 2              But if he was there when there were people

 3    in the bathroom, he still wouldn't have been able to

 4    witness anything, unless he was in the bathroom with

 5    them.

 6              There were no witnesses to the actual event.

 7        Q     But █████s statement implies that, if there

 8    was an attack, Gonzalez would have seen it.

 9        A     That's not true.  Where do you read that?

10        Q     That's what the way I read ███████s

11    statement.

12        A     That's your interpretation; that's not what

13    he says in this statement.  What he says in this

14    statement is "During the course of the evening, a

15    tenant who lived on the second floor of the pool house

16    was moving his belongings out of the apartment while

17    we were in the pool house."

18        Q     So you didn't think it was something that

19    you should know, whether there was an adult in the

20    pool house when this attack was happening?

21        A     Where does it say he was -- okay.

22              Sam said he was not in the pool house --

23        Q     After you got -- after you got --

24        A     Was Sam in the bathroom?

25        Q     -- ███████ -- ████████s statement, why didn't

1  you go back to Sam Gonzalez and ask him, "Were you

2  moving your belongings out?  Were you there when the

3  kids were in the bathroom?"

4      A    Because Sam Gonzalez says "Upon arriving, I

5  saw" --

6           (Reviewing document.)  Sam says "So I left.

7  When I returned, they were gone."

8      Q    Okay.  So that was about the kids in the

9  driveway.

10     A    "After a few moments" -- hold on.  Let me

11  start back.

12          "██████ -- I text ██████ at 10:21 about

13  it.  She asked me to come up to the main house, that

14  the kids were almost done.  After a few minutes of

15  chatting, I went back to the car and stayed there.  I

16  stopped and asked the guys if they were -- were all

17  set.  They said they were waiting for his" --

18  "girlfriend," I think it says --

19     Q    "Brother"?

20     A    "Brother."

21          -- "so I left.  When I returned, they were

22  gone and I went to the pool house."

23     Q    So that "they were gone" were the people

24  parked in the driveway, correct?

25     A    Well, Ms. ██████ says the kids were almost

1   done.

2       Q    Okay.  So how would he be moving his

3   belongings throughout evening?

4       A    Could ███ have been talking about the same

5   time that he was there?

6       Q    Could ███ have been lying?

7       A    Why would ███ lie and give me a sworn,

8   written statement?

9       Q    You -- you don't think that anyone ever has

10  submitted a sworn statement that has a lie in it?

11  That's your experience as a detective?

12          MR. MITCHELL:  Objection to the form and to

13      the tone.

14          Go ahead and answer, if you can.

15          THE WITNESS:  I'm just rereading something.

16          (Reviewing document.)  Go ahead and ask your

17      question again, please.

18  BY MS. BRAXTON:

19      Q    Is it your testimony that anytime somebody

20  submits a sworn, written statement that it is

21  unquestionably the truth?

22      A    I don't recall having someone give me a

23  sworn statement that wasn't the truth.

24      Q    Okay.  And that includes Jane Doe?

25      A    Do I -- was she being truthful?  I think she

Page 79

1  was telling me that --

2      Q    So --

3      A    In her statement, I think she was being

4  truthful in her written statement that she gave me.

5      Q    So is it a detective's practice at the

6  Greenwich Police Department to take at face -- face

7  value every statement that they get and not take any

8  steps to corroborate the assertions made in those

9  statements?

10     A    I didn't -- I didn't have any reason to

11  believe that they were not being truthful with me.

12     Q    I can represent to you that I actually did

13  ask the question of ███████, and he claimed that

14  Gonzalez was there from 6 p.m. on.  So clearly, he was

15  lying.

16          Don't you think you should have tested the

17  credibility of both of those people?

18          MR. MITCHELL:  Object to the form.  It's not

19      really a question; it's a statement.

20          THE WITNESS:  Yes.  Can you --

21          MS. BRAXTON:  I asked a question:  Don't you

22      think you should have checked on the credibility

23      of both of those witnesses?

24          MR. MITCHELL:  That's not a question.

25          THE WITNESS:  ███████ doesn't say what time

1      he's in the bathroom -- or what time he's there,

2      he just says "During a course of an evening."

3  BY MS. BRAXTON:

4      Q    Why didn't you ask him?

5      A    To be -- ████s attorney may have

6  instructed him not to -- that he can't answer any

7  questions, that this is his statement.  I don't recall

8  the details of it.  But that is a possibility.

9      Q    And you still put that information in as if

10  it's --

11      A    Put what information?

12      Q    Into your case reports and into the arrest

13  warrant, even though it may not be true.

14      A    Put what information?

15      Q    Information about ████s statement.

16      A    Yes, I put that in.  That's what he gave a

17  statement to.

18      Q    Okay.  When you did the arrest warrant, you

19  left out the piece about there being a tenant in

20  the -- in the pool house moving his belongings.  And

21  you took out Sam Gonzalez's statement.

22          Why did you do that?

23      A    I don't recall.  I don't -- do you have the

24  warrant?  Can I --

25      Q    Were you -- were you concerned about the

Page 81

1    inconsistency?

2         A    Don't recall.

3         Q    I do have the arrest warrant, but I just

4    can't find it.

5              Let's move on to -- also, aside from Eugene

6    Riccio, was there -- Riccio (phonetic distinction),

7    was there -- who was ██████s attorney, was there

8    anyone else who was facilitating you obtaining ██████s

9    statement?

10        A    Did anyone help me get his statement?

11        Q    Anyone else helping to shepherd it to you.

12        A    What do you mean "shepherding it" to me?  He

13   came and he gave it to me.

14        Q    Okay.  And nobody else talked to you about

15   his statement beforehand?

16        A    Like who?

17        Q    The perpetrator's lawyer?

18        A    ██████  ████████    attorney talked to me about

19   ██████s statement?

20        Q    Yeah.

21        A    No.

22        Q    So you have a specific recollection, and

23   that did not happen?

24        A    I don't recall ever speaking to him about

25   ████████ statement.

1    it, ████s statement -- ████ and ████ both spoke

2    with ████ at the same time, and both ████ -- I'm

3    sorry, both ████ and ████s statement was very

4    similar of what ████ had related to them.

5         Q    And we'll get to that.

6         A    Okay.

7         Q    Did it -- did it occur to you that perhaps

8    they coordinated their statements?

9         A    No.

10        Q    Okay.  Even though one was coming from an

11   attorney?

12        A    No, it didn't.

13        Q    And even though, clearly, he was working

14   with the defense attorney?

15             MR. MITCHELL:  Objection.

16             THE WITNESS:  Yeah, I don't know.

17             MR. MITCHELL:  That's a fact that's not in

18        evidence anywhere.

19   BY MS. BRAXTON:

20        Q    You had no -- no idea that Mike Jones, the

21   perpetrator's lawyer, was coordinating with Gene

22   Riccio, ████s lawyer?

23        A    No.

24        Q    Absolutely no communications that indicated

25   that?

Page 97

1      A    Not that I can recall, no.

2      Q    Now, with respect to -- let's get back to

3  Grace's statement --

4      A    Uh-huh.

5      Q    -- in the case reports, which is -- it

6  starts at 734.

7           So did you ever learn that ███ was

8  disciplined for bullying ███?

9      A    At some point, I did; I don't recall if it

10  was during this investigation or if it was brought up

11  through -- the depositions.  I don't recall when I

12  became aware.

13     Q    Okay.  Why isn't that in the case report or

14  in the arrest warrant?

15     A    Why is what not in --

16     Q    The fact that ███ was bullying --

17  disciplined for bullying ███?

18     A    Because I just answered, I -- I recall

19  having knowledge of that; I don't recall if -- I

20  may -- speaking today, I can recall and say I have

21  knowledge of hearing of that, but I don't remember

22  if -- when I heard it, did I hear of it through the

23  depositions or during the course of the investigation.

24     Q    So if you learned of it during the course of

25  the investigation, should have it been in the case

Page 117

```
 1      A    Value?  I put it in here.  I put what he

 2   told me.

 3      Q    Did you put it in the arrest warrant?

 4      A    I don't remember.  We'd have to go back and

 5   check.

 6      Q    I assume it would be towards the end,

 7   because they were chronological.

 8      A    (Reviewing document.)  Yes.

 9      Q    So you do think it was of evidentiary value?

10      A    I just put in here that he was -- I didn't

11   say whether it was or evidentiary value, it just says

12   that he didn't see or hear anything unusual at the

13   party.

14      Q    He said that.  But he also said that █████

15   couldn't walk.

16      A    ██████████?

17      Q    Did he?  Oh no.  I'm sorry, withdrawn.

18           So you thought that that had evident --

19   like, was valuable enough to put in the arrest

20   warrant, but Sam Gonzalez's statement was not?

21      A    I don't -- I don't recall why that's there

22   and -- and Sam's -- no.

23      Q    Okay.  So do I understand your testimony to

24   be that the only steps you took to corroborate

25   inconsistent testimony or to resolve inconsistencies
```

1    defense attorney?

2         A    No.  Again, every case is different.  So

3    it -- it really just depends on the case.

4         Q    And did you communicate with -- did you know

5    that Mike Jones was Peter Roe's defense attorney?

6         A    Yeah, I believe at one point he was

7    representing him.

8         Q    Okay.  And did you communicate with him?

9         A    I believe so.

10        Q    Okay.  Can you tell me what you recall about

11   your communications with him?

12        A    No, I -- I can't recall the detail of it.

13        Q    Did you ever share with Jones the recording

14   of your first interview with Jane Doe?

15        A    No, I don't believe I did.

16        Q    Do you know whether you did or not?

17        A    I don't see why there would be any reason to

18   share it with him, so no, I don't ever recall sharing

19   it with him.

20        Q    Okay.  Do you recall meeting with him?

21        A    No, I don't.

22        Q    Okay.  We're going -- I'm going to go on

23   to -- I guess this will be Exhibit 11.  That one right

24   there (indicating).

25             (Exhibit 11 was marked for I.D.)

Page 130

1    Q   Okay.  So you don't remember meetings you

2 had with him?

3    A   Uh-uh.

4    Q   Do you remember, like, in October what phone

5 conversations you had with Jones?

6    A   I remember having conversations; I don't

7 remember the -- what we talked about, no.

8    Q   What could you have talked about?

9    A   We could have talked about how the weather

10 was.  We could have talked about, I mean, anything.

11    Q   Do you --

12    A   Probably about this case.

13    No, I don't speak to Mike Jones on a regular

14 basis, unless it's about a case.  And this is the only

15 case I had with Mike Jones so...

16    Q   So this is the only thing you would ever

17 talk to him about?

18    A   Yes.

19    Q   Okay.  And you don't remember a thing about

20 your conversations with him?

21    A   No.

22    Q   But you think you remember asking ███

23 whether she was drinking in August of 2016?

24    A   Yes, I do remember.

25    Q   Hmm.  So regarding ███s statement and

Page 132

1      to --

2            MS. BRAXTON:  Well, on page 465, you're

3      letting him know when --

4            THE WITNESS:  465?

5            MS. BRAXTON:  Uh-huh.

6            THE WITNESS:  I think mine are -- mine might

7      be out of order here.

8            MR. MITCHELL:  No, it's at the bottom.

9            MS. BRAXTON:  They -- they are out of --

10     they are out of order.

11           MR. MITCHELL:  They're out of order.  It's

12     on the bottom.

13           THE WITNESS:  So 465.  Okay.  Go ahead.

14  BY MS. BRAXTON:

15     Q    All right.  So you -- you say "Mike, I want

16  to let you know that I'm scheduled to meet with ████

17  on Monday and I'm preparing a warrant and will be

18  requesting to meet with Capozzi to go over the case

19  with him.  I will keep you posted."

20           So what were you telling him?

21     A    That I'm going to be meeting with ████,

22  that I'm going to be preparing a warrant for his

23  client, and I will let you know if the warrant comes

24  back.  That's kind of what I was saying to him.

25     Q    And he's asking whether there's -- you know,

Page 133

1   whether you can tell him what she said.  Did you tell

2   him?

3        A    Where are you seeing that?

4        Q    Up at the top of that same page.

5        A    If I didn't put it in the email, we didn't

6   talk -- I didn't tell him.

7             And it's not -- it's a big secret to be,

8   like, "I can't tell you what ████ said."  That's not

9   a big secret.  So if I did tell him, it's not like,

10  "Oh, my gosh.  You can't do that."

11       Q    Why didn't you tell Jane Doe and her family

12  about what you were learning from other witnesses,

13  especially if you thought that it was impugning her

14  credibility?

15       A    I did talk to her about it.  I didn't say

16  specifically who was saying what in the -- in the

17  interview, I did talk to her and say there were

18  inconsistencies.  That's what I did.

19       Q    But you didn't say that other witnesses had

20  said things, or what they said?

21       A    Well -- did I say -- did I name people,

22  specifically?  No.

23       Q    Why not?

24       A    Because I didn't -- it's not a -- it's not

25  like you have to tell the person.  She didn't ask; I

Page 145

1            MR. MITCHELL:  You have to answer yes or no.

2            THE WITNESS:  Oh, no.  Sorry.

3    BY MS. BRAXTON:

4        Q    Okay.  And then you said that it -- there

5    was no relevant information, correct?

6        A    That's what I said, yes.

7        Q    Okay.  Yet you included that, both in your

8    case reports and the arrest warrant, correct?

9        A    Correct.

10       Q    Why was that?

11       A    That's -- well, I would obviously need to

12   report if I spoke to him.  So yes, that would be in

13   the report.

14           I don't know why that was -- I can't recall

15   why, in the warrant.

16       Q    And -- and you found that of more of an

17   evidentiary value then Sam Gonzalez's statement?

18       A    I don't recall why I did it that way.

19       Q    Okay.  But you included that and not Sam

20   Gonzalez's statement in the arrest warrant

21   application, correct?

22       A    Correct.

23       Q    Okay.  And after -- also, when you were

24   talking to John Capozzi, did you tell him that ███

25   had changed her story?