Plaintiff Exhibit HH

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CIVIL ACTION NO:   3:18-cv-01322-KAD

JULY 9, 2020

----------------------------------------

JANE DOE,

                Plaintiff

       -vs-

TOWN OF GREENWICH, ET AL,

                Defendant

----------------------------------------

                VOLUME II

   VIDEOTAPED DEPOSITION OF SERGEANT BRENT REEVES

APPEARANCES:

    BRAXTON HOOK, LLC
      Attorneys for the Plaintiff
      280 Railroad Avenue, Suite 205
      Greenwich, Connecticut  06830
      PHONE:  (203) 661-4610
      E MAIL:  mbraxton@braxtonhook.com
    BY:   MEREDITH BRAXTON, ATTORNEY-AT-LAW

    MITCHELL & SHEAHAN, P.C.
      Attorneys for the Defendant
      Sergeant Detective Brent Reeves and
      Detective Krystie M. Rondini
      999 Oronoque Lane, Suite 203
      Stratford, Connecticut  06614
      PHONE:  (203) 873-0240
      E MAIL:  jslippen@mitchellandsheahan.com
     BY:   JESSICA SLIPPEN, ATTORNEY-AT-LAW

```
 1   THEREUPON,
 2              S E R G E A N T    B R E N T   R.   R E E V E S,
 3                    Greenwich Police Department,
 4                           11 Bruce Place,
 5                    Greenwich, Connecticut  06830,
 6              first having been duly sworn, was examined and
 7              testified as follows:
 8   DIRECT EXAMINATION
 9   BY MS. BRAXTON:
10       Q     Okay.  Good morning, Sergeant Reeves.
11       A     Good morning.
12       Q     This is your continued deposition.  You were
13   deposed quite a while ago.
14       A     Uh-huh (affirmative.)
15       Q     I just want to remind you of the basic
16   instructions.
17             Please let me finish a question before you
18   answer it.  I will try to let you finish your answer before
19   you ask another question.
20             If you don't understand the question that I ask,
21   let me know, I will try to rephrase it or clarify.  If you
22   do answer a question, I'm going to assume that you
23   understood it.  Is that okay?
24       A     Sure.
25       Q     And if you need a break, let me know.  I'll just
```

Page 21

```
 1      A       No, and I don't keep any kind of notes, or
 2   blogs, or anything like that for phone calls.
 3      Q       Okay.  Now, do you recall that you testified
 4   about Michael DeAngelo, the security, head of security at
 5   Brunswick School calling you about the Doe complaint?
 6      A       Yes.
 7      Q       Right.  And I believe you said that he told you
 8   that Mr. Doe is calling up and trying to get the kid in
 9   trouble, is that right?
10      A       In essence, to paraphrase.
11      Q       Okay.  Did you ask Mr. DeAngelo whether Mr.
12   ███████ had -- Mr. Doe had contacted Brunswick or Brunswick
13   had contacted Mr. Doe?
14      A       I don't remember if I would have asked him that.
15   I know the conversation was extraordinarily limited.
16      Q       Okay.  But then you called up Mr. ███████,
17   correct?
18      A       Yes.
19      Q       And told him that he shouldn't be talking to
20   Brunswick?
21      A       Yes.
22      Q       And you assumed that he had called Brunswick on
23   his own initiative?
24      A       Well, I know that he had a conversation with
25   Brunswick, whether he initiated it or they called him.  I
```

```
                                                          Page 22
 1    don't know why the school would have called him, that really
 2    wouldn't make any sense.
 3         Q     Why would that not make any sense?
 4         A     Why would it make sense for the school to call
 5    the alleged victim's parents when it's not a school function
 6    and it wasn't a school-sanctioned event?
 7         Q     Well, I mean, in fact, Mr. Philip E mailed Mr.
 8    ▇▇▇▇▇ and asked for a conversation.
 9         A     Okay.
10         Q     Does that not make sense to you?
11         A     I don't control Mr. Philip.
12         Q     Okay.  But you wanted to control Mr. ▇▇▇▇▇ by
13    telling him not to talk to Brunswick?
14         A     No.
15               MS. SLIPPEN:  Object to form.
16               THE WITNESS:  No, I did not want to control
17               Mr. ▇▇▇▇▇.  I was actually trying to lookout
18               for him because what I tried to explain to him
19               was I tried to manage his expectations in this
20               case, okay?  And I did not want him, based
21               solely off an allegation that had just come
22               through, calling the alleged perpetrator's
23               school and trying to get a kid in trouble when
24               we had just initiated this investigation.
25
```

1  BY MS. BRAXTON:

2      Q      And would it have made a difference to you if
3  you knew that it was Brunswick that was calling Mr. ███?
4      A      It wasn't so much the contact, it was the
5  content.
6      Q      And what do you mean by that?
7      A      You know, you could have a conversation with
8  him, maybe the school was calling up out of concern, just
9  calling to check to see if your daughter is okay, I heard
10 that something happened, right?  There is a difference in
11 conversation when you are saying that than when you are
12 saying, you know, hey, I just want to let you know that
13 there is a kid that goes to your school and whatever his
14 conversation was.
15     Q      But you, in fact, didn't ask Mr. Doe about what
16 the content of that conversation was, correct?
17     A      I think we did speak about the content of the
18 conversation.
19     Q      So, did you find out that Mr. Philip was the one
20 that had reached out to Mr. Doe?
21     A      Again, it's not a matter of the contact, it's
22 the content.
23     Q      Okay.  Did you contact Mr. Philip and tell him
24 not to be contacting Mr. Doe?
25     A      Never spoke to Mr. Philip.

1   seeds planted, especially when you are dealing with
2   adolescents, right?
3           One of the key factors you have to remember is,
4   when you are dealing with adults, adults are fairly set in
5   their ways, their mind is fully developed, they have high
6   executive and cognitive function, you don't really worry
7   about planting seeds in their heads, and you can ask very
8   pointed questions with adults.
9           When you are dealing with juveniles, okay, and
10  when I talk about interviewing, for the purposes of
11  interviewing, I'm referring to anybody who's generally under
12  the age of 22, you know, under there, you have to remember
13  their executive function is not fully developed at that
14  point, right?  So, what you have to do is you have to be
15  very cognizant of planting seeds in the adolescent mind's
16  head.  That's the reason why when we deal with juveniles,
17  now up to the age of 18, we would send them for a forensic
18  interview to get, to ask age appropriate questions, you
19  know, by a person trained to not seed the young person.
20      Q       So, why didn't you send Jane Doe for a forensic
21  interview?
22      A       Because that wasn't policy at the time because
23  she was age 16.  We were only sending 13 year olds and below
24  to forensic interviews unless it was someone older who had
25  cognitive function issues.


1    ▮▮▮▮▮▮▮▮'s statement and Sam Gonzalez's statement?

2                  MS. SLIPPEN:  Objection to form.

3                  THE WITNESS:  I'm going to say probably.

4    BY MS. BRAXTON:

5         Q    Okay.  And did you discuss excluding Sam

6    Gonzalez's statement from the arrest warrant?

7         A    I don't remember that we should.  I think that

8    that was the conversation Krystie had with Capozzi, State's

9    Attorney Capozzi, if I remember correctly, but I don't know

10   100 percent.

11        Q    So, you think that State's Attorney Capozzi

12   directed her to exclude Sam Gonzalez's statement?

13        A    I would not use the word directed her because

14   ultimately it's up to us what we submit, and they are not in

15   our chain of command, they are the end customer.

16        Q    Uh-huh.

17        A    So, it's possible that when they were having

18   that conversation, given the fact that Sam Gonzalez gave a

19   statement saying that he saw nothing, it really wouldn't be

20   that relevant.

21        Q    Well, except that ▮▮▮▮ said that he was in the

22   pool house all evening, and Sam said that he didn't get

23   there until the party was basically over.

24        A    Right, that's what I said, Sam saw nothing.

25        Q    Okay.  But you don't see any inconsistency with

1   what ▇▇▇ said in his statement?
2   A   So, is it accurate to say that what you are
3   saying is that Sam did see something and lied in his
4   statement as a friend of the victim?
5   Q   No.  That ▇▇▇ ▇▇▇▇▇ might have been lying in
6   his statement about someone being there to witness what was
7   going on in the bathroom the entire evening?
8            MS. SLIPPEN:  Objection to form.
9            THE WITNESS:  So, you are saying -- I'm
10           just trying to understand it so I can --
11  BY MS. BRAXTON:
12  Q   No.  You know what, if you can't answer the
13  question, tell me you can't answer the question.  I'm not
14  going to have you question me.
15  A   Well, you need to provide me with a question
16  that I can actually answer.
17  Q   You didn't see any inconsistency between ▇▇▇
18  ▇▇▇▇'s statement and Sam Gonzalez's statement?
19  A   Oh, yes, they are different.
20  Q   Okay.  What was the inconsistency you saw?
21  A   The timeframe.  I think Sam said he got there at
22  10:21, and I think ▇▇▇ said, I'm trying to remember, nine,
23  or something like that.
24  Q   And you didn't think there was any reason to
25  followup on that inconsistency with either of them?

Page 117

1    A      Well, my thoughts were, if the victim is
2  providing this, and I think the father's words were
3  something like, I don't remember exactly, it was something
4  like, you know, you have to talk to Sam Gonzalez because
5  he's going to really give you some good information, and he
6  gave us a great statement about seeing nothing, and that he
7  cleaned up beer cans after the fact.  So, I mean, that's
8  inconsistent from what ▓▓▓▓ said, yeah, it's different.
9    Q      All right.  And you didn't think that was
10 something that you should followup on?
11   A      That we should think that Sam is lying?
12   Q      Don't ask me the questions.
13          You didn't think that you needed to followup on
14 the inconsistency you just testified to?
15   A      Well, it's inconsistent, yes.
16   Q      Okay.  And you did not think that you needed to
17 followup on that inconsistency, is that correct?
18   A      So, those types of inconsistencies can get
19 hashed out at trial, that's usually what the prosecutor will
20 do is they will put two people on the stand and they will
21 try to find that out when they are on the stand.  What we do
22 is we present what the witnesses give to us to the State's
23 Attorney.
24   Q      Well, in this case, you did not present that
25 inconsistency to the State's Attorney, did you?

Page 118

```
 1      A       We didn't present the statement that Sam saw
 2   nothing, no.
 3      Q       Okay.  So, the State's Attorney did not know
 4   there was an inconsistency?
 5      A       But he could have gotten it if he asked for it,
 6   but he didn't feel the need to ask for it.
 7      Q       He didn't know there was something to ask for if
 8   you left it out of the arrest warrant?
 9      A       Since they had a conversation about it, he knew
10   it existed.
11      Q       And did you hear that conversation?
12      A       No.
13      Q       Did you overhear -- were you on the phone with
14   them?
15      A       No.
16      Q       Do you know for a fact that that conversation
17   happened?
18      A       Yes.
19      Q       How do you know that?
20      A       Because Detective Rondini told me, and I believe
21   her.
22      Q       And when did she tell you that?
23      A       I don't remember the date.
24      Q       What --
25      A       It could have been that day, I don't know.
```

Page 119

1    Q    What specifically did she tell you?
2    A    I don't remember.  It's four years ago.
3    Q    You don't remember, but you are sure that's what
4    she said?
5    A    Because she told me she did.
6    Q    When did she tell you that?
7    A    I don't know.  What were you doing four years
8    ago, can you remember?  Thank you.
9    Q    Did you discuss with Detective Rondini,
10   including Attorney Russell's information, in the arrest
11   warrant affidavit?
12   A    I knew that she had -- I don't know if she
13   received a call from Russell about it, there might have been
14   one or two, I know that he said his client wasn't going to
15   talk to us, and then it was, it might have been another
16   phone call where he said something about a text message.  I
17   don't remember specifically what it was.
18   Q    Did you discuss with Detective Rondini whether
19   or not she should include that information in the arrest
20   warrant affidavit?
21   A    Maybe.  I don't remember.
22   Q    You have no specific recollection?
23   A    No.
24   Q    Did you delete anything from the arrest warrant
25   affidavit before it went to the State's Attorney's?

Page 129

```
 1                    Okay.  Just a moment.
 2                    Back on the record, 1:11 p.m.
 3     BY MS. BRAXTON:
 4          Q     So, we were talking about when you learned about
 5     the denial of the arrest warrant application by the State's
 6     Attorneys' Office.  You said, if I understood you correctly,
 7     that you conveyed that decision to other people at Greenwich
 8     Police Department, right?
 9          A     As a matter of practice, I probably communicated
10     it to my direct supervisor and to the captain, just to let
11     them know that I would be taking this off the case
12     management because we were closing it out because it was
13     denied.
14          Q     Did you inform anyone not in Greenwich, at the
15     Greenwich Police Department about the denial of the arrest
16     warrant?
17          A     No, I wouldn't talk about a case like this with
18     other people.
19          Q     And when did Detective Rondini learn of the
20     denial of the arrest warrant application?
21          A     I think she learned about it before I did
22     because the E mail, I think, went to her.
23          Q     Okay.  Do you know who she informed about it?
24          A     Probably me, yeah.
25          Q     Okay.  Would she have informed anyone outside of
```

Page 132

```
 1      A       I really don't remember that.
 2      Q       You don't remember any specific conversation
 3   with him?
 4      A       No.
 5      Q       Okay.  Do you remember whether State's Attorney
 6   Capozzi asked any questions of Detective Rondini or anyone
 7   else about the arrest warrant application?
 8      A       I wouldn't know what he asked anybody else.
 9      Q       Okay.  Did he ask you anything?
10      A       No.
11      Q       Okay.  Did he ask for any additional information
12   from you?
13      A       Not from me, no.
14      Q       Okay.  Did Detective Rondini speak to you about
15   conversations she had with State's Attorney Capozzi after
16   the arrest warrant was submitted?
17      A       No, not after the arrest warrant.  After the
18   arrest warrant was submitted or after it was denied?  I'm
19   sorry.
20      Q       We'll take them one at a time.  After it was
21   submitted?
22      A       After it was submitted, she may have spoke with
23   Capozzi, I don't, I don't remember.  I don't know.
24      Q       How about after it was denied?
25      A       There was -- I'm going to say no because there
```

1  is no reason to have to speak to him after it was denied
2  unless we had a question as to the denial.  But his denial
3  letter was fairly straightforward, so there was really no
4  reason to question why.
5       Q     Okay.  I take it from your testimony that you've
6  never had a conversation with Attorney Michael Jones?
7       A     No, I don't know, I don't know who Michael Jones
8  is.
9       Q     Did you have any conversations with Attorney
10 Philip Russell about this case?
11      A     I don't believe I spoke to him about this case.
12 I know Krystie had one or two phone calls.  I don't remember
13 talking to Phil Russell.
14      Q     Okay.  Did you have any conversations with
15 Eugene Riccio about this case?
16      A     He -- I know Gene Riccio, he is one of the
17 attorneys for one of the -- I thought it was for one of the
18 witnesses.  I don't think I spoke to him.  I'm going to say
19 no, I didn't because, I mean, I've spoken to a lot of
20 attorneys over the last few years.  And sometimes they start
21 to blend, as far as the cases, but I don't recall
22 specifically speaking to him about this case.  I don't know.
23      Q     He was ▓▓▓▓ ▓▓▓▓▓▓'s attorney, does that help
24 refresh your recollection at all?
25      A     No, I don't remember any phone conversations

```
 1      Q      Detective Girard, do you recall her being
 2   appointed the liaison officer for Brunswick and Greenwich
 3   Academy in September of 2016?
 4      A      I don't know anything about her being the
 5   liaison.
 6      Q      All right.  Are there liaison officers for
 7   schools?
 8      A      We have that in special victims because we're
 9   responsible for the school resource officers.
10      Q      Okay.
11      A      So, I have our detectives attached to the
12   schools.  So, some are, the SROs are for the high school,
13   and then I have one that does the middle schools, and then
14   the elementary schools are broken up, and then I have one or
15   two who do the private schools.
16      Q      Okay.  And when you say you have them do them,
17   are they assigned as liaisons?
18      A      You know, the nomenclature I would say would be
19   a liaison, but the function really is more for the public
20   schools than the private schools.  Just the private schools,
21   I guess it would be a point of contact if they had some
22   police concern.
23      Q      So, was Girard appointed to cover Brunswick and
24   Greenwich Academy in September of 2016?
25      A      She wasn't appointed to do it.  No, she doesn't
```

```
 1   work for me.
 2       Q     Was she assigned to do it?
 3       A     She may have well been, but it wasn't assigned
 4   by me, I don't know.
 5       Q     Okay.  So, you were the not the person who did
 6   that assignment?
 7       A     No, because she doesn't work for me so I
 8   couldn't signed her to something.
 9       Q     Okay.  But she was assigned around September of
10   2016?
11       A     The answer is I do not know if she was assigned
12   by anybody to do that job.  She doesn't work for me so I
13   don't know who assigns her to do what.  I have somebody from
14   my section who deals with the private schools.
15       Q     Who is that?
16       A     Right now, I think I have Mike Rooney doing
17   that.
18       Q     And do you know who it was in 2000 -- September
19   of 2016?
20       A     No, it could have been Christy, I don't know.
21       Q     Okay.  Is it your testimony that your
22   predecessor would have done the assigning?
23       A     Well, when she worked for Mark, that would be
24   the person who would have assigned her.
25       Q     Okay.  Did you know who was assigned to the
```

1    various schools in September of 2016?

2        A      I could try to remember, I don't -- but I
3    changed it, so I reassigned the elementary schools because
4    we went to two SROs now instead of one.  So, now we don't
5    have to take care of the high school, I have the SROs do the
6    high school, I have one of the detectives do the middle
7    school, and then we have 11.

8        Q      Eleven elementary.

9        A      Eleven elementary schools.

10       Q      So, I'm just confused.  Were you aware in
11   September of 2016 that Christy Girard was the point person?

12       A      I'll just answer no to make it easy, how's that?

13       Q      You do not recall?

14       A      No, I do not recall.

15       Q      Did you communicate with her at all about this
16   case --

17       A      I did not.

18       Q      -- in 2016?

19       A      Absolutely not.

20       Q      Okay.

21              MS. BRAXTON:  Let me take three seconds off
22              the record.

23              (Whereupon, there was a discussion off the
24              record.)

25              THE VIDEOGRAPHER:  Off the record at 1:28