Plaintiff Exhibit JJ

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:18-cv-01322-KAD

----------------------------------------x

JANE DOE,

                        Plaintiff

            -vs-

TOWN OF GREENWICH, ET AL,

                        Defendants

----------------------------------------x

Deposition of MICHAEL D'ANGELO, a Witness, in the hereinbefore-entitled action, taken by the Plaintiff, pursuant to Notice before Victorine D. Hennessey, a duly qualified Notary Public in and for the State of Connecticut, held remotely via Zoom Videoconference in North Haven, Connecticut on July 15, 2020 beginning at 10:00 a.m.

               DEL VECCHIO REPORTING

      STAMFORD    NEW HAVEN    HARTFORD

                (203) 245-9583

```
 1
 2                MICHAEL D'ANGELO,
 3   Brunswick School, 100 Moore Avenue, Greenwich,
 4   Connecticut 06831, having been duly sworn, was
 5   examined and testified as follows:
 6
 7   DIRECT EXAMINATION
 8   BY MS. HOOK:
 9        Q    Good morning, Mr. D'Angelo.
10        Can you tell me, what did you do in preparation
11   for this deposition?
12        A    As I was instructed, I searched for
13   documents on my computer and had, I believe, two or
14   three meetings with the attorneys for the school.
15        Q    And who did you have meetings with, which
16   attorneys?
17        A    Mr. Gooley, Mr. Skonzo, and Mr. Carangelo.
18        Q    Okay.  And when did you meet with them?
19        A    Most recently within the past two weeks,
20   and prior to that, probably -- oh, probably six
21   months or better.
22        Q    Okay.  Did you review any documents?
23        A    The documents that were, I guess, done
24   through an e-mail search on my account, the
25   Brunswick School e-mail account.
```

```
 1        Q    And what about the -- so when you said
 2   that each officer is assigned to a particular
 3   building?
 4        A    Right.
 5        Q    What do they do on a day-to-day basis?
 6        A    Well, each division --
 7             MR. CARANGELO:  Hold on, Mr. D'Angelo, let
 8        me have time to object.
 9             I object to the form of that question.
10   BY MS. HOOK:
11        Q    You may answer.  Objections do not prevent
12   you from answering unless you are instructed not to
13   answer.
14        Go ahead.
15        A    Okay.  So, it varies by building.  So if
16   you want me to go through each building -- I don't
17   have, obviously, their complete responsibilities in
18   my head, but I can give you a general description of
19   what each one does in each division.
20        Q    Yes, I would like that, their day-to-day
21   activities.
22        A    We'll start with the preschool building.
23        The preschool is our Pre-K and kindergarten
24   group.  His day starts in the morning with -- as a
25   greeter out on the sidewalk where dropoff is done.
```

Page 29

```
 1        A    But we do have -- were the only school in
 2   town that has a campus setup the way that ours is in
 3   multiple locations.
 4        Q    Well, you started in 2006, is that right?
 5        A    Yes.
 6        Q    With Brunswick?
 7        A    Yes.
 8        Q    And you were the only person in the
 9   department?
10        A    Correct.
11        Q    Okay.  And when did you begin hiring
12   people?
13        A    The day after the shooting at Sandy Hook.
14        Q    And what year was that?
15        A    2011.
16        Q    2011.
17             So, from 2006 until 2011, you were the only
18   officer?
19        A    Correct.
20        Q    Security officer.
21             Who did you hire after 2011?
22        A    Officer Gary Hoffkins and Officer Pete
23   Silbereisen.
24        Q    And what were they assigned to at that
25   point?
```

```
 1        Q    Have you ever observed them doing those
 2   fitness requirements?
 3        A    We do not test them, no.
 4        Q    Okay.  So after you hired in 2011, Gary
 5   Hoffkins and Peter Silverizon that you did hire in
 6   probably what year, if you can recall?
 7        A    It was probably in 2014.
 8        Q    Okay.
 9        A    And we added -- maybe it was 2016.  I'm
10   trying to remember now -- we added Terry Flanagan,
11   who's no longer with us, he retired last year, and
12   Tim Duff.  And they were the end of, I believe, it
13   was either 2015 or 2016 school year.
14        Q    Did you post those jobs?
15        A    No.
16        Q    Okay.  Did you ask for resumes from
17   anyone?
18        A    I believe we got resumes from them, yes.
19        Q    From whom, from Terry Flanagan and Tim
20   Duff?
21        A    I believe so.  Again, I don't recall if we
22   did or not.
23        Q    Okay.  Did you look anywhere other than
24   the Greenwich Police Department?
25        A    Well, Terry Flanagan wasn't a member of
```

Page 56

1  correctly.  And then many of the younger guys that I
2  wouldn't recognize, I don't know who they are.  But
3  I don't really have any interaction with them.
4      Q    And you said one of them was Joe Rondini?
5      A    Correct.
6      Q    Is he the husband of Krystie Rondini?
7      A    I believe so.
8      Q    And who selected the officers that are
9  going to do the traffic direction?
10     A    That's the Town.
11     Q    So you don't have any choice in who you
12 get?
13     A    No.  I have a contact that I call and
14 basically give him the schedule for the month.
15     Q    Uh huh.  (Affirmative).
16     A    And then they fill it and then I get an
17 invoice every two weeks from the office of Phil
18 Paul, which I go through to confirm that, you know,
19 we were in session, we didn't have a snow day, et
20 cetera, et cetera, and then I approve the payment
21 and send it to the office.
22     Q    Have you ever spoken with Sergeant Brent
23 Reeves?
24     A    Have I ever spoken with him?
25     Q    About matters involving --

Page 57

1     A     The only conversation --

2     Q     Let me --

3     A     I'm sorry.

4     Q     Please finish your answer.

5     A     The only conversation I recall having with
6  him was I was asked to sit on a panel at town hall
7  that involved juvenile justice and he was one of the
8  presenters at the panel.  And following the panel I,
9  you know, I said hello to him and just basic, you
10 know, cordial, you know, how you doing?

11    Q     So, if Sergeant Reeves testified under
12 oath that you called him to find out information
13 about the Doe investigation, would he be mistaken?

14    A     I don't recall calling him, no.

15    Q     Chief Heavey --

16    A     I've spoken --

17    Q     Let me just finish the question.

18    A     I'm sorry.

19    Q     Have you ever spoken to Chief Heavey about
20 matters involving Brunswick School?

21    A     Yes.

22    Q     And when was that?

23    A     I've spoken to him numerous times over the
24 years.

25    Q     Well, can you tell me how many times and

1  in the case, that she had been reassigned recently
2  to the cold case squad up in Rocky Hill and that she
3  pretty much was not in touch with anybody at the
4  police department.
5      Q    Anybody at the police department?
6      A    Well, regarding, you know, with regard to
7  anybody she worked with in the SUV, she wasn't
8  actively working in that unit.
9      Q    So if she wasn't actively work at SVS, why
10 would she be liaison to Brunswick?
11     A    I don't know, you'd have to ask her.  I
12 didn't know she was reassigned to Rocky Hill --
13     Q    Okay.
14     A    -- until she told me.
15     Q    Did you try to call Detective -- I'm
16 sorry, Lieutenant Zuccerella?
17     A    No, not that I recall.
18     Q    Okay.  Did you call Detective Reeves,
19 Brent Reeves -- I mean Sergeant Reeves?  I'm sorry.
20     A    I think we went through this already.  No,
21 I don't recall speaking to Sergeant Reeves.
22     Q    So, Sergeant Reeves testified that you did
23 call him and speak with him?
24     A    Okay.
25     Q    And he testified as to the substance of

1  the conversation with you, but you don't have any
2  recollection of that?
3       A    I don't.
4       Q    Did you conduct any kind of investigation
5  into the allegations?
6       A    No.
7            MR. CARANGELO:  Objection.
8  BY MS. HOOK:
9       Q    Did Brunswick conduct any investigation
10 into the allegations?
11      A    I have no information on that.
12      Q    And let's look at D'Angelo Exhibit 5.
13      A    Okay.
14      Q    So is this the instruction to contact
15 Krystie Girard that you just testified about?
16           MR. CARANGELO:  Objection to form.
17 BY MS. HOOK:
18      Q    Do you understand the question?
19      A    Yes.
20      Q    Okay.
21      A    I'm reading it.
22           There's four pages here?
23      Q    Well, just read the first one.
24      A    Okay.
25           MR. CARANGELO:  Is there a particular part

1  returned to work.
2      Q    The next page of that exhibit, it's an
3  e-mail exchange between you and Tom Philip?
4      A    Okay.
5      Q    On September 29th, 2016 and your e-mail to
6  him says -- I think it's actually Audrey Felsen,
7  Stamford attorney.  What is that regarding to?
8      A    I have no idea.  I have no recall on that.
9      Q    If I informed you that Audrey Felsen was
10 the attorney for the plaintiffs and her family, does
11 that help refresh your recollection?
12     A    No.
13     Q    Okay.  Why were you providing that
14 information to Tom Philip?
15          MR. CARANGELO:  Objection to form.
16          THE WITNESS:  I have no idea.  I have no
17     recall of this.
18 BY MS. HOOK:
19     Q    And where would you have gotten that
20 information from?
21     A    Again, I have no idea.
22     Q    Is that information that was public
23 knowledge?
24     A    Again, I have no idea.
25     Q    If I represent to you that that person was

1  what they are?
2      A    Well, I said it's possible, but nothing
3  comes to mind.
4      Q    Okay.  Do you still contact GPD officers
5  when there's a potential criminal complaint about a
6  Brunswick student?
7          MR. CARANGELO:  Objection to form.
8  BY MS. HOOK:
9      Q    You may answer.
10     A    I have not in -- since -- I think this was
11 probably the last time I contacted the department.
12     Q    When was the first time you contacted the
13 department in that case -- withdrawn.
14         When was the first time you contacted the
15 department regarding a Brunswick student?
16     A    I think this is probably the first time.
17     Q    This is the one and only time you
18 contacted the GPD?
19     A    No.  You said when was the last or the
20 first time, I believe this is the first time.  And
21 the only other time was the other case which was, I
22 think, in 2014.  So the last time was this one, the
23 2014 case was probably the first time.
24     Q    So, those are the only two times you ever
25 contacted GPD in order to obtain information about a

1  criminal complaint against a Brunswick student?
2         MR. MITCHELL:  Object to the form.
3         THE WITNESS:  Right.
4  BY MS. HOOK:
5     Q   So, again, you found out about the
6  complaint from Mr. Philip?
7     A   Yes.
8     Q   What information did Mr. Philip give you?
9         MR. CARANGELO:  Objection, asked and
10     answered.  He gave you the specific
11     information.
12        MS. HOOK:  Are you instructing him not to
13     answer?  Are you instructing him not to answer?
14        MR. CARANGELO:  No, but after that, I
15     will.
16 BY MS. HOOK:
17    Q   Please answer.
18        MR. CARANGELO:  You're badgering this
19     witness.
20        MS. HOOK:  I am not badgering, I am simply
21     following my outline.
22        Mr. Carangelo, you can take your
23     deposition, you have the opportunity to ask
24     questions -- well, you don't -- Mr. Mitchell
25     has the opportunity to ask questions.

Page 137

```
 1  BY MS. HOOK:
 2      Q    Why did you consider Krystie Girard to be
 3  a bit evasive as you described in your e-mail to Tom
 4  Philip that I'm now showing you on the screen?
 5      A    I guess it must have been my impression at
 6  the time that I spoke to her.
 7      Q    But I'm trying to understand what you felt
 8  was evasive?
 9      A    Four or five years ago, I don't know.  I
10  mean, I just -- I got off the phone with her, I
11  felt, perhaps, she was a bit evasive, I don't know
12  specifically what it was in her conversation or her
13  tone that made me think that, but obviously I put it
14  down, so it was something, but I have no recall of
15  it at this point.
16      Q    But you said she heard something was going
17  on but didn't have any details, what details were
18  you hoping to get from her?
19           MR. CARANGELO:  Objection; asked and
20      answered.
21      You may answer.
22           THE WITNESS:  I didn't ask her for
23      details.
24  BY MS. HOOK:
25      Q    What details did she volunteer?
```

```
 1        A    That she didn't have any.  She made that
 2   statement to me and I'm repeating that statement to
 3   Mr. Philip.
 4        Q    And that statement is what you thought was
 5   evasive?
 6             MR. CARANGELO:  Objection to form.
 7             THE WITNESS:  Again, like I said, I had no
 8        idea why she was being evasive at this point.
 9        I may have at the time if we were talking about
10        something that happened yesterday, but, you
11        know, something that happened four years ago in
12        probably a one minute conversation, I don't
13        really know.
14   BY MS. HOOK:
15        Q    Okay.  But you wrote down what she did
16   tell you and you characterized it as evasive?
17        A    Correct, I did do that.
18        Q    Did she tell you during that conversation
19   that she wasn't permitted to give you any
20   information?
21        A    No.
22        Q    Do you know how Phil Russell got involved
23   in the case?
24             MR. CARANGELO:  Object to the form.
25             THE WITNESS:  No, I do not.
```