# Plaintiff Exhibit LL

```
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
---------------------------------x          **CONFIDENTIAL**
JANE DOE,
              Plaintiff,

vs.                       Case No. 3:18-cv-01322-KAD
                          Date:  April 15, 2019
TOWN OF GREENWICH, ET AL,

              Defendants.
---------------------------------x
IN THE SUPERIOR COURT
JUDICIAL DISTRICT OF FAIRFIELD
AT BRIDGEPORT
---------------------------------x
JANE DOE, JOHN DOE AND MARY DOE,

              Plaintiffs,

vs.                       Case No. FBT-CV-18-5037815-S

BRUNSWICK SCHOOL, INC.,

              Defendant.

---------------------------------x

              DEPOSITION OF  ███████████████

   The deposition of ████████████████ was taken on

April 15, 2019, beginning at 10:20 a.m., at 7 Benedict

Place, Greenwich, Connecticut, before Susan Wandzilak,

Registered Professional Reporter and Notary Public in

the State of Connecticut.


              Susan Wandzilak  License No. 377
           DEL VECCHIO REPORTING SERVICES, LLC
             PROFESSIONAL SHORTHAND REPORTERS
                      117 RANDI DRIVE
                MADISON, CONNECTICUT 06443
                      800-839-6867

NEW HAVEN              STAMFORD           HARTFORD
```

```
 1                        ██████████████,
 2       having been first duly sworn, testified as
 3       follows:
 4            THE VIDEOGRAPHER:  We are now on the record
 5       at 10:20 a.m.  This is the deposition of
 6       ██████████████ recorded on April 15, 2019, in
 7       Greenwich, Connecticut.
 8            This deposition is being taken in the case of
 9       Jane Doe versus Town of Greenwich.  And it was
10       noticed by the Plaintiff.
11            My name is Greg Jacques (ph), videotape
12       operator of Geomatrix Productions, 270 Amity
13       Road, Bridgeport, Connecticut.
14            Please state the stipulations.
15            MS. BRAXTON:  All objections except to form
16       are reserved to trial, correct?
17            MS. WADLER:  Yes, that's how we've been --
18            MR. SCONZO:  I agree.
19            MS. BRAXTON:  Does anybody want to designate
20       this deposition transcript?
21            MR. SCONZO:  As confidential, you mean?
22            MS. BRAXTON:  Yes.
23            MR. SCONZO:  I thought you were doing that
24       with all of them.  I would say yes.
25            MS. BRAXTON:  We haven't made a decision
```

```
 1          A.    Actually, Mrs. ███████ did most of the
 2   talking.
 3          Q.    And what did she say?
 4          A.    She told me that her son got into a lot of
 5   trouble and how she made -- she felt very strongly
 6   about him being made accountable for his actions and
 7   that this boy needs to be made accountable for his
 8   actions and to be expelled from school.
 9          Q.    Okay.  And did you ask her to instead drop
10   the case against him?
11          A.    I said:  Could you please try and find some
12   forgiveness in your heart and make this go away.
13          Q.    Okay.  And you didn't think that that was
14   inappropriate?
15          A.    Absolutely not, no.
16          Q.    And did Attorney Jones ask you to go see
17   Mrs. Scanlan and ask her to make it go away?
18          A.    No.
19          Q.    Did ███████████ ask you to do that?
20          A.    No.
21          Q.    Did Eugene Riccio ask you to do that?
22          A.    No.
23          Q.    Did Tom Philip ask you to do that?
24          A.    No.
25          Q.    Did anyone ask to you do that?
```

```
1         Q.   Did anyone ever tell you in substance what
2    ▓▓▓▓▓▓▓▓▓▓ might say in his statement to the
3    police?
4         A.   No.
5         Q.   Did Attorney Jones say anything to you about
6    what he expected ▓▓▓ to say to the police?
7         A.   No.
8         Q.   Did you go with ▓▓▓ to the police
9    department?
10        A.   Yes.
11        Q.   Okay.  And what did ▓▓▓ do to prepare to
12   give her statement?
13        A.   Nothing that I recall.
14        Q.   Did you talk to her about what she was going
15   to say in her statement?
16        A.   No.
17        Q.   Did you read her statement after she wrote
18   it?
19        A.   No.
20        Q.   Did she speak to Detective Rondini when she
21   gave her statement?
22        A.   Briefly.
23        Q.   Okay.  Did Detective Rondini ask her any
24   questions?
25             MR. SCONZO:  Objection.
```

```
 1              THE WITNESS:  Not that I recall.
 2   BY MS. BRAXTON:
 3        Q.   Did  ▮▮▮▮  simply sit down and write down what
 4   she had to say on a piece of paper and nothing else
 5   happened?
 6        A.   Yes.
 7        Q.   Okay.  And did  ▮▮▮▮  have notes with her when
 8   she went to the police station?
 9        A.   No.
10        Q.   Did she have anything on her phone that she
11   looked at while she was writing her statement in the
12   police station?
13        A.   No.
14        Q.   Did she look at anything at all while she was
15   writing her statement in the police station?
16        A.   No.
17        Q.   And how long did it take her to write her
18   statement?
19        A.   Not long, 20 minutes, not even.
20        Q.   Okay.  So she went in.
21        A.   So from beginning to end, we were probably
22   there 20 minutes.
23        Q.   Okay.  Did Detective Rondini greet you there?
24             MR. SCONZO:  Objection.
25   BY MS. BRAXTON:
```

```
1          Q.   At the police station?
2          A.   We were greeted at reception.
3          Q.   Okay.  And tell me what happened at the
4    police station.  What happened after you were greeted?
5          A.   Someone guided us to Detective Rondini's
6    office.
7          Q.   Okay.  And was Detective Rondini there?
8          A.   Yes.  I'm not sure.  I don't know who guided
9    us, but she was there, yes.
10         Q.   And what did she say?
11         A.   I don't remember.  Just formalities:  Hi, how
12   are you?
13         Q.   Did she talk to ▇▇▇ about the content of
14   her -- did Detective Rondini talk to ▇▇▇ about the
15   content of her statement?
16         A.   No.
17         Q.   So tell me everything about the interaction
18   between ▇▇▇ and Detective Rondini, what each of them
19   said during that 20 minutes?
20         A.   I don't remember.
21         Q.   Okay.  What do you remember of that
22   interaction?
23         A.   I remember sitting there and ▇▇▇ writing a
24   statement.
25         Q.   Okay.  So was it -- was there silence during
```

```
1    most of that 20 minutes?
2         A.   Pretty much, yes.
3         Q.   Okay.
4         A.   I mean, I remember saying to Detective
5    Rondini, I hope your eyesight is good because ▋'s
6    writing was tiny.
7         Q.   Okay.  And did Detective Rondini read the
8    statement before ▋ left?
9         A.   She looked at it, yes.  I believe she read
10   it.
11        Q.   And did she ask ▋ any questions about it?
12        A.   No.
13        Q.   Did she ask ▋ whether this was the truth?
14             MR. MITCHELL:  Objection.  Asked and answered
15        already.
16             THE WITNESS:  She didn't ask her that.
17   BY MS. BRAXTON:
18        Q.   Do you know who the ▋ family is?
19        A.   No.
20        Q.   Have you ever met a boy named ▋ who
21   attended Brunswick?
22        A.   No.
23        Q.   Do you know who was paying for -- strike
24   that.
25             Do you know who paid for ▋
```

```
1    BY MS. BRAXTON:
2         Q.   So after you spoke to Detective Rondini and
3    Detective Reeves on November 4th, you spoke to Molly
4    King and Tom Sullivan?
5         A.   I spoke to Molly King and Tom Sullivan before
6    I spoke to the detectives.
7         Q.   Okay.  And what was that conversation?
8         A.   What was what conversation?
9         Q.   Between you and Molly King and Tom Sullivan
10   before you talked to the detectives.
11        A.   It was about ▮▮▮▮, me picking ▮▮▮▮ up from
12   school -- completely distraught, confused, helpless
13   because she had been berated by three faculty.
14        Q.   Okay.  And what did they say to you?
15        A.   They were very upset that ▮▮▮▮ had made the
16   statement.
17        Q.   So they said to you that the basis for their
18   berating her, your word, was that she had made a
19   statement to the police?
20        A.   No, what I'm saying is in that telephone
21   conversation they were upset that she had made a
22   statement to the police.
23        Q.   I think that's what I asked you.
24             MS. BRAXTON:  Can you read back my question,
25        the one before the last one.
```

```
 1              (Whereupon, the last three sets of Q&A were
 2         read back.)
 3              MS. BRAXTON:  So how is that a no?  Did they
 4         say --
 5              MR. NOLIN:  Her answer is her answer.  Why
 6         are you arguing?
 7   BY MS. BRAXTON:
 8       Q.   -- did they say specifically to you that they
 9   were disciplining ▒▒▒▒ because she had made a
10   statement to the police?
11              MS. WADLER:  I object to the form.
12              THE WITNESS:  No.
13   BY MS. BRAXTON:
14       Q.   Did they say to you that they had berated her
15   or they had talked to her about the fact that she gave
16   a statement to the police?
17       A.   No, I'm saying they were upset on the phone
18   with me because ▒▒▒▒ had given a statement to the
19   police.
20       Q.   Well, then --
21       A.   They were upset with me.
22       Q.   Did they know before your telephone
23   conversation with you that ▒▒▒▒ had made a statement
24   to the police?
25              MR. MITCHELL:  Objection to the form.
```

```
 1                THE WITNESS:  Yes.
 2      BY MS. BRAXTON:
 3          Q.   Okay, so they -- I'm confused.  You testified
 4      that they berated her for having given a statement to
 5      the police and now you are saying that no, that's not
 6      what they said they did.
 7                MR. NOLIN:  I object to the form.
 8                THE WITNESS:  I'm telling you my daughter
 9           told me they berated her.  Berate is my word.
10           They told her off for giving that statement to
11           the police.  She told me that.
12      BY MS. BRAXTON:
13          Q.   And what was your conversation -- what I'm
14      trying to get that you don't seem to be able to give
15      me with any clarity is exactly what your conversation
16      was with Tom Sullivan and Molly King.
17                MR. SCONZO:  Objection.
18                MR. NOLIN:  I'm going to object to the
19           counsel constantly arguing with the witness.
20                MS. BRAXTON:  They --
21                MR. NOLIN:  Let me finish.  If you don't like
22           her answers, ask another question.  But your
23           argumentative approach is not at all helpful to
24           getting the information out from the witness.
25      BY MS. BRAXTON:
```

```
 1        Q.   Do you need the question again?
 2        A.   No, I answered it.
 3        Q.   What exactly did Tom Sullivan and Molly King
 4   say to you on the telephone that day?
 5        A.   I don't remember everything, but I do
 6   remember Molly King telling me to buy a book and read
 7   it.  It's about abuse victims and how they don't come
 8   forward straight away.
 9        Q.   And why did she suggest that you read that
10   book?
11        A.   I have no idea.
12        Q.   Is that the only thing you remember from that
13   conversation?
14        A.   That certainly sticks in my head, yes.
15        Q.   So your statement that they berated her for
16   having made a statement to the police is based only on
17   what ▮▮▮▮ said to you, correct?
18             MR. NOLIN:  I object to the form.
19             THE WITNESS:  Yes, and the state that she was
20        in.
21   BY MS. BRAXTON:
22        Q.   The state that she was in doesn't tell you
23   what was said in that meeting, correct?
24             MR. NOLIN:  I object to the form.
25             THE WITNESS:  It tells me she was berated and
```

```
1            what she was telling me was true.
2    BY MS. BRAXTON:
3        Q.   It's possible, is it not, that she was being
4    called to account for violating the honor code?
5            MR. NOLIN:  I object to the form.
6            THE WITNESS:  It's possible, but that did not
7        happen.
8    BY MS. BRAXTON:
9        Q.   How do you know that?
10       A.   She told me she was upset.
11       Q.   So it didn't happen because that's what ▓▓▓▓
12   said?  Is that your answer?
13           MR. NOLIN:  I object to the form.
14           THE WITNESS:  I know my daughter.
15   BY MS. BRAXTON:
16       Q.   Okay, so I'm just making it clear.  Your
17   statements of fact in this deposition are based on
18   your believing 100 percent what ▓▓▓▓▓▓▓▓▓▓ said.
19   Correct?
20           MR. NOLIN:  I object to the form.
21           THE WITNESS:  It is.
22   BY MS. BRAXTON:
23       Q.   And so it would be your testimony that if Tom
24   Sullivan and Molly King testified differently about
25   what occurred in that meeting with ▓▓▓▓, they would
```

```
 1    be lying?
 2            MR. SCONZO:  Objection.
 3            MR. NOLIN:  I object to the form.
 4    BY MS. BRAXTON:
 5        Q.  You can answer.
 6        A.  I'm not answering that one, no.
 7        Q.  You actually have to answer it.
 8            MR. NOLIN:  I don't think she does.  I don't
 9    think a witness is required to comment on
10    hypothetical future testimony of another witness
11    who is not in front of her who is testimony she
12    has not heard.
13            MS. BRAXTON:  It's not privileged.
14            MR. NOLIN:  I don't believe it's a proper
15    question.  I don't believe it's capable of being
16    answered.
17    BY MS. BRAXTON:
18        Q.  So then after this conversation with Molly
19    King and Tom Sullivan, you said that you talked to the
20    detectives, correct?
21        A.  I did, yes.
22        Q.  So you wanted them to know that GA was
23    disciplining ██████ for what you understood to be for
24    having given a police statement.  Is that right?
25        A.  No, it's not.  I felt bullied and I called
```

```
 1   them and I said:  Can we withdraw the statement?  I
 2   need to keep my girl in school.
 3        Q.   Why didn't you testify to that before?
 4             MR. NOLIN:  I object to the form.
 5             THE WITNESS:  You didn't ask me.
 6   BY MS. BRAXTON:
 7        Q.   I think Attorney Sconzo asked you what was
 8   going on.
 9             MR. NOLIN:  I object to the form.
10   BY MS. BRAXTON:
11        Q.   And then you met with Molly King and Tom
12   Sullivan on Monday the 6th or 7th?
13        A.   Yes.
14        Q.   And did you ask them why they berated your
15   daughter for having made a statement to the police?
16        A.   That meeting, all they spoke about was --
17   pretty much all they spoke about was the honor code
18   warning and a conversation that [redacted] had supposedly
19   spoken about the sensitive situation on the bus.
20        Q.   Okay.  And did you have any reason to think
21   that that situation did not occur?
22        A.   Yes.
23        Q.   Why?
24        A.   I asked them.  I said, Why wasn't I total
25   about this weeks ago when it happened?
```

```
 1        Q.   What made you think it was weeks ago?
 2        A.   Well, it certainly wasn't -- you know, from
 3   my understanding, it was.
 4        Q.   But you have no idea when it actually was,
 5   correct?
 6        A.   No, I have no idea.
 7        Q.   And you didn't bring it up to them that you
 8   thought that they were disciplining her for giving a
 9   police statement?
10        A.   I think that was said in the room, yes.
11        Q.   And what did they say to that?
12        A.   Not much.
13        Q.   What did they say?
14        A.   Nothing.  I don't remember.
15        Q.   They were silent when you accused them of
16   doing that?
17        A.   Bob accused them, yes.
18        Q.   Okay.  And so they were silent.
19        A.   Yes.
20        Q.   And the warning that ▓▓▓▓ got does not
21   mention anywhere giving a police statement, correct?
22        A.   No.
23        Q.   And the phone call you had with Tom Sullivan
24   and Molly King on the 4th of November, were they both
25   on the phone at the same time with you?
```

```
1         A.    Yes.
2         Q.    So was it on speaker phone?
3         A.    I don't know how they do it.  It was a
4    conference call, the three of us.
5         Q.    Okay.  So who did you ask about whether you
6    could withdraw your daughter's statement?
7         A.    Detective Rondini.
8         Q.    And what did she say?
9         A.    She spoke with Detective Reeves.
10        Q.    And how did they respond to your request to
11   withdraw her statement?
12        A.    Detective Reeves came on the phone and said
13   don't let Mrs. King bully you.
14        Q.    And that was it?
15        A.    Pretty much, yes.
16        Q.    Okay.  Did he say you cannot withdraw the
17   statement?
18             MR. MITCHELL:  Objection to form.
19             THE WITNESS:  No, he did not say that.  He
20        did not say that.
21   BY MS. BRAXTON:
22        Q.    Okay, so then you decided not to withdraw her
23   statement after speaking to them?
24        A.    Yes.
25        Q.    Okay.  What do you know about your husband's
```