# Plaintiff Exhibit DDD

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CIVIL ACTION NO:  3:18-cv-01322-KAD

MAY 29, 2020

--------------------------------------

JANE DOE,

                            Plaintiff

                  -vs-

TOWN OF GREENWICH, ET AL,

                         Defendant

--------------------------------------


       DEPOSITION OF RICHARD M. HOUGH, SR., Ph.D.

APPEARANCES:

        BRAXTON HOOK, LLC
          Attorneys for the Plaintiff
          280 Railroad Avenue, Suite 205
          Greenwich, Connecticut  06830
          PHONE:  (203) 661-4610
          E MAIL:  ehook@braxtonhook.com
        BY:  ELIZABETH I. HOOK, ATTORNEY-AT-LAW

        MITCHELL & SHEAHAN, P.C.
          Attorneys for the Defendant
          Sergeant Detective Brent Reeves and
          Detective Krystie M. Rondini
          80 Ferry Boulevard, Suite 216
          Stratford, Connecticut  06615
          PHONE:  (203) 873-0240
          E MAIL:  rbmitchell@mitchellandsheahan.com
        BY:  ROBERT B. MITCHELL, ESQUIRE
            REESE B. MITCHELL, ESQUIRE
            reesemitchell@mitchellandsheahan.com

Page 7

```
 1   THEREUPON,

 2         R I C H A R D   M.   H O U G H ,   S R . ,   P h . D . ,

 3                     Residing in Florida,

 4              first having been duly sworn, was examined and

 5              testified as follows:

 6                   THE WITNESS:  My name is Richard Hough, and

 7              my address would be --

 8                   MR. MITCHELL:  I want to put on the record

 9              that Dr. Hough has requested not to give his

10              address due to security issues.  Florida has a

11              statute that says that he does not have to give

12              his address, however, we have produced a -- he

13              will produce a passport as identification for

14              purposes of this deposition.

15                   THE WITNESS:  Right.  The address that I

16              would supply would be a mail area for office,

17              not -- yeah, not a home address.

18                   (Whereupon, there was a discussion off the

19              record.)

20                   THE WITNESS:  Florida is fine.

21                   MR. MITCHELL:  Before we get started, I

22              just want to, the defendant -- the witness is

23              reserving the right to read and sign.

24                   MS. HOOK:  All right.  Can we just take a

25              five minute break and talk about the recording
```

Page 11

```
 1                  MR. ROBERT MITCHELL:  You may speak.
 2                  MS. HOOK:  All right.  This is the very
 3             first video deposition we are doing in this
 4             case.  The bandwidth and the internet access is
 5             spotty.  It's not clear that everybody is going
 6             to have a full hearing or understanding of what
 7             is being said by any of the parties.  The audio
 8             recording of the Zoom meeting of the
 9             videoconference has no legal basis.  It is
10             not -- cannot be used in court.  It has no
11             authority.  It is nothing other than to clarify
12             for the parties who are participating who may
13             not be able to understand or hear because of
14             internet connection interruptions what is
15             happening.
16                  So, the purpose of it is to not -- the
17             rules speak to video recording, the way that
18             we've done it in the past, that is, usable in
19             court.  This is not that type of video
20             recording.  It's merely recording the
21             proceedings as if a tape recorder were in the
22             room.
23                  MR. ROBERT MITCHELL:  Understood.  I would
24             object to that too.  I object to this.  We're
25             not going to go forward unless you give up on
```

Page 12

1           this or we go to the Judge.  You have to call

2           the Judge.

3                MS. HOOK:  All right.

4                MR. ROBERT MITCHELL:  Go ahead and call

5           her.

6                MS. HOOK:  Okay.  So, let's put this on

7           pause for a few minutes and we'll go to the

8           Judge.

9             (Whereupon, there was a discussion off the

10          record.)

11               MR. ROBERT MITCHELL:  What did the Judge

12          say, Liz?

13               MS. HOOK:  I left a message.  The Judge,

14          obviously, is not in chambers.

15               MR. ROBERT MITCHELL:  Well, probably she's

16          at lunch.

17               MS. HOOK:  Well, I don't know that the

18          Judge is actually in the chambers or anybody is

19          in chambers.

20               MR. ROBERT MITCHELL:  Oh, at all, you mean?

21          Oh, I didn't understand that.  I thought you

22          left a message for somebody who was there.

23               So, what do you want to do?

24               MS. HOOK:  Wait for them to call back.

25               MR. ROBERT MITCHELL:  They probably won't.

Page 13

1              I mean, we can go forward, just do the

2              transcript, don't have the recording, that's

3              all, or we can reschedule it.

4                   MS. HOOK:  The problem with that, Bob, and

5              I'm not sure I understand what your objection is

6              because it can't be used for anything other than

7              to help those people who have spotty internet

8              connection.  And Miss Kindley will attest to the

9              fact that when we first got on, there was

10             difficulty with the internet connection.  It's

11             not -- this is a new process.  I think that all

12             of the parties ought to be a little bit more

13             cooperative about making this process

14             successful.  There is no danger of using that

15             Zoom recording for anything other than to fill

16             in gaps, so.

17                  MR. ROBERT MITCHELL:  There's always a

18             danger.  I don't want to use it to fill in gaps.

19             That's my point.  I don't want it used for

20             anything.  It's like I would not allow you to

21             have a Dictaphone machine.

22                  MS. HOOK:  What is the danger?

23                  MR. ROBERT MITCHELL:  The danger is that

24             somehow there will be a contradiction between

25             the transcript and what somebody thinks this

1        transcript, certified by the reporter, is

2        correct or not, whether the tape recording

3        undermines the integrity of the transcript.  I'm

4        not going to go for it.  I'm not going to take

5        that risk.

6            MS. HOOK:  So, you haven't answered the

7        question.  Those tape recordings in those cases

8        that you said in the past that people brought up

9        some kind of a conflict, was that successful in

10       getting the transcript changed?

11           MR. ROBERT MITCHELL:  I believe it was.

12       But I'm not going to go through the conflict.

13       I'm just not going to do it.

14           MS. HOOK:  All right.  Why don't we proceed

15       with the deposition, and if they call back, then

16       we could get on the phone.

17           MR. ROBERT MITCHELL:  Only if you agree not

18       to record it.

19           MS. HOOK:  We won't record it until we get

20       a ruling from the Judge.

21           MR. ROBERT MITCHELL:  Do you have that,

22       Jean, Miss Kindley?

23           (Whereupon, there was a discussion off the

24       record.)

25           MR. ROBERT MITCHELL:  Unless the Judge says

1           it's all right.

2               I'm going to excuse myself for a few

3           minutes and my son will takeover.

4               MS. HOOK:  Okay.  Okay.  So, back to where

5           we were.

6               Can you swear in the witness?

7               (Whereupon, there was a discussion off the

8           record.)

9               MS. HOOK:  Did we -- I'm sorry.  All right.

10   DIRECT EXAMINATION

11   BY MS. HOOK:

12       Q     Okay.  So, Dr. Hough, I see -- okay.  I have got

13   to figure out how to do this in a way that makes sense.

14               I see by your CV that you have been deposed

15   many, many times, so I'm not going to go through too much of

16   the rules.  But you do understand that we have to take turns

17   speaking, we can't speak over each other.

18               Is there anything that is preventing -- that

19   would prevent you from being able to give truthful testimony

20   today?

21       A     No, ma'am.

22       Q     Is there anything that would prevent you from --

23   would impair your memory in any way?

24       A     No.

25       Q     Okay.  So, let's start.  Exhibit 1 is the

1    subpoena.

2                    MS. HOOK:  If everybody could take a look

3               at Exhibit 1 that was provided to everyone.

4    BY MS. HOOK:

5         Q     Okay.  Do you recognize this document, Dr.

6    Hough?

7         A     I do.

8         Q     Okay.  And is this the subpoena that was issued

9    to you for this deposition?

10        A     It is.

11        Q     Okay.  And did you provide everything that you

12   have in your case materials that was not already in the

13   possession of plaintiffs?

14        A     That is correct.

15        Q     Okay.  So, let's go to Exhibit 2, and that is

16   your CV.

17                    MS. HOOK:  Does everybody have Exhibit 2

18              available?

19                    MS. WADLER:  Yes.

20   BY MS. HOOK:

21        Q     Do you have it, Dr. Hough?

22        A     I do.

23        Q     Okay.  So, on the first page of your CV, it says

24   that you have a Doctor of Education in Public Administration

25   concentration.  Can you please explain what that means, what

Page 23

1      Q      That's 2006, '07?

2      A      Yes.

3      Q      Okay.  And one of the courses you list as having

4    taught -- well, first of all, you say courses taught in

5    addition to those listed below, so are you saying that this

6    is not a complete list of the courses that you taught, this

7    is a representative list?

8      A      That's correct.  The various -- over the course

9    of my career, these various roles in different periods of

10   time, I tried to group together courses that I may have been

11   teaching in that period, in that particular time period, but

12   there are many, and I think what you would see, and we could

13   go through these, and I'm scrolling, as we look at each of

14   the different time periods that have been identified, all of

15   those different courses are ones that I have taught multiple

16   times in different places and different times.

17     Q      Okay.  You list this for the University of West

18   Florida, and for the school year, I presume of 2006 to 2007,

19   would that be correct?

20     A      Yes, that seems to be it, yes.

21     Q      Okay.  So, when you say courses taught in

22   addition, there is quite a few courses listed here, and

23   these are not all of them, how -- how many credits were each

24   of these courses?  How many courses did you teach in that

25   school year?

Page 24

1          A          This, the '06/'07 would probably include the

2     summer semester so you would see typically three semesters

3     here.  Each of these courses is a three semester hour

4     course, and typically the load is four classes in each

5     semester.  So, I was just trying, as you were asking that

6     question, to count here.  Ten, I think, as I see here, ten,

7     ten courses.  So, that's probably right because the summer

8     semester, excuse me, typically is less.  This semester right

9     now, I'm teaching two courses because it's the summer.

10         Q          Okay.  And you have listed here Sex Crimes

11    Investigation, can you give us a synopsis of what that

12    course was about?

13         A          I think so.  That would be for, again, an

14    undergraduate student audience to look at factors of various

15    types of sex crimes, a background to those crimes, how

16    statutes address those issues, and then from a law

17    enforcement standpoint as well as other ancillary

18    organizations, how do sex crimes and investigating their

19    occurrence move along through a criminal justice system, and

20    what are the functions of the various people involved in the

21    criminal justice system, and, as I said, other agencies and

22    entities.

23         Q          Did you focus at all on the conduct of an

24    investigation in that course?

25         A          Oh, yes, absolutely.

1        Q       And to what degree did you focus on the conduct?

2   You just described a very wide, broad range of information

3   that you provided during that course, so to the extent that

4   you focused on investigation, what did you teach?

5        A       To the extent that I could remember from 14

6   years ago, the offering of that particular course, which is

7   questionable in terms of remembering that from 14 years ago.

8   The textbook, which I don't know, sitting here today, I

9   don't know what textbook I was using, but they are likely

10  within a four month standard university semester.  If, in

11  fact, that was taught in the four month semester versus a

12  six week semester over the summer, and I don't know, that

13  would probably have in the textbook at least a chapter that

14  focused on typical steps in typical types of sex crime

15  investigations.

16       Q       Okay.  Further down, you have listed that you

17  were an instructor of criminology and criminal justice from

18  1999 to the present at the University of West Florida, and

19  at a different campus at Pensacola, and, again, these are

20  very similar topics.  So, is this just a continuation of the

21  same courses, types of courses that you taught at that

22  university?

23       A       To a large extent, that would be correct since

24  that was a more brief period of time at the remote campus,

25  which is the Emerald Coast campus, that was, as we counted,

1    just a smaller grouping of courses as well as overseeing

2    adjuncts who taught other courses on that campus.  And so,

3    from when I began teaching in that department, and it was

4    named differently way back then, but these would be some of

5    the other courses.  And, yes, some of those are unique and

6    some of those are redundant.

7         Q      Okay.  And you've got listed sex crimes

8    investigation, so I presume it's a similar course, if not an

9    identical course to the one listed above?

10        A      That is correct.

11        Q      Okay.  And then turn to what is listed as page

12   16 of 35.

13        A      Okay.

14        Q      Under curriculum development, do you have that

15   page?

16        A      I do.

17        Q      Okay.  You've got courses created, sex crimes

18   investigation, is that, again, the same course that was

19   referred to in the earlier two entries?

20        A      It is.

21        Q      Okay.  Did anyone work with you on creating that

22   course?

23        A      No.

24        Q      Okay.  I was unable to find any other courses or

25   instructions on sex crime investigation.  Is there anything

1    that I missed in the CV other than those three?

2         A        In terms of calling out and using the actual

3    three words, sex crimes investigation, I don't know,

4    obviously, or hopefully obviously, certainly obviously to me

5    or whoever else I explain it to in the future, such as the

6    jury, the 47 years of my experience in teaching detectives,

7    and students, and police officers incorporates the teaching

8    of sex crimes investigation, and certainly more broadly and

9    on point, how to conduct investigations pretty much

10   continuously for 40 years, which I still do, and that would

11   include at the law enforcement academy level.

12        Q        Okay.  So, if I understand your answer, sex

13   crime investigation is a component of your general

14   instructions over the course of 40 years?

15        A        It certainly would be included within those and,

16   again, in a variety of different venues, and topics, and

17   courses, both in the academy as well as in college and

18   university courses.

19        Q        Okay.  So, let's turn to page 26 of 35.  So,

20   besides teaching courses, you have given presentations in

21   various organizational settings, correct?

22        A        Yes, I have.

23        Q        Okay.  And in close to the bottom of that page,

24   2019, you have listed that you were a subject matter expert

25   on intimate partner violence and protecting the rights of

1   women and children in a briefing on U.S. efforts to empower

2   women and combat violence for the Department of State's

3   International Visitor Leadership Program for the delegation

4   from Bangladesh, India, and Pakistan.  That is quite a

5   mouthful.  Can you explain what that is, what that was, that

6   presentation?

7       A       Absolutely.  And I've done versions of that

8   presentation for a variety of international groups coming in

9   as part of the U.S. State Department's program that you,

10  that you just mentioned.  That has to do with the overall

11  approach and practices used predominantly in the United

12  States for addressing violence against women, predominantly

13  we recognize that a small segment of intimate partner

14  violence is women against men, but we know statistically and

15  as a focus that it is overwhelmingly men against women and

16  girls, and so this has to do with the cultural and

17  professional interchange with these groups, who are

18  professionals, as well as up and coming leaders in their own

19  countries, as well as a couple of very specific visits that

20  we had one-on-one with some of the State Department's named

21  Worldwide Women of Courage on these kinds of issues that

22  have to do with violence against women and against children.

23      Q       And what sort of issues did you discuss or

24  methods, U.S. methods did you share with the deligations

25  from Bangladesh, India, and Pakistan in terms of curbing

1   violence against women?

2        A       Very often what we find to be effective in

3   jurisdictions, not only in the U.S., but where it does exist

4   around the world, is the use of task force approach,

5   recognizing that because intimate partner violence, like

6   much violence, is intergenerationally transmitted.  It is

7   something that is not unique to the United States or to any

8   given country, that it also is a matter that takes the

9   efforts of so many in society, I think the argument could be

10  made for everybody in society, making people aware of the

11  various challenges of the unknown often nature or frequency

12  of such types of violence, like much other violence.  And

13  so, this idea of task force approach utilizing partners

14  throughout society, whether those are criminal justice, the

15  health sector and medical sector, schools certainly from an

16  educational standpoint, community partnerships, whether

17  that's from the business community and your local chamber of

18  commerce to just broader educational campaigns, whether

19  those are public service announcements in using the media,

20  et cetera.  So, just a bit of an all hands on deck approach

21  to a problem that's been with us throughout history.

22       Q       And would special departments within a police

23  department, such as the special victims section, would that

24  be one of the methods that you discussed and imparted to

25  those delegates, the development and application of such

Page 44

1    have to say.

2         A       I can see why.

3         Q       So, you did testify a number of times on law

4    enforcement practices and investigative practices.  Do you

5    recall the outcome of any of those cases?

6         A       I have, as you say, testified in a number of

7    those.  I would not want to guess.  I don't recall because I

8    don't necessarily have an in-depth conversation at any point

9    later about whether a case resolves.  Typically, if there is

10   typical for doing a few of these, that the attorney will

11   send an E mail to just to let you know the case is resolved.

12   I don't necessarily recontact him to ask him what particular

13   way.

14              I am aware for some of the ones where, for

15   instance, if I worked with the law firm previously, it's

16   typically been resolved in favor, if, again, 90 or so

17   percent of these are defendant cases, where it has resolved

18   in favor of the defendant, which, of course, I can't control

19   set of facts, but that's been the outcome generally.

20        Q       So, I'm sorry, I'm not clear.  Did you just say

21   that 90 percent of the cases that you testified in on behalf

22   of defendants resolved in favor of the defendants?

23        A       It may be 100 percent.  What I tried to say was

24   I'm not sure, and so it would be --

25        Q       So, you are guessing that 90 percent or

Page 45

1    100 percent resolved in favor of the defendants?

2         A    No, I'm not really guessing.  What I tried to

3    say was I don't follow back up and ask for a feedback

4    session on my particular role in a case.  But what I've had

5    are the variety of attorneys, you know, generally saying

6    that it's resolved, and if I have a phone call or an E mail

7    with somebody, it has generally been the case that it

8    resolved in favor of whatever the, you know, client, the

9    defendant was that I was dealing with.  Obviously, with

10   these cases, you can, you know, check on that yourself if

11   that's, you know, an important, an important matter.  So, I

12   would simply say, my memory would not allow me to just tell

13   you each one of these how they turned out.

14        Q    Okay.  I'm just confused about, you say on the

15   one hand that your memory doesn't allow you to say for sure,

16   and that you rely on various attorneys following up with

17   you, but yet certain -- with certainty you said that 90

18   percent or maybe 100 percent resolved in favor of the

19   defendant.  How did you reach those percentages with that

20   degree of uncertainty?

21             MR. MITCHELL:  Objection.

22             THE WITNESS:  I appreciate the banter,

23             counsel, on memory versus what's listed here.

24             These things aren't a batting average, not

25             for me, I offer services to --

Page 46

1    BY MS. HOOK:

2        Q      But you provided the percentages?

3        A      We're not going to go down the road of what I've

4    seen in your depositions.  I'm going to give you the

5    courtesy of letting you finish your question, give me the

6    courtesy of answering it, or Madam Court Reporter, so we

7    don't have a muddled record on the matter.

8              My best recollection is that the cases have

9    resolved favorably for whichever group I happen to have been

10   working with.  As I pointed out, the set of facts in a

11   particular case, and ultimately if something did not resolve

12   prior to trial and went to trial, was something that the

13   trier of fact resolved one way or another, I don't control

14   that.

15             I'm happy to spend the balance of our couple of

16   hours talking to you about my memory on how cases turned

17   out, but, as I've already testified, I don't know how they

18   certainly did.  I'm happy to talk to with the jury later

19   about that after you research and determine how each of

20   these turned out.

21       Q      Okay.  I'm just trying to make sure that I

22   understand your statements, and which of your statements are

23   supported by fact and which are supported by guesswork.

24                      MS. HOOK:  I would like to take a break for

25             about five minutes.  So, can we just take a

Page 47

1          break?

2               MR. MITCHELL:  Sure.  Be back here, I got

3               1:11, why don't we round it up to 1:20?

4               MS. HOOK:  Fine.  1:20 is good.

5          (Whereupon, there was a short recess.)

6               MS. HOOK:  Okay.  So, we're back on the

7               record now.

8     BY MS. HOOK:

9          Q     Dr. Hough, I'm going to be screen sharing my

10    screen with excerpts from your book.  If you would like to

11    actually take your hard copy book.  I am going to be

12    referring to the E book page numbers, which I know are

13    different than the hard copy.  So, you could look at it on

14    the screen, okay?

15         A     And we'll see.  I'm not -- I have not seen the E

16    book, so hopefully they are the same.  I don't know.

17         Q     Okay.  All right.  Let me just -- you know, I

18    had it up.  Just give me a second.  I had it up.  There it

19    is.  Okay.  Give me a second.

20               MR. MITCHELL:  Off the record.  A quick

21               question.

22               (Whereupon, there was a discussion off the

23               record.)

24               MS. HOOK:  Okay.  I am going to share the

25               screen now.

 1   BY MS. HOOK:

 2       Q       Okay.  So, I'm showing you a page from your

 3   book, Dr. Hough, Criminal Investigations Today:  The

 4   Essentials.  The subheading of diagramming.  The first

 5   sentence under diagramming states -- I'm sorry.

 6       A       Can you tell me what the page number does show

 7   on there and I'll try to go to it?

 8       Q       Well, it is 78 on the E book, it doesn't show

 9   the page numbers.  This is --

10       A       Okay.

11       Q       But it's under the subheading of diagramming.

12       A       Do you know what chapter that is?  I think I can

13   find it here quickly.  I'm there.

14       Q       Okay.  So, in the first sentence, in the middle

15   of the first sentence, there was a clause that says, the

16   drawing of a scene can be a useful, if not a critical

17   component of documenting an investigation.  Do you see that?

18       A       I do.

19       Q       I'm sorry?

20       A       I do.

21       Q       Okay.  Can you, can you explain a little bit

22   more about the role of drawing a scene by an investigator?

23       A       Certainly.  And we'll back out just a little

24   ways to point out this is a textbook written for an

25   undergraduate audience of college and university students to

Page  49

1    overall understand the process of criminal investigation and

2    which is also why it's referred to as an essentials book,

3    even though it's nearly 400 pages long.

4           Diagramming for certain crimes or certain

5    subsets of certain types of crimes may be useful in

6    explaining to any number of people, not the least of which

7    at some point could be potentially a jury in a criminal case

8    typically, as this implies, about relevant relationships

9    between items of evidence and people.  And so, it just

10   varies with, again, the universe of limitless permutations

11   of what crime might be investigated and whether there is

12   some need to have diagramming or other supportive types of

13   materials or props that might go along to help.

14      Q      In what circumstances would the drawing of a

15   scene be helpful for an investigator, in what types of cases

16   can it be helpful or even critical?

17      A      Sure.  And, again, forgive the narrative style

18   of a professor and a trainer, and that's why what I just

19   said tried to hit at the point that there are virtually

20   unlimited versions of most types of crimes.

21           So, I've been involved in a couple of airplane

22   crashes which were not per se crimes, but they are termed as

23   crime scenes where you have thousands of items that need to

24   be related back to eventually a whole.  Certainly, there are

25   shooting investigations where even if some person tragically

Page 50

1    falls dead in one spot, you may want to relate the various

2    items in the scene, whether it's in a room, in a building,

3    in a field, so, again, this can be explained later to others

4    or later in a process.  You may even have something as

5    perhaps viewed as simple as a theft case, but perhaps the

6    individual fled in some particular direction before being

7    either lost or captured, and that may entail other crimes

8    that came as a result of that.

9            So, once again, being able to perhaps use that

10   kind of visual aid to explain something that is complex or

11   there may be some misunderstanding about an item of evidence

12   in relation to did somebody drop the item of evidence, is it

13   likely they had the item of evidence, those would be just a

14   handful of examples of, quite literally, any state's book or

15   books of criminal statutes, and trying from now until the

16   end of our lives to explain when and when it might not be

17   helpful to a jury or to a prosecutor that they not

18   understand, for instance, where someone was in relation to

19   some other thing, or where objects were in relation to one

20   another.

21      Q     So, building on that, if you have an

22   investigator who has two witnesses, who described the crime

23   scene in different ways, positioning of furniture,

24   positioning of people, is that one of the cases where a

25   drawing of a crime scene would be important for the

1   investigator to try and determine what really happened?

2       A    Well, again, that certainly leads to a great big

3   it depends.  The terminology of witness is one used within

4   not only criminal justice, but in medicine, reporters, et

5   cetera, in terms of what's a witness.  A witness is someone

6   who has some information.  We're not -- we're either talking

7   or not talking about an eyewitness.  If we have two people

8   with some issue of contention over who was closest to the

9   gun that was used to shoot somebody or some weapon, what was

10  someone's vantage point, was it dark, was it light, were

11  they distracted by something else, and you're going to an

12  issue of those kinds of observation memory issues, as

13  opposed to, again, the universe of anything else, it could

14  be important, and that absolutely varies by each individual

15  reported incident and what is alleged to have occurred in

16  that incident or why it is that we're interested in whatever

17  comes next, court, prosecutor, defense attorney, jury, et

18  cetera.

19      Q    Could a drawing be used by an investigator to

20  test the credibility of somebody's statement?

21      A    Once again, throwing out a huge caveat of it

22  really depends.  It would matter of what exactly is the

23  issue.  Is there some probative value to showing that you

24  and I were standing on a street corner this morning and I

25  don't remember if I was closer to the curb than you were, no

Page 52

1    one cares, it doesn't matter.  We might get into quite a

2    debate over which of us was standing closest to the curb,

3    and maybe, if we observed an accident, who was looking in

4    what direction, maybe that would matter.  And, again, that's

5    just the most mundane of examples.

6              So, without specifics of, would I assess in my

7    professional opinion, based on my experience, and research,

8    and ongoing training, that an issue is relevant or could be

9    of, as you say, two witnesses stating who was in what

10   position, it really would depend.

11   Q      If a witness provides a statement that --

12   withdrawn.

13             In testing the credibility of a witness

14   statement, would you use a drawing to determine whether the

15   statement of the witness is physically possible, given the

16   layout of the crime scene?

17   A      Once again, it varies with the case, and every

18   conceivable set of facts that can alter that and what it

19   was.  If there is four counters length between you and a

20   cash register and somebody said you reached over and took

21   money out of the cash register, and we don't have a video or

22   an independent eyewitness, et cetera, et cetera, maybe.

23             So, again, this is so dependent and independent

24   of the thought that there is one method of conducting either

25   an investigation or the use of something, such as, in this

1   example, diagramming.  It is absolutely not that simple.

2           So, to bring it to the instant case, I found no

3   issue with some idea of, hey, I wonder whether there was a

4   diagram in this case, I saw no applicability.

5       Q      Yeah, well, we will get to your report later.

6       A      Sure.

7       Q      But would it be probative to have a diagram of

8   the crime scene if that diagram were to establish that a

9   witness's statement was not possible?

10      A      It could be.  And without going for a legal

11  conclusion, and what those circumstances were, we'll

12  certainly go with it could be.

13      Q      Okay.  So, the next sentence on that page says,

14  the crime scene sketch has value by telling quite a bit

15  about a scene without the embellishment of words that may

16  unintentionally misdirect or place too much emphasis on one

17  item or another.  So, in light of what we were just

18  discussing, how does this concept apply to the hypothetical

19  we were just discussing?

20      A      It would not.  If I turned the hypothetical into

21  talking about this case I was asked to look at, so that

22  wouldn't, you know, that wouldn't be of help, as far as that

23  goes.

24          The general concept for the college students to

25  grasp in this part of the book was the fact that, again, if

Page 54

1    you see a body, or a gun, or some item, or a car, and how

2    far it is or isn't from some other item, as I testified to,

3    an object, it may have some, it may have some value.  It's

4    certainly going to depend on what the information we have on

5    a particular event was.

6         Q     So, in this statement, a crime scene sketch has

7    value because it can tell something about a scene without

8    the embellishment of words.  Are you conveying here that a

9    sketch can test the veracity of the words of a witness?

10        A     Well, I appreciate that that's, I think, the

11   fourth way that you've asked that same question, and I

12   didn't say anything in any of my three replies previous

13   about testing the veracity other than it could, depending on

14   what a particular set of circumstances were, what a

15   particular set of narratives or perspectives were, and

16   whether that had anything to do with what the alleged

17   criminal act might have been or if, as in the example I gave

18   of perhaps a theft and someone ran, and other crimes

19   occurred as they were running from the scene of somewhere,

20   and you may actually need to try to determine sequence or

21   location for other items of evidence, things of that nature.

22        Q     Okay.  I'm moving on to the subsection that says

23   report writing and notetaking.  And let me move this so we

24   can see.

25              Okay.  In the first -- let me just make sure

1    that I got -- okay.  All right.  Forgive me, this is a

2    little bit different than -- it changes each time.

3              All right.  So, if you can all see the screen,

4    on the left-hand side, the first full paragraph begins with

5    officers also document all the information they take in

6    about evidence, suspects, and other persons involved in a

7    crime.  You see that?

8        A    I do.

9        Q    Okay.  And is that part of -- is that from your

10   book?

11       A    That is.

12       Q    Okay.  Can you explain the importance of

13   documenting all the information?

14       A    Sure.  The point here, once again, for these

15   undergraduate students in a university program is that, and

16   I'll use the analogy the medical students, again, is that

17   the fact that for the things that you become aware of, know

18   about, it is often important to document things that may or

19   may not later be relevant at all.  So, you may have a volume

20   of information that gets eventually used, or a lot of it

21   eventually for a variety of reasons may not get used,

22   documentation overall, and if you go back to the beginning

23   of this actual section, it's addressing initially patrol

24   officers.  And in a case that typically would be reported in

25   progress or right after something happened, unlike the

Page 56

1    instant case that we're dealing with today, but also crime

2    scene technicians, forensic technicians, et cetera,

3    detectives, any number of people who may become involved.

4    It is not meant to imply that any human or group of humans

5    in an organization take in all information and knowledge and

6    then try to figure out later does it, does it mean

7    something.  It is a reminder to students, and certainly a

8    reminder to officers and trainees as well, is that the

9    documentation is important.

10        Q      Okay.  I appreciate that this book was written

11   for undergraduate students, but it is based on your 40 years

12   of in-depth knowledge, education, and experience as an

13   investigator, is it not?

14        A      Safe to say.

15        Q      Okay.  So, these are your opinions that you are

16   sharing with the undergraduate students, is that correct?

17        A      Insufficient as an explanation because this is

18   an academic textbook that had 20 reviewers, if you go back

19   to the beginning of the book, experts from across the field,

20   probably seven editors from the rather large publishing

21   house of Sage doing this.  This is academic peer reviewed

22   work.  This isn't Dr. Richard Hough's opinion on how

23   criminal investigations should be conducted.  This is

24   certainly, you know, enhanced and conveyed through my 40

25   plus years of experience, but, no, it's not just my opinion,

1    no.

2        Q       Who else is credited as an author of this book

3    besides you?

4        A       I understand if you are not familiar with

5    publishing or peer review, but no one else is credited as

6    author of the book.

7        Q       Okay.  I actually was in the publishing business

8    for 15 years, so I do understand publishing.  Thank you.

9        A       I know.

10       Q       But this is written, your byline is on this

11   book, correct?

12       A       Correct.

13       Q       Okay.  So, you are listed as the author, and are

14   you saying that the opinions in this book or the statements

15   in this book are not necessarily your opinions or

16   statements?

17       A       Well, that's certainly true because as -- you

18   just flipped to one there, you will see something about CSI

19   Effect, Smith, Perry and Stinson, 2007.

20               If, again, I don't know what area of publishing

21   you were in, but in the academic world of a textbook, we

22   don't get to just say our opinion.  So, yeah, I would reject

23   your assertion that or get me to sign on to it's all just

24   me.  Perhaps if we -- that's not how it works.

25       Q       In the publishing world that I was in, to the

Page 58

1    extent that you are reciting the opinion or the research of

2    someone other than yourself, there needs to be a citation to

3    that.  And if there is no citation, then it is understood

4    that it is based on your own research and your own

5    knowledge.  Is my experience in publishing different than

6    yours?

7        A    It certainly is.  That's not accurate in

8    academe.

9        Q    Okay.  So, as we go through this, please tell me

10   where you disagree with the words that are in your book?

11                  MR. MITCHELL:  Objection.

12                  Liz, if you are going to be using -- you

13                  are turning this into an exhibit.  If you are

14                  going to use it as an exhibit, I request that

15                  you provide a copy of this book at the

16                  conclusion of this deposition so we have it for

17                  the record.  Thank you.

18                  MS. HOOK:  Thank you.

19   BY MS. HOOK:

20       Q    So, Dr. Hough, just let me know when we get to

21   something that you don't agree with, even though it's in the

22   book.

23                  MR. MITCHELL:  Will you be providing a

24                  copy?

25                  MS. HOOK:  No.

Page 59

1   BY MS. HOOK:

2        Q      Let's move on.

3               MS. HOOK:  We can discuss it offline.

4               Please.

5               MR. MITCHELL:  All right.  Let's take a

6               break.

7               MS. HOOK:  Thank you.  No, I'm not ready

8               for a break right now.

9               MR. MITCHELL:  I'm calling a break.

10              MS. HOOK:  All right.  We will stop sharing

11              here and take a break.  Thank you.

12              (Whereupon, there was a short recess.)

13              MR. MITCHELL:  Dr. Hough stepped out for a

14              moment, I think, to go use the restroom.

15              But, Liz, we'll be marking this as an

16              exhibit.

17              MS. HOOK:  Okay.  You could do --

18              MR. MITCHELL:  Please keep track of all the

19              pages that you are using.

20              MS. HOOK:  Okay.  You will have the

21              transcript so you will have it.

22              MR. MITCHELL:  I understand, Liz.

23              THE WITNESS:  I apologize.  I'm back.

24  BY MS. HOOK:

25       Q      Okay.  So, let's go back to the screen sharing,

Page 60

1    okay?

2                        MR. MITCHELL:  Okay.  And for the record,

3               the defendants are marking this as an exhibit,

4               all the book.

5                        MS. HOOK:  Okay.

6    BY MS. HOOK:

7         Q     So, the second paragraph, second sentence, let's

8    see, I'm not sure what -- okay.  Second -- in the second

9    column, the paragraph that begins the formal written report,

10   the second sentence says, an officer or investigator states

11   known facts and not opinions or suppositions.  Is it

12   important for the information that an investigator gathers

13   to be objective facts and -- leave it there.  To be

14   objective facts and not opinions?

15        A     Well, again, this plucking that sentence out of

16   this 400 pages, we'll try to put that in some kind of

17   context to relate.

18              The gathering of information, which is what an

19   investigation clearly is all about, is a matter of taking in

20   and documenting what you -- what is presented to you.  Known

21   facts is very often the province, as we know, perhaps some

22   of the hard sciences, unless we're all witness to an

23   observation.  Determination of weight of what may or may not

24   be considered an actual fact, we know is left up to the

25   trier of fact.

1      Q      Uh-huh.

2      A      So, trying to, again, take that one sentence,

3   I'm trying to get back to, I apologize, about -- and I did.

4      Q      I don't know if you can see my --

5      A      But an officer or investigator states known

6   facts and not opinions or suppositions.  So, standing alone,

7   which that sentence doesn't, but if we take it somewhat

8   alone, yes, much like in the social sciences with students,

9   we tell them, don't just plug in an opinion.  It's my

10   opinion that the dog chased the cat.  Say that I watched as

11   the dog ran after the cat.  So, to that extent, don't

12   include an opinion.

13      Q      Okay.  The third sentence -- well, there's the

14   contents.  If a victim, witness, or informant makes a

15   statement that is not verified by the officer, the statement

16   should be noted as such.  Is it important for information

17   that is provided to be put in the proper context?

18      A      Well, I'm not certain that those two follow one

19   another.

20      Q      Okay.

21      A      Context --

22      Q      Tell me how they don't?

23      A      I'm sorry?

24      Q      Tell me how they don't follow?  Tell me what you

25   were intending to convey in that sentence?

Page 62

1       A       That for the information that you gather, and

2  everyone else who's involved in a particular matter gathers,

3  and whether, as in this case, the information is furnished

4  up to a prosecutor to contemplate in terms of a warrant

5  application, your question, which was not from within that

6  sentence about a context certainly would be important, I

7  would agree with that, the context is always important.

8       Q       Okay.  So, if someone's statement, a victim, an

9  informant, a witness is not verified, is it important for

10  that fact to be contained in the case incident report of the

11  investigation?

12      A       The language of verified or not, most statements

13  that any of us give to one another are either not verifiable

14  or not verified in the initial stating of something.  I

15  understand making much about verification and credibility,

16  and if that were possible, clearance rates for crimes would

17  be more than the 20 to 35 percent that they are, but the

18  actual fact is, as everyone on the jury will recognize and

19  know, is that you do not have the ability as an officer to

20  just independently verify, certify, or label a statement

21  necessarily as fact, which is also why the law enforcement

22  officers enter at times a physical charge, but it is the

23  prosecutor's office that renders the lawful and legal charge

24  in a matter such as the one we're dealing with here today.

25      Q       Dr. Hough, you are the one -- I did not use the

1   term verified, you used the term verified in this sentence.

2   And all the sentence says that if a statement is not

3   verified, that statement, the statement should be noted as

4   such.  I didn't ask a question that every fact must be

5   verified.  The question I asked was, to the extent that

6   statements are not verified, should -- is it important to

7   note that in the case incident report?

8        A    I understand your distinction, and the point

9   there is that, again, with hopefully more succinctly

10  explanation to the jury about this, statements contained

11  either within a report, within an affidavit, you would not

12  label each one this is unverified, this is unverified, this

13  is verified, this is unverified.  The point to these college

14  students is that you are, to the extent that you can, and

15  you seem to go there, put into context information that you

16  have, and to the extent that you are able to say something

17  is or is not either corroborated, verified, you know, it's

18  desirable, it's not often achievable.

19       Q    Okay.  So, to the extent that it is achievable,

20  is it important to put each witness's statement in context

21  in the case incident report?

22       A    I appreciate the additional bite there at the

23  apple.  I stand on what I said, that you, you would not as a

24  convention of writing, certainly not within the routine and

25  customary practices and training of law enforcement label

Page 64

1    every statement as verified, unverified.

2              What you would do is you would attribute

3    information gathered from different people to those people.

4              A prosecutor, as in this case, may make some

5    determination in regards to the information in an

6    investigation, and then as we know ultimately if that were

7    to go to a criminal court, then the jury may make some

8    determination, or the Court, or as in this matter, perhaps a

9    jury will make a determination of whether it was clear or

10   not clear the role of each person who law enforcement got

11   information from and how that knits together into the

12   broader picture of what may or may not have occurred.

13        Q    Okay.  But those qualifications are not listed

14   here.  You don't say to the extent possible or if

15   determined, if the investigator thinks it's important, you

16   make a statement here that if a witness statement is not

17   verified, that fact should be noted.  Very straightforward.

18   Now, you seem to be stepping away from that statement.

19        A    Is there a question there?  That was testimony.

20        Q    Are you stepping away from that statement?  Are

21   you saying that this sentence here is not accurate as

22   written?

23              MR. MITCHELL:  Objection.

24              THE WITNESS:  I, again, appreciate the

25              mischaracterization of a sentence out of a 400

1               page textbook, and certainly out of the context

2               of what I have just gone through the pains to

3               explain, so at the risk of asked and answered,

4               the point here is the fact that knitting

5               together the whole of where information came

6               from and providing that as faithfully as

7               possible and not obscuring where you got

8               something from, if you gave me information, and

9               I say Miss Hook gave me this information,

10              whether I need to label that in some particular

11              way that maybe I'm not able to label one way or

12              another, this sentence out of this book that I

13              authored was not written over a period of two

14              years in anticipation of Roe (sic) v. Town of

15              Greenwich and how you might perhaps utilize this

16              sentence to indicate something that you are not

17              able to.

18    BY MS. HOOK:

19        Q     I'm not asking you to accept my interpretation

20    of the sentence.  I simply asked a yes or no question.

21              Is this sentence, as written, accurate in your

22    opinion?

23        A     I appreciate in a deposition of discovery that

24    you would like a yes or a no answer for your purposes or

25    that of your client.  I've given my answer.

1      Q      So, then your answer is you cannot say whether

2  it's accurate?

3              MR. MITCHELL:  Objection.  That's not what

4          he said.

5              MS. HOOK:  I didn't hear -- I heard no

6          response to my question, so, I --

7              MR. MITCHELL:  You asked the question

8          multiple times in so many ways and he has given

9          the same answer.

10             MS. HOOK:  Excuse me one second.  I'm

11         sorry.  I just got to --

12  BY MS. HOOK:

13     Q      I'm sorry.  So, just because I did not hear a

14  response to my question.  So, let me just ask you this:  Can

15  you state whether this sentence is accurate as written?

16     A      What I can, once again, try to convey is that

17  this sentence doesn't exist in a vacuum.

18     Q      Understand.  So, the answer is no, you can't

19  state whether it's accurate as written?

20     A      Those are your words.

21     Q      Well, I'm asking the question, and you have to

22  provide a response, either yes, no, or I don't know.

23     A      Counselor, I have provided you responses, and I

24  appreciate you telling me how to testify.  However, the

25  sentence, as written, within this 400 page book, and however

Page 67

1    much we will continue to discuss here for the balance of our

2    time this afternoon, is the fact that investigations are a

3    process, they are not a single event.  Information gathered

4    by humans from humans is the stock and trade of what law

5    enforcement officers hope to do and are expected to do, and

6    then offer up, as in this case, to a jury, who will make

7    some determination in regards to the weight of each of those

8    things gathered.

9            I fear I'm inadequate to offer you what it is

10   that you want.  Do I support my own work or do I not support

11   my own work?  That's, that's not an appropriate response for

12   someone to give.

13               MS. HOOK:  Okay.  I appear to be having

14               some technical internet difficulty here, so bear

15               with me.

16               THE WITNESS:  I see it there.

17               MS. HOOK:  I am having difficulty with

18               everything on -- I'm seeing none of the

19               feedback.  Everybody is moving very erratically.

20               So, give me a second until my internet service

21               stabilizes.  There is some background noise.

22               Does somebody have either a television on

23               or -- does anybody else hear it?

24               THE WITNESS:  I think I do.  I think I can

25               hear that somebody may have a background

Page 68

1            something.

2                    MS. HOOK:  Sounds like children, maybe.

3                    MR. MITCHELL:  I don't hear a single thing

4            either.

5                    THE WITNESS:  Liz and I have more acute

6            hearing.

7                    MS. HOOK:  I guess.

8                    THE WITNESS:  My grandchildren.

9                    MS. HOOK:  Okay.  I'm going to -- I'm just

10           seeing a lot -- okay.  The internet is really

11           having quite a bad effect here.

12                   All right.  Is somebody else joining?  I

13           just heard a bell ringing.

14     BY MS. HOOK:

15       Q    Okay.  At the top of the second column on this

16     page, second sentence, in this event, technicians and

17     investigators must be prepared to explain what collection

18     efforts they did make and observations that support why

19     potential evidence was not collected.  And this has to do

20     with presenting to a jury.  So, what --

21       A    Where are we?

22       Q    Can you see my arrow, the caret?

23       A    I do, but I mean, what part of the book or

24     the -- which chapter, is this on chapter two?

25       Q    Under the CSI Effect.

Page 69

1      A      Okay.  All right.  I think I'm with you there.

2  All right.  So, go ahead.

3      Q      Okay.  So, if you see technicians and

4  investigators must be prepared to explain what collection

5  efforts they did make and observations that support why

6  potential evidence was not collected.  Explain the

7  importance of being able to explain to a jury what

8  collection efforts were made by the investigator.

9      A      I'm trying to find that so that I can give it

10  some kind of context here since no sentence ends by itself

11  as you are attempting.

12      Q      It supports the middle of the paragraph that

13  begins the reality.

14      A      Right, okay.  Also simply been little evidence

15  at a scene, is that where it begins?

16      Q      Yes.  And then in this event technicians and

17  investigators.

18      A      Sure.  Okay.  So, the question is?

19      Q      Explain the importance of being able to have an

20  investigator explain what collection efforts were made and

21  what were not made and why.

22      A      Okay.  Again, we'll certainly start at what type

23  of crime is being reported or investigated and then, you

24  know, when that was, is there the potential for available

25  physical evidence is what's being addressed here.  And then