Plaintiff Exhibit RR

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CIVIL ACTION NO. 3:18-cv-01322-KAD

---------------------------------------x

JANE DOE,

                Plaintiff

        -vs-

TOWN OF GREENWICH, ET AL,

                Defendants

----------------------------------------x

Deposition of THOMAS W. PHILIP, a Witness, in the hereinbefore-entitled action, taken by the Plaintiff, pursuant to Notice before Victorine D. Hennessey, a duly qualified Notary Public in and for the State of Connecticut, held remotely via Zoom Videoconference in North Haven, Connecticut on July 16, 2020 beginning at 9:00 a.m.

        DEL VECCHIO REPORTING

   STAMFORD    NEW HAVEN    HARTFORD

         (203) 245-9583

1              THOMAS W. PHILIP,
2  ████ ████████ ████████ ████████ ████████████, having
3  been duly sworn, was examined and testified as
4  follows:
5              COURT REPORTER:  Usual stips?
6              MS. BRAXTON:  Does the witness wish to
7       read and sign?
8              MR. CARANGELO:  Yes, the witness will read
9       and sign.
10             And also I'd like to designate the
11      contents of this deposition as confidential
12      pursuant to the protective order.  And also, as
13      I said yesterday, we need to be as efficient as
14      possible with this third-party witness,
15      especially Mr. Philip who is the head of the
16      school and, obviously, in addition to his
17      regular role as head of the school, is dealing
18      with trying to get school back to session in
19      September in this pandemic.
20             So we're not going to be able to have time
21      to do a full lunch today, so we'll take at
22      most, 15 minutes at lunch, so if people need to
23      order food in, please do that now so we can
24      finish as quickly as possible.  And, again, we
25      will try -- hopefully your questions will

 1             MS. BRAXTON:  You know, you're totally
 2        violating the Federal Rules here,
 3        Mr. Carangelo; you're going to force your
 4        witness to come back.
 5             MR. CARANGELO:  I respectfully disagree.
 6   BY MS. BRAXTON:
 7        Q    Do you know James Heavey?
 8        A    I know who he is, yes.
 9        Q    Have you ever met him?
10        A    I have met him -- I think I met him once.
11   I've probably been in seminars where he's been in
12   the room but not really met him as well.
13        Q    Have you ever met with him about criminal
14   allegations against a Brunswick student?
15        A    I did meet with him once and I don't know
16   if it was -- I don't know if it was criminal -- I
17   mean, I don't know if there were charges.  I think
18   there was something on Arch Street or something.  I
19   don't recall.  I feel like it was a fight or a -- I
20   don't recall, but I do remember a visual of meeting
21   with him once, yup.
22        Q    And what do you recall about what your
23   discussion was with him?
24        A    Well, it had to be fact finding.  I mean,
25   I'm speculating, but I -- the way it would normally

1 work is that we would come in on a Monday morning to
2 school and all the talking that something happened
3 on Arch Street and I probably wanted to see if it
4 was a rule violation that we had to respond to, I
5 would think. I don't recall exactly.
6     Q   So you personally met with Chief Heavey,
7 Police Chief Heavey about that?
8     A   I have this visual of meeting him once
9 about something that happened on Arch Street.
10     Q   And why did you meet with him about it?
11     A   I think I answered that. To try to -- I
12 assume -- this could be speculation -- but I assume
13 to find out whether one of our kids had been in
14 trouble.
15     Q   And you thought you needed to go to the
16 Chief of Police to do that, is that right?
17         MR. CARANGELO:  Objection to form.
18         THE WITNESS:  I wouldn't know who else to
19    go to, it's the only name I know.
20 BY MS. BRAXTON:
21     Q   Was that before or after Michael D'Angelo
22 was hired?
23     A   I don't know. I honestly don't know. It
24 could have been before. It may easily have been
25 before. I don't know.

1            MR. CARANGELO:  Objection to form.
2            You don't need to badger the witness.
3            MS. BRAXTON:  I'm not badgering the
4      witness.
5  BY MS. BRAXTON:
6      Q    Go ahead and answer the question.
7      A    I recall a lot of things from a long time
8  ago and a lot of things from several years ago and
9  some things I don't recall.  I can't remember things
10 that I can't remember.
11     Q    So when you asked Mr. D'Angelo to contact
12 the police, what information are you looking for?
13           MR. CARANGELO:  Objection to form.
14           THE WITNESS:  I didn't tell him to contact
15      the police, you know, it's speculation, that
16      wouldn't surprise us that if we thought a
17      student was involved with the police, that we
18      would try to get more information to
19      investigate.
20           If you're asking about this ▮▮▮ thing, I
21      don't have any idea if the police were
22      involved.
23 BY MS. BRAXTON:
24     Q    I'm asking as a more general matter.  I
25 understand that you were telling me that you have

1  had Mr. D'Angelo reach out to the police on occasion
2  to find out about possible police involvement in a
3  matter involving a Brunswick student, is that
4  correct?
5       A    That's correct.
6       Q    Okay.  So, when you have Mr. D'Angelo do
7  that, what information are you looking to get from
8  the police?
9       A    I guess in general terms what I would say
10 is we're trying to get confirmation as to whether or
11 not one of our students may have violated our
12 expectations.
13      Q    Okay.  So what kind of information --
14 well, are you looking for underlying facts regarding
15 the allegations from the police?
16      A    We're looking for everything -- I guess
17 the over arching statement I'd make is that every
18 single situation is dramatically different, no
19 matter what policies you have, every situation has
20 its own idiosyncrasies that you have to deal with.
21           So speaking in general terms it's dangerous,
22 but it would generally be to see if what -- if there
23 was any information that the police might be willing
24 to share and if it corroborates anything that we
25 have heard either from the boy himself, from gossip,

1          MR. CARANGELO:  Objection to form.

2          THE WITNESS:  I don't, but that doesn't

3     mean I didn't, I just don't remember.

4  BY MS. BRAXTON:

5     Q    And did you reach out to the Greenwich

6  Police Department or did they reach out to you?

7     A    Again, this is speculation, but, you know,

8  the pattern is if there's an event that may involve

9  our students in criminal activity, we would

10 communicate with the Greenwich Police to see if

11 there's going to be a charge because that's going to

12 mean even a higher level of discipline on our part.

13     So I would bet that we reached out to them, but

14 I don't see any reason why they would have reached

15 out to us, but I don't know for sure.

16     Q    Did anyone from the Greenwich Police

17 Department ask you -- or anyone from Brunswick --

18 ask you for any information pertaining to the

19 allegations by ▇?

20          MR. CARANGELO:  Objection to form.

21          THE WITNESS:  I can't recall that, no.

22          MS. BRAXTON:  And what was wrong with the

23     form, Mr. Carangelo?

24          MR. CARANGELO:  You asked about whether he

25     knew or anyone from Brunswick.  He can't

1   attorney, okay, because those are privileged.
2       A   Okay.  Thank you.
3       Q   And I wasn't trying to elicit that from
4   you, so just be careful going forward.
5       So, you said you spoke to two of the students,
6   can you give me their initials please?
7       A   Yup.  So I -- well, I spoke to Peter Roe,
8   obviously, that's one.  And on the phone I spoke to
9   ▇    And I tried to call the family with the last
10  name of ▇, but I wasn't able to get through to the
11  kid to speak to him.
12      Q   So ▇?
13      A   Yes.  And I believe I spoke with ▇
14  later.  I think they were away and it was a week or
15  so later, but I was able to get his story as well.
16      Q   So, with respect to -- so, you said that
17  you interviewed two and then you stopped because my
18  client asked that you cease the investigation,
19  correct?
20      A   Yes.
21      Q   Okay.  So you spoke to Peter Roe and ▇,
22  correct?
23      A   Correct.
24      Q   Is that my understanding?
25      A   And ▇

1        Q     Okay.  So you spoke to ▮ before you
2    received --
3        A     I didn't know exactly when.  I think the
4    timing, as I remember it, was that -- obviously, it
5    was summer and so we can't go through the normal
6    process, so the dean wasn't around.
7            I spoke to -- I definitely spoke with ▮
8    fairly quickly just because I could get through to
9    him.  I don't know whether ▮ was a week later or
10   not.  And then the plan was when school resumed, we
11   would initiate the discipline process and we never
12   got to that point, obviously.
13       Q     Okay.  So, when was the -- was the
14   interview with -- wait a minute.  Withdrawn.
15           When you spoke to ▮ about these allegations,
16   was that before your counsel had received a letter
17   from Miss Doe's counsel asking that the
18   investigation stop or was it after that?
19       A     Before, I think.
20       Q     So, that was fairly early on, is that
21   correct?
22               MR. CARANGELO:  You can answer.
23               I object to the form.
24               THE WITNESS:  I feel like when I first
25           heard about it from Peter Roe, I want to say it

1          was the first or maybe second week of August,
2          and I think your letter came at the end of
3          August -- I feel like it was the end of August.
4          It must be somewhere; someone has to have those
5          somewhere.
6    BY MS. BRAXTON:
7          Q    Well, if you're looking to refresh your
8    recollection timeline wise, if you look at the
9    exhibit we were just examining, Philip Exhibit 5,
10   does that give you a better idea of when Peter --
11         A    Yeah, August 4th.  Yeah, it was early,
12   yeah.
13         Q    Okay.  All right.  I want you to take a
14   look at D'Angelo Exhibit 6.
15         A    "Middle school news from our friend, there
16   are some rumors circulating that she's trying to
17   harm herself."  Is that right?
18         Q    Yes.
19              MR. MITCHELL:  You have D'Angelo 6?
20         Excuse me.
21              THE WITNESS:  Is that what you said,
22         Meredith?
23   BY MS. BRAXTON:
24         Q    Yes.  Yes.
25              MR. CARANGELO:  I can't find D'Angelo 6.

Page 125

```
 1        as well.
 2   BY MS. BRAXTON:
 3        Q    When you read this e-mail, do you think --
 4   I'm sorry, what is your explanation for why you were
 5   directing Mr. D'Angelo to reach out to Krystie
 6   Girard?
 7             MR. CARANGELO:  Objection; asked and
 8        answered.
 9             THE WITNESS:  So do I answer?
10             MR. CARANGELO:  Go ahead.
11             THE WITNESS:  Our issue with any situation
12        where our students might be involved with the
13        police is that if they're going to be charged,
14        we can ramp up the discipline.
15             So, there are two parts to the answer.
16        So, one, to alert the police that we're
17        investigating.  And the second would be to see
18        if there are going to be charges filed, in
19        which case we're going to respond appropriately
20        on our end.
21   BY MS. BRAXTON:
22        Q    Well, when I read Mr. D'Angelo's e-mail to
23   you, it sounds like he was trying to get information
24   from the Greenwich Police, isn't that correct?
25             MR. CARANGELO:  Objection to form.
```

1          THE WITNESS:  It sounds to me like he's
2      trying to ask Officer Girard if the students
3      could be charged or not.  And maybe she didn't
4      know or didn't say.  Maybe she was evasive.  I
5      don't know.  It sounds like she doesn't know
6      much about it.  That actually is why I wanted
7      to mention Exhibit 6 that we were supposed to
8      look at because it says that she's no longer
9      the liaison.  So maybe she wasn't the liaison
10     and we were contacting her because we thought
11     she still was and she'd be reassigned.  I'm not
12     sure how to read into that.
13 BY MS. BRAXTON:
14     Q    So is it your testimony that you were not
15 trying to get information about the Greenwich Police
16 Department about the allegations against the
17 Brunswick student?
18     A    My testimony is that we would certainly be
19 asking the police if one of our students is going to
20 be charged.  No question about it.
21     Q    So why would Krystie Girard be evasive
22 when all you were doing was alerting her about your
23 investigation?
24          MR. CARANGELO:  Objection to form; this
25      misstates the testimony.

```
 1      A    I would think so.  Yeah, I would think so.
 2      Q    And so, you say you've spoken to him and
 3  his parents several times, is that accurate?
 4      A    Yup.
 5      Q    Okay.  How many times did you speak to
 6  Peter Roe?
 7      A    Oh, I don't know.  I mean, certainly he
 8  came in -- well, he called to ask me to come in.  He
 9  came in once.  His parents came in with him, you
10  know, I'd say three, four times, maybe, something
11  like that.
12      Q    So between, say, August 2nd or 3rd and
13  August 15th, he came in three or four times?
14      A    I didn't say he came in, I said that I
15  spoke with him probably three or four times.  He
16  definitely came in, he came in once alone and then
17  he came in with his parents.
18      Q    And then you spoke with him in addition on
19  the phone?
20      A    Uh huh.  (Affirmative).
21      Q    And then you say that -- you've spoken
22  with another boy who was at the party who Peter
23  mentioned, is that ▮▮▮▮ who you are referring to?
24      A    That's my guess, yes.
25      Q    Okay.  So, at that point on August 15th,
```

Page 158

1  had you spoken -- I think previously you said that
2  you also spoke at some point to ▇?
3      A    I guess reading this literally -- maybe he
4  was away or I hadn't heard back from him yet.
5      Q    So, it sounds like you didn't talk to ▇
6  until afterwards, after this?
7      A    Yes.
8      Q    So, can you tell me if you remember around
9  when you spoke to ▇?
10          MR. CARANGELO:  I object to the form.
11      I'll let him answer this, but you're getting
12      far afield again, but you can answer that
13      question.
14 BY MS. BRAXTON:
15      Q    You can answer.
16      A    I can't remember specifically but there
17 was definitely a point I spoke with him.  I think he
18 called me when he got back from vacation before
19 school started.
20      Q    So, it wasn't in person?
21      A    No, no, I think it was on the phone.
22      Q    Do you know when it was in August?
23      A    I'm guessing it was in August.  Then I
24 think there was a later point in the year where he
25 came and it was during the school year where he did

```
 1      Q    Do you deny that you knew that he had not
 2   gone to the police and that you asked him to go and
 3   make a statement on Peter Roe's behalf?
 4           MR. CARANGELO:  Objection to form.
 5           MR. MITCHELL:  It's a compound question.
 6           THE WITNESS:  Do I say something or not?
 7           MS. BRAXTON:  I'll withdraw the question.
 8           THE WITNESS:  The answer is I don't
 9      recall.  As I told you from the beginning, I
10      remember meeting with him at some point in the
11      fall after the summer, because it's different
12      because it was during the school day and it had
13      something to do with him making a statement to
14      the police.  That's all I can remember.
15   BY MS. BRAXTON:
16      Q    So, it's your testimony that you were not
17   aware that you had or had not made a statement?
18      A    To this day, I have not made a statement.
19      Q    And did you ask other students to go in
20   and make statements?
21      A    If any -- I don't know who else was at the
22   party.  Who else would I ask?  I mean --
23      Q    Did Peter Roe talk to you about statements
24   that were being made by witnesses in the
25   investigation?
```

1    Mr. D'Angelo?
2         A    I don't know if I was asking him anything.
3    I don't know.  It looks like he was telling me,
4    doesn't it?
5         Q    Well, it looks like he's responding to
6    your email?
7         A    I don't know.
8         Q    Do you have the rest of that -- did you
9    search for the rest of that e-mail?
10        A    Yeah, we had an IT group and it's way
11   beyond my --
12             MS. BRAXTON:  Well, Mr. Carangelo, I'm
13        asking for the rest of that e-mail chain.
14             MR. CARANGELO:  We'll take that request
15        under advisement.
16   BY MS. BRAXTON:
17        Q    Do you know whether Mike D'Angelo had
18   received the information about who Jane Doe's
19   victim's advocate was from the Greenwich Police
20   Department?
21        A    I don't.  I have no idea.
22        Q    Do you know who else would have had that
23   information?
24        A    I do not.
25        Q    And do you recall why you were asking?

Page 190

1    A    It's speculation, but I actually think we
2    got a letter from Mr. Felsen so that's how we found
3    out.
4    Q    Do you recall getting a letter from her?
5    A    I don't know.  I mean, I'm sure we have,
6    but we may have.
7    Q    If you received a letter from Marjorie
8    Felsen, then you would have known who it was,
9    correct?
10   A    Yeah, I guess.  I mean, I wouldn't --
11   Q    You wouldn't have been asking
12   Mr. D'Angelo?
13   A    Yeah, I don't know.
14   Q    And I want you to look at Exhibit 14.  Let
15   me know when everybody has got it.
16   A    Got it.
17        MS. BRAXTON:  Mr. Carangelo, have you got
18        it?
19        MR. CARANGELO:  Not yet.  Sorry.
20        MS. BRAXTON:  Just let me know.  I have a
21        lot of sympathy for technicians.
22        THE WITNESS:  It's the one from Greg Arch,
23        is that what you mean?
24   BY MS. BRAXTON:
25   Q    Yes, dated October 10th, 2016.

```
 1   BY MS. BRAXTON:
 2        Q    Let me know when you have it?
 3        A    I have it.
 4        Q    So, it's Bates stamped at the bottom WICK
 5   000728.
 6        A    Yup.
 7        Q    And it says, on January 19th at 6:18 p.m.
 8   -- I'm sorry, not 6:18 p.m. at 2:55 p.m.  You say,
 9   "Fingers crossed that good news is coming soon."
10        Did you have any information at this point
11   about the status of the police investigation into
12   the Doe/Roe complaint?
13        A    I believe there's an e-mail from Tom Dunn
14   to Greg Hartch in advance of this saying that
15   charges weren't going to be filed.  I can't attest
16   to it, I don't know if it's in your documents or
17   something but I believe there's something there.
18        Q    Okay.  So you think that someone told you
19   on January 19th that charges were not being filed?
20        A    I think GA's board share told our board
21   share, I believe that's how it happened.
22        Q    So, when you wrote that, you actually had
23   information --
24        A    I can't swear to it.
25        Q    You have to let me finish my question,
```