UNITED STATES DISTRICT
COURT DISTRICT OF CONNECTICUT

_____

PAULA SCANLAN,                      )
           Plaintiff,      ) No: 3:18-CV-01322-KAD
                        )
    v.                          ) December 8, 2021
TOWN OF GREENWICH, ET AL.,          )
           Defendants.     ) 2:30 p.m.
_____    )

                     Brien McMahon Federal Building
                     915 Lafayette Boulevard
                     Bridgeport, Connecticut

MOTION HEARING

B E F O R E:

        THE HONORABLE KARI A. DOOLEY, U.S.D.J.

Courtroom Deputy:                   Official Court Reporter:
Kristen Gould, Esq.                 Tracy L. Gow, RPR

           Chambers: 203.579.5522

2

```
 1   A P P E A R A N C E S :

 2   For Plaintiff, Paula Scanlan:
          ELIZABETH I. HOOK, ESQ.
 3        MEREDITH BRAXTON, ESQ.
          Braxton Hook, LLC
 4        280 Railroad Avenue
          Suite 205
 5        Greenwich, CT 06830
          203-661-4610
 6        Email: ehook@braxtonhook.com
                  mbraxton@braxtonhook.com
 7
     For Defendants Town of Greenwich, Brent Reeves
 8   and Krystie Rondini:
          ROBERT BURDETTE MITCHELL, ESQ.
 9        MARGARET SHEAHEN, ESQ.
          REESE BURDETTE MITCHELL, ESQ.
10        Mitchell and Sheahan, P.C.
          999 Oronoque Lane
11        Stratford, CT 06614
          203-873-0240
12        Email: rmitchell@mitchellandsheahan.com
                  reesemitchell@mitchellandsheahan.com
13                msheahan@mitchellandsheahan.com

14   For Defendant Town of Greenwich:
          ABBY R. WADLER, ESQ.
15        Town of Greenwich
          101 Field Point Road
16        P.O. Box 2540
          Greenwich, CT 06836
17        abby.wadler@greenwichct.org

18   Also present:
          KEVIN SWEENEY, Law Clerk
19

20

21

22

23

24

25
```

```
 1                    (Call to Order, 2:30 p.m.)
 2              THE COURT:  All right.  Good afternoon, everybody.
 3              ALL:  Good afternoon, Your Honor.
 4              THE COURT:  This is the matter of Scanlan v. Town of
 5    Greenwich, et al.  Let me ask counsel to please identify
 6    yourselves for the record, starting with Plaintiff.
 7              MS. HOOK:  Elizabeth Hook with Braxton Hook for the
 8    Plaintiff.
 9              MS. BRAXTON:  Meredith Braxton with Braxton Hook for
10    the Plaintiff.
11              MR. MITCHELL:  Robert Mitchell from Mitchell and
12    Sheahan for Defendants.
13              MS. SHEAHAN:  Margaret Sheahan of Mitchell and
14    Sheahan for the Defendants.
15              MS. WADLER:  Abby Wadler, Assistant Town Attorney
16    for the Town of Greenwich, for the Town of Greenwich.
17              MR. REESE MITCHELL:  Reese Mitchell from Mitchell
18    and Sheahan for Defendants.
19              THE COURT:  All right.  Okay.  Welcome, everybody.
20    We scheduled oral argument.  I've got cross-motions for
21    summary judgment, and I will give everybody an opportunity to
22    advance whatever arguments they want.  I, obviously, have a
23    fair number of questions for the parties.  It seems to me
24    that what makes the most sense is to take up the Plaintiff's
25    Motion for Summary Judgment first, as to the Defendant's
```

1    affirmative defenses.  And I thought I would share with you

2    some of my views, and then invite you, obviously, to tell me

3    I'm right or I'm wrong, in your view.

4         I'm going to start -- I think to a certain extent

5    the parties are briefing past each other, which is not

6    unusual.  Certainly not unusual in this particular case.  I

7    want to start with this -- the affirmative defense of

8    assumption of risk.  I don't think it has a place on this

9    record, and I'll tell you why.

10        It's my understanding that assumption of risk was a

11   doctrine that developed to defeat liability.  And in the

12   negligence context, where it no longer exists, as we know,

13   the result of defeating liability, at least in part, was to

14   impact what a plaintiff could recover.  But it was still at

15   its core an affirmative defense to liability.

16        And I read the arguments being advanced by the

17   Defense, and they are, in my view, perfectly legitimate

18   arguments, but they don't implicate assumption of risk.  They

19   implicate proximate cause.  It's an argument that her -- the

20   basis for some of her damages were known to her at the time

21   that she made the decisions that she made and that the

22   damages that flow from that activity or those events were

23   not, therefore, proximately caused by anything the Greenwich

24   Police Department did or did not do in the course of this

25   investigation.

1          And that's an argument I think would be perfectly

2    legitimate to a jury, and I would permit that in the context

3    of a damages analysis, a proximate cause analysis, with

4    respect to Plaintiff's claimed damages.  But I don't think it

5    falls under the rubric of assumption of risk, so that I would

6    charge the jury on assumption of risk.

7          And I guess I'll start there, and, Attorney

8    Mitchell, I'll ask you to tell me why I've got this wrong.

9    Oops, sorry.

10          MR. MITCHELL:  She's going to argue this.

11          MS. SHEAHAN:  It's Attorney Sheahan's turn.  Thank

12    you, Your Honor.

13          Frankly, I don't disagree.  Our motion was -- is

14    directed towards the causation of the harm that's alleged

15    from the social repercussions of the Plaintiff's peers

16    knowing about the complaint to the police, and also that

17    the -- that those harms flow from her own statements.

18          So I understand your issue about liability.  We

19    cannot have liability for what she did, but as to the issue

20    of the claim itself for equal protection, I don't think it's

21    a defense to that claim.  It's a defense to that claim to the

22    extent that that claim relies on statements that she made.

23          THE COURT:  Okay.  So I think, then, what I'm

24    hearing is, to the extent that I will -- I'm going to grant

25    the motion to the extent I'm not going to charge the jury on

1  assumption of risk, with the understanding that the arguments

2  that were advanced are essentially proximate cause arguments

3  in terms of the Plaintiff's damages.

4      Attorney Hook, agree?  Disagree?  I'm sorry.

5  Attorney Braxton?  I always pick wrong here.

6      MS. BRAXTON:  I totally agree with your analysis,

7  Your Honor.  I agree that it's really about causation of

8  damages, rather than an affirmative defense to the cause of

9  action itself.

10     THE COURT:  Okay.  All right.  Because I think --

11  and I guess I should just complete the record.  To proceed on

12  assumption of risk would be to ask the jury to find that by

13  making the allegations or by making public her accusations

14  she somehow assumed the risk that the Greenwich Police

15  Department would violate her equal protection rights.

16  There's a disconnect there, so that's why I sort of went down

17  the path that I went.

18     Okay.  Turning to waiver and estoppel, which are two

19  sides of the same coin -- give me one second to find what I'm

20  looking for.

21     I think that, again, on this record those

22  affirmative defenses are also misplaced.  If I understand the

23  argument, the Defendants are arguing that the Plaintiff can't

24  have it both ways.  She can't direct the Greenwich Police

25  Department to talk to Brunswick, and then bring an equal

1  protection claim on the basis that the Greenwich Police

2  Department is talking to Brunswick.

3        And there are some facial attraction to that

4  argument, just in terms of logic, but I think that the

5  specifics of waiver and estoppel go -- are not generally

6  talked to -- don't talk to.  They are about their targeted

7  communications.

8        And so, for example, as Defendants point out in

9  their memorandum, the instruction or the direction to talk to

10 Brunswick, if that was going to be the basis of an estoppel

11 or a waiver claim, it would have to have been the

12 Administration communications made pursuant to those

13 instructions that form the basis of the Plaintiff's claim of

14 liability.

15       And that's where the disconnect is here.  Because

16 the Greenwich -- the officers, nobody at the Greenwich Police

17 Department, spoke to the headmaster as was requested, to find

18 out what Peter Roe had said.  But the allegation is that they

19 were communicating or had some sort of back channel line of

20 communication with New Brunswick.  So they don't -- the

21 direction that they talk to Brunswick does not implicate

22 waiver and estoppel because it's not -- the reaction to it is

23 not the basis on which the Plaintiff now brings claims.

24       And I -- that was about as inarticulate as I've been

25 in a long time, but -- so I'm just going to back up a little

1    bit.

2           The Defendants say, with respect to the estoppel

3    claim:   It is clear that Plaintiff, through her attorney,

4    said something intended to induce the Defendants to

5    communicate with Brunswick.

6           I don't think there's any question that that's true.

7           Now, to the extent that the Plaintiff intends to

8    assert that the Greenwich Police Department had those

9    communications as instructed, she is estopped.

10          I agree with that.  But that's not the claim.  She's

11   not claiming that the Greenwich Police Department had those

12   communications as instructed.  She's claiming a whole

13   different type of communication through different channels

14   for different purposes.

15          So I think the analysis with respect to waiver and

16   estoppel breaks down for that reason, as well.  And I don't

17   know who's going to answer that, but I'm happy to hear why

18   I'm wrong.

19          MS. SHEAHAN:   Still me, Your Honor.  Yeah, I think

20   our argument is that there was a -- the requirement for an

21   estoppel is that there be a false representation or

22   concealment of true facts; that there'd be the intention that

23   the other party will take action on the basis of the

24   communication, and knowledge of the real facts.

25          And I think the argument is that the instruction

1  was, Go talk to Brunswick.  Okay.  The instruction was "Go

2  talk to Brunswick" for a number of different reasons -- to

3  obtain the alleged statements that had been gathered and to

4  shut down the investigation.  But it was not abundantly clear

5  that that would be -- that there was a specific kind of

6  communication that would accomplish those ends.

7          And then our argument is that they knew that they

8  didn't want communication to happen, because they were also

9  speaking at other times about, Aha, you had communication

10 with the Brunswick School to find out what was going on with

11 their investigation or what they knew, and that was wrong,

12 so...

13         THE COURT:  Okay.  I'm going to stop you there.  I

14 have always understood the Plaintiff's claim -- and Attorney

15 Hook, Attorney Braxton, you can tell me I'm wrong -- that the

16 alleged -- the nefarious communications --

17         MS. SHEAHAN:  Yes.

18         THE COURT:  --- that are the basis of the

19 Plaintiff's case is not that the Greenwich Police Department

20 was, in fact, gathering information from Brunswick about

21 Brunswick's investigation, but was, instead, the opposite --

22 that they were sharing information about the Greenwich Police

23 Department's investigation as consistent with the policy of

24 protecting Brunswick students.

25         Do I have that right, Attorney Braxton?

1          MS. BRAXTON:  Yes, you do, Your Honor.

2          THE COURT:  So if the allegation is not that they

3    were getting Brunswick's result of investigation -- because I

4    don't think that is; I think the criticism is that they

5    didn't -- then that, for me, is where the disconnect in the

6    affirmative defense is.

7          With that clarification in terms of the nature of

8    Plaintiff's case, does that change your argument at all?

9          MS. SHEAHAN:  Yes, Your Honor, although I don't

10   think that is entirely clear as to what communication they

11   are complaining about.  It certainly wasn't at the time of

12   the letter that was the instruction to go talk to the school,

13   I believe.  But we're happy to have the Court decide on the

14   law as to whether this defense is available.

15         THE COURT:  One of the challenges to summary

16   judgment on a case with a record of, you know, two years of

17   discovery and the thousands of documents and multiple

18   depositions --

19         MS. SHEAHAN:  Yeah.

20         THE COURT:  -- is that sometimes it's impossible to

21   decide on the papers.  I haven't quite figured out how to

22   handle it.  Based on what was before me, my initial

23   assessment is that the waiver and estoppel fall because of

24   the disconnect between the nature of the August letter and

25   the current allegations.

1           If we were to get to trial and the actual evidence

2   all of a sudden implicated waiver or estoppel, because there

3   is a lot of nuance in terms of what might develop, I would

4   obviously have to revisit what the jury hears.  But I haven't

5   quite figured out how to handle that at the summary judgment

6   phase of things.

7           MS. SHEAHAN:  I appreciate that, Your Honor.  I have

8   nothing to add.

9           THE COURT:  Okay.  Attorney Braxton, Attorney Hook,

10  do you wish to add to this?

11          MS. BRAXTON:  If you don't mind.  So, I mean, one of

12  the things that I think needs to be focused on here is the

13  actual communication that they allege forms the basis of

14  their waiver and estoppel argument.  And all it says is that,

15  even more important, Peter Roe has apparently made more than

16  one statement to Mr. Philip, and other witnesses may have

17  made statements to him, according to correspondence from

18  Mr. Philip to the Scanlans.  Those statements should be

19  obtained as part of the investigation immediately.

20          That's all it says.  It doesn't say, Go talk to

21  Brunswick about this, Go have all sorts of communications

22  with them.  It's a very limited and defined statement.  Many

23  of the communications that are complained about that form the

24  basis of the equal protection claim also occurred before this

25  letter.  So, you know, it -- they weren't, obviously, in

1   response to that letter.  Detective Reeves and Det. Rondini

2   stated unequivocally in their deposition that they took no

3   action in reliance on what Plaintiff said in this letter.

4          And if we go back to what the elements are of a

5   waiver or estoppel defense, they are simply not made out

6   here.  The Plaintiff did not know -- I mean, she suspected

7   that the Greenwich Police were beginning to go down the road

8   of violating her rights to an equally rigorous investigation

9   of her case compared to other assault victims, but she did

10  not know.  She did not know that she had any kind of an equal

11  protection claim at that point.  And there's nothing in that

12  letter that is a clear unequivocal statement that she is

13  waiving that claim.

14         And that's what the law requires under waiver.

15  Under estoppel, it requires, you know, some kind of

16  misrepresentation that leads the other party to change their

17  position to their detriment, and there's none of that here.

18  Dets. Reeves and Rondini said that they didn't take any

19  action, so -- and there was no -- there's no

20  misrepresentation that's been pointed out in this letter.

21         So, you know, none of the -- when you just go back

22  to the elements of an affirmative defense for waiver, or for

23  equitable estoppel, none of those elements are met here.

24         THE COURT:  Okay.  All right.  I'm going to look

25  closely at it, and if I think -- obviously, if I think

1     it's appropriate for summary judgment for those reasons or

2     others, I will rule accordingly.

3            MS. BRAXTON:  Thank you, Your Honor.

4            THE COURT:  Okay.  I think, unless the parties wish

5     to expand the record with respect to the Plaintiff's Motion

6     for Summary Judgment, I was going to move on to the

7     Defendant's Motion for Summary Judgment.

8            Attorney Mitchell, Attorney Sheahan.

9            MS. SHEAHAN:  No, Your Honor.  Nothing to add.

10           THE COURT:  Okay.  Thank you.

11           Attorney Braxton.

12           MS. BRAXTON:  For the -- no, I have nothing more to

13    add.  Thank you.

14           THE COURT:  Okay.  All right.  Turning to the

15    Defendant's Motion for Summary Judgment, I guess there are a

16    number of preliminary observations that I would make.

17    Plaintiff's 56(a)(2) statement was pretty unhelpful, frankly.

18    You know, the rule is designed to communicate to the Court

19    "These are the facts on which we disagree and this is the

20    evidence that supports each person's side of the dispute."

21           And that's helpful to a court that's deciding

22    summary judgment, because if one of the facts is "On this

23    date X-Y-Z happened," and the (a)(2) statement says

24    "disputed," and cites to a bunch of record evidence, if that

25    particular fact is material to the outcome of the case, my

1    job is over, frankly.  Not that I'm looking for shortcuts,

2    but that's the whole purpose.  Material facts, conflicting

3    evidence, motion resolved, and probably motion denied.

4         And Plaintiff's opposition in many, many

5    respects -- not in all respects and not with respect to every

6    paragraph -- doesn't do that at all.  It is completely

7    inconsistent with the letter and spirit of the rule:

8    Disputed, undisputed, or you object to the evidence cited to

9    support it; and if it's disputed, you send me somewhere in

10   the record.

11        And I just -- I need to put some examples of this on

12   the record, because I'm going to need an explanation.

13        Paragraph 53:  At no time did Jane Doe reach out to

14   Det. Rondini after she gave her statement to try to clarify

15   or add more details.

16        That is a straight-forward fact.  She either did or

17   she didn't.

18        Disputed:  Jane Doe is a 16-year-old girl who was

19   not experienced in either sexual assault issues or the

20   criminal justice system and did not know what details were

21   important or even what she had said.  This is typical of

22   victims of sexual assault.  The GPD uniform policy manual

23   clearly puts the onus on a police investigator and not the

24   victim to follow up with a victim in a nonjudgmental manner.

25        Although Jane, herself, did not provide more

1   details, her attorney, Audrey Felsen, provided additional

2   information to Det. Rondini, including Peter Roe's FaceBook

3   apology to Brother Doe, a letter from GA counselor Charlanne

4   Zepf Bauerlein, and a summary of events of the party.

5          Every time they included a fact that was clear to

6   them was important to their case, I got a portion of your

7   closing argument.  It's completely unhelpful.

8          Paragraph 65:  Two of Doe's friends, BW Student 3

9   and GA Student 1, also provided sworn statements to the GPD

10  that a few days after the pool party Jane had told them that

11  Roe had just, quote, Grazed her over the swimsuit and laughed

12  about the incident.

13         They either did or did not provide those sworn

14  statements.  That either is or is not what those sworn

15  statements say.  And I get about two-and-a-half pages of

16  argument.

17         Disputed:  These statements are not credible.

18         How is that possibly compliant with our local rules,

19  and how does it help me decide whether or not that fact is in

20  dispute?

21         72:  Det. Rondini re-interviewed Jane Doe so that

22  she could clarify the inconsistencies that had come up during

23  the police investigation.

24         Disputed.  The only inconsistencies were the ones

25  Det. Rondini tried to create.  Det. Rondini re-interviewed

1    Jane to, quote, Confront her with purported inconsistencies

2    and to report back to Roe's attorney, Michael Jones, what she

3    said.

4            And it goes on for about another -- a few more

5    lines.

6            So, the issue at this juncture -- and those aren't

7    the only examples.  It's throughout.  It had to have been a

8    strategic decision that that's how you were going to respond

9    to 56(a)(1), notwithstanding the requirements of the local

10   rule.  I don't know why you did that.  It's completely

11   unhelpful.

12           The question is, what do I do with it?  One of my

13   options is to just deem those facts admitted.

14           MS. HOOK:  Your Honor, may I respond?  So, the first

15   two examples that you provided, it was our attempt or our

16   intention to provide the context behind those facts,

17   because --

18           THE COURT:  But that's not the purpose of the rule,

19   Ms. Hook.  It's not to say "It may be true but," because you

20   don't even say "It's true but."  We have arguments why it's

21   not relevant.  It's just that's not the purpose of the rule.

22           MS. HOOK:  I understand what you're saying.  As to

23   paragraph 72, the statement, as written, we did dispute, and

24   we think that the evidence does support a dispute of fact.

25           Det. Rondini re-interviewed Jane Doe so that she

1    could clarify the inconsistencies that had come up.

2          Those inconsistencies had not come up during the

3    investigation.  They were -- there was not --

4          THE COURT:  Why didn't you just say we dispute that

5    Jane Doe -- that the investigation revealed consistencies,

6    and send me to someplace in the record?  Why do I get your

7    closing argument in response to every piece of evidence the

8    Defense are going to rely on?

9          MS. HOOK:  We pointed out in the record where there

10   was support for that dispute.  Rightfully or wrongfully, our

11   attempt was to show in the record that it wasn't simply one

12   particular piece of evidence that disputed that, but that

13   there were several.

14         THE COURT:  So you stand by this 56(a)(2) statement

15   as compliant with our local rules?

16         MS. HOOK:  Well, Your Honor, obviously you are a

17   better judge of the appropriateness of the 56(1) statement

18   than we are.  We made our best effort to provide context and

19   not to -- we felt that a lot of the statements were loaded,

20   and that in order to give proper context to the statements

21   and show that there was a dispute as to how facts were

22   characterized and what inferences could be drawn from that.

23         Your Honor, if Your Honor would prefer that

24   Plaintiff amends the 56(1) statement, we can do that and

25   follow Your Honor's instruction as to how you would like it

1    submitted.

2            MR. MITCHELL:  Your Honor, at this point, they've

3    had 18 months to submit an appropriately drafted Rule

4    56(a)(2) statement.  They didn't do it.  I think the Court

5    should act as the Court suggested, these facts are admitted.

6    They didn't take -- they didn't dispute them and take you to

7    evidence.  They disputed them, made up responses, and then

8    tried to justify those responses somehow.  As you said, it's

9    their closing argument.  That is not the way this is done or

10   set up.

11           Our clients have waited for 18 months for today.

12   For them to come in now and ask this Court to stop this whole

13   proceeding, essentially, so they can actually follow the

14   rules for once, for the first time in two years, I think

15   would be a terrible mistake.

16           I think that the matters should be deemed admitted.

17           THE COURT:  Well, I will look at that issue as I

18   take up the motion.  A lot of it, even if I do that, frankly,

19   does or does not carry the day.  I mean, the statement about

20   what those two witnesses said in their written statements, we

21   have the statements, we know what they said.  The fact that

22   you find those statements not credible is not an argument to

23   be advanced in the 56(a)(2), and the record will either

24   support those facts or not.

25           So, for a lot of these facts, as I said, they did

1    appear to be supported by the record evidence.  The import of

2    the facts is where -- is for the Memorandum of Law.  And I

3    did get that, as well.  Obviously, the arguments are all in

4    the Memorandum of Law, as well.  I just wish they weren't in

5    the 56(a)(2) also, but it's an issue I will deal with in the

6    decision.

7            Moving on to the more -- to the substantive issues.

8    I just want to sort of make sure I have accurately assessed

9    the record evidence.  I have been through all of this.  I

10   have not committed it to memory, as I'm sure you all probably

11   have.  I will have questions.  I may have questions about

12   where in the record something is found or I may have factual

13   issues that I just haven't found the answer to in the record.

14   But we'll take it up one issue at a time.

15           The first thing I wanted to make sure I had

16   correctly assessed is that the discovery did not -- and the

17   parties agree -- that the discovery did not reveal any

18   express written or express oral policy that the Greenwich

19   Police Department would conduct investigations in which

20   Brunswick students are the accused in a fashion different

21   from how they would conduct any other investigation.

22           Plaintiffs agree with that?

23           MS. HOOK:  Yes, Your Honor.

24           THE COURT:  All right.  And I assume you agree with

25   that, as well?

1          MR. MITCHELL:  Yes, Your Honor.

2          THE COURT:  Okay.  All right.  So Plaintiff would be

3     proceeding under an equal protection claim on an implied

4     policy on the part of the Greenwich Police Department, and

5     that Det. Rondini and Sgt. Reeves acted in accordance with

6     that implied policy in the conduct of Jane Doe's complaint.

7          Do I have that right, Attorney Hook?

8          MS. HOOK:  Yes, Your Honor.  I think that the

9     argument is that -- or the legal claim is that, pursuant to

10    Section 1983, it's a custom and practice that was followed by

11    Det. Rondini and Sgt. Reeves.

12         THE COURT:  Okay.  And it's an implied custom and

13    practice?

14         MS. HOOK:  Yes.

15         THE COURT:  Okay.  All right.  And I know that -- or

16    at least I have not located and the Defense did not bring to

17    my attention any case that has said the observation in *Myers*

18    about circumstances giving rise to an equal protection

19    claim -- that was an express policy, obviously -- I have not

20    located any case that has applied that rationale to an

21    implied policy, but nor have I located any case that says

22    that rationale cannot be asserted to an implied policy.

23         If anybody has any authority to the contrary, now

24    would be the time.

25         MR. MITCHELL:  I think in our memorandum, Your

1  Honor, we cited a number of cases that didn't say it couldn't

2  be applied, but did point out that -- it's an implied

3  policy -- but did point out that in those cases they were

4  explicit, and that's why they were going forward with it.

5          THE COURT:  Fair enough.  Attorney Hook.

6          MS. HOOK:  Your Honor, so *Monell*, the Supreme Court

7  case of *Monell*, said that Congress included customs and

8  usages because of the persistent and widespread

9  discriminatory practices of state officials.  Though not

10 authorized by written law, such practices of state officials

11 could be what -- could well be so permanent and well settled

12 as to constitute a custom or usage with the force of law.

13         And so, *Monell* -- the Supreme Court, in *Monell*,

14 specifically recognized that custom or usage would be

15 sufficient to support a claim of violation of a

16 constitutional right.

17         THE COURT:  But that's a completely different

18 context.  *Monell* was talking about whether you could have

19 municipal liability under 1983.  Because, ordinarily, 1983 is

20 limited to acts of state actors, and you get to a

21 municipality if the conduct at issue is custom and policy.

22         That's a leap for 1983 liability.  It's not an

23 extension of *Myers* to imply policies or customs.  You would

24 argue that *Monell* is the gateway from getting *Myers* to an

25 implied policy?

1          MS. HOOK:  Well, Section 1983 is a violation of a

2     constitutional right by a government actor.  It does not

3     specifically limit it to the municipality, the entity.  It

4     applies to individuals, as well as to government entities.

5          And Section 1983 also very specifically says that it

6     applies under color of any statute, ordinance, regulation,

7     custom or usage.  And the legislative history of that is that

8     Congress was intending to make sure that there could be

9     intentional constitutional violations that would not be

10    necessarily written in a policy, because a policy -- a

11    written policy would be a disparate impact policy, where

12    facially, it looks that it would be appropriate; but in

13    practice, it impacts somebody disproportionately.  If there's

14    an intentional violation of a constitutional right, then that

15    would not be written in a policy, per se.

16         To ignore that, to write that out of an equal

17    protection argument would be to allow all intentional

18    constitutional violations -- it would allow those victims of

19    those constitutional violations to have no redress.

20         THE COURT:  I understand how *Monell* works.  But you

21    only get to the municipality if the individuals have violated

22    a constitutional right.  And the municipality can be held

23    liable for those individual acts, under *Monell*, under the

24    various --

25         MS. HOOK:  Right.

1       THE COURT:  -- provisions of *Monell*.

2       But the individuals -- here, we have an equal

3  protection claim.

4       MS. HOOK:  Right.

5       THE COURT:  And Det. Rondini and Sgt. Reeves are

6  alleged to have violated her equal protection rights because

7  they were acting pursuant to -- they did not advance the

8  investigation as to your client's complaint because her

9  complaint was against a Brunswick student, and the reason

10  they did that is because it was their -- implied, unwritten,

11  whatever you want to call it -- policy of the GPD to protect

12  Brunswick students.

13       So that has to be established as part of the

14  underlying constitutional violation before we take up the

15  issues of *Monell*.  We don't get to *Monell* if we don't have

16  the underlying equal protection claim.

17       MS. HOOK:  Uh-huh.

18       THE COURT:  Fair enough?

19       MS. HOOK:  Fair enough, yes.

20       THE COURT:  Okay.  All right.  So I'm going to

21  circle-back to my last question.  Do you think the language

22  in *Monell* -- *Monell* is a different -- there's a different

23  purpose for its holding, that we just talked about.  But do

24  you believe that the language in *Monell* is instructive in

25  terms of whether a *Myers* claim can be based on an implied

1  policy?

2          MS. HOOK:  I do, Your Honor, because *Monell* in

3  Section 1983 referred to constitutional violations, and equal

4  protection is a constitutional right.  The failure to provide

5  equal protection is a violation -- is a constitutional

6  violation.  There is no distinguishing in *Monell* or in

7  Section 1983, and in other cases that dealt with other

8  constitutional violations -- first amendment, for example,

9  freedom of speech -- there's no distinguishing between the

10  type of constitutional violation that applies under Section

11  1983 to a government actor who takes actions that violate --

12  that injure an individual by depriving them of their

13  constitutional rights.

14          THE COURT:  Okay.  Okay.  So I will be assessing

15  Defendant's Motion for Summary Judgment on Plaintiff's equal

16  protection claim that there was an implied policy, custom or

17  usage -- or custom or practice of the Greenwich Police

18  Department to essentially protect Brunswick students if they

19  are accused of a crime.  Is that a fair assessment of the

20  case?

21          MS. HOOK:  Yes, that is, Your Honor.

22          THE COURT:  Okay.  All right.  Next step.  And as is

23  the case with any implied circumstance, the Court is going to

24  have to assess the evidence to see whether inferences can

25  fairly be drawn from that evidence that such a policy

1    existed, and that the Defendants acted in accordance with

2    that policy.  And this is just me thinking through what the

3    structure of this decision needs to look like.  It seems to

4    me that this is the next logical step.

5           And the Plaintiffs have offered evidence in support

6    of different inferences.  So, for example, one of the claims

7    in the equal protection is that there is a -- I don't know --

8    back channel, exclusive relationship.  I don't mean to limit

9    the scope of the Plaintiff's claim by whatever phrase I use,

10   but there is that aspect of it.

11          And, so, the first body of evidence I would look at

12   is the evidence from which the Plaintiff has asked us to

13   infer these inappropriate communications in furtherance of

14   this policy of protecting Brunswick students.

15          So before we talk about that body of evidence, does

16   the Plaintiff agree that if that back channel or collusive

17   line of communication is not established -- or the inverse,

18   that there's not a genuine issue of material fact to go to

19   the jury on the issue -- does that end the Plaintiff's case?

20          MS. HOOK:  No, Your Honor, we don't agree with that,

21   because there are a number of different facts from which a

22   jury could infer that there was preferential treatment given

23   to Brunswick students.  That is only one of the kinds of

24   material facts that there is evidence of.

25          THE COURT:  I'm going to stop you there, because I

1 just want to make sure I understand.

2          As I read the complaint, the policy complained of

3 derives from this line of communication.  I mean, it's pretty

4 replete.  So without that line of communication, what

5 possible theory do you argue to the jury the Greenwich Police

6 Department would just randomly decide that Brunswick students

7 deserve different treatment?

8          I mean, without that communication, it doesn't make

9 any sense.  Why pick Brunswick over Country Day or over --

10 you know, it seems to me, as I read your complaint, that line

11 of communication, whatever you want to call it, is

12 instrumental, perhaps core, to the equal protection claim.

13          MS. HOOK:  But it's not the only connection.  So

14 there is a pattern of hiring GPD retired police officers as

15 security guards.

16          THE COURT:  Right.  And that's evidence from which

17 you would ask the inference to be drawn that that line of

18 communication exists.  I'm not saying that I'm going to find

19 that it doesn't exist.  I just want to make sure I understand

20 the off-ramps as I go through the process.

21          MS. HOOK:  Right.  Your Honor, it's not simply that

22 there is a line of communications and there's overt

23 communications that caused something to happen.  There is

24 favoritism, implied favoritism, by the fact that there is an

25 incentive given to police officers at GPD to act favorably

1    towards Brunswick if that is a retirement plan for them, in

2    the same way that Det. Girard's child was a student.  The

3    connection, the personal connection with Brunswick by one of

4    the police officers who was investigating a complaint against

5    a Brunswick student.  Those aren't, overtly, communications,

6    but they are evidence from which a jury could infer there is

7    favorable treatment by GPD police officers.

8            The fact that Det. Girard was appointed liaison to

9    Brunswick when she was in cold cases, there is a reason that

10   the jury -- the jury can infer that the reason for that is

11   because she has that special connection and she can provide

12   information.

13           The fact that there may not be an actual -- if the

14   communications themselves is -- the argument is that the

15   communications themselves are not necessary to establish that

16   there is a closer connection between Brunswick School and GPD

17   than any other school and GPD.

18           And in some circumstances -- excuse me.  With the

19   mask, it's hard for me to breathe.

20           In some circumstances, it's a conflict of interest

21   that applies.  And so, Your Honor, it's not just the

22   communications.  It's the inference from the facts that there

23   is an incentive from GPD to act favorably, and there's a

24   pattern of that.

25           THE COURT:  Counsel.

1            MR. MITCHELL:  Your Honor.

2            THE COURT:  I'm going to ask you the tip your mic

3    up.  I don't often have trouble hearing you, Counsel, but...

4            MR. MITCHELL:  No, I know you don't.  Can you hear

5    that?

6            THE COURT:  Yes.

7            MR. MITCHELL:  I have trouble with the masks, too, I

8    confess.

9            THE COURT:  Yes.

10           MR. MITCHELL:  I have to disagree with opposing

11   counsel and agree with the Court.  The whole issue here is

12   whether there was some kind of back channel.  GPD could have

13   all -- and that, if nothing else, goes to this particular

14   case.  Assume, hypothetically -- which we do not concede,

15   obviously, because we believe there's no evidence in the

16   record to support this case.

17           But assume for a moment they can show there was some

18   close connection, there was some inherent implied policy in

19   the GPD in some instances, to protect Brunswick.  They still

20   have to show that it happened and it applied to this

21   investigation.  And they have problems there.  They have to

22   show that the back channel the Court mentioned existed here.

23   And the fact that Brunswick School may have hired a hundred

24   cops, ex-GPD cops as security guards, has nothing to do with

25   that at all.  They have to have evidence of some

1  communication between the two over the standard

2  investigation.

3       The evidence they have really presented is not

4  there.  One of their great pieces of evidence is the fact

5  that Peter Roe was represented by an attorney, Mike Jones,

6  who was being paid by a Brunswick trustee.  So, what?  I

7  mean, that doesn't prove anything.  Their theory is that

8  obviously Det. Rondini would speak to Michael Jones, who then

9  talked to Peter Roe, who would then go talk to Tom Philip,

10  who would then tell Peter Roe what to tell Mike Jones what to

11  tell Rondini.

12       But that never happened.  There's not one shred of

13  evidence that ever happened.  There is no back channel

14  communication.  That's their basic problem.  Tom Philip

15  testified he never talked to anybody in the police department

16  about this matter.  Mike DeAngelo, the head of security, who

17  was a former GPD officer, said he did talk to them, but only

18  to ask them if they were going to arrest Peter Roe so he

19  could start arranging to kick him out of school, and that

20  they wouldn't tell him any more than that.

21       And that's it.  That's not a back channel

22  communication of any sort, whatsoever.  And without that

23  communication, whatever policy the GPD may or may not have

24  had, it didn't apply in this case.  There's no causation.

25  It's complete failure of causation.  And that, again, sets

1   aside the fact that -- I don't think there's any evidence of

2   a policy either, other than the assumptions and suppositions

3   that opposing counsel and her clients have stuck onto some

4   rather insignificant factual statements.

5          But to answer the Court's question directly, without

6   that back channel, this case is dead, irrespective of any

7   other part of the evidence in the record.

8          THE COURT:  All right.

9          MS. HOOK:  Your Honor, let me just address that one

10  matter.  To the extent that there are or aren't direct

11  communications in the Scanlan case and the issue -- the case

12  that's brought this litigation, the fact is that there was a

13  long-standing pattern of a custom and usage by the GPD.  So

14  pursuant to that long-standing pattern and custom, the

15  officers could have been acting in compliance with that

16  custom and usage without having the overt direct back channel

17  communications.  We think that there is, clearly,

18  evidence/facts from which a jury can infer that those back

19  channel communications did occur.

20         But the fact is that --

21         THE COURT:  In this case?

22         MS. HOOK:  I'm sorry?

23         THE COURT:  In this case?

24         MS. HOOK:  In this case, yes.

25         THE COURT:  And what would that evidence be?

1            MS. HOOK:  Well, Sgt. Reeves said he had

2    conversation with head of security, Mike DeAngelo, who called

3    him and told him that the Scanlans were trying to get a boy

4    in trouble, and he immediately called Mr. Scanlan and

5    threatened him -- essentially intimidated him to say, you

6    know, you're trying to get this boy in trouble, you're

7    ruining his college career.  This is "he said/she said," it's

8    not going anywhere, and tried to convince him to drop the

9    case.

10            Sgt. Reeves testified that he had that conversation,

11    so --

12            THE COURT:  And I think he had a slightly different

13    characteristic -- characterization of that conversation.  He

14    acknowledged that it occurred.

15            MS. HOOK:  Right.

16            THE COURT:  He did not accept Father Doe's

17    description of it.

18            MS. HOOK:  Yes.  And, so, that makes it a disputed

19    fact from which a jury could infer that there was a back

20    channel communication between Sgt. Reeves and Brunswick that

21    precipitated a call with Mr. Scanlan.  That's a disputed

22    fact.

23            But what I'm saying is that there is

24    long-standing -- going back to 2014, several cases that we

25    outlined in the memo of law that showed different -- in some

1    cases different facts, but always the same basic pattern, and

2    that was a delay of the investigation until Brunswick could

3    be notified, and intervened by contacting the victim's family

4    or contacting witnesses.

5           The fact that there was - never been an arrest of

6    any Brunswick student in any of these complaints, criminal

7    complaints.  The fact that the explanations --

8           THE COURT:  We're getting into the evidence now as

9    the inferences that this policy existed.  I wanted to take it

10   one step at a time.

11          MS. HOOK:  Okay.

12          THE COURT:  I'm still on back channel

13   communications.  Fair enough.

14          Counsel, what say you to the reliance on

15   Mr. DeAngelo calling Det. Reeves, and Det. Reeves then, based

16   on the content of that conversation, contacting the

17   Plaintiff's father?

18          I recognize that you have a very different take on

19   what that conversation was, the purpose for it and what it

20   included.  But if the jury credits Father Doe, that it was an

21   effort in response to a communication from Brunswick to

22   derail Plaintiff's willingness to go forward, does that get

23   at least the question of a back channel to the jury?

24          MR. MITCHELL:  No.

25          THE COURT:  Why?

1           MR. MITCHELL:  Several reasons.  First of all, Your

2    Honor, I believe Mr. DeAngelo said, when he called Sgt.

3    Reeves, Sgt. Reeves declined to talk to him about the facts

4    of the case or what Mr. DeAngelo knew.  He did tell him that

5    they were trying to get this kid expelled, I think.

6           Sgt. Reeves may or may not have called Mr. Scanlan

7    -- he called Mr. Scanlan, but one of the things he said, and

8    I think everybody agrees to it, is Tell Mr. Scanlan to quit

9    talking to Brunswick because that's going to interfere with

10   the investigation.

11          That was certainly not going to, you know -- that's

12   not a back channel.  He didn't give any information to Mr.

13   DeAngelo.

14          And all Officer DeAngelo did -- or, I'm sorry -- all

15   Mr. DeAngelo did was tell Mr. Reeves that the Scanlans are

16   trying to get this kid expelled.  That's not a back channel.

17   I don't care what he said.  I don't care if he said it or

18   not, frankly.  That's not enough to establish a back channel

19   by which Det. Reeves and, more importantly, Det. Rondini, who

20   did the actual investigation, are trying to influence

21   Brunswick or get information from Brunswick or by which

22   Brunswick is trying to influence the way the investigation

23   was handled.

24          And I would point out that one of the things the

25   Plaintiffs have done is they have conceded that the

1    investigation was handled properly.  They made that

2    representation a couple of times.

3            THE COURT:  We'll get there.

4            MR. MITCHELL:  I know, but it goes to this back

5    channel issue, too, because a properly handled investigation

6    can certainly not include, you know, saying things to

7    Brunswick you shouldn't say.  And there's no indication of

8    that Det. Reeves said anything to Brunswick that was

9    inappropriate.  Or that Sgt. --

10           THE COURT:  I think the argument is that Brunswick,

11   by making that phone call, was --

12           MR. MITCHELL:  Doing what?

13           THE COURT:  -- opening the back channel to get Det.

14   Reeves to reach out to the complainant to go away.

15           MR. MITCHELL:  I don't think that's --

16           (Reporter clarification.)

17           MR. MITCHELL:  Oh, I'm sorry.  Got to get back to a

18   microphone.

19           As Your Honor said, usually people can understand me

20   all around the room.

21           But let's assume for a moment that happened exactly

22   as counsel said it did.  I don't accept that, I don't think

23   it did, but let's assume it did.  That's not a back channel

24   that would be inappropriate in this case.  It would be

25   perfectly appropriate for Sgt. DeAngelo to call Det. Reeves

1    and say, This is what's going on, and for Det. Reeves to call

2    Mr. Scanlan and say, Stop it.  There's nothing wrong with

3    that.

4          That doesn't show that GPD has any policy of doing

5    anything or that they give any effect to any GPD policy to

6    favor Brunswick School, especially in the absence of any

7    other evidence in any other case involving any other schools

8    handled any differently.  And there is no such evidence.

9    They don't have anything.  They have a telephone call which

10   resulted in -- which, according to them, resulted in Det.

11   Sgt. Reeves calling Mr. Scanlan and Mr. Scanlan interpreting

12   that as an effort to have him stop the investigation or stay

13   out of the investigation.

14         And that's, so what?  Nothing happened.  It didn't

15   take effect.  They went ahead with the investigation.  An

16   investigation that the Plaintiffs have conceded was handled

17   properly.  It resulted in a request for an arrest warrant,

18   which is all the police can do.  They can ask for the arrest

19   warrant.  They can't arrest anybody.

20         So if -- you have to have some result to have a back

21   channel.  A back channel of people talking about the weather

22   or the time of day is not terribly important.  It's not a

23   material fact.  It's an immaterial point, is the problem they

24   have, even assuming their representations are correct.

25         THE COURT:  Fair enough.

1          MS. HOOK:  Your Honor, there is -- Sgt. Reeves

2     testified that he did have a conversation with Mr. Scanlan

3     about there being drinking at the party.  And when -- at

4     deposition, when he was asked how he found that out, he said,

5     Well, it was in the investigation, the information that we

6     received.

7          However, the case investigation reports clearly show

8     that there was no statement given to the police at the time

9     that he had that conversation with Mr. Scanlan about there

10    being alcohol at the party.

11         The only evidence or the only statement that was

12    received at that point was from a student named Ben, who said

13    that Peter Roe came to the party, he appeared to be drunk,

14    but he didn't know where he got the alcohol from.

15         So for -- a jury can infer that the way that

16    Mr. -- that Sgt. Reeves got that information was from the

17    headmaster, because the headmaster had, by that time, already

18    interviewed a number of students who were at the party.

19         THE COURT:  So even though Det. Reeves said he never

20    spoke to Headmaster Philip, and even though Headmaster Philip

21    said he never spoke to anybody from the Greenwich P.D., you

22    would ask the jury to infer that they're both lying because

23    of the timing of the accusation?

24         MS. HOOK:  It's not the timing of the accusation.

25    He could not have gotten that information the way he said

1    that he got that information, so it's a matter of a
2    credibility.
3           MR. MITCHELL:  Your Honor, she just explained how he
4    could have gotten it.  She just stated that another witness
5    had told him that Peter Roe showed up drunk.  Assuming he was
6    drunk, there probably was drinking going on.  And Brian
7    Scanlan testified that Peter Roe had a bottle of whiskey with
8    him that was emptied out by the time he left.  So telling
9    Mr. Scanlan that there was drinking at your house is not
10   exactly a genius's leap of logic.
11          MS. HOOK:  And, Your Honor, Mr. --
12          MR. MITCHELL:  It proves nothing.
13          MS. HOOK:  Mr. Scanlan testified that he was -- that
14   Sgt. Reeves told him that he got that information from
15   Michael DeAngelo.  Again, it is a disputed fact and the jury
16   can infer -- they can choose to believe Mr. Scanlan or they
17   can choose to believe Sgt. Reeves.
18          MR. MITCHELL:  But it's not a material fact, Your
19   Honor.  That's the problem.  Even if it's true, it makes --
20   it has no ultimate bearing on this case because it doesn't
21   establish anything.  It doesn't establish that anybody from
22   Brunswick School tried to adversely impact the investigation.
23   Because we know it's true there was drinking.  Because as
24   they point out, another one of the kids said that.  And it
25   doesn't show that Sgt. Reeves was trying to establish -- or

1   get Brunswick School to do anything in particular.

2          This back channel was obviously a total waste of

3   time.  It could have been kids with a couple of cans with a

4   string between them for all the good it was doing anybody.

5   But they seem to take the position, Your Honor, if there was

6   any communication at all, we have to -- a reasonable jury

7   could infer that that communication was improper, to give

8   effect to an improper policy that violated the constitutional

9   rights of Paula Scanlan, and that's just not true.  Even if

10  they're right in their factual representations, that

11  inference could not be reasonably drawn from what counsel has

12  said.

13         MS. HOOK:  Your Honor, based on the timing -- and,

14  so, Mr. Scanlan was asked by Headmaster Philips to provide an

15  e-mail outlining what happened.  He provided that e-mail.

16         Mike DeAngelo had a conversation with Sgt. Reeves,

17  that Sgt. Reeves testified to, literally within a day or less

18  than a day -- Mr. Scanlan was in Europe, so it's hard with

19  the time difference.

20         He called Mr. Scanlan, and testified that he said,

21  you know, I heard from Mike DeAngelo that you're trying to

22  get a kid in trouble.

23         A jury can infer from the timing of those

24  communications that, A, Sgt. Reeves was responding directly

25  to an outreach by Brunswick to put a stop or to slow down or

1    to dissuade Mr. Scanlan from pursuing any criminal complaint

2    in this case.  And, B, that the information that he received

3    was inappropriate information; that Michael DeAngelo was

4    giving him information that he had received from Mr. Scanlan

5    through a ruse of trying to get information from him that

6    they could feed to the police department and have the police

7    department then dissuade Mr. Scanlan by saying this is a "he

8    said/she said."

9            THE COURT:  Wait, wait, wait, wait.  Are you saying

10   that your client's father somehow got -- by virtue of this

11   collusive relationship, somehow got duped into sending this

12   e-mail, and then that information was given to Mr. DeAngelo

13   to provide to Sgt. Reeves as an effort to derail this

14   litigation?  Is that what I heard you just say?

15           MS. HOOK:  Not an effort -- it's not an effort to

16   derail this litigation.  In an effort to convince Mr. Scanlan

17   not to pursue the criminal complaint against Peter Roe.

18           THE COURT:  So you believe that there's evidence

19   that Brunswick and the Greenwich Police Department contrived

20   to get Mr. Scanlan to provide information, so that that

21   information could then be turned around and used by

22   Brunswick, given to the Greenwich Police Department so the

23   Greenwich Police Department can do what they do, which is

24   derail the investigation?

25           MS. HOOK:  Your Honor, I don't think that --

1          THE COURT:  You're not making this argument to this

2   jury?

3          MS. HOOK:  No, I'm not.

4          THE COURT:  I mean, in the world of conspiracy

5   theories, that one's out there.

6          MS. HOOK:  All right.  I went a little bit afar from

7   what I was trying to say.  So let us get back to the facts

8   that have been testified to and from which a jury can infer

9   what is the truth.

10          And the truth is that there is a close proximity

11   between Michael DeAngelo calling Sgt. Reeves, Sgt. Reeves

12   calling Mr. Scanlan.  There is a dispute --

13          THE COURT:  And we know that there's a causal

14   connection between that.

15          MS. HOOK:  Right.

16          THE COURT:  Because the first thing he said to

17   Mr. Scanlan was --

18          MS. HOOK:  Mike DeAngelo called --

19          THE COURT:  -- Stop talking to Brunswick and

20   interfering with my investigation, among other things.

21          MS. HOOK:  Right.

22          THE COURT:  So there's no dispute, I don't think,

23   that one led to the other.

24          MS. HOOK:  Right.  But what that conversation from

25   Mr. -- from Sgt. Reeves with Mr. Scanlan was, was not the

1   conversation of an impartial police detective calling the

2   victim's father to discuss the investigation.  It was this is

3   a "he said/she said," it's not going anywhere, you could be

4   liable for hosting issues because there was drinking at the

5   party, your son could be arrested for -- because he was the,

6   you know, over 18 -- for the altercation.  There was

7   intimidation that took place during that conversation.

8          Now, we understand there is a dispute between Sgt.

9   Reeves and Mr. Scanlan as to the content of that, and that's

10  for the jury to decide.

11         THE COURT:  Okay.

12         MR. MITCHELL:  Your Honor, as I said, skip the

13  dispute.  Assume what she says is true.  It's a big "So

14  what?"  The question in the case is whether the police

15  department acted to favor Brunswick in this case with respect

16  to the investigation of Paula Scanlan's complaint.

17         If you assume everything she said is true, it proves

18  nothing because in this case the investigation went on, it

19  was completed, they sought the arrest warrant, the State's

20  Attorney made the decision not to prosecute, not to seek an

21  actual arrest warrant from the Superior Court.  Not the

22  police department.

23         They have test -- they have stated in their

24  pleadings, in their papers, that the investigation was

25  carried out well within the scope of acceptable standard,

1    publicly acceptable police procedures.

2         What do they want them to do?  I don't -- maybe the

3    Brunswick School did reach out like they said.  Maybe it even

4    threatened Det. Reeves.  Maybe it did all sorts of things.

5    None of it has any causal effect on this.  Nothing happened.

6    The Plaintiff did not suffer under any stretch of the

7    imagination.  No one could infer that the Plaintiff suffered

8    from any communication of that nature from this so-called

9    back channel.  That doesn't establish anything in this case.

10        THE COURT:  Okay.

11        MR. MITCHELL:  That's their problem.  And that is

12   based on supposition, too, going back to her point.  You

13   know, you have to assume that Brunswick reached out with the

14   intention to have -- that Mr. Scanlan come in and give a

15   report, so that Brunswick would then turn around and give it

16   to Det. Reeves, who, in turn, would turn around and try and

17   threaten Mr. Scanlan, and so on, et cetera.

18        This is a pile of presumptions and assumptions

19   placed one on top of the other.  But even if you assume it

20   all true, as I said, it makes no difference.  It's not a

21   material fact.

22        THE COURT:  Okay.  Why don't we move forward.

23   The -- also part of the Plaintiff's claim, obviously, is the

24   evidence from which they would ask that the jury draw an

25   inference as to the existence of this policy or custom to

1    protect Brunswick students.

2           As I understand Plaintiff's case, it derives, in

3    part, from -- or that that evidence is evidence relating to

4    the 2014 sexual assault investigation involving a video, a

5    2014 -- I'm not quite sure what to call it -- allegation or

6    allegations that in 2014 there was a second video; a 2015

7    fight at the teen center and a press statement in connection

8    with the events in 2014.

9           Before we take up that -- and I will say this, clear

10   pattern -- you've said it a couple times now, Ms. Hook or

11   Ms. Braxton, a clear pattern.  There is no clear pattern

12   here.  The question is whether -- for me, is whether there is

13   a sufficient number of events that, in combination, would

14   allow a jury to draw the inference that you are requesting.

15          The briefing is written in hyperbole on both sides

16   of this issue.  There is a lot of inference on inference on

17   inference with respect to some of these events.  I can tell

18   you that the events surrounding this alleged video from 2014

19   that nobody can remember and nobody can tie to any

20   investigation and nobody can even tie with any probative

21   evidence to Brunswick School, I can't imagine a circumstance

22   under which the jury is going to hear anything about that.

23          And I think that there are hard questions that

24   you'll need to answer, frankly, when we talk about the 2014

25   videotape, that we do know who the -- I won't even call her a

1    victim, since she has, herself, indicated that there was no

2    victimization there.  And some of the inferences you're

3    asking the Court to draw regarding the teen center fight and

4    the press statement.

5            Before we talk about that, I think we need to

6    circle-back to the point to which the Defendants keep

7    returning, which is their expert's opinion that the

8    investigation was -- complied with standards of appropriate

9    police procedure, the argument that you have agreed to that

10   when arguing that that opinion is irrelevant, and how your

11   case gets past that determination.  And if it doesn't get

12   past that determination, where is the genuine issue of

13   material fact on that issue in this record evidence that does

14   not include what I'll call cynical or sarcastic assessments

15   of what was done or what was not done.  I mean, this is a

16   question that the jury needs to hear from competent evidence.

17           So I'm going to start over here, and I'm going to

18   ask you -- you've done it well in the papers, but I'm going

19   to ask you to walk me through how that assessment and that

20   evidence is the next off-ramp as I'm writing this decision.

21           MR. MITCHELL:  Okay.  What I hear you asking me is

22   how I would analyze the concerns about the Rondini

23   investigation and arrest warrant application; right?  Am I

24   right?

25           THE COURT:  Yes.

1          MR. MITCHELL:  Okay.

2          THE COURT:  Yes, I guess I should be more clear.

3          MR. MITCHELL:  No, I just want to make sure I was

4   correct.  I thought I was.

5          THE COURT:  Okay.

6          MR. MITCHELL:  A couple problems you've outlined.

7   We presented an expert witness -- or we have presented an

8   expert witness on that point, on the propriety of how Det.

9   Rondini under Sgt. Reeves' supervision, conducted that

10  investigation and prepared the arrest warrant application.

11  That affects this case in two ways.

12          First of all, as I've said and the Court has noted,

13  they -- the Plaintiffs have tried to defeat or get rid of Dr.

14  Hough's report on the basis it's irrelevant because there is

15  no question about the propriety of the investigation or the

16  way the arrest warrant application was prepared.

17          THE COURT:  No, I rejected that argument.

18          MR. MITCHELL:  Pardon?

19          THE COURT:  I rejected that argument and found that

20  the Complaint was replete with allegations --

21          MR. MITCHELL:  I agree.

22          THE COURT:  -- that the investigation was a sham.

23  And, so, I rejected the position that they took that it was

24  irrelevant.

25          MR. MITCHELL:  Okay.  That's the first I've heard of

1    it, but okay.

2         The other problem we have with what they've done is

3    when you read through the thirty or forty pages in their

4    briefing of this against summary judgment about the Rondini

5    investigation, the way they attack it is they attack it as if

6    they're experts.  They provide the opinion that this should

7    have been done and that should have been done and this

8    contradiction should have been explored in more detail;

9    written statements were insufficient, they should have

10   questioned the witnesses further; the one fellow who brought

11   in the typed statement and signed it and swore it, that was

12   wrong and shouldn't have been handled that way.

13        None of that information -- none of that evidence is

14   competent.  It doesn't fall within Section 701 Rules of

15   Evidence.  It's not competent lay opinion.  It requires more

16   than what they have.  They don't have the expertise to make

17   those determinations or those observations or even raise

18   those issues.

19        Frankly, the reason we hired Dr. Hough to begin

20   with, is we assumed -- mistakenly, apparently -- that they

21   would get an expert witness to attack Det. Rondini's

22   investigation.  They didn't do that.  They decide to rely

23   upon themselves.  And they can't.  They can't rely upon the

24   testimony of counsel, and they can't rely upon the testimony

25   of any other witnesses in this case who aren't experts.  And

1   they didn't ask precise questions to any of the police

2   officers that they deposed about this.  They asked some

3   generalized questions, but they didn't ask anything about

4   Rondini's investigation, per se.

5         And without that, they don't have any evidence of

6   anything.  They have a lot of suppositions, a lot of

7   assumptions, a lot of presumptions, a lot of cynical and

8   sarcastic comments, but nothing that the jury could ever

9   hear.

10         And without those points, those sarcastic comments

11   being presented, no reasonable jury could infer anything

12   other than that Det. Rondini did a good job, or an

13   appropriate job, both with the investigation and the arrest

14   warrant application.  And, remember, in this particular case

15   we're not dealing with a police department that just -- that

16   didn't take the investigation to a conclusion, that didn't

17   seek the arrest warrant.  They did do all those things.

18   Plaintiffs are going to have to show that that arrest warrant

19   application was improper somehow.  Again, they don't have the

20   expertise.

21         I will bet you dollars to doughnuts neither one of

22   the Plaintiff's counsel has ever written an arrest warrant

23   application, let alone been able to opine about the propriety

24   of it.  And their picks and nits and whatnot about all this

25   different investigation and all these points of the

1    investigation in the warrant application are things that they

2    simply are not competent to testify about.  And without

3    competent evidence, they can't win on the Motion for Summary

4    Judgment.  They have to present this Court with competent

5    evidence that contradicts this, and they have none.

6            THE COURT:  Attorney Hook, let me just start by

7    pointing out I think the law is clear that a person is not --

8    does not have a constitutional right to have any particular

9    person prosecuted.  A person does not have a right to a

10   particular type of investigation.  The jury would be -- I

11   guess I haven't decided yet, but it's possible that the jury

12   would be charged in that regard.

13           So what this comes down to is, I think, your ability

14   to prove the allegation that this was less than and, I think,

15   it was more than less than.  The allegation is that it was a

16   sham.  And what is your -- what is the evidence that -- well,

17   there's two questions, and I guess I'll let you answer them

18   in whatever order you want.

19           The first -- one question is:  What is the evidence

20   that creates a genuine issue of material fact on the

21   propriety of the investigation?  And the second question is:

22   Even if there is no evidence to contradict their expert, does

23   that end the case for the Plaintiff?

24           In whatever order.

25           MS. HOOK:  Okay.  Well, let me take the second one

1   first.  Their expert, as we discussed during the oral

2   argument on our motion, did not opine on their own policies

3   and practices.  And this is an equal protection claim, not a

4   negligence claim.  This is whether or not did they apply the

5   same approach to Brunswick investigations as they do to other

6   investigations as evidence of equal treatment.

7        So, what Dr. Hough opined on is basic procedure that

8   does not inform as to the content or the competency.  It's

9   just basic procedure, and it goes to the issue of negligence.

10  It doesn't go to the issue of equal protection, because he

11  cannot -- he did not read the policies, did not

12  interview, did not gain any information about GPD's policies

13  and practices and customs and usages.  He simply opined on

14  this investigation as compared to his experience with police

15  departments across the country.

16       If GPD has a particular approach, and they varied

17  that approach with respect to only one group of

18  investigations, that is relevant and that's a material fact

19  for a jury to determine whether or not that creates an

20  inference that they have provided preferential treatment for

21  this one particular group.

22       THE COURT:  So I just want to understand you.  So

23  because the expert, himself, didn't do a comparative analysis

24  of this investigation versus other Greenwich Police

25  Department investigations, his opinion is not the end of the

1  inquiry?

2          MS. HOOK:  Not for equal protection, no.

3          THE COURT:  Okay.

4          MS. HOOK:  The other thing is that his opinion is

5  not fact.  It's opinion.  And the jury has the right to weigh

6  his opinion and make determinations, as that opinion is

7  related to the facts.

8          Second thing is, he just generally related his

9  opinions to the facts of the case in such a broad spectrum,

10  he provided nothing in his expert report, provided nothing at

11  his deposition as to any specifics of the investigations.  So

12  he didn't really provide enough even for a jury to weigh his

13  opinions as to facts.

14          But his opinions are not facts.  So they're not

15  genuine issues of material -- he cannot create genuine issues

16  of material fact.

17          THE COURT:  If I determine -- well, let me ask you

18  this, the second question:  What is the record evidence that

19  would contradict his conclusion?

20          MS. HOOK:  There are practices that -- sorry --

21  Capt. Zuccerella testified to regarding how investigations in

22  SVS should have been conducted or were conducted when he was

23  head of SVS.  And he testified that providing investigation

24  to headmasters of the school should never happen.  He

25  testified that he told Sgt. Reeves, Don't talk to DeAngelo,

1    he's going to call you constantly to try and get information.

2    He testified that once the schools get involved, everything

3    disappears and it derails the investigation.

4        He testified as to the 2014 investigation of the

5    video, that that should have been prosecuted, and he thinks

6    that that should have gone to an adult prosecution, but that

7    was derailed because the headmaster got involved; and once

8    that happens, everything goes to pot.

9        THE COURT:  Whoa, whoa, whoa.  What is the evidence

10   that the headmaster had anything to do with the 2014

11   investigation going south?

12       MS. HOOK:  The 2014 investigation?

13       THE COURT:  Yeah.

14       MS. HOOK:  Well, he got information from Det. Girard

15   and he -- the evening of the complaint being brought to the

16   police department -- contacted the victim's father, or was in

17   touch with the victim's father; and by the next morning, the

18   victim's father had said, without even seeing the video, that

19   she wasn't going to testify.

20       THE COURT:  But that -- again, "Coincidence?  I

21   don't think so."  You can't stand up in front of a jury and

22   say, "Coincidence?  I don't think so."

23       MS. HOOK:  Well, it's --

24       THE COURT:  It's the evidence.  Because the evidence

25   as to what happened after that is pretty well undisputed.

1   The parents said she said it's consensual.  And Det. Girard,

2   concerned about whether or not that could possibly be the

3   case, said, I think you need to see this video.

4          So they come down to see the video, they see the

5   video, they express some shared concern, and they go back --

6   they say they have to go back and talk to their daughter.

7   And they persist in the position that they don't -- that it's

8   not a criminal act.

9          Det. Girard, still concerned, not necessarily -- and

10  I would say "to the contrary of" -- trying to protect a

11  Brunswick student, contacts the State's Attorney's Office and

12  says, What do I do in this situation, I have concerns about

13  what I'm seeing on this video.  And the State's Attorney

14  said, If the victim is not willing to identify herself as a

15  victim, if she's saying it's consensual, there's nothing you

16  can do about it, but I would like to get something in

17  writing.

18         So they go back to the parents and they say, If this

19  is your decision, you need to put that in writing.  And

20  that's what happened.

21         How does that get laid at the feet of the headmaster

22  of Brunswick?

23         MS. HOOK:  Because sergeant -- he was then Sgt.

24  Zuccerella.  Capt. Zuccerella testified, that in that

25  particular investigation -- he was head of SVS at the time --

1    he had no knowledge that Det. Girard was providing that

2    information to the headmaster.  He would not have approved of

3    that.  And his opinion was, as head of SVS at the time, that

4    the involvement of Brunswick is what made that investigation

5    go south.  And the letter --

6            THE COURT:  So he is as cynical as you are.

7            MS. HOOK:  I'm sorry?

8            THE COURT:  So he's as cynical as you are.  What's

9    the evidence that ties that investigation ending the way it

10   did to something that Brunswick did?  Tom Philip has been

11   deposed.  Was he asked?

12           MS. HOOK:  Was he asked about that?  Yes.

13           THE COURT:  Yes.  And did he say, Yeah, I called up

14   the father to try to protect my student?

15           MS. HOOK:  Your Honor, I think that he had very

16   little recollection of that conversation or that

17   investigation at all.

18           But, again, these are facts.  Your Honor, the jury's

19   entitled to hear what the head of SVS at the time thought of

20   that investigation and thought about Brunswick's involvement

21   and thought about the fact that he -- he was not told about

22   his subordinate's actions in communicating with Greenwich.

23           There were two boys who videotaped in that

24   particular incident.  One of them was from Greenwich Country

25   Day School.  She did not call the headmaster of Greenwich

1    Country Day School.  She did not provide him with any

2    information.  The only person she contacted was Brunswick.

3           THE COURT:  But if there's no evidence that that

4    contact had any impact -- and I'm not talking about

5    supposition or cynicism -- if there was no evidence that that

6    communication impacted the outcome of that investigation, how

7    does that create -- how does that allow the inference of a

8    policy?

9           And I'm going to -- counsel has been -- clearly

10   wants to respond to some of the things you have said.  We'll

11   take it one point at a time.

12          Counsel.

13          MS. HOOK:  Your Honor, let me just say one more

14   thing.  The letter from the parents did not say that there

15   was not an assault.  They said that they were not going to

16   pursue anything at the time and they --

17          THE COURT:  But there's no question that they told

18   her -- the daughter says it was consensual.

19          MS. HOOK:  That was before they saw the video and

20   then they questioned whether an unconscious girl could give

21   consent.  She was clearly unconscious in the video.  And so

22   it's -- when they saw the video, they questioned whether or

23   not an unconscious girl could give consent.

24          MR. MITCHELL:  That's not true, Your Honor.

25          MS. HOOK:  Let me just finish.  But the other

1  evidence that is in the record are other investigations

2  where the victim --

3          MR. MITCHELL:  May I respond to this point, Your

4  Honor?

5          THE COURT:  If you're going to move to a different

6  investigation --

7          MS. HOOK:  No.  I'm responding to the comparative

8  evidence that you had asked about.

9          In other investigations not involving Brunswick --

10  students, where the victim refused to testify, where her

11  family said nothing happened, the boy is just immature -- an

12  arrest warrant application was filed and an arrest was

13  issued -- an arrest warrant was issued.

14          MR. MITCHELL:  That's not true, either, Your Honor.

15  I know exactly which incident she's referring to, and that

16  involved a stepfather.

17          THE COURT:  Yeah, I think that's --

18          MR. MITCHELL:  He was abusing his own stepdaughter.

19  It was statutory rape, and the stepfather conceded he'd done

20  it.  The daughter said it was not consensual, that she had

21  been attacked.  And the fact that the family decided they

22  didn't want to go forward becomes irrelevant, because the

23  statutory rape case, the State has to prosecute.  It has no

24  bearing on this at all.

25          I mean, this is the kind of nonsense they push all

1    the time.

2         And as far as the case of the 2014 video, to my

3    recollection, there are two points of contact between Det.

4    Girard and Tom Philip -- one, she called him on the phone to

5    tell him that the parents of the little girl -- the young

6    woman involved, wanted to talk to their daughter before the

7    police interrogated her; and, two, he sent an e-mail, which

8    the Plaintiffs have portrayed as an e-mail only to Tom

9    Philips, but which, in fact, was an e-mail to Tom Philips and

10   to Molly King, the headmistress of the school the girl went

11   to, to let them both know the parents -- the father had

12   called and said their daughter consented, they didn't want to

13   go forward.  And that was the end of it.

14        There's no way from those two facts anybody -- any

15   reasonable human being could somehow infer that the Greenwich

16   Police Department worked with Brunswick School to talk -- to

17   coerce the parents into having their daughter back down from

18   any claims she had that she'd been assaulted.

19        THE COURT:  Let me just ask.  Attorney Hook, that

20   was one thing I made note of, and I -- it's a little bit of a

21   side issue.  Why would the e-mail you submitted not include

22   that Molly King was on the chain?

23        MS. HOOK:  Because we did not have that e-mail.

24        MR. MITCHELL:  That's not true.  It's attached to

25   the deposition.

1          THE COURT:  Stop it.  Just stop it.  You stop it.

2          MR. MITCHELL:  I'm sorry, but it --

3          THE COURT:  It was brought to your attention at Det.

4     Girard's deposition.

5          MS. HOOK:  At the deposition.

6          THE COURT:  That the -- and the document was

7     marked --

8          MS. HOOK:  Yes.  Yes, it was marked.

9          THE COURT:  -- that had both.

10         MS. HOOK:  There was no intention to hide that.  So

11    let me just point out.  Molly King was an appropriate person

12    to notify because she was the headmistress of the school at

13    which the victim attended.  But if this was an equal

14    communication to everyone involved, that video was first

15    brought to the attention of GPD by Greenwich Country Day

16    School.  And Adam Rohdie, who is the headmaster of Greenwich

17    Country Day School, testified that he never had any contact

18    with anybody from GPD after bringing that first video.

19         THE COURT:  And what's the inference to be drawn

20    from that?

21         MS. HOOK:  Well, what was the reason for contacting

22    Brunswick, where one of the boys who engaged in the sexual

23    assault and the videotaping --

24         THE COURT:  I think that you need to pull back on

25    just assuming that what happened was a sexual assault.  Might

1   it have been?  I think there's certainly compelling evidence

2   of that.  But the victim, herself, is on record as having

3   said that it was not that.  And, so, even if this -- well,

4   let me back up.

5          I assume this video is not floating around anywhere?

6          MS. HOOK:  No.  We did not request it.  We have not

7   seen it.  We have information about the video from all of the

8   people who saw the video, including Sgt. Zuccerella and Det.

9   Girard.  The fact is that in the video, she was unconscious.

10  Everybody agrees to that.  Even the parents state it.  And

11  that is in the case investigation report.  They questioned

12  how she could have given consent, even though she told her

13  parents she gave consent.

14         THE COURT:  But given what happened at the Greenwich

15  Police Department -- because that's really what this case is

16  about, in terms of what they did or did not do -- given the

17  parents' persistent position, given the advice from the

18  State's Attorney under the circumstances presented, how does

19  the jury get asked to infer this collusive relationship, that

20  this investigation was the result of this collusive

21  relationship or policy of protecting Brunswick students?

22         MS. HOOK:  Again, the fact that there was exclusive

23  and unreported communications between the detective and

24  Headmaster Philip.  Now, if --

25         THE COURT:  But it's the parents.  It's the parents

1    who made the decision.  It's the State's Attorney who made

2    the decision.  Det. Girard made very clear she was not

3    comfortable with the outcome or the conduct of this

4    investigation.  So if she's not comfortable with how this

5    thing is ending, how is it ending as a result of her effort

6    to further a policy of protecting Brunswick students?

7           MS. HOOK:  Your Honor, the case investigation report

8    did not follow the same pattern as other case investigation

9    reports.  There were huge gaps of information.  None of the

10   contacts with Brunswick were listed in that case

11   investigation report.  She did not provide that information

12   to her supervisor, who was unaware.  And the pattern is that

13   in each of these instances, including the Scanlan case, once

14   there is a complaint, the headmaster calls the victim's

15   parents and then attempts to have -- to convince them not to

16   pursue any --

17          THE COURT:  But that's on Brunswick, and you sued

18   them.  But we're talking about the Greenwich Police

19   Department.  And everything that you've accused Brunswick of

20   can only be part of this case against the Greenwich Police

21   Department if that collusive connection is established.

22          MS. HOOK:  But the headmaster would not have the

23   information as how to contact the parents of the victim on

24   the evening of the day that the complaint goes to GPD without

25   getting that information from GPD.

1          MR. MITCHELL:  Your Honor --

2          MS. HOOK:  The whole purpose of giving him that

3   information that quickly was to allow him to intervene.

4          THE COURT:  But what's the evidence of that?  That's

5   it right there.  The purpose of that communication was to

6   allow him to intervene.  What is the evidence of that?

7          MS. HOOK:  The fact that the contacts were not

8   reported to her supervisor.  The fact that those contacts,

9   none --

10          THE COURT:  But isn't her supervisor part of the

11  Greenwich Police Department?  Wouldn't he be in on this

12  collusion policy?

13          MS. HOOK:  The custom and practice could exist even

14  though one or two police officers do not agree with it and do

15  not want to comply with it.  And I'll point out to the Court,

16  there's a case, Second Circuit case, *Jeffes v. Barnes*, and

17  that goes to the other question that Your Honor asked.  That

18  was a case where it was corrections officers who had

19  witnessed a beating of inmates, and were uncomfortable with

20  it.  And the sheriff then acquiesced, was aware of the fact

21  that other corrections officers who had -- who had beaten the

22  inmates then retaliated against the officers who made a

23  report about their improper conduct, and no action was taken.

24          And, so, they filed -- they were harassed out of

25  their jobs.  They filed a Section 1983 claim based on their

1    First Amendment rights to free speech.

2         And there was only one prior -- for in terms of a

3    pattern, the Court found that there was a long-standing

4    practice or custom which constituted the standard operating

5    procedure of the government entity, and that was to have a

6    code of silence over -- you know, Don't rat out your fellow

7    officers.

8         So, you know, there is a case where there may not be

9    every officer that agrees with the custom or practice.  In

10   this case, the Court found that there was a custom or

11   practice, based on one prior example in the past, where there

12   had been harassment of fellow officers based on their being

13   union scabs.

14        THE COURT:  A whistleblower, of sorts.

15        MS. HOOK:  I'm sorry?

16        THE COURT:  A whistleblower, of sorts.  Harassment

17   of somebody who complained.

18        MS. HOOK:  Right.  But in the prior complaint of

19   harassment, there was immediate action by the sheriff to

20   address it and to stop it; whereas, in the case at bar there,

21   there was no action.  So the Court found practice, a

22   long-standing custom or practice, based on one prior

23   incident, in terms of the pattern.

24        THE COURT:  But you haven't explained to me -- I

25   understand the argument about why Det. Girard's conduct might

1    raise an inference of some form of impropriety, whatever that

2    impropriety might be.  But you haven't answered the question

3    as to how those communications, even if evidence -- even if

4    they're inappropriate and even if they are -- had a purpose

5    of, you know, alerting Tom Philip, you haven't gotten from

6    the purpose of alerting Tom Philip to Tom Philip's conduct,

7    to the ultimate decision of the parents, to the statement of

8    the victim, the advice of the State's Attorney, and the

9    closing of the case.

10         MS. HOOK:  Okay.  We don't know what the

11   communications between Det. Girard and the State's Attorney

12   were because they were very barely mentioned in the case

13   investigation report.

14         THE COURT:  Do we have testimony?  Weren't they

15   asked about it?  Wasn't she asked about it?  Do we have that

16   testimony?

17         MS. HOOK:  She was asked about it.  She didn't have

18   a great recollection, as I recall, of the particular facts.

19         THE COURT:  Okay.

20         MS. HOOK:  So there is not information in the case

21   investigation report that should be there.  There was nothing

22   reported about the content --

23         THE COURT:  I'm not asking what's not there,

24   Ms. Hook.  I'm asking you what the evidence is that ties

25   these inappropriate communications to the outcome of that

1   investigation.  Because unless this nefarious communication
2   is established to achieve the result that is the subject of
3   this policy, which is protection of Brunswick.  I understand.
4   The Brunswick student was not charged.

5            But there's an evidentiary disconnect between the
6   communication and the Brunswick student not being charged.
7   What defeats evidentiary disconnect?  How is a jury going to
8   say, The parents did what they did, the daughter said what
9   she said, the State's Attorney advised as the State's
10  Attorney advised because this initial communication occurred,
11  when we don't know what happened after that?

12           MS. HOOK:  I think if you look at the pattern of
13  each time there is a Brunswick student charged and the same
14  actions happen -- the same communication to the headmaster,
15  the same contact by the headmaster of the victim's family --
16  I think what we're talking about here is circumstantial
17  evidence from which a jury can infer that the actions taken
18  by the Greenwich Police Department were intended to
19  facilitate the avoidance of a prosecution.

20           Now, it doesn't have to point to -- there can be
21  circumstantial evidence from which the jury can determine
22  whether they believe this pattern of activity, which shows up
23  in every case that we pointed out, was intentional.  And it
24  doesn't have to have the smoking gun.  There does not have to
25  be direct evidence.  A jury can infer from the facts, from

1    circumstantial evidence, that something has happened.

2          THE COURT:  Attorney Mitchell.

3          MR. MITCHELL:  A few problems with her presentation,

4    Your Honor.  First of all, most importantly, their judgments

5    on what violated policy -- what should have been done but

6    wasn't done, et cetera -- are their judgments.  They aren't

7    experts in this matter.  Now, they have Sgt. Zuccerella

8    saying, in a broad sense, certain things wouldn't

9    ordinarily -- I wouldn't have done this, I wouldn't have done

10    that.  And that's the way the deposition reads.

11          He does say he didn't know that Krystie Girard had

12    contacted the headmaster.  But all she did was tell the

13    headmaster the parents wanted to talk to the daughter before

14    the police did.  I don't think that really any reasonable

15    inference can be drawn from that of some kind of collusion to

16    the detriment of the daughter or the parents or in favor of

17    Brunswick School.

18          But the fundamental problem with the Plaintiff's

19    case, which we've gone through in our papers and I'm not

20    going to beat it to death, but it boils down to the fact that

21    the adverse inferences, the adverse evidence, if you will,

22    on almost all of -- in all of these instances, in fact, is

23    something the Plaintiffs and their counsel have engrafted on

24    them.  Lay opinion.  Which is never going to be admissible in

25    this case.

1          Without that lay opinion, you have a set of

2     disconnected facts that don't lead to any causal -- there's

3     no conspiracy.  There's no general policy.  For example,

4     let's take Krystie Girard.  If Krystie Girard did, in fact,

5     act outside of GPD's policies, does that not contradict the

6     argument that GPD had a policy or practice of doing what

7     Krystie Girard apparently was doing that was wrong?

8          There's no evidence of that at all.  The evidence

9     that they've put on is that the GPD had certain policies and

10    practices that they, in their judgment with their expert

11    opinion, claims she didn't follow.  They aren't qualified to

12    say that, quite frankly.

13         Some of these policies are things like, You have to

14    conduct a competent investigation.  They have no ability at

15    all to judge that.  That's not evidence.  That's their

16    opinion.  But the point is, even if she didn't follow those

17    policies, well, that's showing some kind of ratification of

18    her wandering off the reservation.  In fact, she becomes an

19    outlier and violates GPD's policies to her own benefit,

20    apparently.  That doesn't support their case of some

21    generally overriding GPD policy to favor Brunswick School.

22         Without some evidence that in that particular

23    instance, with regard to Krystie Girard's activities, the

24    police department ratified it through its chief or some other

25    supervisor.  What they've said is her supervisor, Sgt.

1    Zuccerella, particularly, didn't like that.  He's the only

2    supervisor they've ever talked to about Krystie Girard.

3         THE COURT:  Well, ratification is really more of a

4    *Monell* issue.  In terms of Krystie Girard's conduct in 2014,

5    I think that's more a question of whether prior GPD officers

6    acted consistent with the claim the Plaintiff advances, which

7    is that they do things that are intended to protect accused

8    Brunswick students.

9         MR. MITCHELL:  That may be true, but she is the

10   first example they have.  There are no prior examples.

11        THE COURT:  I agree with that.

12        MR. MITCHELL:  So they're saying she is the example,

13   Your Honor.  And they talked to her supervisor, who said he

14   never would have ratified this.  Nobody -- there's no

15   evidence at all.  There's no place -- there's not even a hint

16   in the record that the police department ratified what would

17   have been, according to the Plaintiffs, a violation of GPD's

18   standing policies in the way she conducted that

19   investigation.

20        And without that as a matter of fact, you can't

21   conclude that somehow she represented a "secret handshake"

22   type policy that nobody else in the world knew about except

23   her.  And they don't have any evidence that anybody else knew

24   about any of this.  Just her.  And that assumes you,

25   hypothetically, accept their whole explanation that somehow

1   she did something wrong, which I don't think the evidence

2   shows anyway.

3        I mean, they have this double, triple whammy that

4   they try to argue, that somehow she contacted the Brunswick

5   School and got the headmaster somehow to call the teacher --

6   the parents, to get them to lean on their daughter to back

7   off any possible sex assault claim.  They have no evidence

8   from him, apparently.  They have no evidence from Krystie

9   Girard.  No evidence from the parents, and no evidence from

10  the supposed victim.  Nobody except their suppositions of

11  what happened, based upon the fact that Krystie Girard did

12  call the headmaster and tell him that the parents had asked

13  that they be allowed -- that the parents be allowed to talk

14  to the young lady before the police department did.  You

15  can't possibly draw an inference from that, that even comes

16  close to what they think it does.

17       And then, even if you look at it in view of what

18  happened, in light of what happened afterwards, you have the

19  second communication which goes to both Mr. Philip and to the

20  head of the girl's school, where the young lady was then

21  attending, to let them know that the parents had called that

22  they didn't want to go forward with this anymore.  And that's

23  it.

24       And then you have Krystie Girard going to the

25  State's Attorney and going back to the parents after they

1    said they didn't want to pursue the case to try to talk them

2    into pursuing the case, which is totally contradictory to

3    what their premise is, to what the assumption, the

4    supposition and the predictions, or whatever you want to call

5    it, that the Plaintiffs put forward.

6         There's no reasonable way -- no possible way, in

7    fact, that any reasonable juror could look at the facts that

8    exist in this case, the admissible evidentiary facts, and

9    conclude anything other than that Krystie Girard was given

10   this case to look at; she looked at it; the parents said the

11   young lady said she consented, it was not an assault; Krystie

12   Girard tried to talk them; went back to them and said, Look,

13   you really need to consider this, I think it's still a crime,

14   I think it should be prosecuted; they said, We don't want to

15   do it; and the State's Attorney said, I'm not taking the

16   case, go get a letter from them; and she did, and that was

17   the end of it.

18        MS. HOOK:  So, Your Honor, each of those prior

19   incidents are not -- the purpose of the evidence about those

20   incidents is not to litigate each individual incident.  It is

21   to provide evidence of a commonality of facts, commonality of

22   conduct by GPD and by Brunswick.  And, so, the jury can infer

23   from the commonality of the conduct that occurred in those

24   prior instances, along with the conduct that occurred in the

25   case at bar, whether or not there was a custom or usage.

1           There is not -- it's not Plaintiff's burden to prove

2    that each of those prior incidents had that back channel of

3    communications.  The prior incidents are there to establish

4    that there is a custom or usage.  Whether or not the arrest

5    warrant applications that were successful differ

6    substantially, significantly, materially, from the facts of

7    those investigations is not a legal matter.  It's not -- it's

8    a matter for, let's say, the expert to have opined on it, or

9    for the jury to look at those facts and make a determination

10   whether they think that there is a difference in those facts,

11   whether they can infer that there was preferential treatment

12   in one and not the other.  They're facts.  They're not legal

13   propositions.

14           MR. MITCHELL:  Your Honor, I submit that not a

15   single instance pointed out by the Plaintiffs brought to this

16   Court can be looked upon as establishing any commonality of

17   any kind of conduct by any reasonable person, let alone a

18   reasonable juror judging this case.  And that, precisely, is

19   why it should be dismissed.

20           As counsel said, some of these issues, like

21   materiality, would be determined by an expert witness, which

22   they don't have.  They have not presented -- they presented

23   their own opinions.  That is not admissible evidence.  But

24   based on the admissible evidence in the record so far, 30

25   depositions and some 10,000 pages of documents later, no

1    reasonable person, no reasonable juror could find any

2    commonality of practice that was adverse to the people of

3    Greenwich -- of the Town of Greenwich or in favor of

4    Brunswick School students, period.

5           MS. HOOK:  Your Honor, that is incorrect, because we

6    pointed out -- in terms of policy and practice by the GPD, we

7    submitted evidence of testimony by Lt. Bonney, by Capt.

8    Barry, by Capt. Zuccerella.  We also provided evidence of

9    written policies as in the conflict of interest policy.

10          So it's not -- we are not positing a lay opinion in

11   contrast to an expert that didn't address those particular

12   policies.  We're positing the people who are the

13   decision-makers and their own policies.

14          MR. MITCHELL:  Not true, Your Honor.  What they did

15   is they put the policies in the record, and that's -- that's

16   appropriate.  What's not appropriate and what's not

17   admissible is their judgment of whether somebody violated

18   these policies.

19          For example, Krystie Girard.  Did she violate the

20   conflict of interest policy?  They say she did.  Nobody else

21   said that.  They're not experts.  They didn't provide an

22   expert.  In fact, our experts say it's irrelevant, it's just

23   not a negligence case.

24          They've completely lost sight of the fact that

25   whether or not this investigation of Paula Scanlan's

1    complaint was handled appropriately is a fact.  It's a fact

2    that it was handled appropriately.  And that's an important

3    fact, a critical fact.  If it was handled appropriately, that

4    means they have to show that if an investigation, properly

5    handled with an arrest warrant properly presented, was

6    somehow so subtly modified that it was guaranteed that the

7    State's Attorney would reject the arrest warrant application.

8         I'm not going to say it's a totally ridiculous

9    proposition, but it borders on it, without the evidence --

10   that they don't have -- to show anything.  They've taken a

11   whole bunch of -- a skew of cases that have no relation to

12   each other and no relation to Det. Rondini and no relation to

13   Sgt. Det. Reeves, and tried to somehow sketch together this

14   picture of a collusive atmosphere at the Greenwich Police

15   Department designed to save Brunswick boys from being

16   criminally prosecuted.

17        And there just isn't anything in the record that

18   supports that except their suppositions and their judgments

19   that certain arrest warrants didn't match other arrest

20   warrants and pieces are missing, vital information was not

21   looked at.  They have no competence in that area.

22        And that evidence would never go to a jury without

23   those suppositions, without somebody saying, Yes, arrest

24   warrant B should have had, you know, Item C in it and this

25   information about this addressee, et cetera.  Without

1   somebody testifying to that, the so-called commonality

2   doesn't exist.  It dissolves like a mist on a hot day.  And

3   that's their problem, and that's why this case should be

4   dismissed.

5          MS. HOOK:  State Attorney Capozzi testified that he

6   expects all of the information gathered in a case

7   investigation to be contained in the arrest warrant

8   application.  It was not a supposition by any lay witness.

9   Lt. Bonney and Capt. Barry testified that conflict of

10  interest policy means that somebody who has any kind of

11  personal interest in the entity being investigated should not

12  be assigned to that investigation.

13         Lt. Zuccerella said that's what he understood that

14  policy to be.  And he took it a step further, and he would

15  recuse himself immediately for anything even remotely

16  connected with that.  Capt. Zuccerella testified that when he

17  was head of SVS, his custom and practice was not to involve

18  or give information to the schools because they muck things

19  up.  He testified that he gave that -- as outgoing SVS head

20  to the incoming SVS head, who was Sgt. Reeves -- he gave that

21  advice to Sgt. Reeves.  He said, I told him don't talk to

22  Mike DeAngelo because he's going to call constantly to get

23  information.  And that's why we're in this case here, because

24  he called him and he gave him information.

25         THE COURT:  Isn't that evidence powerful evidence

1   that this collusive relationship did not exist if the head of

2   SVS is saying, Do not talk to them?

3         MS. HOOK:  The head of SVS, as I said before, as in

4   the *Jeffes* case, it was surprising to us, but Capt.

5   Zuccerella was an outlier, in terms of the testimony in the

6   case that we received from all of the police officers.  He

7   was not told about the communications with the headmaster.

8   And I think he was not told about those communications

9   because Det. Girard knew --

10        THE COURT:  That doesn't answer my question,

11  Attorney Hook.

12        MS. HOOK:  No.  What I'm saying is that just because

13  there is one police officer who is not going to agree to

14  engage in a custom or practice that violates some parties'

15  constitutional rights doesn't mean that that custom and

16  practice doesn't exist.  It just means that that person is

17  the outlier.  And he is the only outlier.

18        When it came to evidence, a third-party witness, Dr.

19  X, has no vested interest in anything in this action.

20        THE COURT:  Dr. X is not testifying in this trial.

21        MS. HOOK:  No, I understand that.  What I'm trying

22  to say, Your Honor, is that she testified that she saw this

23  video and that it was handed over, and then it disappears.

24  So --

25        THE COURT:  Attorney Hook, come on.  See, that's the

1    problem.  You jump from one allegation to a nefarious,

2    sinister outcome.  She says she gave it to a retired GPD

3    person.  It's not even the Department.  He says he gave it to

4    somebody at the Department.  The person he says he gave it to

5    has no recollection of receiving it; he will accept that he

6    believes the testimony, he just has to recollection of it.

7              MS. HOOK:  Right.

8              THE COURT:  If he did get a second video -- he does

9    recall another video, it was completely dark, and he thought

10   it was about underage drinking.  Zero, nobody, beyond Dr. X

11   and the retired police officer she gave that video to, has

12   any recollection -- in the GPD -- has any recollection of

13   seeing any video that involved any sexual assault or was in

14   any fashion tied to Brunswick School.

15             So, for you to say Dr. X gave it to Person B and it

16   disappeared presupposes evidence that is not in this record,

17   and it's -- you lose --

18             MS. HOOK:  Your Honor, there is other evidence in

19   the record.  And that is, Lt. Gray, now Capt. Gray, when he

20   gave the press release or he gave information to the press

21   about the 2014 incident, said there were two investigations,

22   there were two parties.  There is no evidence of any second

23   investigation.  There's no evidence that there was any

24   investigation opened up, but he gave that information to the

25   press, and Headmaster Philip in his letter to parents the day

1   before that investigation was closed talked about a second

2   investigation, that there were two investigations.

3          So a jury can infer that there was a second

4   investigation that -- what happened to it?

5          THE COURT:  There's no evidence of that, other than

6   a newspaper report that has been dismissed really as the

7   result of a rumor.  There's no -- I would not --

8          MS. HOOK:  But Your Honor --

9          THE COURT:  On this record, you could not stand up

10  in front of the jury and say there was a second 2014

11  investigation based on the evidence on this record, competent

12  evidence.  Nobody in the Greenwich Police Department recalls

13  seeing that video or anything like it.  And people are making

14  suppositions like, Well, maybe if it was that video, it was

15  too dark; If it was that video, I thought that was about

16  underage drinking.

17         Nobody has any recollection.  There's no evidence in

18  the evidence -- I'm not going to -- it'll be in my decision,

19  but that second, that Dr. X -- I'll call it the Dr. X video,

20  if this case gets through summary judgment, the Dr. X video

21  and any testimony about it is not going to this jury.  It's

22  not.  It's just --

23         MS. HOOK:  Okay.  But, Your Honor, I just would like

24  to clarify.  It's not just Dr. X.  It's Lt. Keegan.  And Lt.

25  Bonney said, I don't have a recollection, but if he says he

1    gave it to me I have no reason not to believe him.  And --

2              THE COURT:  I read the briefs.  I understand your

3    argument.

4              MS. HOOK:  Okay.

5              THE COURT:  I find them unpersuasive.

6              MS. HOOK:  Okay.

7              THE COURT:  All right.  Anything else before we

8    recess?  Any other arguments?  I'm sure I didn't hit

9    everything that was in there.

10             MR. MITCHELL:  One quick point, Your Honor.  And

11   just one, and I will be very brief.

12             They talk about -- she talks about these other

13   questions to police officers about policies and practices, et

14   cetera.  But in the depositions, the one thing they never did

15   was present these officers with conduct by Det. Rondini and

16   say, Did this violate anything?  Ever?  Never.

17             They asked the police officers, Do you have a

18   policy?  Yes, We have a policy against such and so.  We have

19   policy to do such and so.  We have a policy -- for example,

20   there is one that investigations should be handled

21   competently.  Okay, fine.  They have a policy.

22             They never asked these officers, Well, did Det.

23   Rondini do that?  And the reality is, without that, they have

24   nothing.  They have people saying, Yes, we have policies;

25   Yes, we do this.  Sgt. Zuccerella -- or Capt. Zuccerella --

1   says, Well, yes, at the time I was head of SVS and I don't

2   think she should have talked -- she says, I would not have

3   talked to the headmaster, I don't think she should have.

4          But all she did was tell the headmaster she got a

5   phone call that this was -- that the parents wanted to talk

6   to their daughter before the police interrogated her.  What

7   did that possibly have to do with anything that was

8   nefarious, other than in the minds of Plaintiff's counsel?

9   Nothing Sgt. Zuccerella said would allow you to put that

10  taint on it.  That's the problem with their case.  Sgt.

11  Zuccerella said -- or Capt. Zuccerella said nothing in his

12  deposition that would taint that.

13         Also, they have a "conflict of interest" policy, you

14  shouldn't get involved in an investigation if you have an

15  interest in the party involved.  Well, the truth of the

16  matter, Brunswick School wasn't involved in the investigation

17  upfront until they found out later on that the boys came from

18  the school.  But it wasn't at the school.  It didn't involve

19  the school, per se.  It involved some kids who went to the

20  school.

21         And what they never did is say, Capt. Zuccerella,

22  here are the facts of this case, did this violate -- in your

23  opinion, did this violate the "conflict of interest" policy

24  of the police department?  They never did that.  He never

25  answered that question.  They never asked that question.

1          So with that kind of evidence, they have no

2     evidence.  They have nothing, again, in which any reasonable

3     person could conclude that the GPD did anything wrong, let

4     alone had a policy to do anything wrong.

5          And I will leave it at that, Your Honor.  I would

6     just ask the Court to please grant the Motion to Dismiss.

7          THE COURT:  Okay.

8          MS. HOOK:  Your Honor, may I just reply to --

9          THE COURT:  You may, but you have to answer my

10    question first.  Is it your position that you can present the

11    jury with the actual policies, either in writing or through

12    the testimony of witnesses, and then present the conduct of

13    the investigation and let the jury decide whether the

14    investigation violated the policies?  Did that make sense?

15         MS. HOOK:  Yes, it does make sense, Your Honor.  I

16    think that the jury does not need to reach the ultimate

17    decision as to whether there was an exact violation of

18    policies.  The jury needs to reach the decision as to whether

19    the conduct that may have skirted the letter, but not -- they

20    can determine whether or not those facts make them feel

21    uncomfortable without coming up with the ultimate conclusion

22    that there was an exact violation of policy.

23         But I think that the jury should accept the

24    decision-makers', the policy-makers' opinion as to what the

25    policies mean.  Because it's not the jury's --

1      THE COURT:  So who is going to testify as to what
2  the policies mean?
3      MS. HOOK:  Well, we had Capt. Barry.  We had Capt.
4  Zuccerella.  We had Lt. Bonney.  We had State's Attorney
5  Capozzi.
6      THE COURT:  So they're going to testify what these
7  policies mean.  And what does the jury do with that *vis-a-vis*
8  Det. Reeves -- Sgt. Reeves and Det. Rondini.
9      MS. HOOK:  Well, they think that what -- the actions
10  of what those detectives did, did not comport with what those
11  decision-makers believe the policies meant.
12      THE COURT:  That was my question.
13      MS. HOOK:  They can infer --
14      THE COURT:  Do you think the jury should be able to
15  decide, based on the conduct and meaning of the policies -- I
16  guess I'll add to the question -- when juxtaposed to the
17  evidence regarding the conduct of the investigation?
18      MS. HOOK:  Yes.
19      THE COURT:  Okay.
20      MS. HOOK:  And let me just point out one thing.  So
21  in terms of Det. Rondini, there was a statement provided by
22  Sam Gonzalez, who was an adult friend who was living in the
23  pool house at the time, who was at -- who came to the home.
24  He wasn't at the party.  He came to the home.  And he was in
25  the pool house at the time.  Some of his statements directly

1   contradicted the statement of Brunswick Student L., and it

2   was used as a credibility problem for Paula Scanlan.  And one

3   of those things was that he was in the pool house and he

4   described what he observed.

5        When we deposed State's Attorney Capozzi, he had no

6   idea that Sam Gonzalez was in -- that there was somebody in

7   the pool house at the time, because Mr. Gonzalez's statement

8   was not put into the arrest warrant application.  It was

9   deleted as having no evidentiary value.  And State's Attorney

10  Capozzi testified that he would liked to have known that

11  there was somebody who was in the pool house at the time of

12  the event, and he did not have that information.

13       He also testified that he expects all of the

14  information to be provided to him, not for it to be sifted

15  through by the police officers.

16       MR. MITCHELL:  Your --

17       THE COURT:  Thank you, Attorney Hook.

18       MR. MITCHELL:  Your Honor, if I may respond.  First

19  of all, that's not actually what happened.  Mr. Gonzalez did

20  not testify he was in the pool house at the time the alleged

21  assault took place.

22       THE COURT:  You got to get closer to the mic.

23       MR. MITCHELL:  Mr. Gonzalez did not say in his

24  affidavit that he was in the pool house at the time the

25  assault took place.  He was actually out in front, because he

1   got there quite a bit late.  He came to the front of the

2   house where he saw Peter Roe, drunk, standing in the driveway

3   waiting for his ride to leave.  Not in the pool -- he went to

4   the pool house afterwards.

5          As far as Mr. Capozzi is concerned, he pointed

6   out -- I think the gist of his testimony, if you read it, is,

7   yes, he expects to get all material evidence.  But I think it

8   is the police officers' determination first to make a

9   decision as to what is material and what's immaterial.  In

10  fact, Mr. Capozzi pointed out a couple of rather, you know,

11  extreme instances of what immateriality would be.  But he

12  could have -- he clearly could have asked if he wanted more

13  evidence, but he got -- he got enough.  He got what he had to

14  have.

15         And again, they apparently don't dispute the

16  propriety of the affidavit itself -- of the arrest warrant

17  affidavit.  I mean, they go back and forth.  It's like

18  trying to shoot at mercury, Your Honor, to fight their case.

19  And the reason for that is there's just nothing to it.

20         So I did want to correct the record with respect to

21  Sam Gonzalez, because that's not what he testified to -- or

22  what he swore to.

23         MS. BRAXTON:  Okay.  May I just add something about

24  the Gonzalez statement?

25         THE COURT:  Sure.

1          MS. BRAXTON:  So he was living in the pool house at

2     the time, renting it temporarily.  And he was at work late,

3     came back to the house at like 10:21.

4          Brunswick Student L put in his attorney written

5     statement submitted to the police that the tenant was there,

6     like through the course of the evening, and was moving his

7     belongs around.

8          Sam Gonzalez had text evidence that he did not get

9     to the house until 10:21 p.m.  He wasn't there during the

10     party, so Brunswick Student L's statement to the police was

11     completely contrary to the documentary evidence from Sam

12     Gonzalez about whether he was there or not.

13          During his deposition, Brunswick Student L admitted

14     that he lied to the police in his statement, and that there

15     wasn't a tenant there.  And that statement was used to, you

16     know, generate a conflict about what --

17          THE COURT:  Yeah, but his deposition five years

18     later that he lied to the police, that can't be visited upon

19     either the State's Attorney or the police officer preparing

20     the application; can it?  They don't know he's lying.

21          MS. BRAXTON:  Yeah.  I mean, so Det. Rondini did not

22     follow up on any of that with, you know, Brunswick Student

23     L.

24          THE COURT:  So, this is where we're circling back to

25     the adequacy of what she did.

1          MS. BRAXTON:  Right.

2          THE COURT:  And that, I think, is a real crossroads

3    on this decision, because you didn't disclose an expert that

4    says what she did was inadequate.  I don't know that the

5    jury, as a bunch of laypeople, can make that determination

6    without the necessary expertise.

7          Now, obviously you're going to be able to

8    cross-examine the expert, Hough, about what you believe

9    wasn't done, and the record that's been developed in terms of

10   what wasn't done and what maybe should have been done,

11   whether -- I haven't been all the way through the deposition

12   yet to see whether that happens.

13         But I think that other than -- I don't -- I have to

14   look at it, but I don't think that this jury can be asked to

15   decide was this investigation -- well, let me back up.

16         The allegation is that the investigation was a sham,

17   and obviously, the jury can be asked to decide that.  The

18   question is:  What is the competent evidence that has to go

19   to the jury to make that determination?

20         MS. BRAXTON:  Well, for example, ASA Capozzi could

21   testify about whether it's appropriate to leave

22   Mr. Gonzalez's statement out entirely, and the portion of

23   Brunswick Student L's statement that conflicted with Sam

24   Gonzalez, out of the arrest warrant, which is what happened.

25         THE COURT:  And I assume ASA Capozzi was asked about

1   that?

2           MS. BRAXTON:  Well, he was asked about whether

3   it should --

4           MR. MITCHELL:  He was not asked about that

5   particular issue.

6           MS. BRAXTON:  About whether --

7           If I could finish speaking before I'm interrupted, I

8   would really appreciate it.

9           He was asked about whether Mr. Gonzalez's statement

10  should have been included and whether everything that

11  Brunswick Student L had in his statement should have been

12  included, and he said yes.

13          MR. MITCHELL:  I have nothing further, Your Honor,

14  unless you have another question.

15          THE COURT:  I'm sure I have many, but the hour is

16  late.  Okay.  This has been very helpful.  Thank you both for

17  being as prepared as you were.  I think that it has helped me

18  to identify precisely the issues that I need to decide and in

19  what order I need to decide them before I get to the end

20  result.

21          I'll do a single decision with respect to both

22  motions.  As I indicated, I think I've already decided that

23  the jury is not going to be charged on assumption of risk if

24  this case goes to trial, for the reasons I've already

25  indicated.  I will look again at the waiver and estoppel

1   arguments.  I may reach the same conclusion.  I may pull back

2   until we hear evidence at trial, if the case is going to go

3   to trial.

4           This is going to be a substantial undertaking, and I

5   know you all have been waiting for a long time for the

6   argument to be had and the decision to issue.  I just don't

7   want you to be under the illusion that it's going to be in

8   the coming weeks, so...

9           MS. BRAXTON:  Thank you, Your Honor.

10          MS. HOOK:  Thank you, Your Honor.

11          THE COURT:  Okay.  Anything else we can do this

12  evening?  Hearing nothing.  Okay.  Thank you, counsel.  We'll

13  be in touch.

14          MR. MITCHELL:  Thank you, Your Honor.

15          MS. BRAXTON:  Thank you, Your Honor.

16          (Proceedings concluded, 4:46 p.m.)

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3            RE: *SCANLAN v. TOWN OF GREENWICH, ET AL.*

4                   Criminal No. 3:18-cv-01322-KAD

5

6        I, Tracy L. Gow, RPR, Official Court Reporter for the

7     United States District Court, District of Connecticut, do

8     hereby certify that the foregoing pages, 1 through 85, are a

9     true and accurate transcription of my shorthand notes taken

10    in the aforementioned matter to the best of my skill and

11    ability.

12

13                           /s/   TRACY L. GOW
                             Official Court Reporter
14                           U.S. District Court
                             915 Lafayette Boulevard, Room 216
15                           Bridgeport, Connecticut 06604
                             (203) 910-0323
16

17

18

19

20

21

22

23

24

25