## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PAULA SCANLON,<br>　　　*Plaintiff*, | ) | 3:18-CV-01322 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| TOWN OF GREENWICH, et al.,<br>　　　*Defendants*. | ) | MAY 20, 2022 |

### MEMORANDUM OF DECISION RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF No. 282 & ECF No. 284)

Kari A. Dooley, United States District Judge:

In this civil rights action, Plaintiff, Paula Scanlon,[1] asserts that Defendants, Town of Greenwich, and Detective Krystie Rondini ("Rondini") and Sergeant Detective Brent Reeves ("Reeves"), both officers with Greenwich Police Department, violated her right to equal protection when investigating her complaint of a June 3, 2016 sexual assault. She alleges, in substance, that because she named a student who attends Brunswick School as her assailant, Defendants, in collusion with Brunswick School and as a matter of Greenwich Police Department policy, conducted a "sham" investigation to shield the named assailant from prosecution. After years of extensive discovery and contentious litigation, the parties each filed motions for summary judgment. Plaintiff seeks summary judgment as to several of Defendants' Affirmative Defenses[2] and Defendants seek summary judgment on Plaintiff's Complaint. Defendants assert that Plaintiff has unearthed no evidence of the alleged policy of collusion to protect Brunswick School students and has not offered adequate evidence that the investigation undertaken by Defendants was

---

[1] When this action was commenced, Plaintiff was granted permission to proceed under the pseudonym Jane Doe. She has since decided to proceed using her real identity.

[2] The Court indicated at oral argument on the cross-motions for summary judgment that many of Plaintiff's arguments had merit. However, insofar as the Court has determined to grant Defendants' motion for summary judgment, Plaintiff's cross-motion is rendered moot.

improper or unprofessional, let alone a "sham." After a detailed review of the parties' substantial submissions, the Court concludes that Plaintiff has not identified a body of evidence that supports the inference that such a policy existed or, by extension, evidence that Defendants acted in accordance therewith in the investigation of her complaint. Defendants' motion for summary judgment is therefore GRANTED. (ECF No. 282).

**Standard of Review**

The standard under which courts review motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Significantly, the inquiry being conducted by the court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co*., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted).

"When a motion for summary judgment is properly supported by documents or other evidentiary materials," the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). A nonmoving party's "mere speculation or conjecture as to the true nature

of the facts" will not suffice to overcome a motion for summary judgment. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See id.* ("[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."); *see also Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) (concluding that nonmovant's "implausible claim" consisting of "bald assertion, completely unsupported by evidence," did not present "sufficient disagreement to require submission to a jury"). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## Facts

As a preliminary matter, the Court addresses Plaintiff's non-compliance with Local Rule 56(a). Local Rule 56(a)2(i) provides in pertinent part:

> A party opposing a motion for summary judgment shall file and serve with the opposition papers a document entitled "Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment," which shall include a reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c). . . . All admissions and denials shall be binding solely for purposes of the motion unless otherwise specified. All denials must meet the requirements of Local Rule 56(a)3. . . .

D. Conn. L. Civ. R. 56(a)2(i). Local Rule 56(a)3 requires that a denial of a movant's material fact be followed by a specific citation to evidence in the record, supporting the denial. D. Conn. L. Civ. R. 56(a)3. "Failure to provide specific citations to evidence in the record as required by . . . Local Rule [56(a)3] may result in the Court deeming admitted certain facts that are supported by the evidence." *Id. See Shetucket Plumbing Supply Inc. v. S.C.S. Agency, Inc.*, No. 3:05-CV-424(RNC), 570 F. Supp. 2d 282, 283 n.1 (D. Conn. July 3, 2008) (finding factual assertions in Local Rule

56(a)1 Statement to be "deemed admitted because they have not been squarely denied with specific

citation to evidence in the record as Local Rule 56(a)(3) requires"); *see also* Fed. R. Civ. P.

56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another

party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the

motion."). Further, Local Rule 56 "does not impose an obligation on a district court to perform an

independent review of the record to find proof of a factual dispute." *S.E.C. v. Glob. Telecom Servs.,*

*L.L.C.*, No. 3:03 CV 418 PCD, 325 F. Supp. 2d 94, 109 (D. Conn. July 19, 2004).

Here, Plaintiff's Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment does

not comply with Local Rule 56(a) in multiple significant respects. With respect to numerous

paragraphs, rather than indicate that Defendants' Rule 56(a)1 Statement of Fact is denied or

disputed with a citation to record evidence, she identifies facts as "disputed" that are not *in fact,*

disputed. She then follows this "disputed" designation with sometimes lengthy argument as to the

inferences that should or should not be drawn from the fact.

By way of example, Defendants' Local Rule 56(a)1 Statement includes at ¶ 53: "At no

time did [Plaintiff] reach out to [Defendant] Rondini after she gave her statement to try to clarify

or add more details." (ECF No. 282-1 at 9, ¶ 53) (citing ECF No. 283-1 at 264:9–12). Defendants'

citation to Plaintiff's deposition is accurate. Plaintiff acknowledged that she did not, in fact, "reach

out to [Defendant] Rondini after she gave her statement to try to clarify or add any more details to

her statement." (ECF No. 283-1 at 264:9–12). Notwithstanding, Plaintiff's response to this

statement of fact is as follows:

> Disputed. [Plaintiff] was a 16-year old girl who was not experienced in either sexual
> assault issues or the criminal justice system and did not know what details were
> important or even what she had said. This is typical of victims of sexual assault. . .
> . The [Greenwich Police Department] Uniform Policy Manual clearly puts the onus
> on the police investigator, and not the victim, to follow up with a victim in a non-
> judgmental manner. . . . Although [Plaintiff], herself, did not provide more details,

her attorney Audrey Felsen provided additional information to [Defendant] Rondini, including Peter Roe's Facebook apology to [Plaintiff's brother], a letter from [Greenwich Academy] counselor Charlanne Zepf Bauerlein and a summary of the events of the party. . . .

(ECF No. 312 at 15, ¶ 53) (internal citations omitted). Plaintiff's response is not in compliance with Local Rule 56(a). *See Risco v. McHugh*, No. 10 Civ. 6314(ER), 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. June 14, 2012) (finding Local Rule 56(a)2 Statement deficient where it "frivolously purports to deny certain factual assertions that a review of the record establishes have previously been admitted by Plaintiff in sworn testimony").

Similarly, Defendants' Local Rule 56(a)1 Statement includes at ¶ 65: "Two of [Plaintiff's] friends, [Brunswick] Student 3 and [Greenwich Academy] Student 1, also provided sworn statements to the [Greenwich Police Department] that a few days after the pool party [Plaintiff] had told them that Roe had just 'grazed' her over the swimsuit and laughed about the incident." (ECF No. 282-1 at 11, ¶ 65) (citing ECF No. 283-17 at 19–22; ECF No. 283-18 at 25–26, 30–32). Again, Defendants have accurately reported the content of these witness statements. Notwithstanding, Plaintiff's response to this statement of fact is as follows:

Disputed. These statements are not credible because there are numerous inconsistencies in them that [Defendant] Rondini failed to investigate, and they were provided with much prodding and coercion by Peter Roe's attorney Michael Jones. . . . [Defendant] Rondini's Case/Incident report concerning [Greenwich Academy] Student 1's statement describes . . . [Plaintiff] as very distraught when first approached by [Greenwich Academy] Student 1 in school—behavior that is inconsistent with [Greenwich Academy] Student 1's later description about [Plaintiff] laughing about it: "[[Greenwich Academy] Student 1] related that the Tuesday after the party at [Plaintiff's] she and [Plaintiff] were talking in school about the party when [Plaintiff] began to cry. [[Greenwich Academy] Student 1] asked [Plaintiff] what happened and she said something with [Peter Roe], [[Greenwich Academy] Student 1] asked her if [Peter Roe] raped her and [Plaintiff] only began to cry more. [[Greenwich Academy] Student 1] told her to calm down and she would come over to her house after school so they could talk then since school was not the best place to talk." . . . [Plaintiff's brother] walked into [Plaintiff's] room at the time [Greenwich Academy] Student 1 and [Brunswick] Student 3 were talking to her that day and observed that [Plaintiff] was crying

hysterically and not laughing, as suggested by these two witnesses. . . . Since [Defendant] Rondini never asked [Plaintiff] about this incident to resolve the discrepancy, she did not get this information. . . . Furthermore, [Greenwich Academy] Student 1 reported [Plaintiff's] words as Peter Roe's action as "his hand grazed her inner thigh." . . . By contrast, [Brunswick] Student 3 said [Plaintiff] described Roe's action as he "just grazed her over her swimsuit." . . . Other than using unlikely words for teenagers such as "grazed and "swimsuit," these two statements are not consistent with each other and, more importantly, not consistent with the several other statements provided by friends to whom [Plaintiff] had told the story. . . .

[Greenwich Academy] Student 1 had also been disciplined by [Greenwich Academy] administration for having bullied [Plaintiff] in the months after the investigation began. . . . The student's mother called [Greenwich Police Department] the next day with the intention of withdrawing her daughter's statement but was talked out of doing so by [Defendant] Reeves. . . .

[Brunswick] Student 3's statement was prepared by his attorney and submitted by him and his attorney in typewritten form at [Greenwich Police Department] headquarters. . . . Although [Defendant] Rondini was not at headquarters when they arrived and did not accept the statement, she falsely testified at deposition that she was there, took his statement, asked him only a couple of questions. . . . [Brunswick] Student 3 testified at deposition that he was at [Greenwich Police Department] headquarters only five minutes or so, didn't recognize [Defendant] Rondini, who was in the room during his deposition, that no one asked him any questions, and that his attorney had typed his statement. . . . The case/incident report is prepared by Badge 30, identified by Defendants as police officer Eric Scorca, and [Defendant] Rondini's work calendar confirms that she left for the day before [Brunswick] Student 3 arrived at the station. . . . [Brunswick] Student 3's statement also states that there was a tenant in the pool house where the assault took place in the bathroom, and that he was moving his belongings out during the party. This is in direct contrast with the tenant of the pool house, whose statement indicates that he did not arrive to the main house until around 10:21 p.m., and did not go to the pool house until all of the [Plaintiff's] friends were gone, around 11:15 p.m. . . . [Brunswick] Student 3's witness statement said that Roe was taken into the pool house bathroom around 9 p.m., and approximately 40 minutes later, around 9:40 p.m., he assisted Roe out of the bathroom and was taken by his two friends out to get the Uber. . . . In addition, the tenant was not moving his belongings out of the pool house that evening. . . . [Defendant] Rondini took no steps to resolve this discrepancy to try to ascertain credibility. Instead, she simply removed Gonazlez's statement and the portion of [Brunswick] Student 3's statement that referred to Gonzalez, from the arrest warrant application altogether. . . .

(ECF No. 312 at 21–22) (internal citations omitted). Again, Plaintiff's response is not in compliance with Local Rule 56(a). *See Risco*, 868 F. Supp. 2d at 85 n.2 (determining that Local

Rule 56(a)2 Statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts").

These are just two of many examples of Plaintiff's misuse of the Local Rule 56(a)2 Statement of Facts to argue the merits of her case. Indeed, many of Plaintiff's responses are replete with legal argument, conclusory allegations, personal belief and speculation,[3] which is inappropriate. *See* D. Conn. L. Civ. R. 56(a)3; *Costello v. New York State Nurses Ass'n*, No. 10 Civ. 3245(SAS), 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. April 25, 2011) (deeming admitted Rule 56(a)1 Statements where plaintiff responded with conclusory allegations, speculation, conjecture or legal arguments). Unfortunately, Plaintiff's approach defeats the purpose of Local Rule 56(a) as it all but precludes the Court from using the competing statements of facts to identify the existence and scope of any actual factual disputes.

Therefore, unless otherwise noted, the following facts are either expressly undisputed or deemed admitted by Plaintiff's failure to comply with Local Rule 56(a)3. *See Miron v. Town of Stratford*, No. 3:11-CV-466 (VLB), 976 F. Supp. 2d 120, 127 (D. Conn. Sept. 30, 2013) ("Where a party fails to appropriately deny material facts set forth in the moving party's 56(a)1 statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted.").

**The Parties**

In 2016, Plaintiff, then a minor, and her family lived in Greenwich, Connecticut. In the spring of 2016, Plaintiff was a sophomore in high school attending Greenwich Academy, a private all girls preparatory academy in Greenwich, Connecticut. (ECF No. 312 at 1, ¶¶ 2–3). Greenwich

---

[3] Plaintiff's argument with respect to Defendants' Local Rule 56(a)1 Statement at ¶ 53, premised in part upon her assessment that the witness statements were contrived or fabricated because teenagers would not use the terms "grazed" or "swimsuit," is emblematic of the veil of cynicism through which Plaintiff views any evidence that contradicts her own narrative.

Academy shares facilities and academic programs with Brunswick School, a private all boys preparatory academy in Greenwich, Connecticut. (*Id.* at 2, ¶¶ 5–6). The two schools' campuses are adjacent to each other and students from either school can, and often do, take courses offered at both schools. (*Id.* at 2, ¶ 6).

Defendant Rondini has been a member of Greenwich Police Department since 2004. (*Id.* at 7, ¶ 43). She has been assigned to the Special Victims Section since 2012. (*Id.*). Defendant Reeves is also a member of Greenwich Police Department and is Defendant Rondini's supervisor. (*Id.* at 8, ¶ 44). As Defendant Rondini's supervisor, Defendant Reeves is involved in all the cases Defendant Rondini handles and would read, review and discuss cases with her on a daily basis. (*Id.*).

On June 3, 2016, Plaintiff hosted a "pool party" at her home which was attended by students from Brunswick School, Greenwich Academy as well as at least one friend of Plaintiff who did not attend either school. (*Id.* at 1, ¶¶ 1, 4). Her parents were present as were the parents of some of her friends. (*Id.* at 2, ¶ 7). In addition, Plaintiff's brother and his friend were present during the party. (*Id.* at 2, ¶ 9).

**The Investigation**

On July 26, 2016, Plaintiff reported to her school counselor that she was sexually assaulted during the June 3, 2016 pool party at her home.[4] (*Id.* at 7, ¶ 41). That same day, Defendant Rondini

---

[4] The Court discusses the events of the June 3, 2016 pool party only to the extent revealed during the course of the investigation, not as may have been revealed during this litigation. In this vein, Plaintiff's objection to any evidence as to those events on the grounds that the Court ruled that "the events of the party are not admissible in this action" is OVERRULED. The Court issued no such ruling and cannot understand the genesis of Plaintiff's claim in this regard. The Court limited discovery on the basis that the jury would not be asked to decide what did or did not happen on June 3, 2016. The Court made no ruling as to the admissibility of evidence. Further, to the extent the investigation of Plaintiff's complaint revealed information pertaining to the events of the June 3, 2016 pool party, the nature and scope of that information is clearly relevant to an assessment of the investigation and whether Defendants violated Plaintiff's right to equal protection. Moreover, for purposes of this decision, the Court accepts, without finding, that Plaintiff was assaulted on June 3, 2016.

received a report from the Department of Children and Families regarding Plaintiff's allegation of a sexual assault. (*Id.* at 7, ¶ 42).

On July 28, 2016, Plaintiff's parents met with Defendant Rondini at the Greenwich Police Department to discuss the investigation into Plaintiff's allegations. (*Id.* at 8, ¶ 46). On August 2, 2016, Defendant Rondini went to Plaintiff's home to take Plaintiff's statement. (*Id.* at 8, ¶ 49). Plaintiff's parents were home at the time and both Defendant Rondini and Plaintiff's school counselor sat with Plaintiff as she gave her statement. (*Id.* at 9, ¶ 50).

Plaintiff told Defendant Rondini that the accused assailant, Peter Roe, a Brunswick School student, was very drunk at the pool party.[5] (ECF No. 283-19 at 5:1–13); (ECF No. 283-17 at 1). Therefore, Plaintiff and two of Roe's friends took Roe to the pool house bathroom for him to regurgitate the alcohol in his stomach. (ECF No. 283-17 at 1); (ECF No. 283-19 at 5:1–13); (ECF No. 282-1 at 4–5, ¶¶ 23–25). The two other boys left the bathroom at different times eventually leaving Plaintiff alone with Roe. (ECF No. 283-17 at 1–2); (ECF No. 283-19 at 5:14–25, 6:1–5); (ECF No. 282-1 at 5, ¶ 26). Plaintiff reported that, once alone, Roe tried to "get with" her, pushed himself up against her hard but she was able to push him away. (ECF No. 283-17 at 2); (ECF No. 282-1 at 5, ¶ 27); (ECF No. 283-19 at 6:4–25, 7:1–21). Plaintiff further reported that he pulled part of her top down and got "a finger inside the bottom of [her] suit bottom." (ECF No. 283-17 at 2). Plaintiff's written statement was consistent with the audio recording of her oral statement made the same day—August 2, 2016. (ECF No. 283-19).

Thereafter, Plaintiff's parents hired Attorney Audrey Felsen to represent her during the ongoing investigation. (ECF No. 282-1 at 8, ¶ 45). Attorney Felsen communicated with Defendant

---

[5] Roe appeared in this action through counsel and filed a motion for a protective order which sought, in part, use of a pseudonym. The Court granted that request insofar as Roe was a minor during the events in question and was never charged as a result of Plaintiff's accusation.

Rondini throughout the investigation and provided additional information whether requested by Defendant Rondini or not, although the parties disagree as to the quality and quantity of those communications. (*Id.* at 9–10, ¶ 55). Plaintiff's family also provided the police with the names of witnesses they believed were pertinent to the investigation, and summaries of information they expected from those witnesses. (*Id.* at 10, ¶ 56). In addition, at the request of Plaintiff's family, on September 1, 2016, Plaintiff's treating psychologist sent a letter to Defendant Rondini detailing Plaintiff's statement to her regarding the events at issue. (*Id.* at 10, ¶ 57). Roe had counsel during the investigation and through counsel declined to give a statement or submit to an interview by Greenwich Police Department, thus exercising his constitutional right to remain silent. (*Id.* at 10, ¶ 58). Thomas Philip, Headmaster of Brunswick School, indicated that if any charges were filed against Roe, then he would be removed from enrollment at Brunswick School. (ECF No. 283-13 at 154:6–12).

During the investigation, the Greenwich Police Department interviewed or obtained statements from approximately nineteen people, to include members of Plaintiff's family, other attendees of the June 3, 2016 pool party and individuals to whom Plaintiff had spoken about the assault, including her school counselor. (ECF No. 282-1 at 10, ¶ 59); (ECF No. 283-17). The investigation revealed, and Plaintiff had disclosed, that she spoke with several people about the incident prior to disclosing the assault to her school counselor. (ECF No. 282-1 at 11, ¶¶ 64–66). The various statements attributable to Plaintiff were in some instances different from each other and at least arguably inconsistent. (*Id.* at 10, ¶ 60). For example, Plaintiff told her counselor that she thought what Roe had done was "rape" but denied intercourse. (ECF No. 283-17 at 12–13). Plaintiff described to her counselor "[two] groping incidents—one on the upper part of her body/chest and one in the lower part of her body." (*Id.* at 13). To her counselor, Plaintiff clarified

that "he pulled her bathing suit top down and tried to grope her chest; he put his finger(s) in her vagina/vaginal area." (*Id.* at 14). Plaintiff said it was relatively quick as she tried to move his hands off of her. (*Id.*).

A witness identified as Minor 14, who was at the party but is not a Greenwich Academy student, told Defendant Rondini that on the night of the incident Plaintiff told her that Roe kept trying to "come onto her" in the bathroom but that she was able to push him off; that Roe attempted to "hook up" with Plaintiff but she told him no "over and over again for many reasons, including that he had a girlfriend and that he was extremely drunk." (*Id.* at 7); (ECF No. 282-1 at 11, ¶ 64). A witness identified as Greenwich Academy Student 1, told Defendant Rondini that on the Tuesday after the pool party, Plaintiff told her that while she was in the bathroom with Roe, he "tried to make out with her" and his "hand grazed her inner thigh." (ECF No. 283-17 at 19); (ECF No. 282-1 at 11, ¶ 65). Plaintiff indicated to Greenwich Academy Student 1 that "nothing penetrated her, so to speak." (ECF No. 283-17 at 19). Greenwich Academy Student 1 stated that while recounting the events of the party, Plaintiff "did not seem traumatized, she was even laughing a bit." (*Id.*); (ECF No. 282-1 at 11, ¶ 65). A witness identified as Brunswick School Student 3 provided a typed written statement through his attorney that on Tuesday, June 7, 2016, he and Greenwich Academy Student 1 were invited to Plaintiff's home. (ECF No. 283-17 at 20–22). On that date Plaintiff told Brunswick School Student 3 and Greenwich Academy Student 1 that Roe "had just 'grazed' her over her swimsuit." (*Id.* at 22); (ECF No. 282-1 at 11, ¶ 65). Brunswick School Student 3 further reported that Plaintiff "actually laughed when she made that statement . . . [and] [t]he three of [them] agreed it was not a big deal." (ECF No. 283-17 at 22); (ECF No. 282-1 at 11, ¶ 65). As a result of the inconsistencies between witness statements,

Defendant Rondini was unclear as to the precise nature of the physical assault. (ECF No. 282-1 at 13, ¶¶ 72–73).[6]

Similarly, Defendant Rondini received conflicting information as to the extent Plaintiff and the other guests may have been drinking alcohol at the pool party. (*Id*. at 12, ¶ 68). In the September 1, 2016 letter sent to Defendant Rondini at the request of Plaintiff's family, Plaintiff's psychologist stated that Plaintiff told her that she had not been drinking during the pool party and that alcohol was not provided to attendees. (*Id*. at 14, ¶¶ 57, 68, 79); (ECF No. 283-21 at 1–2). Additionally, a witness identified as PK, a friend of Plaintiff's brother who was also present, told Defendant Rondini that he did not see any indication of alcohol being consumed at the pool party. (ECF No. 283-17 at 9–10). Plaintiff was not asked on August 2, 2016 whether she had been drinking. (ECF No. 283-19). She did not volunteer the information one way or another. (*Id*.). However, during the investigation, Defendant Rondini was told by Greenwich Academy Student 1 that "both [Plaintiff and Roe] had been drinking." (ECF No. 283-17 at 19). And initial witness statements made clear that Roe had arrived at the pool party very intoxicated. (*Id*. at 1); (ECF No. 283-19 at 5:1–13). Further, Defendant Rondini was told by Minor 14 that Roe walked into the party "carrying what looked to be a wine or whiskey bottle," and that Plaintiff "seemed to have been drinking a deep reddish drink" though she was not sure if it had alcohol in it. (ECF No. 283-17 at 5); (ECF No. 282-1 at 12, ¶ 69). She added that "the majority of the drinks were alcohol and other kids were

---

[6] The Court describes these statements not to undermine Plaintiff's credibility or to question the validity of her sexual assault complaint. This case is about Defendants' conduct during the investigation of Plaintiff's complaint. What Defendants were told, accurate or not, was the available information on which they acted. Plaintiff repeatedly loses sight of her own case by advancing an after-the-fact narrative as to why the investigation should have resulted in a different outcome. For example, as discussed above, Plaintiff challenges the credibility of these statements and criticizes Defendant Rondini for including them in the application for an arrest warrant for Roe. Similarly, Plaintiff relies extensively upon an expert witness who provides context for her conduct as a victim of sexual assault. This is, again, irrelevant as to whether Defendants colluded with Brunswick School or conducted a sham investigation. Defendants certainly did not have the benefit of this expert's assessment of Plaintiff's conduct at the time they were conducting the investigation.

definitely drinking." (ECF No. 283-17 at 6); (ECF No. 282-1 at 12, ¶ 69). Moreover, Minor 14 stated that after the party Plaintiff "seemed pretty out of it" so they decided to go to bed. (ECF No. 283-17 at 8). As a result of the inconsistencies between witness statements, Defendant Rondini was also unclear as to the extent to which Plaintiff and the attendees may have consumed alcohol at the pool party.[7] (ECF No. 282-1 at 13, ¶¶ 72–73).

On November 17, 2016, Defendant Rondini re-interviewed Plaintiff in the presence of her counsel to clarify the information gathered through the investigation. (*Id*. at 13, ¶¶ 71–74); (ECF No. 283-20). During the interview, Defendant Rondini explained that some witnesses had indicated that Plaintiff had been drinking. (ECF No. 282-1 at 14, ¶ 77); (ECF No. 283-20 at 4:13–20). Plaintiff acknowledged that she had a few sips of beer which had been brought to the pool party by Brunswick School Student 3. (ECF No. 282-1 at 14, ¶ 78); (ECF No. 283-20 at 5:11–23).

Defendant Rondini also asked Plaintiff to describe the nature of the physical assault. (ECF No. 282-1 at 13, ¶¶ 71–73); (ECF No. 283-20 at 9:21–25, 10:1–2). While Plaintiff struggled to find the right words, she confirmed that Roe's finger "didn't go inside, but it was like right there," to which Defendant Rondini responded: "Touching? Would you say touching like skin-to-skin contact?" Plaintiff replied: "Yeah." (ECF No. 282-1 at 14, ¶¶ 75–76); (ECF No. 283-20 at 10:1–14).

During the investigation, Plaintiff's parents also hired Attorney Meredith Braxton to represent her during the investigation. (ECF No. 282-1 at 8, ¶ 45). On August 23, 2016, Attorney Braxton sent a letter to Defendant Reeves in which she requested that Headmaster Philip be

---

[7] Plaintiff contests the significance of this apparent contradiction because, when deposed in this action, Plaintiff's psychologist clarified that Plaintiff did not deny drinking, rather she denied being intoxicated and described herself as steady on her feet. But deposition testimony provided years after the fact is irrelevant to whether Defendant Rondini observed an apparent inconsistency in the information provided at the time of the investigation. Again, Plaintiff attempts to re-write the outcome of the investigation or undermine the legitimacy of the investigation with information gathered during this litigation—information not available to Defendants at the time of the investigation.

interviewed insofar as he may have additional information germane to the investigation. (ECF No. 307-43 at 5–6). The letter also contained numerous complaints about how Greenwich Police Department was conducting the investigation. (*Id.*). Specifically, Attorney Braxton indicated that there was an "initial delay" in the investigation into Plaintiff's allegations, disagreed with the characterization of the pool party as a "drinking party," and rebuked the characterization of the events as a "he said/she said" incident. (*Id.*). Moreover, Attorney Braxton took issue with Brunswick School conducting its own investigation into Plaintiff's allegations, criticized Greenwich Police Department for declining to ask Brunswick School to cease its independent investigation and accused Greenwich Police Department's investigation as being motivated by an "unduly cozy relationship" with Brunswick School. (*Id.*). Ultimately, Attorney Braxton stated to Defendant Reeves, "we are putting you and the [Greenwich Police Department] on notice that if we are not satisfied that the [Greenwich Police Department] fulfilled its duty in this case, we will go to the press and/or victim's rights advocates to air our discontent . . . in a public forum." (*Id.* at 6).

Notwithstanding the request contained in the letter, neither Defendant Rondini nor Defendant Reeves interviewed Headmaster Philip. (ECF No. 282-1 at 16, ¶ 89). Defendant Reeves testified that he did not see any reason to interview Headmaster Philip, as the headmaster of an educational institution is mandated to report known accusations of sexual assault to the Department of Children and Families. (ECF No. 304-9 at 78:14–25). Defendant Rondini testified that she made the affirmative decision not to interview Headmaster Philip. (ECF No. 283-7 at 30:15–20).

In December of 2016, at the conclusion of the investigation, Defendant Rondini submitted a twenty-one-page application for an arrest warrant for Roe to Assistant State's Attorney John Cappozzi seeking to charge Roe with sexual assault in the fourth degree in violation of Conn. Gen.

Stat. § 53a-73a. (ECF No. 282-1 at 14, ¶ 80); (ECF No. 283-22 at 2–22). The application recapped much of the information gathered during the investigation.[8] (ECF No. 282-1 at 14–15, ¶ 81); (ECF No. 283-22 at 2–22). In January of 2017, Assistant State's Attorney Cappozzi determined that the application lacked probable cause and did not present it to a judge of the Superior Court of Connecticut. (ECF No. 282-1 at 15, ¶ 83); (ECF No. 283-18 at 7).

Following this determination, Plaintiff's counsel and her parents sought a meeting with the State's Attorney Richard Colangelo. (ECF No. 282-1 at 15, ¶¶ 84–85). At the meeting, Plaintiff's counsel and her parents asked that the decision not to bring charges against Roe be revisited and reversed. (*Id.* at ¶ 85). State's Attorney Colangelo advised Plaintiff, her parents and her lawyer that the case would not be prosecuted because of the inconsistencies in Plaintiff's statements. (*Id.* at ¶¶ 85–86). Ultimately, it was the decision of the State's Attorney, not Defendants, that the charges against Roe would not be pursued.[9] (*Id.* at ¶¶ 83, 85–86).

Defendants retained Dr. Richard Hough as an expert in the field of police practices and procedures to review the adequacy of Greenwich Police Department's investigation of Plaintiff's complaint and the preparation of the arrest warrant application. (*Id.* at 17, ¶¶ 93–94). Dr. Hough reviewed, *inter alia,* the investigative file, which included all witness statements and reports of interviews, as well as the Application for Arrest Warrant submitted by Defendant Rondini for Roe. (ECF No. 283-44 at 11–14). Dr. Hough did not review the Greenwich Police Department policy and procedure manuals applicable to the 2016 investigation. (ECF No. 313-8 at 49:1–23). Dr. Hough offered an opinion that the investigation of Plaintiff's complaint and arrest warrant

---

[8] Plaintiff advances considerable criticism regarding the content of the application. For reasons discussed, those criticisms neither create a genuine issue of material fact nor support an inference that the investigation was intentionally subpar.

[9] Plaintiff does not allege that State's Attorney Colangelo or Assistant State's Attorney Cappozzi were aware of or complicit in the alleged Greenwich Police Department policy of shielding Brunswick School students from prosecution.

application were handled in a reasonable and appropriate manner that accorded with customary law enforcement practice involving allegations of battery or sexual assault.[10] (ECF No. 282-1 at 17–18, ¶¶ 95–97).

**Communication with Brunswick School**

It is not disputed that Defendant Rondini had no communication with anyone at Brunswick School during the investigation.[11] (*Id.* at 15, ¶ 87). Headmaster Philip also had no direct communication with Greenwich Police Department regarding this investigation and Greenwich Police Department never asked Headmaster Philip for information regarding the investigation. (*Id.* at 16, ¶ 89); (ECF No. 283-13 at 146:15–25, 217:18–23). Headmaster Philip specifically testified that he "would have told [Greenwich Police Department] whatever they wanted to know . . . [b]ut they never asked" him for information. (ECF No. 283-13 at 163:20–25, 164:1–2).

However, during the investigation, Plaintiff's family was in touch with Greenwich Academy regarding the allegations, the adequacy of support for Plaintiff, accommodations in light of the accused attending Brunswick School and other topics such as the nature and process of Roe's discipline. (ECF No. 307-53 at 122:16–25, 123:1–21); (ECF No. 304-5 at 1). On August 8, 2016 and at the request of Headmaster Philip, Molly King, the Greenwich Academy Headmistress, asked Plaintiff's father to provide an account of Plaintiff's allegations. (ECF No. 307-3 at 5). On

---

[10] Plaintiff sought to exclude Dr. Hough's testimony as irrelevant. (ECF No. 318). At oral argument on the motion to preclude, the Court determined that Dr. Hough's opinion in this regard was appropriate under Fed. R. Evid. 702 and would be considered in conjunction with Defendants' motion for summary judgment in light of Plaintiff's allegation that Defendants conducted a "sham" investigation. The Court also precluded certain opinions and took others under advisement. As the Court does not rely upon any of the opinions precluded or taken under advisement, the Court does not further address Plaintiff's motion to preclude Dr. Hough's testimony.

[11] Plaintiff's contention that Defendant Rondini secretly communicated with Brunswick School by communicating with Roe's lawyer, who in turn communicated with Roe, who in turn communicated with Headmaster Philip is little more than a conspiracy theory spun of whole cloth. Defendant Rondini had no control over who Roe or his lawyer spoke to about the investigation. And it is a fanciful notion indeed that Roe's lawyer would expect his client to share privileged communications with Headmaster Philip as a means of facilitating some illicit backchannel between Brunswick School and the Greenwich Police Department.

August 14, 2016, Plaintiff's father sent a detailed email to both Headmistress King and Headmaster Philip. (*Id.* at 13–14). Therein, Plaintiff's father summarized the circumstances of the pool party, emphasized that the pool party was "heavily supervised" and assured that no alcohol was served "either by the parents or anyone else," and speculated that some attendees may have been drunk as a result of consuming alcohol before the pool party. (*Id.* at 13). With respect to the accused, Plaintiff's father alleged that Roe's behavior was "aggressive and lewd" and "highly inappropriate" toward other female attendees, which resulted in a physical altercation with Plaintiff's brother. (*Id.*). Plaintiff's father further detailed the incident in the pool house bathroom where Plaintiff was sexually assaulted and described her treatment and accommodations following the incident. (*Id.* at 13–14).

Thereafter, Michael D'Angelo, Brunswick School Director of Security and a former officer of the Greenwich Police Department,[12] contacted Defendant Reeves to provide information he had regarding the investigation. (ECF No. 283-9 at 45:5–25, 46:1–6, 166:6–9); (ECF No. 307-33 at 21:3–6). The information D'Angelo provided included notifying Defendant Reeves that Plaintiff's father had contacted Headmaster Philip regarding Plaintiff's complaint and the corresponding investigation. (ECF No. 283-9 at 164:21–25, 166:6–9). D'Angelo told Defendant Reeves that Plaintiff's parents were calling Headmaster Philip in attempt to get Roe "in trouble" at Brunswick School. (*Id.* at 45:5–25, 166:20–25); (ECF No. 307-33 at 21:3–10). In response, Defendant Reeves told D'Angelo that he could not share any information about the investigation and subsequently

---

[12] D'Angelo retired from Greenwich Police Department in July of 2006. (ECF No. 283-12 at 11:4–9).

testified that he in fact shared no information about the investigation. (ECF No. 283-9 at 45:18–19, 46:2–6, 166:6–12).[13]

Following Defendant Reeves' conversation with D'Angelo, Defendant Reeves contacted Plaintiff's father by telephone. (*Id.* at 164:13–18); (ECF No. 307-2 at 31:1–23); (ECF No. 307-30 at 2–4); (ECF No. 307-48 at 68–70:1–25). He advised Plaintiff's father that he could be exposing himself to liability by communicating Plaintiff's allegations to third parties, including Headmaster Philip, and by having hosted a party with underaged-drinking. (ECF No. 307-2 at 32:20–23); (ECF No. 307-48 at 69:20–23). Plaintiff's father testified that Defendant Reeves told him that Plaintiff's complaint "was a 'he-said/she-said case and it is going nowhere . . . [because] there were no witnesses'" and that it would hinder Roe's efforts to go to college. (ECF No. 307-48 at 69:18–19, 70:15–16). Contrary to this testimony, Defendant Reeves testified that he advised Plaintiff's father as to the nature of the investigation and the potential consequences of repeating the allegations against Roe while the investigation was still ongoing. (ECF No. 283-9 at 168:15–25, 169:1–9). Specifically, Defendant Reeves testified that he explained "to [Plaintiff's father] that these cases are notoriously challenging to prosecute to begin with," even where a sexual assault investigation "actually has physical evidence," and that "in this particular case, [the Greenwich Police Department] didn't have physical evidence." (*Id.* at 167:10–20). Additionally, Defendant Reeves testified that he further advised Plaintiff's father that he "should probably be careful about making allegations to the school where [Roe] goes while the investigation is pending . . . [b]ecause he could ultimately get in trouble maybe." (*Id.* at 168:24–25, 169:1–6, 172:14–21).[14]

---

[13] Headmaster Philip testified that he directed D'Angelo to contact Greenwich Police Department to find out if Roe would be arrested so that Brunswick School could prepare to impose appropriate discipline. (ECF No. 283-13 at 125:3–20, 152:6–12, 153:20–25, 154:1–16).

[14] The parties dispute Defendant Reeves' intent in contacting Plaintiff's father. Plaintiff's father testified that he considered this contact a "dressing down" in an effort to get Plaintiff to withdraw or "drop" her complaint. (ECF No. 307-2 at 32:15–16); (ECF No. 307-48 at 70:8–10). On the other hand, Defendant Reeves explained that he "was trying

At the direction of Headmaster Philip, D'Angelo also contacted Christy Girard, a detective of Greenwich Police Department in the Special Victims Section, seeking information regarding the investigation of Plaintiff's complaint. (ECF No. 283-13 at 128:1–14); ECF No. 283-12 at 113:24–25, 114:1–7). D'Angelo testified that Girard "didn't have anything to offer," and, at the time of the contact, advised Headmaster Philip that she was "evasive" and provided no information regarding the investigation.[15] (ECF No. 283-12 at 114:22–25); (ECF No. 283-31 at 1). Girard does not recall this contact. (ECF No. 308-19 at 200:9–20). In any event, Defendant Rondini never spoke to Girard about the investigation of Plaintiff's complaint. (ECF No. 283-8 at 119:17–25).

As a factual matter, the Court concludes that there is no direct evidence of any inappropriate or "backchannel" communications between Defendants and Brunswick School regarding the investigation of Plaintiff's complaint, or any Greenwich Police Department policy of protecting Brunswick School students. Without such direct evidence, the Court examines the circumstantial evidence from which Plaintiff argues such communications were made or such "backchannel" existed. This additional circumstantial evidence regarding alleged collusion with Brunswick School or the existence of Greenwich Police Department's implicit policy of protecting Brunswick School students is addressed below.

---

to set up [Plaintiff's] father so that [Plaintiff's] father wouldn't be upset if the case didn't end up going the way most victims think a case is going to go, because they are the ones who are there." (ECF No. 283-9 at 171:19–23). Defendant Reeves further explained that he was "trying to protect [Plaintiff's father] from getting in trouble by talking about a juvenile suspect in a pending investigation," and that his concern was that Plaintiff's father has "enough going on with the investigation . . . [and] [h]e doesn't need to get heat from [Roe's] family as well." (*Id.* at 172:1–9). The Court need not resolve the competing testimony regarding this telephone conversation because even if the Court allows that Defendant Reeves expressed sympathy for Roe or evidentiary weaknesses with respect to Plaintiff's complaint, this singular conversation is not enough to get Plaintiff's case to a jury. As discussed, there is an absolute dearth of direct or circumstantial evidence to support Plaintiff's claim that her equal protection rights were violated as a result of a Greenwich Police Department policy to shield Brunswick School students from prosecution.

[15] Plaintiff observes that in August of 2016, Girard was made liaison to Brunswick School and that the inference to be drawn from this is that she was "intended to serve as a conduit for information on the [Plaintiff's] investigation." This remarkable assertion is without any factual or evidentiary foundation. Similar to the theory of illicit "backchannel" noted above, this unfounded accusation is nothing more than conjecture born of cynicism.

**Discussion**

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal quotation marks omitted). "Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. . . . In so doing, we have explained that [t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citations omitted; internal quotation marks omitted). "Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Beard v. Town of Monroe*, 666 F. App'x 62, 65 (2d Cir. 2016) (internal quotation mark omitted).[16] Alternatively, "[a] violation of equal protection by selective enforcement arises if: (1) the person, compared with others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."[17] *Crowley v. Courville*, 76 F.3d 47, 52–53 (2d

---

[16] "In order to demonstrate sufficient similarity to a comparator, the plaintiff must establish that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Telian v. Town of Delhi*, 709 F. App'x 79, 81 (2d Cir. 2018).

[17] "Although the issue of whether an action was motivated by malice generally is a question of fact properly left to the jury, . . . summary judgment [is proper] where the nonmoving party adduces nothing more than speculation to support its claims." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 502 (2d Cir. 2001).

Cir. 1996) "Under either theory, a plaintiff must [demonstrate] that he or she was treated differently from others similarly situated." *Arteta v. Cty. of Orange*, 141 F. App'x 3, 8 (2d Cir. 2005); *Hu v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019).

"Classifications that do not proceed [ ] along suspect lines . . . must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 219 (2d Cir. 2012) (internal quotation mark omitted; alterations in original). The Second Circuit Court of Appeals has observed that when a statute, policy or other state action does not "burden a fundamental right or involve a suspect or quasi-suspect classification such as race, sex, alienage, or national origin, . . . [it] is presumed to be valid and will be sustained if the classification is . . . rationally related to a legitimate state interest." *Myers v. Cty. of Orange*, 157 F.3d 66, 75 (2d Cir. 1998) (quoting *Cleburne*, 473 U.S. at 440). The Second Circuit explained that, with respect to state action that draws distinctions on the basis of non-suspect classifications, "the Equal Protection Clause allows the States wide latitude and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Myers*, 157 F.3d at 75. However, where distinctions drawn by the States are not rationally related to a legitimate state interest, they will not be sustained. *Id.* (collecting cases). Plaintiff asserts that she was treated differently from other claimants alleging criminal assault because she identified her assailant as a Brunswick School student. Classification on the basis of college-preparatory day school enrollment is, of course, a non-suspect classification subject to rational basis review.

In *Myers*, the plaintiff challenged a district attorney "first-come first-served" policy which acted as a blanket proscription against accepting or investigating criminal-cross complaints until the initial complaint had been either dismissed or prosecuted. *Id.* at 69. There, the police responded

to a complaint of an assault purportedly committed by the plaintiff. *Id.* at 69–70. The plaintiff, when interviewed, denied the assault and claimed that he himself was the victim of an assault by the complainant. *Id.* at 69. The police did not investigate his claim, accept his complaint or pursue his allegations, and instead, pursuant to the policy, prosecuted the plaintiff on the strength of the first complaint. *Id.* at 70–71. The plaintiff was ultimately exonerated and brought an equal protection claim challenging the policy by which he was not allowed to file a cross-complaint against his accuser. *Id.* at 72.

The Second Circuit held that the policy in question violated the cross-complainant's constitutional right to equal protection under the law. *Id.* at 74. Specifically, the Second Circuit stated that "a policy by a police department or district attorney's . . . office favoring an initial complainant over a later one without giving primary regard to the particular facts involved in the case violates the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 69. The Second Circuit further found that the policy "create[d] an unnecessary risk that innocent persons will be prosecuted and possibly convicted," and concluded that the policy "bears no rational relationship to the legitimate governmental interest in impartial law enforcement." *Id.* at 75–76.

In *Dalton v. Reynolds*, the plaintiff brought an equal protection claim on grounds similar to those asserted here. 2 F.4th 1300 (10th Cir.), *cert. denied*, 142 S. Ct. 348 (2021)). The plaintiff in *Dalton* was the executer of the estate of a decedent who had been murdered by her boyfriend, a police officer with the defendant city police department. *Id.* at 1303. Plaintiff alleged that the decedent's equal protection rights were violated on the basis that her domestic violence complaint was handled differently than other victims of domestic violence because she had named a police officer as the abuser. *Id.* Prior to the murder, the decedent had made multiple reports of domestic violence against her boyfriend. *Id.* at 1304–05. The case evidence established a chilling escalation

of events and a series of reports of violence and threats by the boyfriend directed towards the decedent. *Id.* at 1304–06. Instead of acting in accordance with department policy and practice, the defendant police department, *inter alia*, tried to diffuse the situation in an effort to protect the boyfriend; failed to timely refer the complaint to a different law enforcement agency; and when another law enforcement agency engaged the boyfriend during the escalating situation, failed to advise that agency of the earlier complaints or threats to the decedent. *Id.* at 1304–08. The Tenth Circuit Court of Appeals determined that the plaintiff established an equal protection violation insofar as there was no rational basis to conduct the investigation of the police officer assailant differently than a complaint against a non-police officer, and that to do so served no legitimate state interest. *Id.* at 1309–10.

In support of her equal protection claim, Plaintiff alleges that Greenwich Police Department had an implicit policy of protecting Brunswick School students at the expense of their victims which undermined Greenwich Police Department's ability to fully investigate her complaint against a Brunswick School student, thereby depriving her of the right to be treated the same as other victims of criminal assaults. (ECF No. 311 at 50–51). Preliminarily, unlike in *Dalton*, Plaintiff here alleges that Defendants had a pattern and policy of treating complaints against Brunswick School students differently than complaints against others—not that they only did so in response to her complaint. And unlike in *Myers,* Defendants deny the existence of any policy at all and thus do not defend this case on the theory that such a policy serves some legitimate state interest. The threshold question for the Court is whether there is a genuine issue of material fact as to the existence of such a policy or Defendants acting in accordance therewith in the investigation of Plaintiff's complaint.[18]

---

[18] Although a private citizen has a right to equal protection under the Fourteenth Amendment, "[a] private citizen does not have a constitutional right to compel government officials to arrest or prosecute another person." *McCrary v. Cty.*

Discovery is now complete. The parties agree that there is no evidence of an express Greenwich Police Department policy, written or oral, of the type alleged. And as discussed above, nor is there direct evidence of inappropriate communications between Brunswick School and Defendants with respect to Plaintiff's assault complaint. Nor is there any dispute that Defendants did, in fact, submit an application for an arrest warrant charging Roe with sexual assault in the fourth degree and that the decision not to present the application to a Superior Court judge was made by Assistant State's Attorney Cappozzi and State's Attorney Colangelo, who are not defendants and who are not alleged to have been complicit in the policy of collusion and protection alleged.

Notwithstanding, Plaintiff asserts that there is adequate circumstantial evidence from which an implicit policy of this nature may be inferred. After careful examination of the evidence from which Plaintiff advances this claim, it is clear that the inference she seeks is not a reasonable one. It is born of cynicism, conjecture, inappropriate lay opinion and supposition upon supposition.

First, there is no dispute that Brunswick School security staff are comprised largely of former Greenwich Police Department officers. As such, Brunswick School staff would have and do have relationships with some of their former colleagues who are employed at the Greenwich Police Department. This alone does not support an inference that Defendants improperly shared information with Brunswick School or that a policy of collusion to protect Brunswick School students existed.

---

*of Nassau*, 493 F. Supp. 2d 581, 588 (E.D.N.Y. 2007); *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (holding that a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another). Thus, if there is no genuine issue of material fact that no such policy existed or, by extension, that Defendants did not act in accordance therewith, the Court need not take up whether Defendants properly conducted the investigation of Plaintiff's complaint. In other words, if the evidence does not tend to support any reasonable inference that Defendants' investigation had the nefarious purpose of protecting Roe, the manner in which it was conducted and the result of the investigation are not relevant to Plaintiff's claims.

In addition to the fact that Brunswick School's security is staffed by former Greenwich Police Department officers, Plaintiff cites to her father's email to Headmaster Philip which was followed by the call from Defendant Reeves as evidence of collusion. Plaintiff argues that the timing of the telephone call permits the inference that Defendants were actively working with Brunswick School to subvert the investigation of Plaintiff's complaint. Independently and in combination, neither the fact that the security staff were former Greenwich Police Department officers, nor Defendant Reeves' call to Plaintiff's father supports the inference Plaintiff urges.[19] Defendant Reeves acknowledged that D'Angelo called him and shared information that Plaintiff's father was in communication with Brunswick School. But as discussed above, Greenwich Police Department did not initiate any communications with Brunswick School during the investigation of Plaintiff's complaint and, when contacted by Brunswick School, Greenwich Police Department did not share any information. However, upon receiving information from D'Angelo, Defendant Reeves acted on that information as he saw fit. The parties' disagreement as to Defendant Reeves' subjective intent when he called Plaintiff's father does not create a genuine issue of material fact as to whether the call was the result of collusion with Brunswick School or a policy to protect Brunswick School students.

Lastly, Plaintiff cites to four complaints of assault which she argues demonstrates the complicit and nefarious nature of the relationship between Greenwich Police Department and Brunswick School: (1) a 2014 investigation into whether one or more Brunswick School students sexually assaulted an intoxicated girl and recorded the assault; (2) a similar allegation from around

---

[19] Plaintiff also cites the email from D'Angelo to Headmaster Philip regarding D'Angelo's efforts to obtain information from Girard, in which he describes Girard as "evasive." Plaintiff asserts that the use of the word "evasive" supports an inference that at other times, Girard has freely provided information in response to D'Angelo's inquiries thus demonstrating the "backchannel." This is yet another example of Plaintiff advancing an unsupported supposition as a "reasonable inference."

the same time period; (3) a 2015 investigation of a fight between a Brunswick School student and a student at Greenwich High School; and (4) the investigation of Plaintiff's complaint.

**The 2014 Investigation**

In October of 2014, Greenwich Police Department received information that a minor female was recorded being digitally manipulated under her clothing by a male juvenile, who attended Brunswick School. (ECF No. 283-35 at 1–2). Girard was assigned the investigation. (*Id.* at 1). In the video, the minor female appeared to be unresponsive and unaware of her surroundings. (*Id.*). Greenwich Police Department was able to identify the minor female and Girard contacted her parents. (*Id.* at 2). The parents advised Girard that the contact was consensual. (*Id.*); (ECF No. 283-5 at 96:11–15). Not satisfied, Girard advised the parents that they should view the video and expressed her doubt that the contact was consensual. (ECF No. 283-35 at 2); (ECF No. 283-5 at 96:19–25, 97:1–13). Girard shared the video with the parents, who also questioned whether their daughter could have consented to the contact depicted. (ECF No. 283-35 at 2). The parents indicated that they would speak with their daughter again. (*Id.*); (ECF No. 283-5 at 97:18–20). Thereafter, the parents again advised Girard that the contact was consensual, and they did not want Greenwich Police Department to undertake any investigation. (ECF No. 283-35 at 7); (ECF No. 283-5 at 97:20–22). Not comfortable with the parents' decision, Girard contacted the State's Attorney for guidance, who instructed her to "get it in writing" that the minor female and her family did not wish to make a criminal complaint. (ECF No. 283-35 at 7); (ECF No. 283-5 at 97:24–25, 98:1–11). The parents provided a written statement to that effect and the investigation closed. (ECF No. 283-35 at 7, 9–10). Mark Zuccarella, Sergeant of Greenwich Police Department's Special Victims Section at that time, testified that he and Girard felt that the minor

female depicted in the video was violated and they wanted Brunswick School students arrested in connection with the assault. (ECF No. 307-16 at 203: 5–10, 204:4–7).

From this series of events, Plaintiff asserts that Defendants knew of a sexual assault by a Brunswick School student and failed to investigate.[20] Plaintiff's characterization misstates the evidence, and even accepting Plaintiff's characterization, does not support an inference of a policy of protecting Brunswick School students from prosecution.

While it is certainly true that the video provided *evidence of* a sexual assault, purportedly perpetrated by a Brunswick School student, the minor female who appears in the video to be the victim of such an assault disavowed any such conclusion. Through her parents, Girard and Greenwich Police Department were repeatedly advised that there would be no criminal complaint made in connection with the events depicted on the video and that the contact was consensual.

However, even if one accepts Plaintiff's conclusion that, in fact, a sexual assault occurred and it was perpetrated by a Brunswick School student, this 2014 investigation does not give rise to an inference of the collusion or policy alleged by Plaintiff. To the contrary, the evidence regarding the Greenwich Police Department's handling of this matter bespeaks the opposite. Girard did not accept the parents' initial assessment that the contact was consensual. She encouraged them to view the video, which they did. When they repeated that no criminal complaint would be made because the contact was consensual, she was sufficiently troubled by what she saw on the video that she reached out to the State's Attorney for advice as to how she should proceed.

---

[20] In a bit of a red herring, Plaintiff also alleges that Girard violated Greenwich Police Department's conflict-of-interest policy in investigating this claim because her son was attending Brunswick School during the course of the investigation. Specifically, Plaintiff avers that, through her son's enrollment, Girard received a financial benefit from Brunswick School in exchange for her compliance in colluding in favor of Brunswick School students. Plaintiff has provided no evidence to support this stunning accusation of corruption or of Girard's direct or indirect receipt of any financial benefit from Brunswick School. Moreover, even if Girard had received some form of financial benefit from the Brunswick School in exchange for a "sham" investigation, it does not follow that Greenwich Police Department maintained a policy of protecting Brunswick School students or that Defendants Rondini and Reeve acted in accordance with any such policy two years later during the investigation of Plaintiff's complaint.

These are not the actions of Greenwich Police Department shielding Brunswick School students from prosecution. After Girard followed the advice of the State's Attorney, there was little else she could do. Indeed, officers of Greenwich Police Department's Special Victims Section believed that the minor female depicted in the video was violated and wanted Brunswick School students arrested in connection with the assault. Although Girard still had doubts about whether the video depicted a consensual encounter, there was never a complaint to investigate as the parents of the minor female depicted in the video made clear that they wanted no investigation. In sum, although the view from ten thousand feet might suggest that a Brunswick School student committed a sexual assault and Greenwich Police Department did nothing about it, the view from the ground demonstrates just the opposite. The 2014 investigation provides no basis upon which to infer either collusion between Greenwich Police Department and Brunswick School or a policy to protect Brunswick School students from prosecution.[21]

**The Second Video of a Sexual Assault**

Plaintiff asserts that there was a second video showing a sexual assault of a minor female that was never investigated by the Greenwich Police Department. The evidence regarding this claim is so reed thin that it sheds no light on Plaintiff's allegations.

In 2014, a witness identified as Dr. X testified that she found a video on her daughter's phone depicting what appeared to be several male juveniles sexually assaulting a naked minor female. (ECF No. 283-15 at 23:25, 24:1–7). Dr. X did not know the identity of the minor female or the male juveniles depicted in the video. (*Id.* at 24:11–20, 25:1–22, 26:2–4, 41:7–16). She

---

[21] The Court rejects Plaintiff's unsupported allegation that Girard inappropriately communicated with Headmaster Philip during this 2014 investigation. Although Girard did advise Headmaster Philip that the minor female's parents wanted to speak with her prior to any interview by Greenwich Police Department and that the parents had subsequently informed Girard that no sexual assault had occurred, she also shared this information with Headmistress King because the minor female depicted in the video was a student at Greenwich Academy.

testified that her daughter told her that she did not know who the male juveniles were but assumed they were Brunswick School students. (*Id.* at 25:10–12, 24–25, 26:1–4, 39:7–16, 41:17–19, 44:10–25). Dr. X testified that she submitted the video via text message to the cell phone of Thomas Keegan, a retired police officer of Greenwich Police Department who was not employed by Greenwich Police Department at the time, and she does not know what happened to it thereafter. (*Id.* at 29:5–24, 30:1–10, 39:3–6, 41:4–6).

Keegan testified that he never viewed a video depicting a naked minor female. (ECF No. 283-38 at 77:13–15, 78:4–15, 22–25). He does recall a video involving underage drinking but the video he received was too dark to see anything. (*Id.* at 78:8–21, 85:7–8). He testified that he gave the video to James Bonney, a former lieutenant at Greenwich Police Department who was employed by Greenwich Police Department at the time. (*Id.* at 76:3–6, 77:1–10, 85:10–13).

Bonney does not recall ever receiving a video from Keegan or having any involvement in the matter. (ECF No. 307-18 at 47:10–17, 79:7–13). Bonney accepts that if Keegan said that he gave a video to him, then he probably did. (*Id.* at 79:12–13; 80:5–6). Bonney further testified that if he received a video depicting what might be a sexual assault, he would have given it to Greenwich Police Department's Special Victims Section. (*Id.* at 79:14–25). But Bonney does not recall doing so with respect to a video purportedly sent from Keegan in 2014. (*Id.* at 79:21–25, 80:1–2, 19–21). Zuccarella testified that there is no record of any such video being received by Greenwich Police Department's Special Victims Section or of any investigation being opened as a result. (ECF No. 307-16 at 214:17–25, 227:5–24, 228:14–22, 229:2–4, 233:6–23, 234:11–20, 25, 235:1).

Plaintiff asserts that this evidence establishes that Greenwich Police Department received evidence of a sexual assault by Brunswick School students and did nothing. No rational jury could

reasonably so conclude based upon the evidence of record. First, the only person who claims to have seen this video is Dr. X and she cannot identify the minor female or the boys depicted therein. While she might be able to describe the video content, she cannot identify the male juveniles at all, let alone the school that they attended. And her daughter's statement to her that she assumed the male juveniles were Brunswick School students is inadmissible hearsay.[22] Second, there is no evidence that this video was ever provided to Greenwich Police Department. Dr. X testified that she gave it to Keegan, a *former* officer of Greenwich Police Department at that time. Keegan, however, has no recollection of ever seeing such a video. He recalls a completely dark video involving underaged drinking which he gave to Bonney. Bonney, however, has no recollection of receiving any video from Keegan, let alone one depicting what may have been a sexual assault involving Brunswick School students. Although Bonney testified that had he received such a video he would have given it to Greenwich Police Department's Special Victims Section, there is no evidence of any such video being received by Greenwich Police Department or the Special Victims Section. In sum, there might have been a video, that might have depicted a sexual assault of an unknown minor female, by unidentified male juveniles that might have been Brunswick School students and this video might have been provided to the Greenwich Police Department. Beyond Keegan however, the evidence as to the existence or delivery of this video to Greenwich Police Department completely evaporates. Keegan, the first link in the chain of delivery, does not remember seeing or receiving such a video at all; Bonney does not recall seeing or receiving such a video and Greenwich Police Department has no record of receiving such a video. In order to

---

[22] Even if the statement is not hearsay, there is no evidence that the identification of the male juveniles as possible Brunswick School students was communicated to Keegan, Bonney, Greenwich Police Department or anyone else. Without some indication that Defendants had that knowledge, this incident affords no basis upon which to infer that the alleged policy of collusion and protection existed.

draw the extraordinary inference urged by Plaintiff, the jury would be required to resort to unacceptable and impermissible speculation to an equally extraordinary degree.

**The 2015 Investigation**

On October 3, 2015, a fight occurred at the Greenwich Teen Center between a Brunswick School student and a Greenwich High School student. (ECF No. 283-34 at 3–4). The Brunswick School student was 17 years old while the Greenwich High School student was 18 years old. (*Id.* at 3, 5); (ECF No. 283-39 at 1). The Greenwich High School student sustained injuries requiring medical attention, while the Brunswick School student did not. (ECF No. 283-34 at 4). The Greenwich High School student's father reported the incident to the Greenwich Police Department approximately one hour later. (*Id.* at 3). Thereafter, an investigating officer of Greenwich Police Department was dispatched to the hospital where the Greenwich High School student was receiving medical attention. (*Id.*). The Greenwich High School student and his father spoke with the investigator and the Greenwich High School student provided a sworn written statement averring that the Brunswick School student was the initial aggressor and that he did not strike back. (*Id.* at 3–5). The Greenwich High School student also reported that, after security personnel broke up the fight, he and the Brunswick School student were brough to speak with Kyle Silver, the Director of the Teen Center. (*Id.* at 5). Silver told investigating officers that, immediately following the fight, the Greenwich High School student admitted to him that he had been the initial aggressor and had started the fight by pushing the Brunswick School student. (*Id.* at 11). Silver's statement corroborated the Brunswick School student's statement provided during an interview by Greenwich Police Department. (*Id.* at 9). The investigation ultimately revealed that the Greenwich High School student instigated the altercation and that the Brunswick School student acted in self-defense. (*Id.* at 13). No charges were brought or pursued against either student. (*Id.*).

Plaintiff opines that following the fight, Headmaster Philip "swung into action" in an effort to control the narrative and protect the Brunswick School student. Specifically, Plaintiff notes that on October 8, 2015, Headmaster Philip emailed the Greenwich High School student's parents stating he had lengthy discussions with the Brunswick School student and his father, and also contacted the Teen Center and the Greenwich Police Department. (ECF No. 283-39 at 2). Plaintiff suggests that the Greenwich Police Department's investigation of this incident supports an inference of collusion or policy to protect Brunswick School students because (1) Greenwich Police Department did not document its contact with Headmaster Philip, and (2) Greenwich Police Department did not reconcile the sworn statement of the Greenwich High School student—that the Brunswick School student instigated the altercation—with the statements of Silver and the Brunswick School student—that the Greenwich High School student instigated the altercation. The Court disagrees. No jury could reasonably conclude based upon this evidence that a Greenwich Police Department policy of protecting Brunswick School students exists. Even if Headmaster Philip's contact with Silver and the Brunswick School student had influenced their statements, an assertion for which there is no evidence, there is no evidence that Greenwich Police Department was aware of or complicit in Headmaster Philip's efforts.[23] Moreover, the fact that the Greenwich Police Department did not document contact from Headmaster Philip does not tend to establish an illicit backchannel between Brunswick School and Greenwich Police Department as alleged. Indeed, only the Brunswick School student, the Greenwich High School student and Silver were able to provide any details with respect to the initiation of the fight. Again, Plaintiff's assertion that Headmaster Philip's contact with Greenwich Police Department may have altered

---

[23] Although there is little evidence tending to support this accusation, whether Headmaster Philip undertook steps to protect Brunswick School students from being arrested, conduct on which the Court need not opine, does not establish that he did so with the assistance of the Greenwich Police Department. Plaintiff has oft been critical of Headmaster Philip and in doing so has conflated his conduct with that of Defendants.

the outcome of the investigation requires resort to unacceptable and impermissible speculation. The investigation of the Teen Center incident provides no basis upon which to infer either collusion between Greenwich Police Department and Brunswick School or a policy to protect Brunswick School students from prosecution.

### The Investigation of Plaintiff's Complaint

Finally, Plaintiff spends considerable time and effort dissecting and criticizing the investigation of her complaint. She argues that Defendants' allegedly deficient investigation of her complaint is evidence itself of a policy of collusion and protection of Brunswick School students. The Court disagrees.

Dr. Hough, Defendants' expert in the field of police practices and procedures, opined that Greenwich Police Departments' investigation of Plaintiff's complaint and arrest warrant application were handled in a reasonable and appropriate manner that accorded with customary law enforcement practice involving allegations of battery or sexual assault. In seeking to preclude the testimony of Dr. Hough as irrelevant, Plaintiff asserts that the competence of Greenwich Police Department's investigation as it relates to customary law enforcement practices is not an issue in this case. (ECF No. 318-1 at 5). Specifically, Plaintiff states that "[t]here is no allegation or claim that [Greenwich Police Department's] investigation failed to comply with customary law enforcement practice." (*Id.* at 1–2).[24] Defendants argue that this statement is a judicial admission that Defendants' investigation of Plaintiff's complaint was in full compliance with customary law enforcement practices, which would largely dispense with Plaintiff's factual and legal arguments

---

[24] Plaintiff elaborated that, alternatively, the appropriate legal standard at issue is whether Greenwich Police Department's investigation of Plaintiff's complaint "followed the same practices and policies as their investigations of other criminal assault complaints." (*Id.* at 5).

regarding the inadequacies of the investigation.[25] Plaintiff asserts that this was not a judicial admission but was simply the framing of the issues surrounding Dr. Hough's testimony.

"A judicial admission is a statement made by a party or its counsel which has the effect of withdrawing a fact from contention and which binds the party making it throughout the course of the proceeding . . . . To constitute a judicial admission, the statement must be one of fact—a legal conclusion does not suffice. . . . Moreover, a statement must have sufficient formality or conclusiveness to be a judicial admission. . . . [The Second Circuit has] explained that a judicial admission must also be deliberate, clear, and unambiguous. . . . [Thus,] in order for a statement to constitute a judicial admission it must not only be a formal statement of fact but must also be intentional, clear, and unambiguous." *In re Motors Liquidation Co*., 957 F.3d 357, 360–61 (2d Cir. 2020) (citations omitted; internal quotation marks omitted). "A court can appropriately treat statements in briefs as binding judicial admissions of fact." *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994). "Admissions by parties are not subject to judicial scrutiny to ensure that the admissions are fully supported by the underlying record." *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009).

At the outset of this litigation, Plaintiff alleged that the investigation was a "sham" designed to insulate Roe from prosecution. (*See* ECF No. 11 at 2, ¶ 3) (Greenwich Police Department's Special Victims Section "subordinates its own investigation into complaints against Brunswick students"); (*id.* at 3–4, ¶ 7) (Greenwich Police Department's Special Victims Section completed

---

[25] Defendants also raised this issue in response to Plaintiff's motion to preclude Dr. Hough's testimony. (ECF No. 330 at 1, 5–6). Specifically, Defendants noted Plaintiff's "recent admission" in her motion to preclude that Defendants' investigation into her complaint "conformed to accepted police practices and standard procedures." (*Id*. at 1, 5). In light of this admission, Defendants further argued that "Plaintiff has now abandoned" her position that they conducted a "sham" investigation. (*Id*. at 6). Plaintiff responded to Defendants' argument in her reply memorandum in support of the motion to preclude. (ECF No. 331 at 1, 3). The Court did not take up the issue in connection with that motion and instead ruled that the prior allegation of a "sham" investigation defeated Plaintiff's argument that Dr. Hough's testimony was irrelevant. (ECF No. 365). Defendants raised the issue again in the summary judgment briefing and the Court is required, in this context, to address the issue.

"a sham investigation . . . that was designed to . . . convince the State's Attorney not to file any charges against the Brunswick attacker"); (*id.* at 4, ¶ 8) (Greenwich Police Department's Special Victims Section "compromises its ability to conduct an objective and thorough investigation"); (*id.* at 6, ¶¶ 14–15) (Defendant Reeves "directed" and Defendant Rondini "conducted" "the sham investigation into [Plaintiff's] complaint"); (*id.* at 10–11, ¶ 33d) (Defendants Reeves and Rondini utilized "'interview' techniques . . . designed to allow the Brunswick Witnesses to put forward the Brunswick version of events, without any kind of challenging questioning"); (*id.* at 13, ¶ 37) (Defendants Reeves and Rondini "took . . . steps to undermine Plaintiff's complaint and impugn her credibility so that an arrest warrant would never be issued"); (*id.* at 15, ¶ 44) ("Defendants violated Plaintiff's rights by subordinating their investigation into her sexual assault complaint"); (*id.* at 16, ¶ 50) (Defendants "subverted the mandatory [Greenwich Police Department] policy"); (*id.* at 16, ¶ 51) (Defendants "used coercion, intimidation and manipulation of facts to interfere with Plaintiff's right to prosecute her complaint"). The reasonable inference to be drawn from such an allegation is that the investigation was, *at the very least*, subpar and not in accordance with customary police practices and procedures.

The motion to preclude Dr. Hough's testimony followed the completion of years of discovery. Plaintiff sought to preclude the testimony as irrelevant and thereby asserted that "[t]here is no allegation *or claim* that [Defendants'] investigation failed to comply with customary law enforcement practice." (ECF No. 318-1 at 1–2) (emphasis added). This is Plaintiff's own statement of her factual claims and it has the effect of withdrawing the previously raised fact in contention regarding the "sham" investigation. Although the assertion that the testimony of Dr. Hough is irrelevant is a legal conclusion, the reason offered as to why it is irrelevant—specifically, that Plaintiff does not allege or claim that the investigation did not comport with customary law

enforcement practice—is not. This admission simply cannot be reconciled with the earlier allegation that the investigation was a sham. Moreover, Plaintiff repeats this statement throughout her memoranda in support of her motion to preclude Dr. Hough's testimony. This judicial admission precludes Plaintiff from now asserting otherwise or arguing that alleged deficiencies in the investigation of her complaint provide circumstantial evidence of the policy she alleges. *See Christian Legal Soc. Chapter of Univ. of California, Hastings Coll. of L. v. Martinez*, 561 U.S. 661, 677–78 (2010) (refusing to consider party's argument that contradicted factual stipulation because "factual stipulations are formal concessions that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission . . . is conclusive in the case." (Internal quotation mark omitted)); *see also, e.g., Oscanyan v. Arms Co.*, 103 U.S. 261, 263 (1881) ("The power of the court to act in the disposition of a trial upon facts conceded by counsel is as plain as its power to act upon the evidence produced."); *see also In re Motors Liquidation Company*, 957 F.3d 357, 360 (2d Cir. 2020) ("A judicial admission is a statement made by a party or its counsel which has the effect of withdrawing a fact from contention and which binds the party making it throughout the course of the proceeding.").[26]

Notwithstanding, even if Plaintiff's statement was not a binding judicial admission, Plaintiff's criticism of Defendants' investigation does not raise a genuine issue of material fact as to the existence of or Defendants' compliance with a policy of collusion and protection of Brunswick School students. In this vein, Plaintiff offers multiple criticisms of Defendants Rondini and Reeves regarding the extent to which they complied with Greenwich Police Department policies. Plaintiff's criticism is little more than inadmissible lay opinion by witnesses who are not

---

[26] *But see Hoodho*, 558 F.3d at 191 ("In rare cases, a court may disregard a stipulation if to accept it would be manifestly unjust or if the evidence contrary to the stipulation is substantial." (Internal quotation mark omitted)). The Court does not find this to be such a case.

competent to assess the propriety of Defendants' actions. For example, Plaintiff offers, in essence, the lay opinion of herself and others that Defendants' investigation was deficient because Defendants failed to question witnesses or obtain texts and other documentary evidence, or otherwise deviated from the applicable professional standard of care.[27]

A proponent of lay opinion testimony must satisfy the three foundational requirements set forth in Fed. R. Evid. 701. *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005). Fed. R. Evid. 701 requires that lay opinions be "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) *not based on scientific, technical or other specialized knowledge within the scope of Rule 702*," which governs expert testimony. *Id.* (emphasis added). While it is questionable whether Plaintiff can meet the first two requirements, there is little question that Plaintiff cannot satisfy the third requirement because an evaluation of Defendants' police investigative work and the extent to which it complied with customary and appropriate police procedures is not a matter within the ordinary kin of an average juror. *See Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, 10 (2d Cir. 2017) ("to constitute lay opinion, an opinion must be the product of reasoning processes familiar to the average person in everyday life, rather than scientific, technical, or other specialized knowledge") (internal quotation marks omitted); *see also Garcia*,

---

[27] Plaintiff additionally argues that Defendant Rondini improperly omitted conflicting statements from the arrest warrant application, in violation of Greenwich Police Department policy. Specifically, Plaintiff notes that, on September 5, 2016, Samuel Gonzalez, a tenant staying at the pool house during the summer of 2016, provided a statement to Defendant Rondini in which he averred that he returned to the pool house at approximately 11:15 p.m. after the pool party ended and the attendees left. (ECF No. 314-27 at 1); (ECF No. 283-18 at 23). Plaintiff contends that Gonzalez's statement and the time of his arrival is "extremely important" because it contradicted Brunswick Student 3's statement that "a tenant who lived on the second floor of the pool house was moving his belongings out of his apartment while [attendees] were in the pool house." (ECF No. 283-17 at 22). The arrest warrant application did not include Brunswick Student 3's statement regarding the presence of the tenant and indicated that Gonzalez did not provide any information of evidentiary value. (ECF No. 283-22 at 15–16, 20). Defendant Reeves testified that Gonzalez's statement was not relevant because Gonzalez indicated that he was not present during the time of pool party or the incident. (ECF No. 314-20 at 130:15–22, 31:13–23, 133:25, 134:1–5) (ECF No. 314-33 at 115:5–20).

413 F.3d at 216 (precluding police officer's opinion introduced as lay testimony where officer's reasoning process in formulating opinion depended, in whole or in part, on specialized training and experience); *see also Vann v. City of New York,* 72 F.3d 1040, 1049 (2d. Cir. 1995) (determining that deliberate indifference to excessive force claims may be proven through "expert testimony that a practice condoned by the defendant municipality was 'contrary to the practice of most police departments' and was 'particularly dangerous' because it presented an unusually high risk that constitutional right would be violated"); *Restivo v. Hessemann,* 846 F.3d 547, 579–80 (2d Cir. 2017) (finding expert testimony regarding applicable professional standards for police officers to be relevant "because it can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights") (internal quotation mark omitted); *see also Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004) (precluding bank examiner's opinion introduced as lay testimony which discussed whether observed bank procedures comported with "typical international banking transactions"). Although Plaintiff or others might be of the opinion that Defendants should have done more to investigate her complaint, such lay opinions are not competent evidence that Defendants' investigation of Plaintiff's complaint was, in fact, deficient.

Plaintiff did not present a witness qualified to give such testimony regarding the competence of Defendants' investigation or any other admissible evidence objectively identifying deficiencies in the investigation.[28] On the other hand, Defendants secured the assistance of Dr.

---

[28] Plaintiff did not disclose any expert on police policy or procedures. The extent of evidence Plaintiff offers with respect to customary law enforcement practice is the Greenwich Police Department Unified Policy Manual that was in effect during the investigation of her complaint. Plaintiff also relies on the deposition testimony of Assistant State's Attorney Cappozzi, Zuccarella, Bonney, and Robert Berry, a Captain at Greenwich Police Department. However, these witnesses were not disclosed as expert witnesses on customary law enforcement practice involving allegations of battery or sexual assault and the deadline to do so has long passed.

Hough, who opined that Defendants' investigation in this case suffered from no significant infirmities and was conducted within established protocols and parameters for such investigations. Because Plaintiff has not countered this expert testimony, the record is therefore devoid of material evidence that reasonably supports any finding that Defendants' investigation of Plaintiff's complaint was deficient[29] or tends to demonstrate a policy of collusion and protection of Brunswick School students.[30]

Upon review of the voluminous evidentiary material amassed over two years of discovery, the Court concludes that there is no genuine issue of material fact as to the existence of an implied policy of protecting Brunswick School students from prosecution at the expense of their victims or that Defendants acted in accordance therewith. Insufficient evidence of any such policy has been unearthed so as to create a triable issue of fact. To hold otherwise would require wholly unsupported conjecture and speculation, which is insufficient to withstand summary judgment. *See Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 17 (2d Cir. 1999) ("[nonmovant's]

---

[29] Plaintiff references other allegedly "comparable" cases that were investigated by Greenwich Police Department but did not involve Brunswick School students. Plaintiff argues that these other investigations demonstrate heightened and more thorough investigative techniques than those employed by Defendants in the investigation of Plaintiff's complaint. The Court has examined these proffered "comparable" cases and concludes that they are so dissimilar to Plaintiff's complaint as not to be comparable at all. Accordingly, they do not support any inference that Defendants acted in accordance with a policy of protecting Brunswick School students while investigating Plaintiff's complaint.

[30] Plaintiff also claims that a November of 2014 Greenwich Times article tends to support her theory of nefarious investigative practices by Greenwich Police Department. To the extent Plaintiff offers the newspaper article for the truth of the matters asserted therein, the Court will not consider such evidence in deciding Defendants' motion for summary judgment. *Castillo v. Hogan*, No. 3:14-CV-1166 (VAB), 2019 WL 1649944, at *6 (D. Conn. Apr. 16, 2019); *see Odom v. Matteo*, No. 3:08-cv-1569 (VLB), 772 F. Supp. 2d 377, 404 (D. Conn. 2011) ("[N]ewspaper articles offered for the truth of the matters asserted therein are inadmissible hearsay that may not be considered by the Court in deciding a motion for summary judgment."); *see also Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 347 n. 29 (S.D.N.Y. 2005) (finding newspaper articles offered in support of plaintiffs' pattern and practice claims to be "inadmissible hearsay and unusable to defeat summary judgment"); *see also United States v. Difeaux*, 163 F.3d 725, 729 (2d Cir. 1998) (holding that newspaper articles alleging improper motivations of prosecutor's office were impermissible hearsay). Even if this article was not hearsay, it does not tend to support any inference of a policy of collusion or protection as alleged by Plaintiff. Plaintiff's assertion that the Greenwich Police Department spokesperson lied in connection with the 2014 investigation of the video discussed above is simply unsupported. Her argument regarding the import of the newspaper article fails for the same reason her reliance on the Greenwich Police Department handling of that investigation does not support her claims. The parents of the minor female in question told Greenwich Police Department that there was no sexual assault.

assertion that the [movant] enforced the ordinance against it with an impermissible motivation is sheer 'conjecture and speculation' that is insufficient to withstand the [movant's] motion for summary judgment"). Plaintiff's conclusory allegations that are unsupported by evidence do not create a genuine issue of material fact. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (finding that "conclusory testimony" "unsupported by documentary or other concrete evidence" was "not enough to create a genuine issue of fact in light of . . . evidence to the contrary").

In sum, Plaintiff has presented insufficient evidence for a reasonable jury to find that the investigation of her complaint was compromised by either collusion between Defendants and Brunswick School, a Greenwich Police Department policy to protect Brunswick School students from prosecution or any other constitutionally improper motivation. As such, there is no genuine issue of material fact that Plaintiff was not treated differently from others similarly situated. Accordingly, Plaintiff's claim that Defendants violated her right to equal protection when investigating her complaint claim fails as a matter of law. *See Casciani v. Nesbitt*, 392 F. App'x 887, 889 (2d Cir. 2010) (affirming summary judgment on equal protection claim under class of one and selective enforcement theory where nonmovant failed to raise genuine issue of fact that he was treated differently) (summary order); *see also Gray v. Maquat*, 669 F. App'x 4, 5 (2d Cir. 2016) (affirming summary judgment on equal protection claim under class of one and selective enforcement theory where no reasonable jury could conclude that any of nonmovant's alleged comparators were contextually similarly situated); *see also Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) ("A court may grant summary judgment [on equal protection claim] in a defendant's favor on the basis of lack of similarity of situation . . . where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated.").

**Conclusion**

For all of the foregoing reasons, Defendants' motion for summary judgment is GRANTED. (ECF No. 282). Plaintiff's motion for summary judgment is DENIED as moot (ECF No. 284).

The Clerk of the Court is directed to enter judgment in favor of Defendants on Plaintiff's Complaint and to close the case.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of May 2022.

 */s/ Kari A. Dooley*

KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE